# EXHIBIT A

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| In re Lakeview Loan Servicing Data Breach Litigation | Case No. 1:22-cv-20955-DPG |

## DECLARATION OF SCOTT NORTON

I, Scott Norton, declare as follows:

1. I am employed by Bayview Asset Management, LLC ("Bayview"), and my title is Senior Vice President and Head of Operational Risk. I have personal knowledge of the matters stated herein and, if called upon to do so, would testify competently thereto.

### Mandiant

2. On October 4, 2019, Bayview entered into a Master Services Agreement ("MSA") with Mandiant. (A true and correct copy of the Mandiant MSA is attached hereto as Exhibit 1). Pursuant to the MSA, on October 4, 2019, Bayview and Mandiant executed a Statement of Work ("SOW") providing that Mandiant would be at the ready to immediately provide incident response services should a data security incident occur. (A true and correct copy of the 2019 SOW is attached hereto as Exhibit 2). The term of the 2019 SOW was one-year.

3. As part of retaining Mandiant to be at the ready to investigate a data security incident should one occur, Mandiant gathered information about Bayview's systems, security tooling, logging, and other relevant matters to assess Bayview's ability to quickly provide necessary information should Mandiant need to provide incident response services.

4. On February 7, 2020, Mandiant published a report assessing Bayview's ability to respond to a data security incident by deploying investigative technologies, providing log data, providing documentation of the environment, and supporting or executing common incident

response activities. Mandiant did not perform any further work for Bayview related to this SOW after issuing the report.

5.      On June 10, 2021, Bayview and Mandiant entered into a new SOW to continue to remain ready to provide incident response services should a data security incident occur. (A true and correct copy of the 2021 SOW is attached hereto as Exhibit 3). The intent of the 2021 SOW was to ensure that Mandiant would remain on retainer and, thus, remain ready to assist Bayview's outside counsel if a data security incident occurred. That intent is reflected in Exhibit A to the 2021 Statement of Work, which is an engagement letter template to be used by Bayview's counsel to retain Mandiant. The template states that Mandiant's services would be "requested by and performed at the direction of Counsel in connection with Counsel's provision of legal advice to [Bayview]."

6.      While additional work was discussed in June 2021, this work was deferred and not performed until 2022, after the data security incident at issue in this litigation ("the Incident") occurred. Mandiant was not performing any work for Bayview at the time the Incident took place or was discovered.

## **Protiviti**

7.      On December 2, 2019, Bayview and Protiviti entered into an MSA. (A true and correct copy of the Protiviti MSA is attached hereto as Exhibit 4). Prior to the Incident, Protiviti was engaged to perform two services related to data privacy and/or information security:

a.   Protiviti was engaged to help Lakeview Loan Servicing, LLC ("Lakeview") understand the flow of data, including personally identifiable information, between Lakeview and subservicers that serviced the loans for which Lakeview held the mortgage servicing rights. This included documenting the mechanisms used to transmit data between Lakeview and the subservicers and inventorying where Lakeview's data was staged for transmission or stored for archival purposes.

    b.   Protiviti was engaged to assist with an audit assessing the risks and controls related to databases that are not at issue in this litigation; *i.e.*, the databases involved in this audit were not potentially accessed in the Incident.

8.    In addition to the services detailed above, Protiviti was engaged to perform other advisory services. These other services did not relate to data privacy and/or information security.

9.    I am aware that Protiviti was engaged by BakerHostetler to obtain and interpret technical data regarding Bayview's network for use by BakerHostetler. This is different from the work that Bayview retained Protiviti to provide in December 2019.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 2, 2023



Scott Norton

# EXHIBIT 1



**A FireEye® Company**

## MASTER SERVICES AGREEMENT

This Master Services Agreement (this "Agreement"), effective as of the later of the signature dates below (the "Effective Date"), is made by and between Mandiant, as further defined below ("Mandiant") and Bayview Asset Management, LLC, a Delaware limited liability company, having a place of business at 4425 Ponce de Leon Blvd., 5th Floor, Coral Gables, FL 33146 ("Customer"), and sets forth the terms and conditions under which Mandiant will perform certain professional services for Customer. "Mandiant" means (i) FireEye, Inc., doing business as "Mandiant," a Delaware corporation with its principal place of business at 601 McCarthy Blvd., Milpitas, CA, 95035 with respect to Services rendered inside of the United States. For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1. **DEFINITIONS**

   1.1. **"Deliverables"** means the written reports that are created by Mandiant specifically for Customer as a result of the Services provided hereunder, and that are identified as deliverables on a Statement of Work. In no event will Indicators of Compromise be considered "Deliverables," even if such Indicators are incorporated into a Deliverable.

   1.2. **"Indicators of Compromise"** or **"Indicators"** means specifications of anomalies, configurations, or other conditions that Mandiant is capable of identifying within an information technology infrastructure. Mandiant will not publish or distribute Indicators in any way that could identify Customer.

   1.3. **"Mandiant IP"** means all Mandiant proprietary materials, including without limitation Mandiant's Confidential Information (as defined in Section 6), Deliverables any hardware and/or software used by Mandiant in performing Services, Indicators of Compromise, Mandiant's processes and methods (including any forensic investigation processes and methods), and any Mandiant templates and/or forms, including report and presentation templates and forms.

   1.4. **"Statement of Work"** or **"SOW"** means a mutually agreed-upon document executed by both Mandiant and Customer, describing Services, rates and timelines (if applicable) for those Services, and incorporating this Agreement.

   1.5. **"Service"** or **"Services"** means the professional services described on a Statement of Work.

2. **DESCRIPTION/CONDITIONS OF SERVICE**

   2.1. **Service and Deliverables**. Mandiant agrees to perform the Services and provide the Deliverables, if any, as set forth on each Statement of Work solely within the United States and nowhere else. Each Statement of Work will be numbered, and Statement of Work 1 is attached hereto as Exhibit A-1. All Statements

of Work shall be deemed part of and subject to this Agreement. Any changes to a Statement of Work must be mutually agreed upon in writing.

   2.2. **Hardware and Software Deployment**. If the Services require the installation and use of hardware and/or software, all such hardware and software must be specified and agreed upon in the applicable Statement of Work. Customer will cooperate with Mandiant's installation thereof and shall provide physical space, electrical power, Internet connectivity and physical access as reasonably determined and communicated by Mandiant.

3. **PAYMENT AND EXPENSES**

   3.1. **Payment Terms**. Customer agrees to pay Mandiant the fees set forth in each Statement of Work. In the absence of a fee schedule, Customer agrees to pay Mandiant's then-current hourly rates for the Services.

   3.2. **Invoicing**. Mandiant shall invoice Customer as set forth on each Statement of Work or, in the absence of an invoice schedule, shall invoice Customer monthly. Mandiant's invoices, and all payments, will be in US Dollars unless otherwise indicated on the applicable invoice or in the applicable Statement of Work. Customer shall be responsible (unless there is an applicable exemption certificate provided by Customer on or before the Statement of Work effective date), and Mandiant shall invoice Customer (as a separate line item on such invoices), for all taxes or similar charges applicable to the Services, including without limitation state and local sales, VAT, and excise taxes, with the exception of those taxes based on Mandiant's net income, Mandiant property, or Mandiant's business.

   3.3. **Payment**. Customer shall pay Mandiant within thirty (30) calendar days after the date of each invoice, without setoff or recoupment. Customer agrees to pay interest on all delinquent amounts at the lesser of 1.5%

**Confidential**

**Version 01/31/2019**

per month or the maximum rate permitted by applicable law. Pre-paid fees are non-cancelable and non-refundable. Each SOW, together with this Agreement, represents the complete, final and exclusive terms and conditions governing the Services. As such, Mandiant may invoice Customer without the requirement that Customer provide a subsequent purchase order. Any subsequently issued purchase order shall be for administrative purposes.

**3.4. Expenses.** Customer shall reimburse Mandiant for any and all expenses that fall within one or more of the expense categories set forth in a Statement of Work so long as such expenses are attributable to Services performed under this Agreement, are for travel pre-approved by Customer, and conform to Customer's expense reimbursement policies attached hereto as Exhibit E. Notwithstanding the foregoing, Customer will reimburse Mandiant for any expense that Customer has pre-approved, regardless of whether it is consistent with the Customer travel and expense policy. Mandiant will provide appropriate documentation for all expenses exceeding $25. If Mandiant is required by applicable law, legal process or government action to produce information, documents or personnel as witnesses with respect to the Services or this Agreement, such as by responding to one or more subpoenas, Customer shall reimburse Mandiant for any time and expenses (including without limitation reasonable external and internal legal costs) incurred to respond to the request, unless Mandiant is itself a party to the proceeding or the subject of the investigation. Notwithstanding the preceding, Customer will only be required to pay Mandiant for its time spent traveling to and from Customer's designated locations and for incident response Services only. Travel time shall not be reimbursed for any other Services unless specifically agreed upon in the applicable Statement of Work.

## 4. INTELLECTUAL PROPERTY

**4.1. Grant of License.** Subject to Customer's timely payment of applicable fees, and subject to the terms of this Agreement, Customer shall have a perpetual, non-exclusive, nontransferable, right and license to (unless otherwise set forth in a Statement of Work) use, display and reproduce the Deliverables for its internal business purposes. Deliverables may not be shared with any third party other than Customer's Affiliates, legal advisors, auditors and law enforcement agencies ("Permitted Third Parties") without the prior written consent of Mandiant. Permitted Third Parties shall also include Customer's contractors and service providers, provided that the contractor or service provider has signed a confidentiality agreement with the Customer that provides similar confidentiality protection to the disclosed information between the Customer and contractor or service provider as provided for in this

Agreement and the contractor or service provider is only using the shared Deliverables to provide services to the Customer. Customer may share a summary of a Deliverable with its customers under similar confidentiality and protection terms provided for in this Agreement.

**4.2. Intellectual Property Rights.** Customer acknowledges that (a) Mandiant may use Mandiant IP to provide the Services, (b) Customer may obtain access to certain Mandiant IP as a result of Mandiant's performance of its obligations under this Agreement, and (c) certain Deliverables may incorporate Mandiant IP. Mandiant IP is and shall remain the sole and exclusive property of Mandiant and Mandiant shall retain all right, title and interest in and to the Mandiant IP and all derivative works thereof. Between Customer and Mandiant, Mandiant shall retain all rights and title in and to any Indicators of Compromise Mandiant developed by or for Mandiant. Mandiant hereby grants to Customer an irrevocable, non-exclusive, perpetual, royalty-free, fully paid-up license to use any Mandiant IP incorporated into the Deliverables, solely as part of the Deliverables and not separate from the Deliverables, as necessary for Customer to make use of the Deliverables.

**4.3. Restrictions.** Subject to the exceptions set forth herein, Customer agrees not to reproduce or modify any portion of the Mandiant IP, and will not disclose, sell, sublicense or otherwise transfer or make available all or any portion of the Mandiant IP to any third party without the prior written consent of Mandiant. Nothing contained in this Agreement shall directly or indirectly be construed to assign or grant to Customer any right, title or interest in or to the trademarks, copyrights, patents or trade secrets of Mandiant or any ownership rights in or to the Mandiant IP. Customer shall not cause or permit the reverse engineering, reverse assembly, or reverse compilation of, or otherwise attempt to derive source code from, the Mandiant IP. Customer shall not create derivative works based upon all or part of the Mandiant IP. Customer shall not resell, redistribute or make available Mandiant IP or the Services to any third party (except in connection with the disclosure of a Deliverable as permitted under this Agreement), and shall not use the Mandiant IP, Services or the Deliverables to provide services to any third party.

**4.4. Customer-Owned Property.** As between the parties, Customer will be and remain, at all times, the sole and exclusive owner of the Customer-Owned Property (including, without limitation, any modification, compilation, derivative work of, and all intellectual property and proprietary rights contained in or pertaining thereto). Mandiant will promptly return to Customer all Customer-Owned Property upon the termination or expiration of this Agreement, or sooner

at Customer's request. "Customer-Owned Property" means any technology, software, algorithms, formulas, techniques, know-how, data, information, supplies, tools, and other tangible and intangible items that are made available by Customer to Mandiant or otherwise accessed by Mandiant in the course of its performance hereunder. Mandiant will not publish or distribute Indicators in any way that could identify Customer.

**4.5. U.S. Government Restricted Rights.** The Mandiant IP constitutes "commercial items", "commercial computer software" and "commercial computer software documentation," respectively, pursuant to DFAR Section 227.7202 and FAR Section 12.212, as applicable. Any use, modification, reproduction, release, performance, display or disclosure of the Mandiant IP by the United States Government shall be governed solely by the terms of this Agreement and shall be prohibited except to the extent expressly permitted by the terms of this Agreement. The Mandiant IP was developed fully at private expense.

**5. TERM AND TERMINATION**

**5.1. Term.** The initial term of this Agreement is one (1) year (the "Initial Term") from the Effective Date unless otherwise terminated as set forth herein. The Agreement will renew for successive periods of the same duration as the Initial Term (each a "Renewal Term," and together with the Initial Term, the "Term") only upon the parties' mutual, written agreement. If any Statement of Work remains in effect upon the expiration of the Term, then the Term shall automatically extend for the sole purpose of governing such Statement of Work, and not for the purpose of executing any additional Statements of Work.

**5.2. Termination.** Either Party shall have the right to terminate this Agreement or any individual Statement of Work, in whole or in part, upon thirty (30) days' written notice in the event that the other Party, or any of its officers, employees or agents, materially violates any provision of this Agreement or the applicable Statement of Work and fails to cure such breach within the thirty (30) day notice period. Termination of the Agreement or a Statement of Work shall be in addition to and not in lieu of any other remedies. If at any time after termination or expiration of an SOW or this Agreement Customer requires Mandiant to provide any expert testimony or similar activities, then Mandiant shall be required to do so, subject to the terms and conditions of this Agreement that would have been in place despite such termination or other expiration. If such performance imposes any material expense or other burden on Mandiant, then the Parties shall negotiate in good faith to enter into an SOW therefor; however, performance of such activities and agreement to such SOW shall not be unreasonably withheld, delayed, or conditioned.

**5.3. Consequences of Termination.** Upon the termination or expiration of this Agreement, the parties shall cooperate to ensure the return to Mandiant of all Mandiant IP (including all copies thereof) and the return to Customer of all Customer-Owned Property and Deliverables (including work in progress), wherever located within ten (10) days of such termination or expiration. Notwithstanding the preceding, Mandiant acknowledges that Customer may retain the Deliverables except in the case of Customer terminated for breach. To the extent the foregoing requires the uninstallation of any hardware or software from any Customer IT systems or physical premises, such effort will be reasonably coordinated and scheduled by the parties. Alternatively, Mandiant may direct Customer to destroy the Mandiant IP and Customer may direct Mandiant to destroy the Customer-Owned Property and/or Deliverables.

**5.4. Survival.** All Sections of this Agreement that by their nature should survive termination or expiration will survive, including without limitation Sections 1, 3 (with respect to amounts that properly accrued prior to termination or expiration), 4, 5.3, 5.4 and 6 through 8. Without limiting the foregoing, termination of this Agreement shall not relieve Customer of the obligation to pay for Services rendered or goods provided prior to such termination.

**6. CONFIDENTIALITY**

**6.1. Confidential Information.** "Confidential Information" means the non-public information that is exchanged between the parties, provided that such information is: (i) identified as confidential at the time of disclosure by the disclosing party ("Discloser"), or (ii) disclosed under circumstances that would indicate to a reasonable person that the information should be treated as confidential by the party receiving such information ("Recipient"). The terms and conditions of this Agreement, the nature of the discussions and the relationship between the parties, and the terms of any commercial transaction between the parties, including pricing for any product or service of Mandiant, shall be considered Confidential Information. All Customer-Owned Property and Deliverables shall be considered Customer's Confidential Information. Each party agrees that it shall: (i) take reasonable measures to protect the Confidential Information by using the same degree of care, but no less than a reasonable degree of care, to prevent the unauthorized use, dissemination or publication of the Confidential Information as the Recipient uses to protect its own confidential

information of a like nature; (ii) limit disclosure to those persons within Recipient's organization with a need to know and who have previously agreed in writing, prior to receipt of Confidential Information either as a condition of their employment or in order to obtain the Confidential Information, to obligations similar to the provisions hereof; (iii) not copy, reverse engineer, disassemble, or decompile any prototypes, software or other tangible objects which embody the other party's Confidential Information and/or which are provided to the party hereunder; (iv) not use the Confidential Information of the other Party for any purpose other than to perform or receive (as applicable) the Services hereunder; and (v) comply with, and obtain all authorizations required by, all applicable export control laws or regulations. Confidential Information shall not include information that is (a) part of or becomes part of the public domain (other than by disclosure by the Recipient in violation of this Agreement); (b) previously known to the Recipient without an obligation of confidentiality; (c) independently developed by the Recipient outside this Agreement; or (d) rightfully obtained by the Recipient from third parties without an obligation of confidentiality. At the end of this Agreement, or earlier if requested by the Discloser, the Recipient shall promptly return, where feasible, or destroy all Confidential Information, other than Confidential Information that may be retained in backup resources or for administrative purposes such as financial reporting and record-keeping, which shall remain subject to the confidentiality obligations hereof.

**6.2. Exceptions**. Notwithstanding Section 6.1, if Customer has hired Mandiant to perform a PCI DSS Compliance Audit or a PCI investigation, Mandiant may provide The Payment Card Industry Security Standards Council, LLC (PCI SSC), card companies and the relevant merchant bank with all Reports of Compliance (ROC) and all related assessment and investigative report documents generated in connection with such work. Notwithstanding Section 6.1, except with respect to Nonpublic Personal Information (as defined below), either Party may disclose the Confidential Information of the other Party to the extent such disclosure is required to comply with applicable law or the valid order or requirement of a governmental or regulatory agency or court of competent jurisdiction, provided that the Recipient (a) restricts such disclosure to the maximum extent legally permissible; (b) notifies the Party to whom the Confidential Information belongs as soon as practicable of any such requirement; and (c) that subject to such disclosure, such disclosed materials shall in all respects remain subject to the restrictions set forth in this Agreement.

**6.3. Publicity and Advertising.** Notwithstanding any

other provision of this Agreement, neither Party may issue press releases or endorsements which reference the other Party or include statements attributable to the other Party without the prior written consent of the other Party.

## 7.  WARRANTIES, LIABILITY

**7.1. Limited Warranty**. Mandiant warrants that (a) the Services will be provided in a professional, workmanlike, and timely manner pursuant to industry standards for the same or similar services; (b) all Services and Deliverables shall comply with all applicable laws; (c) all personnel used to perform the Services shall be properly skilled, trained, experienced, and educated; , and (d) no Service shall deliver and no Deliverable shall include any malicious code, virus, disabling code, time bomb, Trojan horse, or other code or component intended to (i) damage, destroy, alter, or disrupt a computer program, firmware, or hardware; or (ii) reveal, damage, destroy, alter, or disrupt data or other information.

**7.2. Acceptance**. Customer shall have fifteen (15) business days from Customer's receipt of each Deliverable to review such Deliverable (the "Acceptance Period") to determine whether the Deliverable conforms to the written specifications for that Deliverable set forth in the Statement of Work (the "Specifications"). After Customer has completed the review described in this Section, Customer will notify Mandiant in writing either that: (i) the Deliverable conforms to the Specifications and acceptance has occurred ("Acceptance"); or (ii) the Deliverable does not conform to the Specifications or this Agreement. Acceptance shall also be deemed to occur if Customer does not notify Mandiant of its acceptance or rejection of a Deliverable prior to the expiration of the Acceptance Period. Upon receipt of such notice of non-conformance, Mandiant will correct and re-deliver such Deliverable, at no additional cost to Customer. Failure of a Deliverable to conform to the Specifications after three (3) Customer request shall be considered a material breach of Section 7.1(a). Customer's Acceptance of a Deliverable shall not constitute a waiver of any other rights Customer may have pursuant to this Agreement or at law or in equity.

**7.3.** THE ABOVE-STATED LIMITED WARRANTY REPLACES ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTIES OF CONDITION, UNINTERRUPTED USE, ACCURACY, LEVELS OF SERVICE, MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, AND NONINFRINGEMENT, AND MANDIANT DOES NOT WARRANT THAT THE SERVICES WILL BE UNINTERRUPTED OR ERROR-FREE.

**7.4. Indemnification**.

(a) By Mandiant. Mandiant agrees to indemnify, hold harmless, and defend Customer, its affiliated entities, and each of their respective directors, officers, partners, employees, and agents (each a "Customer Indemnified Party") from and against any and all losses, liabilities, damages, costs, expenses (including reasonable attorneys' fees), suits, claims, proceedings, hearings, and other actions that arise out of or related to: (i) an allegation that any Service, Deliverable, or Mandiant IP infringes or misappropriates any copyright, trade secret, patent, or other intellectual property right of a third party; or (ii) any breach by Mandiant of Section 6 or Section 8.2. Mandiant shall have no obligation for any alleged infringement to the extent arising from (1) the combination, operation, or use of the Deliverables or Mandiant IP with products, services, information, technologies, or processes not furnished or approved by Mandiant, where such infringement would not have arose but for such combination, operation, or use; (2) modifications to the Deliverables or Mandiant IP not made or authorized by Mandiant; (3) failure to permit Mandiant to update the Deliverables or Mandiant IP, provided such update is delivered with at least 30 days' notice, Customer is not charged for such update, or (4) use of the Deliverables or the Mandiant IP except in accordance with the express terms of this Agreement or Mandiant's written instructions (the foregoing clauses (1), (2), (3) and (4), collectively, "Customer Indemnity Responsibilities"). Upon the occurrence of a claim for which indemnity is or may be due under this Section, or in the event that Mandiant believes that such a claim is likely, Mandiant may, at its option (A) appropriately modify the Services, the Deliverables and/or the Mandiant IP so that it becomes non-infringing but is functionally equivalent, or substitute functionally equivalent hardware, software, or services; or (B) obtain a license to the applicable third-party intellectual property rights. If Mandiant is unable to achieve (A) or (B) after exercising all commercially reasonable efforts, either party may terminate this Agreement or the applicable Statement of Work on written notice to the other party, in which case Mandiant shall promptly refund to Customer a portion of the fees paid by Customer hereunder for the terminated Services, Deliverables, and Mandiant IP, pro-rated on a five (5)-year straight-line basis. The foregoing states the entire liability of Mandiant and Customer's sole remedy for any actual or alleged infringement or misappropriation with respect to infringement of any patents, copyrights, trade secrets, or other proprietary rights by the Deliverables, Mandiant IP, or any part thereof.

(b) By Customer. Customer agrees to indemnify, hold harmless and defend Mandiant, its officers, directors, employees and agents (each an "Mandiant Indemnified Party") from and against any losses, liabilities, damages, costs and expenses (including reasonable attorneys' fees) incurred by any such Indemnified Party as a result of the Customer Indemnity Responsibilities.

(c) Procedures. A party seeking indemnification (the "Indemnitee") from the other (the "Indemnitor") agrees that (i) it shall promptly notify the Indemnitor in writing of any claim the Indemnitee seeks indemnification against; provided, however, that any failure or delay in providing such notice shall not excuse the Indemnitor's indemnification obligation unless and only to the extent such failure or delay materially prejudices the Indemnitor's defense of such claim, (ii) it shall grant the Indemnitor sole control of the defense and any related settlement negotiations; provided, however, that any settlement that requires the Indemnitee to take or omit taking any action or otherwise admits any fault, liability, or culpability on the part of the Indemnitee shall require the Indemnitee's prior, written authorization, and (iii) it shall cooperate with the Indemnitor in the Indemnitor's defense of such claim, at the Indemnitor's expense and request.

(d) Each party will defend (the "Indemnifying Party") the other party (the "Indemnified Party") against any third party lawsuit or action based on (i) the grossly negligent acts or willful misconduct of its employees or agents, or (ii) bodily injury (including death) to persons or damage to tangible property, and such property damage or bodily injury directly arises out of performance of this Agreement. The Indemnifying Party will pay those costs and damages finally awarded (or agreed to in a settlement) against the Indemnified Party in any such suit or action.

**7.5.   Limitation of Liability.** THE CUMULATIVE LIABILITY OF EACH PARTY FOR ALL CLAIMS ARISING FROM OR RELATING TO THIS AGREEMENT, INCLUDING WITHOUT LIMITATION ANY CAUSE OF ACTION SOUNDING IN CONTRACT, TORT, OR STRICT LIABILITY, SHALL NOT EXCEED THREE TIMES THE TOTAL AMOUNTS PAID AND/OR PAYABLE TO MANDIANT BY CUSTOMER UNDER THIS AGREEMENT IN THE TWELVE (12) MONTHS IMMEDIATELY PRIOR TO THE FIRST EVENT GIVING RISE TO SUCH LIABILITY (THE "LIABILITY CAP"). THIS LIMITATION OF LIABILITY WILL APPLY WITHOUT REGARD TO WHETHER OTHER PROVISIONS OF THIS AGREEMENT HAVE BEEN BREACHED OR HAVE PROVEN INEFFECTIVE. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY LOST REVENUES OR PROFITS, OR OTHER INDIRECT, SPECIAL, INCIDENTAL, CONSEQUENTIAL OR EXEMPLARY DAMAGES ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE SERVICES PERFORMED UNDER THIS AGREEMENT, EVEN IF THAT PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. THE FOREGOING LIMITATIONS OF LIABILITY AND DISCLAIMERS OF DAMAGES ARE INDEPENDENT OF THE REMEDIES SET FORTH IN SECTION 7.2. THE LIMITATIONS OF LIABILITY CONTAINED IN THIS AGREEMENT WILL APPLY ONLY TO THE MAXIMUM EXTENT PERMISSIBLE UNDER APPLICABLE LAW, AND NOTHING IN THIS AGREEMENT PURPORTS TO LIMIT EITHER PARTY'S LIABILITY IN A MANNER THAT WOULD BE UNENFORCEABLE OR VOID AS AGAINST PUBLIC POLICY

IN THE APPLICABLE JURISDICTION. THE FOREGOING LIMITATIONS AND EXCLUSIONS WILL NOT APPLY TO ANY VIOLATION OF THE INTELLECTUAL PROPERTY RIGHTS SET FORTH IN SECTION 4, PAYMENT OBLIGATIONS, EACH PARTY'S INDEMNIFICATION OBLIGATIONS SET FORTH IN SECTION 7.4 (INDEMNIFICATION), OR EITHER PARTY'S (A) BREACH OF SECTION 6, (B) BREACH OF SECTION 8.2, (C) BREACH OF SECTION 7.1(D), FAILURE TO COMPLY WITH APPLICABLE LAW, OR GROSS NEGLIGENCE, INTENTIONAL MISCONDUCT, FRAUD. Notwithstanding the above, each party's maximum cumulative liability for all claims, losses and damages arising from its breach of Section 6, 8.2 or 7.1(d) hereunder will not exceed the greater of two (2) times the Liability Cap or four million dollars ($4,000,000). The disclaimers, exclusions and limitations of liability set forth in this Agreement form an essential basis of the bargain between the Parties and, absent any of such disclaimers, exclusions or limitations of liability, the provisions of this Agreement, including without limitation the economic terms, would be substantially different.

8. **GENERAL**

8.1. <u>Governing Law</u>. This Agreement is made under and shall be governed by and construed in accordance with the laws of the State of Florida, U.S.A., without reference to conflict of laws principles. Any action or proceeding arising from or relating to this Agreement must be resolved exclusively in the state or U.S. federal courts located in Miami, Florida. Each party agrees to waive and hereby waives the right to trial by jury of any action, suit, proceeding, dispute, claim or controversy arising out of or relating to the Agreement. In the event of litigation between the parties arising out of this Agreement, the prevailing party shall be entitled to an award of reasonable attorneys' fees and costs; provided, however, that in the event a party prevails on some, but not all, of the claims, the court may in its discretion award attorneys' fees at it sees fit.

8.2. <u>Privacy</u>. (a) If Mandiant is a data processor under this Agreement, in accordance with applicable data protection laws, including but not limited to the EU General Data Protection Regulation (GDPR), Mandiant agrees that it will: (a) only deal with and process personal data controlled by Customer in compliance with, and subject to, the instructions received from Customer and in compliance with this Agreement and will not use or process the personal data for purposes other than those permitted by the Customer, anticipated by the Documentation for the Services, or for the purpose of research and development of Mandiant's products and services; (b) adopt and maintain appropriate (including organizational and technical) security measures in processing Customer's personal data in order to protect against unauthorized

or accidental access, loss, alteration, disclosure or destruction of such data, in particular where the processing involves the transmission of data over a network, and against all other unlawful forms of processing; and; (c) provide to the Customer, upon request, a list of current sub-processors which may handle personal data at Mandiant's direction; and (d) take all reasonable steps to ensure that (i) persons employed by it, and (ii) other persons engaged at its place of work, are aware of and comply with applicable data privacy laws and regulations. Mandiant may process or otherwise transfer any personal information in or to any country outside of the country of origination, including such countries with less restrictive data protection laws, to the extent necessary for the provision of the Services. If required and where applicable, Mandiant will enter into mutually agreed-upon country-specific data transfer mechanisms, including the Privacy Shield framework and the EU Standard Contractual Clauses as approved by the European Commission, to help ensure an adequate level of data protection for the personal data that will be processed or transferred. Customer agrees it is responsible for obtaining any applicable consents from data subjects for Customer's use of FireEye to process Customer's data.

(b) Without otherwise limiting the foregoing, Mandiant acknowledges and understands that Customer may be subject to certain privacy and information security laws, specifically including § 501(b) of the Gramm-Leach-Bliley Act (15 U.S.C. 6801 et seq.), and may be required to comply with related regulations, which may include the "Privacy of Consumer Financial Information" regulation (12 CFR Part 1016), the "Standards for Safeguarding Customer Information" regulation (16 C.F.R., Part 314), and the Interagency Guidelines Establishing Standards for Safeguarding Customer Information (12 C.F.R. Section 208, Appendix D-2) (collectively, the "Privacy Laws"), pursuant to which Customer is required to ensure that Mandiant appropriately safeguards all non-public, personally identifiable information, including but not limited to: (i) personal or financial information regarding Customer's former, current, or prospective clients, customers, or employees; (ii) "nonpublic personal information" regarding a "consumer," as those terms are defined by federal law, including, but not limited to, Section 6809(4) of the Gramm-Leach-Bliley Act and its applicable implementing regulations; and (iii) any other consumer information protected by applicable state law, including any information that identifies, relates to, describes, is capable of being associated with, or could reasonable be linked, directly or indirectly, with a particular person, household, or other customer of Customer (collectively, "Nonpublic Personal Information") that is provided or made

available to Mandiant pursuant to this Agreement or otherwise obtained, accessed, or received by Mandiant by virtue of its performance hereunder. In addition to any other obligations regarding the same, Mandiant agrees to comply with all Privacy Laws and the security, privacy, and other requirements set forth in Exhibit B attached hereto.

**8.3.** **Compliance with Laws.** Each party represents and warrants that it shall comply with all laws and regulations applicable to it with respect to the Deliverables, including all export control regulations and restrictions that may apply to the Deliverables. Customer will not export any Deliverables to any countries embargoed by the United States (currently including Cuba, Iran, North Korea, Sudan and Syria). Each party acknowledges that it is familiar with and will comply with the provisions of the U.S. Foreign Corrupt Practices Act ("the FCPA") and the U.K. Bribery Act of 2010 ("UKBA"), as applicable, and each party agrees that no action it takes will constitute a bribe, influence payment, kickback, or other payment that violates the FCPA, the UKBA, or any other applicable anticorruption or anti-bribery law.

**8.4.** **Security Clearance.** Customer shall provide the necessary security specifications and/or DD254 to Mandiant if security resources are required.

**8.5.** **No Third Party Beneficiaries.** This Agreement is intended for the sole and exclusive benefit of the signatories and is not intended to benefit any third party. Only the parties to this Agreement may enforce it.

**8.6.** **Assignment.** Any assignment of this Agreement by a party to another party, including any transfer by operation of law or otherwise, without prior written consent, shall be null and void. A Party may assign this Agreement, in whole or in part, without consent, in connection with any merger, asset purchase or sale, stock purchase or sale or similar change of control transaction provided that the assignor notifies the other party of such assignment at least 30 days in advance of assigning, in which case the non-assigning Party may terminate this Agreement, without penalty, if such termination notice is delivered within thirty (30) days of receipt of notice of assignment.

**8.7.** **Severability.** Any provision of this Agreement that is held to be invalid by a court of competent jurisdiction shall be severed from this Agreement, and the remaining provisions shall remain in full force and effect.

**8.8.** **Force Majeure.** Mandiant shall not be liable for any delays or other non-performance resulting from circumstances or causes beyond its reasonable control, including, without limitation, fire or other casualty, act of God, strike or labor dispute, war or

other violence, any law, order or requirement of any governmental agency or authority, or any act or omission of employees or agents of Customer. In this event and to the extent of any period of such delay, nonperformance shall not be deemed a breach of this Agreement and the schedule and the due dates of Services and Deliverables shall be adjusted accordingly.

**8.9.** **Waiver.** Failure or delay by either Party to enforce compliance with any term or condition of this Agreement shall not constitute a waiver of such term or condition, and no waiver of any term or condition of this Agreement shall be effective unless that waiver is made in writing by the Party making the waiver.

**8.10.** **Independent Contractor.** For purposes of this Agreement, Mandiant is an independent contractor. Nothing contained herein shall be construed to create an employment, principal-agent relationship, or joint venture between Mandiant and Customer, and neither Party shall have the right, power or authority to obligate the other to any third party. No third parties are beneficiaries of this Agreement or the Services, and Customer is not purchasing Services hereunder for the benefit of any third party.

**8.11.** **Notice.** Unless otherwise stated, all notices required under this Agreement shall be in writing and shall be considered given: (i) when delivered personally; (ii) five (5) days after mailing, when sent certified mail, return receipt requested and postage prepaid; (iii) one (1) business day after dispatch, when sent via a commercial overnight carrier, fees prepaid; or (iv) upon delivery when sent by facsimile transmission confirmed by telephone. All communications will be addressed at the locations set forth above or as otherwise instructed. A copy of all notices to Mandiant must also be sent to: FireEye, Inc., Attention: General Counsel, 601 McCarthy Boulevard, Milpitas, California, 95035.

**8.12.** **Entire Agreement.** This Agreement and any Exhibits attached hereto set forth the entire understanding and agreement of the Parties and supersede any and all oral or written agreements or understandings between the Parties as to the subject matter of this Agreement, including that Master Services Agreement by and between Customer and Mandiant Corporation, as a successor-in-interest to Mandiant, dated as of September 6, 2013 (the "Prior Agreement"). To the extent any Statements of Work are still in effect as of the Effective Date, the Parties agree that as of the Effective Date, such Statements of Work shall be governed by this Agreement and not the Prior Agreement, which the Parties agree is hereby terminated. This Agreement shall control over any conflicting provisions of any purchase order or other

business form of Customer, and such conflicting provisions are expressly rejected. No agreements or other obligations will be binding upon Mandiant personnel unless contained in this Agreement or otherwise approved by Mandiant in writing in advance. This Agreement may be amended or changed only by a writing signed by an authorized representative of both Parties.

**8.13.** __Headings__. The headings in this Agreement are for convenience of reference only and have no legal effect.

**8.14.** __Counterparts__. This Agreement may be executed in counterparts, each of shall constitute an original, and all of which shall constitute one agreement.

**8.15.** __Regulatory__. Mandiant represents and warrants to Customer that as of the Effective Date and through the remainder of the Term, Mandiant's performance hereunder shall conform to all applicable regulatory requirements and industry standards necessary and applicable to Mandiant, including, but not limited to, OFAC, FHFA, HUD, and FMEL monitoring requirements, and that all personnel used by Mandiant or on behalf of Mandiant to perform under this Agreement or to perform any function related to this Agreement are and shall continue to not be listed on any exclusionary list maintained by any applicable governing or regulatory authority (collectively, the "Regulatory Requirements"). Within ten (10) days following the end of each calendar quarter throughout the Term, Mandiant shall review its accounts and all systems used in connection with its performance hereunder to ensure that Mandiant continues to comply with the Regulatory Requirements. Promptly thereafter, Mandiant shall provide a written statement to Customer specifying that the review is complete and that it continues to comply with the Regulatory Requirements or, if it does not, detailing those issues identified during the review.

**8.16.** __Insurance__. During the Term and for five (5) years thereafter, Mandiant shall carry and maintain the following insurance coverage:

| Workers Compensation | As prescribed by statute or other jurisdiction in which is work is to be performed |
|---|---|
| Employer's Liability | • $1 million bodily injury each accident<br>• $1 million bodily injury by disease, policy limit<br>• $1 million bodily injury by disease, each employee |
| Commercial General Liability | $1 million each occurrence and $2 million in the aggregate, covering bodily injury, property damage, personal injury, blanket contractual liability and completed operations |
| Excess Liability Insurance | $4 million per occurrence and in the aggregate (Umbrella Form) over the Employer's, General, and Auto Liability |
| Fidelity Coverage (Crime) | $1 million |
| Technology and Professional Liability, Media Liability, Network Security Liability, Privacy Injury Liability and Privacy Regulation Proceeding and Fines coverage | $2 million |
| Commercial Auto Liability | $1 million combined single limit covering all owned, non-owned and hired automobiles, if the use of automobiles is required |

In addition, Mandiant shall carry All Risk Property insurance on all of its property located at any of Customer's physical premises in an amount equal to the replacement value of Mandiant's property. Each such All Risk Property policy shall include a waiver of subrogation clause in favor of Customer. Mandiant agrees to waive its rights of subrogation against Customer in advance of the loss. With respect to all insurance requirements required under this Section, Mandiant's insurance carriers shall be licensed or authorized to do business in the state of Florida and each other state where Services are to be provided, and each such carrier shall maintain a financial rating of "A-" or better by A.M. Best Co.

Mandiant shall, prior to the commencement of the Services and upon reasonable prior request at any time during the Term, furnish Customer with a certificate of insurance evidencing coverage in the amounts listed in this Section. Mandiant shall ensure that all such insurance policies require notice to Customer in writing if such policy is to be cancelled no less than thirty (30) days prior such cancellation. The liability policies listed

Confidential

above, except for the Workers Compensation/Employer's Liability, Fidelity Coverage and Technology and Professional Liability policies, shall name Customer and its directors, employees, agents, and authorized representatives as additional insureds as its or their interests may appear. For Fidelity Coverage, loss payee status is limited to Client coverage only. Mandiant's failure to deliver satisfactory evidence of coverage shall not be construed as a waiver of its obligation to provide the required insurance coverage. Receipt by Customer of a non-conforming certificate of insurance does not constitute acceptance. Mandiant's failure to comply with the terms of this Section shall be considered a material breach of this Agreement.

**8.17. Background Check Requirements and On-Site Security.** To the extent not prohibited by applicable law, Customer requires, and Mandiant shall perform (at no additional cost to Customer), background checks in accordance with Exhibit D, of all Mandiant employees, contractors, and other personnel ("Personnel") who are on-site at Customer's physical premises or otherwise have any access to any electronic data or information technology systems of Customer or Customer's Confidential Information ("Covered Personnel"). To the extent not prohibited by applicable law, Customer may from time to time conduct background checks, credit checks, reference checks, or any other reasonable checks or testing of Mandiant's officers, directors,

partners and managers. Mandiant shall indemnify, defend, and hold harmless Customer and its directors, partners, employees, and agents against all liability and claims arising from such checks or testing and the use and reporting of any results, but only to the extent Customer (a) uses such background checks or testing for determining the eligibility of Personnel, (b) gives Mandiant prior notice, (c) keeps results confidential and (d) Customer pays the costs of such checks and tests. Mandiant shall ensure that all Personnel who have access to Customer's physical premises in connection with the performance of Mandiant's obligations hereunder shall at all times comply with the security regulations and procedures set out in the form attached as Exhibit C. In the event of any conflict between the terms of the regulations and procedures set out in the form of Exhibit C and the terms of this Agreement, the terms of the form of Exhibit C shall prevail. Upon Customer's request, Mandiant shall provide written attestation (in a form reasonably provided by Customer) to Customer that Mandiant has complied with the requirements of Exhibit D.

*[Signature page follows]*

IN WITNESS WHEREOF, this Master Services Agreement has been executed by Mandiant and Customer as of the Effective Date.

**FireEye, Inc., d/b/a Mandiant**

Signature: _Joe Zuccaro_

Name: Joe Zuccaro

Title: Sr. Director - Contracts

Date: 10/1/2019

**BAYVIEW ASSET MANAGEMENT, LLC**

Signature: _____

Name: Eric Lozano, CIO

Title: _____

Date: October 4, 2019

EXHIBIT A-1

STATEMENT OF WORK 1

(attach)

## EXHIBIT B

## SECURITY, PRIVACY, AUDIT

1. <u>Nonpublic Personal Information.</u>

   a. Mandiant agrees that it shall use Nonpublic Personal Information only for the purpose of complying with its obligations under this Agreement and not for any other purpose.

   b. Mandiant shall promptly notify Customer when it confirms or suspects any unauthorized access to Nonpublic Personal Information or if Mandiant becomes aware that it has become the subject of any government, other enforcement, or private proceeding relating to its data handling practices. For purposes of clarity, external pings and other broadcast attacks on Customer's firewalls, port scans, unsuccessful log-on attempts, denial of service attacks, and any similar routine attempts or any combination of the above, will not constitute a suspicion of unauthorized access so long as the attempt DOES NOT impact the privacy or security of Customer Information or Customer Systems.

   c. Mandiant shall use and process such Nonpublic Personal Information in accordance with applicable privacy and data protection laws and regulations, and in the case of any request or demand to disclose such personal information under color of law, Mandiant shall (i) notify Customer without undue delay of the existence, terms, and circumstances surrounding such request; (ii) cooperate with Customer on the advisability of taking legally available steps to resist or narrow such request; (iii) cooperate with Customer on any such steps that Customer considers advisable; and (iv) if disclosure of the Nonpublic Personal Information is required or deemed advisable by Customer, exercise its best efforts to obtain an order, stipulation, or other reliable assurance acceptable to Customer that confidential treatment shall be accorded to such portion of the Nonpublic Personal Information to be disclosed.

   d. Mandiant must certify the destruction of all Nonpublic Personal Information upon request and in accordance with Mandiants's Data Retention and Backup Policy (provided any Nonpublic Personal Information retained by Mandiant remains subject to the requirements of this Agreement, including those of this Exhibit).

   e. Mandiant must not copy Nonpublic Personal Information for third parties or otherwise expose or communicate Nonpublic Personal Information to third parties without the express written consent of Customer's senior manager responsible for this Agreement. Mandiant may share Nonpublic Personal Information with its listed data sub-processors under a general consent from Customer, provided such data sub-processors have satisfied Customer's due diligence requirements and are subject to confidentiality, privacy, and security obligations at least as restrictive as those of Section 6 of the Agreement and this Exhibit.

   f. At any time, Customer may request information regarding Mandiant's privacy/data protection practices and Mandiant will provide Customer with such information within five (5) business days of the request. Customer may monitor and revoke Mandiant's access to Nonpublic Personal Information at any time, with or without cause and such revocation will not affect Customer's obligations for payment for Services unless such revocation was due to a breach by Mandiant of the Agreement.

   g. Intentionally Blank.

   h. Mandiant agrees that it shall pay all costs and expenses related to and/or caused by any security breach or suspected security breach caused by Mandiant as they are incurred by Customer up to the limits of liability defined in the Agreement.

   i. Mandiant and Customer agree that the obligations set forth in this Section 1 shall survive termination of the Agreement.

   j. Mandiant agrees that it shall not retain, use, or disclose any Nonpublic Personal Information for any purpose other than for the specific purpose of performing its obligations contemplated in the Agreement or as otherwise expressly permitted by applicable law. Mandiant represents and warrants that it does not and shall not have

any need to retain, use, or disclose any Nonpublic Personal Information in violation of this sub-section (j) in order to satisfy its obligations hereunder.

2. <u>Information Security</u>.

   a. In addition to the foregoing, Mandiant shall implement, monitor, and maintain appropriate administrative, technical, and physical measures, policies, procedures, and safeguards (the "Security Procedures") designed to: (i) ensure the security and confidentiality of Customer's Confidential Information and Nonpublic Personal Information; (ii) protect against any anticipated threats or hazards to the security or integrity of Customer's Confidential Information and Nonpublic Personal Information; and (iii) protect against unauthorized, unlawful, or accidental access, disclosure, transfer, destructions, loss, alteration, or use of Customer's Confidential Information and Nonpublic Personal Information. Mandiant shall periodically provide, at Customer's written request, current information and documentation (including, but not limited to, audits of its security measures, policies and procedures, summaries of test results, or other equivalent evaluations) confirming Mandiant has satisfied its obligations under the preceding sentence. Mandiant shall identify to Customer a Mandiant representative who will serve as a data security contact twenty-four (24) hours a day, seven (7) days a week, 365 days a year.

   b. Mandiant warrants and covenants that its Security Procedures will, at all times during the term of this Agreement, (i) comply with all laws and regulations applicable to Mandiant, (ii) meet or exceed the information security standards and practices that are commonly utilized by the leading service providers in Mandiant's industry that have access to Confidential Information or Nonpublic Personal Information, and (iii) offer at least as much protection to Customer's Confidential Information and Nonpublic Personal Information as Mandiant affords to its own confidential information and materials.

   c. Mandiant further agrees that, unless otherwise agreed to by Customer in writing, it will not modify the Security Procedures in any way that might reasonably be expected to reduce the overall scope or level of security protections that (i) were in effect as of the Effective Date of this Agreement or (ii) were enhanced or increased after the Effective Date.

   d. If Mandiant becomes aware of any actual or suspected unauthorized access to Customer's Confidential Information or Nonpublic Personal Information (an "Incident"), Mandiant will take appropriate actions to contain and mitigate the Incident, including notification to Customer as soon as possible, but within forty-eight hours (48) hours of learning of the Incident (subject to any delay requested by an appropriate law enforcement agency), to enable Customer to expeditiously implement its response program. Upon request of Customer, Mandiant will cooperate with Customer to investigate the nature and scope of any Incident and to take appropriate actions to mitigate, remediate, and otherwise respond to the Incident or associated risks. Without limiting the foregoing, Customer shall make all final decisions regarding notification of any Customer employees, customers, consumers, government representatives, media, the general public, and/or any other third party of any such Incidents, subject to applicable law. For purposes of clarity, external pings and other broadcast attacks on Customer's firewalls, port scans, unsuccessful log-on attempts, denial of service attacks, and any similar routine attempts or any combination of the above, will not constitute a suspicion of unauthorized access so long as the attempt DOES NOT impact the privacy or security of Customer Information or Customer Systems.

   e. Mandiant shall notify Customer without undue delay, as soon as practicable, of any change in employees, subcontractors, agents, or information security staff with access to Customer's systems and networks during the term of an SOW.

3. <u>Customer Information</u>. Mandiant shall comply with 12 C.F.R. 570 Appendix B, Interagency Guidelines Establishing Information Security Standards and shall implement and maintain adequate information security measures to protect against unauthorized access to or use of Confidential Information of Customer, including without limitation that Nonpublic Personal Information relating to the customers and applicants of Customer ("Customer Information"), which measures shall include as applicable: (i) access controls on information systems, including controls to authenticate and permit access only to authorized individuals and controls to prevent employees from providing Customer Information to unauthorized individuals who may seek to obtain this information through fraudulent means; (ii) access restrictions at physical locations containing Customer Information, such as buildings, computer facilities, and records storage facilities

**Confidential**

to permit access only to authorized individuals; (iii) encryption of electronic Customer Information, including while in transit or in storage on networks or systems to which unauthorized individuals may have access; (iv) procedures designed to ensure that information system modifications are consistent with the information security measures; (v) dual control procedures, segregation of duties, and employee background checks for employees with responsibilities for or access to Customer Information or Customer's premises or facilities; (vi) monitoring systems and procedures to detect actual and attempted attacks on or intrusions into information systems; (vii) response programs that specify actions to be taken when Mandiant detects unauthorized access to information systems, including immediate reports to Customer; (viii) measures to protect against destruction, loss or damage of Customer Information due to potential environmental hazards, such as fire and water damage or technological failures; (ix) training staff to implement the information security measures; (x) regular testing of key controls, systems and procedures of the information security measures by independent third parties or staff independent of those that develop or maintain the security measures; and (xi) reporting to Customer on the results of its audits, summaries of test results, and other evaluations of Mandiant's information security systems and procedures.

4.   _Cybersecurity._ Mandiant shall maintain a cybersecurity program designed to protect the confidentiality, integrity and availability of the Mandiant's information systems.  The cybersecurity program shall be based on the Mandiant's risk assessment and compliance with New York Cybersecurity Rules 23 NYCRR 500.  The program shall be designed to perform the following core cybersecurity functions (at a minimum):

    a.   Mandiant shall have policies and procedures for access controls, including use of multi-factor authentication to limit access to relevant information systems and Nonpublic Personal Information.

    b.   Mandiant shall have policies and procedures for use of encryption to protect Nonpublic Personal Information in transit and at rest.

5.   _Inspection of Books; Audits._

    a.   Mandiant shall keep detailed accounts and records of all activities carried out, and all costs and expenses incurred, in the performance of its obligations under this Agreement.  Upon twenty-four (24) hours' notice to Mandiant and during normal business hours and only if required under applicable data protection law, Customer has the right to audit and verify Mandiant's operating environment and other areas of service (including those of any subcontractors) to ensure that Mandiant is maintaining adequate controls and security measures, that Mandiant's billings to Customer are correct, and that reports relating to Mandiant's performance are accurate.  Customer may conduct audit and verification reviews itself or with the assistance of a third party organization (provided that the third party organization executes a confidentiality agreement that contains protections for confidential information comparable to this Agreement), at Customer's expense, subject to Section 5(e) below.  All audits shall be performed in a manner intended to minimize disruption to the Parties' respective businesses.  All such audits and verifications may be conducted during the term of this Agreement and for a period of ten (10) years after the termination or expiration of this Agreement.

    b.   Only if required under applicable data protection law audits shall be limited to information relating to Mandiant's performance hereunder, and may include, without limitation: (i) Mandiant's practices and procedures; (ii) Mandiant's computer systems; (iii) Mandiant's controls, security measures, and procedures; (iv) Mandiant's disaster recovery and back-up procedures; (v) any matter necessary to enable Customer to meet requirements of law; (vi) Mandiant's compliance with the requirements hereof; (vii) billing data and records; and (viii) Mandiant's procedures to maintain the confidentiality of Customer's Confidential Information.

    c.   Only if required under applicable data protection law Mandiant shall assist Customer's auditors (including internal audit staff), regulators, consultants, and other representatives as is reasonably required.  Mandiant shall cooperate fully with Customer or its designees in connection with audit functions and with regard to examinations by regulatory authorities and shall, on a timely basis, furnish each with information requested.

    d.   In no event shall Customer while conducting audits and investigations materially interfere with Mandiant's ability to perform its obligations under this Agreement or conduct its other operations in the ordinary course of business.

**Confidential**

**Version 01/31/2019**

e.   Customer shall bear its expenses relating to any audit performed under this provision; provided, however, if any such inspection reveals that any invoice or payment has not been rendered or made in accordance with the terms of this Agreement, resulting in an overcharge to Customer of five percent (5%) or more of the aggregate charges subject to audit, Mandiant shall reimburse Customer for its reasonable internal costs and external expenses in connection with any audit without prejudice to any other remedies or claims of Customer.  In no event shall Customer be obligated to pay to Mandiant any costs or expenses incurred by Mandiant in assisting the completion of the audits contemplated under this exhibit.

f.   Following an audit or examination by Customer, Customer may (in its sole discretion) conduct (in the case of an internal audit), or request an exit conference with Mandiant to obtain Mandiant's factual concurrence with issues identified in the review.

g.   Upon Customer's request, and not withstanding the other limitations of this Section 5, including those limiting Customer's audit rights to only the extent required by applicable law, Mandiant shall:  (i) provide to Customer a copy of Mandiant's most recent external independent audit reports (including, but not limited to, any SSAE 16/SSAE 18, SOC1, SOC2 or other similar audits of Mandiant's operations, information security program, and/or disaster recovery/business continuity plan) (the "Audit Reports"); (ii) comply with Customer's requests to complete other Mandiant oversight materials; and (iii) use Customer's secure Mandiant management portal when sharing Audit Reports and completing oversight material.  At all times during the term of this Agreement and for as long as Mandiant controls any Customer data, Mandiant's performance hereunder shall not be performed in a manner that offers less security than that described in such Audit Reports.

**Confidential**

**Version 01/31/2019**

**EXHIBIT C**

**SECURITY REGULATIONS**

**General Security Provisions:**

Mandiant shall take all reasonable steps to ensure that Personnel and agents:

- While on Customer's physical premises, carry any security pass (such as a picture ID) that has been issued by Customer. Such pass must be presented to security personnel prior to entering the elevator banks or escalator areas, and at any other time on request.

- Immediately report the loss of any security-related item (such as keys or a security pass) to Customer's security department.

- Leave the physical premises at the agreed time (i.e., the official end of the individual's work day, unless otherwise arranged).

- Enter only those portions of the physical premises where his or her presence is necessary for the proper performance of duties under this Agreement.

- Comply with reasonable and permitted direction given by members of Customer's security department and, in particular, permit such searches as required under Customer's policies. Under current policy, Customer reserves the right to search Customer's physical premises and all objects on the premises within applicable law (including desks, closets).

**Confidential**

**Version 01/31/2019**

## EXHIBIT D

### BACKGROUND CHECKS

Mandiant shall not use any Covered Personnel who has not satisfactorily completed the following background checks: criminal records check, employment checks, educational checks, and right to work verification. Unacceptable criminal background generally includes, but is not limited to, any misdemeanor or felony conviction, as well as any entry of a guilty or "no contest" plea, which is determined to be reasonably related to the performance of the job duties and/or interaction with fellow co-workers (theft, assault, battery, fraud, perjury, etc.) within the past 10 years. If any conviction exists as to any Covered Personnel, Mandiant agrees to disclose this information to Customer.

All Covered Personnel are required to have a High School diploma or equivalent unless otherwise required by the position.

DocuSign Envelope ID: ...

EXHIBIT E

EXPENSE REIMBURSEMENT POLICY

# Employee Travel and Expense Policies

## Purpose

It is the Company's policy to reimburse employees for reasonable expenses incurred while representing the Company or conducting business on behalf of the Company. No policy can encompass every possible occurrence, and this policy should be used as a guideline. Employees are expected to use good judgment when incurring business expenditures by planning their trips, accommodations, visits and other arrangements as economically as possible in relation to time and cost.

The following procedures have been designed to ensure the efficiency of arranging travel and making business expenditure claims. If the correct procedures are not followed, travel arrangements and expense claims will not be authorized without a waiver from a senior manager.

For the following, "employees" shall mean contractor's employees, contractors, and other personnel working on behalf of contractor.

## Air Travel

### Domestic Flights

Domestic air travel should be made on a _coach-economy basis_ unless the President or Chief Operating Officer pre-approves other arrangements. Only Managing Directors may travel in business class for U.S. "cross country red-eye" flights.

The Company does _not_ reimburse any costs related to trip insurance or airline "upgrades" (such as preferred seating, preferred flight boarding, extra frequent flyer points, etc.). The Company _does_ reimburse for checked baggage fees and for upgraded seating when no other alternatives are available.

_Non-refundable_ tickets are to be purchased for all business travel. Employees should attempt to make use of any refunded tickets for future business flights only.

_Airfare over $600_ – Please explain the reason for the higher cost on your expense report.

_Airfare over $800_ – Must be pre-approved in writing _by a Senior Vice President or higher in advance of purchase._ The approval must be attached when the expense report is submitted to Accounting.

_Airfare over $1,000_ – Must be pre-approved in writing _by the President or Chief Operating Officer_ in advance of purchase. The approval must be attached when the expense report is submitted to Accounting.

### International Flights

International air travel should be made on a _coach-economy basis_ unless the President pre-approves other arrangements. Any air travel costing over $3,000 (US Dollars) must be formally approved by a Senior Vice President or higher. Only Managing Directors may travel in business class for trans-continental flights.

## Taxis/Limousines

**Confidential**

**Version 01/31/2019**

Taxi fares will be reimbursed with valid receipts. Limousines/car service will only be reimbursed when alternative transportation is not available and/or the fare for limousine travel is equal to or less than other means of transportation. If extensive car travel is required, a rental car may be more economical than using taxis.

## Rental Cars

Employees should request a **mid-size / intermediate** car (not a luxury or larger car), unless there is another specific business purpose. Cars should be re-fueled prior to their return to avoid the excessive re-fueling charge by the rental agency. If you plan on using a full tank of gas, it might be more economical to take advantage of the rental agency "fuel option."

Rental Car Insurance

The guidelines on whether Bayview employees should accept or decline auto insurance when renting automobiles for business purposes are detailed below. Only allowable auto insurance taken out in accordance with this policy will be reimbursed by the Company.

**US / Canada Employee Rents Auto in US / Canada**: Employees should **decline** the auto insurance offered by car rental companies. If you sign up for the rental car insurance, you will **not** be reimbursed by the Company.

If you have an accident in the US/Canada or return your rental car and find that there is damage:

(1) In case of an accident, get a copy of the police report.
(2) When you return the car, the rental company will complete a Damage Report. Be sure to get your copy.
(3) Be aware that you may be charged a deductible amount against the auto damage.

Please call Jose Fernandez (305) 644-2555 (in the Miami office – Finance department) to notify Bayview of a claim. Send all the documentation you have along with an explanation of what occurred. If you have a contact name from the rental company, please include.

If you had to charge a deductible deposit, send the documentation and your charge slip to Jose Fernandez (in the Miami office). He will process a payment to you. Please do not include this amount on your expense report.

Once you have provided Jose Fernandez the above information, he will handle the claim. You will only be contacted if additional information or clarification is required.

**US Employee Rents Auto in Puerto Rico or outside North America):** Employees should **accept** the auto insurance offered by car rental companies. The cost of the insurance should be included on your expense report and will be reimbursed by Bayview.

If you have an accident under the "accept" scenario above, all claim information would go through the auto rental company. If you have an accident under the "decline" scenario above, please follow instructions under the "US/Canada Employee Rents Auto in US/Canada" section above.

Employees are responsible for fines and penalties for parking or traffic violations (or any other crime) incurred when using a personal car or a rental car for business travel.

## Hotels

Hotel expenses are to be separated on the expense report by each day. Room charges should be separated from telephone, meals and other expenses.

**Hotel rooms should not exceed $250 per night (excluding taxes).** Use of higher priced rooms should be confined to those instances

where it is absolutely necessary (e.g. same hotel as a conference) and must be pre-approved by a Senior Vice President or higher.

Employees are responsible for canceling any reservations that will not be kept. "No-show" charges are not reimbursable, except in cases beyond the control of the employee. An explanation must be attached to the expense report and will be decided on a case-by-case basis.

Long distance calls should be made via cellular phone or charged to a long distance calling card and included on the expense report. **It is the policy of the Company not to reimburse for calls made from hotel rooms**, as these charges are significantly higher than the cost of calling card calls or cellular phones.

Meals charged at hotels should follow the guidelines for meals (below).

Other items appearing on the hotel folio must be explained and shown on the expense report separately. **Movies and mini bar items (other than meals within our meal policy below) will not be reimbursed.**

## Meals

Non-Client Business Meals – The Company expects employees to exercise good judgment while traveling on Company business and to keep expenses for meals reasonable. The amounts shown below are **maximum caps** for meals while traveling on Company business (including gratuity):

**United States Travel        International Travel (in US $)**

| | United States Travel | International Travel (in US $) |
|---|---|---|
| Breakfast | $20 | USD $30 |
| Lunch | $20 | USD $30 |
| Dinner | $35 | USD $50 |

Receipts are required for **all** meal reimbursements. Meal reimbursements for meals with others must include a business meal form with the names and titles of the persons present, the cost, establishment name, purpose of meeting (e.g. sales prospect, contract negotiation, etc.) and date.

Client Business Meals – Business meals should be reasonably priced and appropriate for the circumstances. **The maximum cost is $75 per person**. This requires the completion of a business meal form with a detailed description of purpose and location of meal, and names and company name of all attendees. Exceptions to the $75 maximum require written approval from a Senior Vice President or higher.

## Auto Mileage

Employees will be reimbursed for the use of their personal vehicle while on Company business at the current IRS rate (listed on the expense report on the Company Intranet – Bayview Marina) **in excess of that person's normal commute to his/her home office**. The mileage reimbursement rate includes reimbursement for gas, insurance and other operating costs. Mileage reimbursement requests must include the number of miles traveled, the destinations traveled to, and the nature of the business conducted. If total reimbursement is expected to exceed $300, the employee should look at alternatives such as renting a car or flying. Driving to the airport is only reimbursable from your work location to the airport, per IRS regulations.

Generally, while traveling via auto for business, the employee will be covered by his or her own auto insurance coverage.

Any employee traveling 500 or more miles in one week must submit the expense report to the CFO or SVP-Finance for approval (in addition to the other required approvals).

**Confidential**

## Tips

Customary and reasonable tips and gratuities for skycaps, hotel luggage handling, etc. will be reimbursed only if specific details are provided. Tips for meals will be reimbursed up to twenty percent (20%), excluding sales tax.

## Other

Business gifts should not exceed $25 without Managing Director approval.

Client events (e.g. sports events, golf, etc.) which exceed $100 must be pre-approved by a Senior Vice President or higher. The Company will not reimburse for adult entertainment.

The Company does not pay expenses for spouses or other guests on business trips. Any exception to this policy must be approved in advance by a Senior Vice President or higher.

Notwithstanding the foregoing, Company will reimburse Mandiant for any expense that Company has pre-approved, regardless of whether it is consistent with the above travel and expense policy.

**Confidential**

# EXHIBIT 2



Statement of Work

This Statement of Work is valid when signed before October 30, 2019

This Statement of Work ("SOW") is made and entered into as of the later of the signature dates below, ("SOW Effective Date"), by and between FireEye, Inc., d/b/a Mandiant ("Mandiant") and Bayview Asset Management, LLC ("Customer"). This SOW is hereby incorporated into and made part of the Master Services Agreement (the "Agreement"), dated October 4, 2019, between Customer and Mandiant. Capitalized terms used in this SOW will have the meanings given to them in the Agreement.

# 1. Description of Services

Mandiant agrees to provide services ("Services") as set forth below. The Services will consist of the following:

## 1.1. Incident Response Retainer Service

Mandiant agrees to provide incident response services ("Incident Response Services") during the twelve (12) month period from the SOW Effective Date (the "Covered Period"). Each request for Incident Response Services that is confirmed under this SOW, will consume a minimum of forty (40) IR Retainer Support Hours. During the Covered Period Mandiant will provide Incident Response Services as requested by Customer in the following areas:

- Computer security incident response support
- Digital forensics, log, and malware analysis support
- Incident remediation assistance

Upon SOW execution, Customer will receive a welcome letter that describes the Mandiant Incident Response Service Declaration Process, 24/7 contact information and email address for requesting Incident Response Services. Customer is provided access to Mandiant's toll-free hotline, which is available twenty-four (24) hours a day and seven (7) days a week.

Following Customer's request for Incident Response Services, Mandiant will engage with Customer to determine if Incident Response Services are required or if Mandiant is able to effectively assist based on the situation. Mandiant will respond to Customer's request within a maximum of four (4) hours following the initial request. If Mandiant and Customer agree that Incident Response Services are necessary, Mandiant will assign a Mandiant Incident Response Lead ("IR Lead") within twenty-four (24) hours of the Customer's request for Incident Response Services. The time frames to respond to Customer's request for Incident Response Services and assign an IR Lead, as described above, are collectively called the "IR Service Levels."

Upon engagement for Incident Response Services as described above, the IR Lead will determine the appropriate next steps with Customer. This may include one of the following common scenarios: 1) Customer provides Mandiant evidence (e.g., logs, malware samples, forensic images or live response datasets) to analyze, 2) Customer leverages Mandiant's endpoint technology, either remote or on premise, to enable Mandiant to perform analysis of a system of interest or a large number of systems. During this discussion, Customer and Mandiant will determine the appropriate technology stack, if any, required to complete the analysis.

If Mandiant and Customer determine that the requested Incident Response Services can be performed using Mandiant's technology stack, Mandiant will provide the required components to Customer for installation on the Customer endpoints to be analyzed (each, an "Endpoint"). Mandiant may also provide network equipment to Customer for installation to facilitate Mandiant's network monitoring procedures.

Customer acknowledges that Mandiant may use other tools, including cloud-based analytics tools and cloud-email monitoring tools, in the course of performing Services, and agrees that Mandiant may use all such tools in its discretion.



Statement of Work

This Statement of Work is valid when signed before October 30, 2019

Customer will cooperate with Mandiant to facilitate Mandiant's use of any such tools. Any charges for such tools are set forth in the Technology Fees section of this SOW (Section 5) or will be agreed upon between the parties jointly in writing.

## 1.2. Additional Mandiant Consulting Services

In addition to the Mandiant Services described in Section 1.1 and 1.2 of this SOW, during the Covered Period, Mandiant may provide additional consulting services on a per-request basis, as described below. The activities to be performed may be more explicitly defined and approved as mutually agreed upon "Work Orders" under this SOW or, in some cases where a Work Order is not necessary, may be described in writing on quotes accepted by Customer. For purposes of clarity, this SOW does not obligate Customer to any additional fees unless and until both parties execute a Work Order as set forth below, or, if no Work Order is necessary, until the Customer has accepted Mandiant's quote in writing. The following services can be requested via a Work Order:

- Mandiant Strategic Consulting Services
  - Security Program Assessment
  - Security Program Transformation
  - Response Readiness Assessments
  - Table Top Exercises
- Mandiant Technical Services
  - Compromise Assessments
  - Investigative Support, Forensics, Litigation Support, and Advisory Services (other than Incident Response Services)
- Mandiant Proactive Services
  - Vulnerability Assessments
  - Penetration Testing
  - Red Team Assessments
  - Red Team Operations
- Mandiant Training and Education Services

For each Work Order under this SOW, Mandiant and Customer will agree on a defined scope and any Deliverables that are unique to each Work Order, and the rates set forth in Sections 4 and 5 of this SOW will apply. Each Work Order will be a separate document governed by this SOW.

### Work Order Process

During the Covered Period, Customer may request Services under this Section 1.2 of this SOW, and if mutually agreed, Mandiant and Customer may enter into a separate, mutually agreed-upon work order ("Work Order") with respect to such Services. All such Work Orders will incorporate and be governed by the terms of the Agreement and this SOW.

Each Work Order under this SOW will contain the following sections:

- Detailed description of requested work
- Estimate of requested effort including hours and duration
- Work Order Deliverables
- Estimated expenses and fees (including technology fees, if applicable)

Process for execution of a Work Order:

- Customer will request a Work Order estimate from Mandiant
- Mandiant will develop at no cost to Customer a Work Order containing the sections as described above.



Statement of Work

This Statement of Work is valid when signed before October 30, 2019

- Mandiant will then send the Work Order to the Customer for review and approvals.
- A Work Order shall be deemed accepted only if executed by authorized signatories of each party.

All work under specific Work Orders will be performed in accordance with the rates listed in Section 4 below for the Services to be performed on either a fixed fee or time and materials basis as agreed upon in the Work Order. Services under a Work Order will not commence until the Work Order has been executed. Customer will pay all invoices as set forth in the Agreement. Unless otherwise agreed upon in the Work Order, invoices for the fees and expenses will be issued on a monthly basis in arrears. Actual expenses will be invoiced as set forth in Section 6 and technology fees will be invoiced as set forth in Section 5.

## 2. Deliverables

Below are Deliverables that may be produced. Additional Deliverables may be defined as part of Work Orders as described in Section 1.2.

Any other reports (including intelligence reports), presentations, materials or other written information provided by Mandiant as a result of the Services are Mandiant IP and will not be considered "Deliverables" as defined in the Agreement.

### 2.1. Incident Response Retainer Service

The following Deliverables may be produced for Incident Response Services:

- Incident Response Service Status Reporting – During a declared Incident Response engagement, Mandiant will provide weekly status reporting that will summarize activities completed, key engagement statistics, issues requiring attention and plans for the next reporting period.

- Incident Response Service Final Report – Upon completion of any declared Incident Response engagement, Mandiant will provide a detailed final report covering the engagement activities, results and recommendations for remediation in a written detailed technical document.

- Incident Response Service Executive Briefing – Upon completion of any declared Incident Response Service engagement and as required to inform senior executives or board level members, Mandiant will provide an executive brief that summaries engagement results and recommendations in executive format.

## 3. Schedule

All parties will mutually agree to the scheduling of Services under this SOW and each Work Order, as applicable. Any Services described in Section 1.2 must commence within the Covered Period, and must be requested no later than forty-five (45) days prior to the end of the Covered Period to allow for scheduling so that Services may commence prior to the end of the Covered Period.

## 4. Professional Fees

Professional fees are          which consists of three elements



Statement of Work

This Statement of Work is valid when signed before October 30, 2019

| Element | Cost |
|---|---|
| IR Service Levels | |
| Pre-paid fees to be applied to either Incident Response Services described in Section 1.1 or Additional Mandiant Consulting Services described in Section 1.2 above ("Pre-Paid Consulting Services Fees"). | |

During the Covered Period, the Pre-Paid Consulting Services Fees may be applied to hours incurred for Services under Section 1.1 or 1.2 of this SOW according to the following discounted rate schedule listed below in the "Prepaid Discounted Rate" column.

| Description | Prepaid Discounted Rate | Additional Fees Rate |
|---|---|---|
| Incident Response Services | | |
| IR Services Travel Time (actual time spent traveling for Incident Response Services) | | |
| Mandiant Proactive Services (Vulnerability Assessments, Penetration Testing, Red Team Assessments, Red Team Operations) | | |
| Mandiant Technical Services (Compromise Assessments, Forensics, and litigation support) | | |
| Mandiant Strategic Consulting Services (Security Program Assessment, Security Program Transformation, Annual Security Program Maturity, Response Readiness Assessments, Tabletop Exercises, Threat Intelligence Briefings, Threat Diagnostics Assessments) | | |
| Mandiant Training and Education Services | | |
| Malware Analysis Reverse Engineering or Services not previously defined | | |

Pre-Paid Fees will be invoiced on or about the SOW Effective Date, and are non-cancelable and non-refundable (except as specified herein or in the Agreement). Pre-Paid Consulting Services Fees do not include and cannot be applied to long-term evidence storage, Technology Fees (as described in Section 5 below) or Expenses (as described in Section 6 below). Any additional fees for Incident Response Services described in Section 1.1 or Additional Mandiant Consulting Services described in Section 1.2 in excess of the Pre-Paid Consulting Services Fees will be billed at the rates shown in the "Additional Fees Rate" column in the table above and invoiced monthly in arrears at the rates set forth in the table above, unless otherwise agreed in the applicable Work Order. When Customer and Mandiant have agreed on a fixed fee for Services as documented in a Work Order, Mandiant will calculate the fixed fee based on the applicable hourly rate noted above times the anticipated number of hours to complete the Services. Customer agrees that this SOW represents the complete, final and exclusive terms and conditions governing the Services. As such, Mandiant may invoice Customer in advance, unless otherwise stated in this SOW, without the requirement that Customer provide a subsequent purchase order. Any subsequently issued purchase order shall be for administrative purposes.

## 5. Technology Fees

When Customer has requested Incident Response Services under this SOW and Mandiant has been engaged or Mandiant determines that a technology stack is required to support a Work Order then Mandiant will determine the



Statement of Work

This Statement of Work is valid when signed before October 30, 2019

appropriate technology components required to support the Services. In addition to professional services fees in Section 4, Customer agrees to pay technology fees from the date of delivery at the price per unit quoted in the table below. These fees will be invoiced monthly and charged to the nearest whole month; they are not pro-rated.

| Unit Description | Price per Unit |
|---|---|
| **Endpoint Incident Response Technology** | |
| Hardware appliance, up to 10,000 nodes | |
| Cloud up to 100 nodes | |
| Cloud up to 1,000 nodes | |
| Cloud up to 10,000 nodes | |
| Supplemental up to 10,000 nodes | |
| **Network Incident Response Technology** | |
| 1Gb appliance | |
| 10Gb appliance | |
| **Cloud-Based Log Analysis Technology** | |
| Instance up to 5,000 events per second, 10TB storage, 30 day retention | |
| Instance up to 10,000 events per second, 20TB storage, 30 day retention | |
| **Email Incident Response Technology – Cloud with AV/AS** | |
| 100-499 inboxes | |
| 500-999 inboxes | |
| 1000-1999 inboxes | |
| 2000-4999 inboxes | |
| 5000-9999 inboxes | |
| 10,000+ inboxes | |
| **Evidence Storage** | |
| Storage of each physical evidence item | |
| **Other** | |
| Domestic shipping and handling of hardware | |
| International shipping and handling of hardware | |

In addition to the technology listed in the table above, Mandiant may require the use of other tools to facilitate the investigation. Written authorization from Customer for any charges related to the use of technologies not detailed in the above table shall be required.

## 6. Expenses

Customer shall reimburse Mandiant for the following expense categories that are directly attributable to work performed under this SOW:

- Travel and living expenses.



Statement of Work

This Statement of Work is valid when signed before October 30, 2019

- Mileage in company or personal vehicles at the rate approved by the by the U.S. Internal Revenue Service.
- Computer storage media.
- Postage and courier services.
- Shipping, freight, import duties, and tariffs.
- Printing, reproduction, and binding.
- Any other expenses resulting from the work performed under this SOW.

Upon request, Mandiant will provide electronic copies of expense receipts for all expense related items greater than $25. Expenses will be invoiced monthly in arrears as incurred, and reimbursement of those expenses shall be subject to the requirements of the Agreement.

## 7. Assumptions

1. Mandiant will provide Deliverables to Customer throughout this engagement. Draft Deliverables are considered final upon written confirmation from Customer or fifteen (15) business days after their submission date from Mandiant to Customer, whichever is earlier.
2. When Mandiant's personnel are performing Services on site at Customer's premises, Customer will allocate reasonable working space and physical access for all Mandiant assigned personnel. To accomplish the work described in this SOW or a Work Order, Mandiant may use both onsite or off-site personnel, depending on the tasks desired by Customer and agreed upon by Mandiant.
3. Customer will make available key individuals that can best help plan operations around security event monitoring, analysis, threat intelligence, and incident response.
4. Estimated professional fees do not include any hardware, software, licensing, maintenance, or support costs of any Mandiant or other third-party product or service suggested by Mandiant as we conduct the activities outlined within this SOW.
5. All parties will mutually agree upon any changes to this SOW in writing.

## 8. Contact Information

Customer will provide Mandiant with points of contact information in the following table:

| Business Line Contact | |
|---|---|
| Name: | Brian Rosario |
| Title: | Vice President, IT Security |
| Email: | Brianrosario@bayview.com |
| Phone: | 305.817.5144 |
| Street: | 4425 Ponce de Leon Blvd. 5th Floor |
| City: | Coral Gables |
| State: | FL |
| Zip: | 33146 |
| Payables Contact | |
| Name: | Rosa Suarez |



Statement of Work

This Statement of Work is valid when signed before October 30, 2019

| Title: | AP Manager |
|---|---|
| Email: | rosasuarez@bayview.com |
| Phone: | 305.646.6437 |
| Street: | 4425 Ponce de Leon Blvd, 5th Floor |
| City: | Coral Gables |
| State: | FL |
| Zip: | 33146 |

## 9. Additional Security Testing Terms and Conditions

The below terms will apply to any Proactive Service (including penetration testing and red team engagements) requested under this SOW or any Work Orders.

1. As a part of any penetration testing that may be part of this SOW, Mandiant may, among other things, (a) scan Customer's network and systems for ports, services and other entry points that can be exploited, and (b) probe those entry points in an effort to gain access to Customer's network and systems in an effort to determine the severity of the vulnerability.

2. CUSTOMER UNDERSTANDS THAT, ALTHOUGH MANDIANT TAKES PRECAUTIONS TO AVOID DAMAGE TO CUSTOMER'S NETWORK AND SYSTEMS, DISRUPTIONS, OUTAGES AND/OR DATA LOSS MAY OCCUR AS A RESULT OF ANY PENETRATION TESTING. Customer represents and warrants that all systems on its network or otherwise accessible during the penetration test have been backed up, and that any data loss or other damage caused by the penetration testing can be easily and quickly reversed.

3. If appropriate, Customer will provide to Mandiant certain information required for performing its tests, including a description and location (e.g., an IP address) of the systems and networks to be tested. Customer represents and warrants that all information provided is true and accurate and that Customer owns or is authorized to represent the owners of the systems and networks described in connection with the penetration testing.

4. If appropriate, Customer may inform all or a selected group of its employees, contractors, and other third parties about any penetration testing to be undertaken by Mandiant. In the event that Customer decides not to inform anyone of the penetration testing, Customer understands that people may spend time and money on behalf of Customer in detecting, blocking, investigating or responding to activities of Mandiant. IN LIGHT OF THE POSSIBILITY THAT SUCH ACTIONS MAY BE TAKEN AND EXPENDITURES MAY OCCUR, CUSTOMER SHOULD CONSULT WITH CUSTOMER'S LEGAL COUNSEL AND/OR A MEMBER OF EXECUTIVE MANAGEMENT PRIOR TO ANY SUCH ZERO KNOWLEDGE ENGAGEMENTS. Customer may also want to consider contacting such third-party service providers as Customer's telecommunications carrier to alert them to the testing.

5. If appropriate, user data contained on systems that are tested may be accessible to Mandiant and Mandiant may download portions of such data (e.g., as proof of access) solely as necessary to perform the Services. Such downloaded shall be irretrievably deleted as soon as the need for such data ends.

6. If appropriate, at any point during the testing, either party may pause or stop the test. Should the testing be terminated, a rationale for such termination shall be provided by the party requesting such termination and such rationale shall be clearly documented.



Statement of Work

This Statement of Work is valid when signed before October 30, 2019

## 10. Signature

IN WITNESS WHEREOF, Mandiant and Customer as of the SOW Effective Date have executed this Statement of Work.

**FireEye, Inc. d/b/a Mandiant**

Signature: *Joe Zuccaro*
DocuSigned by:
87A95693983E4B7...

Name: Joe Zuccaro

Title: Sr. Director - Contracts

Date: 10/1/2019

**Bayview Asset Management, LLC**

Signature: _____

Name: _____

Title: Eric Lozano, CIO

Date: 10/4/19

# EXHIBIT 3



Statement of Work

Thi  Statement of Work i  valid when  igned before June 10, 2021

This Statement of Work ("SOW") is made and entered into as of the later of the signature dates below, ("SOW Effective Date"), by and between FireEye, Inc , d/b/a Mandiant ("Mandiant") and Bayview A  et Management, LLC ("Customer"). This SOW is hereby incorporated into and made part of the Master Service  Agreement (the "Agreement"), dated October 4, 2019 between Cu tomer and Mandiant Capitalized terms used in this SOW will have the meanings given to them in the Agreement. Services performed outside the Americas will be performed by and invoiced to the Customer by FireEye Ireland Ltd., regardless of which FireEye entity is party to this SOW, and in such cases FireEye Ireland Ltd. will be deemed "FireEye" a  et forth in thi  SOW  Service  performed within the America  will be performed by and invoiced to the Customer by FireEye, Inc., regardless of which FireEye entity is party to thi  SOW, and in  uch ca e  FireEye, Inc  will be deemed "FireEye" a  et forth in thi  SOW

# 1. Description of Services

Mandiant agrees to provide services ("Services") as set forth below. The Services will consist of the following:

## 1.1. Incident Response Retainer Service

Mandiant agree  to provide incident re pon e  ervice  ("Incident Re pon e Service ") during the twelve (12) month period from the SOW Effective Date (the "Covered Period"). Each request for Incident Re pon e Service  that i  confirmed under thi  SOW, will con ume a minimum of forty (40) IR Retainer Support Hours. During the Covered Period Mandiant will provide Incident Response Services as reque ted by Cu tomer in the following area

* Computer security incident response support
* Digital forensics, log, and malware analysis support
* Incident remediation assistance

Upon SOW e ecution, Cu tomer will receive a welcome letter that de cribe  the Mandiant Incident Response Service Declaration Process, 24/7 contact information and email address for requesting Incident Response Services. Customer is provided access to Mandiant's toll-free hotline, which is available twenty-four (24) hours a day and seven (7) days a week.

Following Customer's request for Incident Response Services, Mandiant will engage with Customer to determine if Incident Response Services are required or if Mandiant is able to effectively assist based on the situation. Mandiant reserves the right to decline any engagement if taking on the engagement would create a conflict of interest. Mandiant will respond to Customer's request within a maximum of four (4) hours following the initial request. If Mandiant and Customer agree that Incident Response Services are necessary, Mandiant will assign a Mandiant Incident Response Lead ("IR Lead") within twenty-four (24) hours of the Customer's request for Incident Response Services. The time frames to respond to Customer's request for Incident Response Services and assign an IR Lead, as described above, are collectively called the "IR Service Levels." The IR Service Levels will become effective fifteen (15) business days from the SOW Effective Date.

Upon engagement for Incident Response Services as described above, the IR Lead will determine the appropriate next steps with Customer. This may include one of the following common scenarios: 1) Customer provides Mandiant evidence (e.g., logs, malware samples, forensic images or live response datasets) to analyze, 2) Customer leverages Mandiant's endpoint technology, either remote or on premise, to enable Mandiant to perform analysis of a system of interest or a large number of systems. During this discussion, Customer and Mandiant will determine the appropriate technology stack, if any, required to complete the analysis.



If Mandiant and Customer determine that the requested Incident Response Services can be performed using Mandiant's technology stack, Mandiant will provide the required components to Customer for installation on the Customer endpoints to be analyzed (each, an "Endpoint"). Mandiant may also provide network equipment to Cu tomer for in tallation to facilitate Mandiant' network monitoring procedure

Customer acknowledges that Mandiant may use other tools, including cloud-based analytics tools and cloud email monitoring tool , in the cour e of performing Service , and agree  that Mandiant may u e all such tools in its discretion. Customer will cooperate with Mandiant to facilitate Mandiant's use of any such tools. Any charges for such tools are set forth in the Technology Fees section of this SOW (Section 5) or will be agreed upon between the parties jointly in writing.

## 1.2. Additional Mandiant Consulting Services

In addition to the Mandiant Services described in Section 1.1 and 1.2 of this SOW, during the Covered Period, Mandiant may provide additional consulting services on a per-request basis, as described below. The activities to be performed may be more explicitly defined and approved as mutually agreed upon "Work Orders" under this SOW or, in some cases where a Work Order is not necessary, may be described in writing on quotes accepted by Customer. For purposes of clarity, this SOW does not obligate Customer to any additional fees unless and until both parties execute a Work Order as set forth below, or, if no Work Order is necessary, until the Customer has accepted Mandiant's quote in writing. The following services can be requested via a Work Order:

- ∗ Mandiant Strategic Consulting Services
  - o Security Program Assessment
  - o Security Program Transformation
  - o Response Readiness Assessments
  - o Table Top Exercises
- ∗ Mandiant Technical Service
  - o Compromise Assessments
  - o Inve tigative Support, Foren ic , Litigation Support, and Advi ory Service  (other than Incident Response Services)
- ∗ Mandiant Proactive Services
  - o Vulnerability Assessments
  - o Penetration Testing
  - o Red Team Assessments
  - o Purple Team Assessments
- ∗ Mandiant Training and Education Services

For each Work Order under this SOW, Mandiant and Customer will agree on a defined scope and any Deliverables that are unique to each Work Order, and the rates set forth in Sections 4 and 5 of this SOW will apply. Each Work Order will be a separate document governed by this SOW.

Work Order Process

During the Covered Period, Customer may request Services under this Section 1.2 of this SOW, and if mutually agreed, Mandiant and Customer may enter into a separate, mutually agreed-upon work order ("Work Order") with respect to such Services. All such Work Orders will incorporate and be governed by the terms of the Agreement and this SOW.

Each Work Order under this SOW will contain the following sections:

- ∗ Detailed description of requested work
- ∗ Estimate of requested effort including hours and duration
- ∗ Work Order Deliverables
- ∗ E timated e pen e  and fee  (including technology fee , if applicable)

Process for execution of a Work Order:



- ∗ Customer will request a Work Order estimate from Mandiant
- ∗ Mandiant will develop at no cost to Customer a Work Order containing the sections as described above.
- ∗ Mandiant will then send the Work Order to the Customer for review and approvals.
- ∗ A Work Order shall be deemed accepted only if executed by authorized signatories of each party.

All work under specific Work Orders will be performed in accordance with the rates listed in Section 4 below for the Services to be performed on either a fixed fee or time and materials basis as agreed upon in the Work Order. Services under a Work Order will not commence until the Work Order has been executed. Customer will pay all invoices as set forth in the Agreement. Unless otherwise agreed upon in the Work Order, invoices for the fees and expenses will be issued on a monthly basis in arrears. Actual expenses will be invoiced as set forth in Section 6 and technology fees will be invoiced as set forth in Section 5.

## 2. Deliverables

Below are Deliverables that may be produced. Additional Deliverables may be defined as part of Work Orders as described in Section 1.2.

Any other reports (including intelligence reports), presentations, materials or other written information provided by Mandiant as a result of the Services are Mandiant IP and will not be considered "Deliverables" as defined in the Agreement.

### 2.1. Incident Response Retainer Service

The following Deliverables may be produced for Incident Response Services:

- **Incident Response Service Status Reporting** – During a declared Incident Response engagement, Mandiant will provide weekly status reporting that will summarize activities completed, key engagement statistics, issues requiring attention and plans for the next reporting period.

- **Incident Response Service Final Report** – Upon completion of any declared Incident Response engagement, Mandiant will provide a detailed final report covering the engagement activities, results and recommendations for remediation in a written detailed technical document.

- **Incident Response Service Executive Briefing** – Upon completion of any declared Incident Response Service engagement and as required to inform senior executives or board level members, Mandiant will provide an executive brief that summaries engagement results and recommendations in executive format.

## 3. Schedule

All parties will mutually agree to the scheduling of Services under this SOW and each Work Order, as applicable. Any Services described in Section 1.2 must commence within the Covered Period, and must be requested no later than forty-five (45) days prior to the end of the Covered Period to allow for scheduling so that Services may commence prior to the end of the Covered Period.

## 4. Professional Fees

Profe   ional fee  are █████████████████████ which con  i t  of two element



| Element | Cost |
|---|---|
| IR Service Levels | |
| Pre paid fee  to be applied to either Incident Re pon e Service  de cribed in Section 1.1 or Additional Mandiant Consulting Services described in Section 1.2 above ("Pre-Paid Consulting Services Fees"). | |

During the Covered Period, the Pre Paid Con ulting Service  Fee  may be applied to hour  incurred for Services under Section 1.1 or 1.2 of this SOW according to the following discounted rate schedule listed below in the "Prepaid Discounted Rate  column.

| Description | Prepaid Discounted Rate | Additional Fees Rate |
|---|---|---|
| Incident Response Services | | |
| IR Services Travel Time (actual time spent traveling for Incident Response Services) | | |
| Mandiant Proactive Service  (Vulnerability Assessments, Penetration Testing, Red Team Assessments, Red Team Operations) | | |
| Mandiant Technical Service  (Compromi e Assessments, Forensics, and litigation support) | | |
| Mandiant Strategic Consulting Services (Security Program A e ment, Security Program Transformation, Annual Security Program Maturity, Re pon e Readine  A e ment , Tabletop Exercises, Threat Intelligence Briefings, Threat Diagno tic  A e ment ) | | |
| Mandiant Training and Education Service | | |
| Malware Analy i  Rever e Engineering or Service not previously defined | | |

Pre-Paid Fees will be invoiced on or about the SOW Effective Date, and are non-cancelable and non-refundable (e cept a  pecified herein or in the Agreement)  Pre Paid Con ulting Service  Fee  do not include and cannot be applied to long-term evidence storage, Technology Fees (as described in Section 5 below) or E pen e (a  de cribed in Section 6 below)  Any additional fee  for Incident Response Services described in Section 1.1 or Additional Mandiant Consulting Services described in Section 1 2 in e ce  of the Pre Paid Con ulting Service  Fee  will be billed at the rate  hown in the "Additional Fees Rate" column in the table above and invoiced monthly in arrears at the rates set forth in the table above, unle  otherwi e agreed in the applicable Work Order  When Cu tomer and Mandiant have agreed on a fixed fee for Services as documented in a Work Order, Mandiant will calculate the fi ed fee ba ed on the applicable hourly rate noted above time  the anticipated number of hours to complete the Services. Customer agrees that this SOW represents the complete, final and e clu ive term  and condition  governing the Service  A  uch, Mandiant may invoice Cu tomer in advance, unless otherwise stated in this SOW, without the requirement that Customer provide a  ub equent purcha e order  Any  ub equently i ued purcha e order  hall be for admini trative purposes.

## 5. Technology Fees

When Customer has requested Incident Response Services under this SOW and Mandiant has been engaged or Mandiant determines that a technology stack is required to support a Work Order then Mandiant will determine the appropriate technology components required to support the Services. In addition to professional services fees in Section 4, Customer agrees to pay technology fees from the



date of delivery at the price per unit quoted in the table below. These fees will be invoiced monthly in arrears and charged to the nearest whole month; they are not pro-rated.

| Unit Description | Price per Unit |
|---|---|
| **Endpoint Incident Response Technology** | |
| Hardware appliance, up to 10,000 nodes | |
| Cloud up to 100 node | |
| Cloud up to 1,000 node | |
| Cloud up to 10,000 nodes | |
| Supplemental up to 10,000 node | |
| **Network Incident Response Technology** | |
| 1Gb appliance | |
| 10Gb appliance | |
| **Cloud-Based Log Analysis Technology** | |
| In tance up to 5,000 event  per  econd, 10TB  torage, 30 day retention | |
| In  tance up to 10,000 event  per  econd, 20TB  torage, 30 day retention | |
| **Email Incident Response Technology – Cloud with AV/AS** | |
| 100-499 inboxes | |
| 500-999 inboxes | |
| 1000-1999 inboxes | |
| 2000-4999 inboxes | |
| 5000-9999 inboxes | |
| 10,000+ inboxes | |
| **Evidence Storage** | |
| Storage of each physical evidence item | |
| **Other** | |
| Domestic shipping and handling of hardware | |
| International shipping and handling of hardware | |

In addition to the technology listed in the table above, Mandiant may require the use of other tools to facilitate the inve tigation  Written authorization from Cu tomer for any charge  related to the u e of technologies not detailed in the above table shall be required.

## 6. Expenses

Customer shall reimburse Mandiant for the following expense categories that are directly attributable to work performed under this SOW:

* Travel and living expenses.
* Mileage in company or personal vehicles at the rate approved by the by the U.S. Internal Revenue Service.
* Computer storage media.
* Postage and courier services.
* Shipping, freight, import duties, and tariffs.
* Printing, reproduction, and binding.



∗   Any other expenses resulting from the work performed under this SOW.

Upon request, Mandiant will provide electronic copies of expense receipts for all expense related items greater than $25. Expenses will be invoiced monthly in arrears as incurred, and reimbursement of those expenses shall be subject to the requirements of the Agreement.

## 7. Assumptions

1. Mandiant will provide Deliverables to Customer throughout this engagement. Draft Deliverables are considered final upon written confirmation from Customer or fifteen (15) business days after their submission date from Mandiant to Customer, whichever is earlier.
2. When Mandiant's personnel are performing Services on site at Customer's premises, Customer will allocate reasonable working space and physical access for all Mandiant assigned personnel. To accomplish the work described in this SOW or a Work Order, Mandiant may use both onsite or off-site personnel, depending on the tasks desired by Customer and agreed upon by Mandiant.
3. Customer will make available key individuals that can best help plan operations around security event monitoring, analysis, threat intelligence, and incident response.
4. Estimated professional fees do not include any hardware, software, licensing, maintenance, or support costs of any Mandiant or other third-party product or service suggested by Mandiant as we conduct the activities outlined within this SOW.
5. All parties will mutually agree upon any changes to this SOW in writing.

## 8. Contact Information

Cu tomer will provide Mandiant with point  of contact information in the following table

| Business Line Contact | |
|---|---|
| Name: | Brian Rosario |
| Title: | VP, IT Security |
| Email: | BrianRosario@Bayview.com |
| Phone: | 305.710.1013 |
| Street: | 4425 Ponce De Leon Blvd. |
| City: | Coral Gables |
| State: | FL |
| Zip: | 33146 |
| Payables Contact | |
| Name: | IT Finance |
| Title: | N/A |
| Email: | ITFinance@BayviewAssetManagement.com |
| Phone: | N/A |
| Street: | 4425 Ponce De Leon Blvd. |
| City: | Coral Gables |
| State: | FL |
| Zip: | 33146 |



## 9. Additional Security Testing Terms and Conditions

The below term   will apply to any Proactive Service (including penetration te ting and red team engagements) requested under this SOW or any Work Orders.

1. As a part of any penetration testing that may be part of this SOW, Mandiant may, among other things, (a) scan Customer's network and systems for ports, services and other entry points that can be exploited; and (b) probe those entry points in an effort to gain access to Customer's network and systems in an effort to determine the severity of the vulnerability.
2. CUSTOMER UNDERSTANDS THAT, ALTHOUGH MANDIANT TAKES PRECAUTIONS TO AVOID DAMAGE TO CUSTOMER'S NETWORK AND SYSTEMS, DISRUPTIONS, OUTAGES AND/OR DATA LOSS MAY OCCUR AS A RESULT OF ANY PENETRATION TESTING. Customer represents and warrants that all systems on its network or otherwise accessible during the penetration test have been backed up, and that any data loss or other damage caused by the penetration testing can be easily and quickly reversed.
3. If appropriate, Customer will provide to Mandiant certain information required for performing its tests, including a description and location (e.g., an IP address) of the systems and networks to be te ted  Cu tomer repre ent  and warrant  that all information provided i  true and accurate and that Customer owns or is authorized to represent the owners of the systems and networks de cribed in connection with the penetration te ting
4. If appropriate, Customer may inform all or a selected group of its employees, contractors, and other third parties about any penetration testing to be undertaken by Mandiant. In the event that Customer decides not to inform anyone of the penetration testing, Customer understands that people may  pend time and money on behalf of Cu tomer in detecting, blocking, investigating or responding to activities of Mandiant. IN LIGHT OF THE POSSIBILITY THAT SUCH ACTIONS MAY BE TAKEN AND E PENDITURES MAY OCCUR, CUSTOMER SHOULD CONSULT WITH CUSTOMER'S LEGAL COUNSEL AND/OR A MEMBER OF E  ECUTIVE MANAGEMENT PRIOR TO ANY SUCH ZERO KNOWLEDGE ENGAGEMENTS  Customer may also want to consider contacting such third-party service providers as Cu tomer'  telecommunication  carrier to alert them to the te ting
5. If appropriate, user data contained on systems that are tested may be accessible to Mandiant and Mandiant may download portion  of  uch data (e g , a  proof of acce  )  olely a  necessary to perform the Services.  Such downloaded shall be irretrievably deleted as soon as the need for  uch data end
6. If appropriate, at any point during the testing, either party may pause or stop the test. Should the te ting be terminated, a rationale for  uch termination  hall be provided by the party requesting such termination and such rationale shall be clearly documented.



## 10. Signature

IN WITNESS WHEREOF, Mandiant and Cu tomer a  of the SOW Effective Date have e ecuted thi Statement of Work.

**FireEye, Inc. d/b/a Mandiant**

Signature   Joe Zuccaro
Joe Zuccaro (May 11, 2021 10:06 PDT)

Name:   Joe Zuccaro

Title   VP Commercial Legal, Americ

Date:   May 11, 2021

**Bayview Asset Management, LLC**

Signature   _Eric L. Lozano_

Name:   Eric Lozano

Title   CIO

Date:   May 11, 2021



**Exhibit 1: Engagement Letter Template**

[DATE]

<u>**PRIVILEGED & CONFIDENTIAL ATTORNEY WORK PRODUCT**</u>

[VENDOR NAME]

[VENDOR ADDRESS]

    Re:    Assistance related to cybersecurity incident response

[Vendor]

This letter ("Engagement Letter") sets forth the agreement between Mayer Brown LLP ("Counsel"), [VENDOR] ("Vendor") and Bayview Asset Management, LLC ("Client") effective as of [DATE], whereby Vendor will provide to Counsel the Services described herein. Such services are being requested by and performed at the direction of Counsel in connection with Counsel's provision of legal advice to Client.

It is Counsel's intention and the position of Counsel that Vendor's work for it will be covered by the attorney-client privilege, work-product doctrine, and other applicable privileges. Accordingly, it is agreed that all working papers and other documents prepared or received by Vendor pursuant to this Engagement Letter will be maintained by Vendor as confidential material in accordance with the terms herein, and in the Statement of Work ("SOW") as defined below. To that end, any documents, drafts, or other materials prepared by Vendor in connection with this Engagement shall be conspicuously labeled as follows and bear a notation that they were prepared at the request of Counsel:

    **Privileged & Confidential**

    **Prepared at the Direction of Counsel**

Failure to include this marking shall not affect the privileged nature of a communication. To the extent that Client or Counsel requests Vendor to perform activities that are not subject to the attorney-client privilege, so doing shall not affect the privileged character of other work directed by Counsel.

In addition, in the event that Vendor receives a subpoena or other information request for documents and/or testimony from a private litigant, governmental, or regulatory body relating to Vendor's current or prior work concerning the Client, Vendor shall (unless prohibited by law) provide the Client and Counsel with notice and the opportunity to intervene and raise objections. Vendor further agrees, to the extent feasible, at Client's expense, to undertake reasonable efforts to assist Client with any objections to any such subpoena or other form of legal process through appropriate legal means.

**SCOPE OF SERVICES**

Vendor agrees to perform the incident response services set forth in the Statement of Work dated [DATE] ("SOW") between Vendor, Counsel, and the Client (collectively, the "Services").  As between Vendor and Client, the Services are pursuant to the Vendor Master Services Agreement ("MSA") effective [DATE], between Vendor and Client. For the avoidance of doubt, nothing herein shall be deemed to make Counsel a party to, or otherwise bind Counsel to the MSA.



**REPORTING TO COUNSEL**

Vendor will report preliminary observations orally to Counsel.  Upon written request and at the direction of Counsel, Vendor will provide Counsel requested written output.  The output associated with the Services may include a report containing Vendor's observations and recommendations.

Upon written request and at the direction of Counsel, project plans and weekly status updates will be completed and communicated to Counsel to provide transparency into project execution.

Any work described in the preceding two paragraphs will be at Vendor's hourly rate set forth in the SOW.

**NO PUBLIC STATEMENTS**

Vendor will not issue any publicity, advertisement, or news release or make any other public disclosure with respect to this agreement or any related agreements, transactions, or anticipated litigation, or otherwise make any oral or written statements or disclosures with respect to such agreements or transactions or the existence of the parties' relationship or discussions, without the prior written consent of Counsel.

**FEES, TIMING, AND OTHER SERVICES**

The SOW indicates the fees and timing for the Services.  Client acknowledges and agrees that Client bears sole responsibility for payment of any fees owed to Vendor. Vendor understands and agrees that in no event shall Counsel be obligated to pay any fees owed under this Engagement Letter, including in the event of nonpayment by Client.

Very truly yours,

Mayer Brown LLP

By: _____

Title:     _____

Date:     _____


**Accepted By:**

[VENDOR]                                              Bayview Asset Management, LLC

By: _____          By:     _____

Title:_____          Title:   CIO_____

Date:_____          Date:   _____



Statement of Work

This Statement of Work is valid when signed before June 10, 2021

502402071 v7

# Mandiant 210430 Contract (SOW Bayview Asset Management_Mandiant SOW)

Final Audit Report                                    2021-05-11

| | |
|---|---|
| Created: | 2021-05-11 |
| By: | Jessica Goldstein (JESSICAGOLDSTEIN@bayview.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAEPe-1ktV3j-CjqWADie6-0mxan_mGTpW |

## "Mandiant 210430 Contract (SOW Bayview Asset Management_ Mandiant SOW)" History

Document created by Jessica Goldstein (JESSICAGOLDSTEIN@bayview.com)
2021-05-11 - 4:27:59 PM GMT- IP address: 63.167.253.10

Document emailed to Joe Zuccaro (joe.zuccaro@fireeye.com) for signature
2021-05-11 - 4:29:35 PM GMT

Email viewed by Joe Zuccaro (joe.zuccaro@fireeye.com)
2021-05-11 - 5:06:02 PM GMT- IP address: 199.16.196.4

Document e-signed by Joe Zuccaro (joe.zuccaro@fireeye.com)
Signature Date: 2021-05-11 - 5:06:21 PM GMT - Time Source: server- IP address: 199.16.196.4

Document emailed to Eric Lozano (ericlozano@bayview.com) for signature
2021-05-11 - 5:06:22 PM GMT

Email viewed by Eric Lozano (ericlozano@bayview.com)
2021-05-11 - 5:14:42 PM GMT- IP address: 76.110.103.225

Document e-signed by Eric Lozano (ericlozano@bayview.com)
Signature Date: 2021-05-11 - 5:14:57 PM GMT - Time Source: server- IP address: 76.110.103.225

Agreement completed.
2021-05-11 - 5:14:57 PM GMT

Adobe Sign

# EXHIBIT 4

<u>**MASTER SERVICES AGREEMENT**</u>

THIS MASTER SERVICES AGREEMENT, dated as of December 2, 2019 ("**Effective Date**"), is by and between **PROTIVITI INC.**, a Delaware Corporation ("**Protiviti**"), and **BAYVIEW ASSET MANAGEMENT, LLC** a Delaware Limited Liability Corporation ("**Client**").

WHEREAS, Protiviti is in the business of providing internal audit, risk assessment, staff augmentation and consulting services; and

WHEREAS, Client desires to engage Protiviti with respect to such services and may desire to engage Protiviti from time to time for additional services;

THEREFORE, the parties hereto agree as follows:

<u>**Agreement**</u>

This Master Services Agreement, including the terms and conditions set forth in <u>Attachment I</u>, all exhibits referenced herein and attached hereto, and each Statement of Work (as defined below) (collectively, the "**Agreement**") represents the entire agreement between Protiviti and Client regarding the engagement to which a Statement of Work refers, supersedes all other oral, written or electronic communications between the parties concerning the subject matter thereof, and shall be binding on and inure to the benefit of the parties and their respective successors and permitted assigns.  If Protiviti accepts a purchase order initiated by Client on a separate form, it is done as an accommodation only and any terms and conditions contained in that form which vary, amend or supplement the terms and conditions of this Agreement or Statement of Work shall be null and void and of no effect.   The term "hereunder" shall mean this entire Agreement as a whole unless reference to a specific section of this Agreement is made. In the event of conflict between any Statement of Work and this Agreement (excluding such Statement of Work), the terms set forth in this Agreement shall govern unless the parties specifically agree otherwise in such Statement of Work. This Agreement may be signed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

<u>**Statements of Work**</u>

All services that Protiviti shall provide under this Agreement shall be memorialized in a statement of work substantially in the form attached hereto as <u>Exhibit A</u>, which, when fully executed by both parties, shall be incorporated herein and become part of this Agreement as though fully set forth herein (each a "**Statement of Work**").  Each Statement of Work will include a description of Protiviti's services (the "**Services**"), a summary of Protiviti's approach, a list of the key tasks, a description of the Deliverables (as defined below), if any, a list of Client's obligations, a description of the project staffing and the names of the engagement team leaders, fees for Services and the stipulated level of involvement by Client personnel.

Permitted Use Affiliates

The parties agree that Client's Affiliates (as defined below) may order Services directly from Protiviti, under and in accordance with the terms and conditions of this Agreement, and upon execution of a Statement of Work by a Client Affiliate (an "Executing Affiliate") and Protiviti, referencing and incorporating this Agreement, this Agreement shall govern the Statement of Work and the provision of Services thereunder and references to Client herein shall refer to the Executing Affiliate. An Executing Affiliate will not be entitled to assign the rights conferred on it pursuant to this Agreement without Protiviti's written consent.  Protiviti and Client reserve the right to rescind or vary this Agreement or vary any term of it by mutual agreement without the consent of the Affiliate.  Client shall not be responsible or liable for the Executing Affiliate's performance or obligations and any claim Protiviti may have as against an Executing Affiliate may only be brought against such Executing Affiliate

If Client seeks to consolidate their use of Protiviti's services through the use of Vendor Management Systems or Managed Service Provider ("VMS") and requires that Protiviti provide certain services through

DocuSign Envelope ID: F2F9280A-06A5-49B3-8A1D-CFAB0801BFA3

such VMS, the parties agree that Protiviti may increase its fees and costs for the provision of such services through the VMS. In addition, the parties agree that such requirement will be limited to the provision of staffing services only, and Protiviti shall not be required to provide consulting services through use of a VMS. Client acknowledges that Protiviti's work is highly dependent on the availability of Client's personnel, Client's contractors and other factors beyond the control of Protiviti. Protiviti will use commercially reasonable efforts to assist Client in meeting any stated deadlines but Client acknowledges that despite these efforts, due to, among other things, the factors noted above, any stated deadlines and timelines may not be met. Periodically, Protiviti may adjust its fees to reflect (i) pricing changes and rate modifications associated with customary promotions of engagement personnel and (ii) the use of subject matter experts. Such changes will be communicated to Client in a timely manner, and upon written approval from Client, will apply to Client after such notice. Client shall be responsible for payment of all taxes and any related interest and/or penalties resulting from any payments made or Services rendered hereunder, other than any taxes based on Protiviti's net income. Payment is due thirty (30) days from receipt of invoice. If Client disputes any fee, charge, or billing by Protiviti, Client may withhold the disputed payment amount, provided that Client shall notify Protiviti in writing of such dispute by the date payment would otherwise be due. Client and Protiviti agree to use reasonable efforts to mutually resolve the disputed amounts in a reasonable time.

"**Deliverables**" means literary works or other works of authorship (such as documentation, reports and similar works) that Protiviti is required to deliver to Client as part of the Services, in each case as specifically set forth in the Statement of Work as Deliverables. All Deliverables will be prepared solely for the use by Client, its Affiliates, and their respective management, employees, directors, and third-party service providers (provided such third-party use is solely for the benefit of Client or its Affiliate). The Deliverables may not be relied upon for any purpose by any third party without the prior written consent of Protiviti. Each party grants only the licenses and rights specified in this Agreement. No other rights or licenses (including, but not limited to, licenses or rights under patents) are granted either directly, by implication or otherwise.

**PROTIVITI INC.**                                    **BAYVIEW ASSET MANAGEMENT, LLC**

By _Patrick J. Mitchell_ _____     By _Scott Norton_ _____
E4F14BC527FB47A...                                       641D23A83A06415...on
Managing Director                                      Senior Vice President
                                                       Head of Internal Audit

Date: 12/4/2019                                        Date: 12/4/2019

375253.1 12/03/2019 6:15:19 PM.

DocuSign Envelope ID: 72F928B1-A6A5-49B3-8A1D-CEAB9021BFA3

ATTACHMENT I

**Terms and Conditions to Master Services Agreement Dated as of December 2, 2019 Between
BAYVIEW ASSET MANAGEMENT, LLC ("Client") and PROTIVITI INC. ("Protiviti")**

1. **Client Responsibility.**  Client acknowledges that the achievement of any policy, process, model, system or risk management practice depends not only on the design and implementation, but also on the quality, experience and continuity of personnel involved, the diligent ongoing execution of any such policy, process, model, system or risk management practice, and appropriate modifications as changing conditions warrant.  Client understands and accepts responsibility for all decisions related to, and implementation and ongoing modification of, policies, processes, models, systems and risk management practice assessments, methods and assumptions, if any, developed in the course of the Statement of Work.

   All Deliverables are based upon information made available by Client to Protiviti as of the date such Deliverables are provided to Client.  Protiviti has no obligation to update any Deliverable.

   In addition, the ultimate responsibility as to the accuracy and sufficiency of Protiviti's approach and the specific scope of Protiviti's work and the nature, extent and timing of Protiviti's procedures performed, in each case, rests with Client (e.g., Chief Audit Executive, management and the Audit Committee).

2. **Responsibility for Internal Controls.**  Client is solely responsible for establishing and maintaining its own effective internal control system, record keeping, management decision-making and other management functions.  Client shall be fully and solely responsible for (i) applying independent business judgment with respect to the Services and the Deliverables, (ii) making any implementation decision related thereto, and (iii) determining further courses of action with respect to any matters addressed in any Deliverable or Service.

3. **Regulated Activity.**  Client understands that Protiviti is not a public accounting firm and does not issue opinions on financial statements or offer any attestation services.  To the extent required by applicable law (e.g., the U.S. Securities Exchange Act of 1934 and U.S. Securities and Exchange Commission regulations (referred to collectively as the "**SEC Rules**")), Client (i) acknowledges to Protiviti that it is Client's responsibility to design, establish and maintain a system of internal accounting controls in compliance with applicable laws (including the SEC Rules), including "disclosure controls and procedures" and "internal controls and procedures for financial reporting," as each such term is used and defined under the Sarbanes-Oxley Act of 2002, as amended, and the interpretive guidance and regulations relating to such act, and (ii) acknowledges to Protiviti that it is Client's responsibility to make such disclosures with respect to this engagement that are required by applicable laws (including SEC Rules).

4. **Authoritative Standards.**  Client acknowledges that there is no authoritative standard against which risk management, business consulting, and technology consulting practices can be directly compared. In practice, methodologies and approaches vary considerably.  New and refined practices continue to evolve and the characterization of policies, procedures or models as sound, "industry standard" or "best" practices is judgmental and subjective.

5. **Confidential Information.**  Each party (the "**Recipient**") agrees to protect the Confidential Information of the other party (the "**Disclosing Party**") in a manner consistent with the treatment that Recipient accords its own Confidential Information of a similar nature, but in no event with less than a reasonable degree of care, and the Recipient agrees to use and reproduce Confidential Information only to perform its obligations under this Agreement. The Recipient shall limit disclosure of Confidential Information solely to those employees, agents, and subcontractors who need to access the Confidential Information to perform hereunder and are subject to confidentiality and non-use restriction substantially similar to those herein. The Recipient shall be liable for any use, disclosure or dissemination of Confidential Information by such parties. "Confidential Information" means all information which is identified by the Disclosing Party at the time of disclosure as being of a confidential nature (including, but not limited to,

375253.1 12/03/2019 6:15:19 PM.

DocuSign Envelope ID: F2E92804-06A5-49B3-BA1D-CEAB0801BFA3

business plans, products, trade secret processes or methodologies, software, documentation, design specifications, other technical documents and other proprietary rights or information) or that is disclosed to the Recipient under circumstances that would lead a reasonable person to understand that such information is confidential or proprietary in nature. In addition and without limiting any of the foregoing, Confidential Information includes the existence, context and scope of the Agreement. Client's Confidential Information includes all Nonpublic Personal Information. With respect to Protiviti, Confidential Information will also include, whether or not marked or identified as confidential or proprietary, Protiviti's internal policies and practices and its SOC II certification report.  Except with respect to Nonpublic Personal Information, Confidential Information does not include information that (i) is or becomes generally available to the public without breach by Recipient of its confidentiality obligations under this Agreement, (ii) is received by Recipient from a third party without restriction against disclosure and without breach of this or any agreement, (iii) was known to Recipient without restriction prior to disclosure, or (iv) is independently developed by Recipient without subsequent use of Disclosing Party's Confidential Information.  If Recipient becomes legally compelled (including by deposition, interrogatory, request for documents, subpoena, civil investigative demand or similar process) to disclose any of the Confidential Information, Recipient shall (to the extent legally permitted) provide Disclosing Party with prompt prior written notice of such requirement so that discloser may seek a protective order or other appropriate remedy. Notwithstanding anything to the contrary contained herein, Protiviti shall not at any time, directly or indirectly, use Client's Confidential Information to purchase, hold, trade in, or act as an advisor or agent for any person or entity purchasing, holding, or trading in any securities, securitization certificates, or notes the proceeds of which are from any mortgage loans for which Client provides information. Protiviti will also not use Client's Confidential Information to make any contact with any of the obligors of the mortgage loans or any other person identified in Client's Confidential Information unless such contact is necessary for Protiviti to perform the Services.

6. **Distribution of Deliverables.**  Unless otherwise expressly set forth in the applicable Statement of Work, Deliverables or other documents or materials that are provided by Protiviti that are Protiviti-branded or marked as being authored by Protiviti, or Deliverables or other documents or materials that, based on the circumstances, context or any related communications, would lead a reasonable reader to understand that Protiviti produced, authored or contributed to such Deliverables, documents or materials (collectively, "**Branded Deliverables**") are for the use and benefit of Client only and not for any other party (each a "**Third Party**"), including, but not limited to, Client's shareholders, business partners, contractors or advisors.  If Client desires to disclose Branded Deliverables, or make reference to Protiviti, to any Third Party (other than Client's Affiliates (as defined below), legal counsel and external auditors who need access to such information and who have agreed to keep such information confidential), Client will obtain Protiviti's prior written approval and, if requested by Protiviti, obtain from such Third Party a non-disclosure agreement and release in a form satisfactory to Protiviti.  Protiviti accepts no liability or responsibility to any Third Party who benefits from or uses the Services or gains access to any Deliverables, including, but not limited to, Branded Deliverables.  Because Protiviti accepts no liability to any Third Party with respect to the Services or Deliverables, including, but not limited to, Branded Deliverables, Client agrees to indemnify, defend and hold Protiviti, its affiliates, directors, officers, employees, vendors, and contractors ("**Protiviti Parties**") harmless from and against any and all losses, damages or liabilities (including costs, expenses and reasonable attorneys' fees) resulting from or related to a Third Party claim, regardless of the legal theory asserted, arising in any manner out of or in connection with the Services or Deliverables, including, but not limited to, Branded Deliverables.  The Protiviti Parties are entitled at their election to retain separate counsel; provided that it shall be at their own cost and expense, except where the need for separate counsel arises from a conflict of interest.

For purposes of this Agreement, "Affiliates" means all entities howsoever organized or denominated that are affiliated with Client as of the Effective Date or that become affiliated with Client during the term of this Agreement.  "Affiliated" means any entity that controls, is controlled by or is under common control with Client.  For this purpose, "control" means, with respect to any entity, the possession of the power to direct or cause the direction of the management and policies of such entities, whether through

DocuSign Envelope ID: 22F9289414GA5-19B3-8A1DCEAB0801BFA3

ownership or voting rights, provided that an entity shall be considered an Affiliate only for the time during which such control exists.

For the avoidance of doubt, there are no restrictions on Client on the disclosure to any Third Party of Deliverables that do not constitute Branded Deliverables; such disclosure is in Client's sole discretion.

7. **No Third-Party Beneficiaries.** This Agreement has been entered into solely between Client and Protiviti, and no third-party beneficiaries are created hereby.

8. **Responsibility for Information.** Protiviti shall be entitled to rely on all information provided by, and the decisions and approvals of, Client in connection with Protiviti's work hereunder. Client hereby releases Protiviti and its personnel from any liability and costs relating to the Services to the extent that such liability and costs result from any information provided, or decisions or approvals made, by Client personnel that were not complete, accurate or current. In addition, Client has the sole responsibility for (and any liability associated with) the selection and retention of the vendor (the "Vendor") providing the services to upload, store and transmit data between Protiviti and Client. PROTIVITI HAS NO LIABILITY OR RESPONSIBILITY FOR ANYTHING ARISING OUT THE SERVICES PROVIDED BY THE VENDOR AND MAKES NO WARRANTIES WITH RESPECT TO THE VENDOR'S PRODUCTS OR SERVICES.

9. **Services.** Changes to any Services must be agreed upon by Protiviti and Client and will not be considered effective unless and until both parties agree in writing to an amendment to the applicable Statement of Work. Client shall reimburse Protiviti for any fees or expenses (including, but not limited to, legal expenses) reasonably incurred by it in connection with providing evidence in, or preparing to serve or serving as a witness with respect to, any lawsuits, investigations, claims or other proceedings in any way connected with, or related to, the Services.

10. **Indemnification.**

   a. Client shall indemnify, defend and hold harmless Protiviti for any losses (including Protiviti's own internal expenses and damages) to the extent resulting from (i) any act or omission of Client that constitutes the gross negligence, willful misconduct, or fraud of Client, or any act outside the scope of the authority granted to Client hereunder; or (ii) any tangible personal property damage, personal injury, or death caused by Client for bodily injury or damages to real property resulting directly from Client's gross negligence or willful misconduct.

   b. Protiviti shall indemnify, defend, and hold harmless Client, its affiliates, and each of their respective directors, officers, employees, agents, and representatives from and against all losses, liabilities, judgments, awards, penalties, fines, costs, expenses (including reasonable attorneys' fees), claims, demands, actions, lawsuits, and other proceedings (including Client's own internal expenses and damages) to the extent resulting from: (i) Protiviti's breach of Section 5 or Exhibit B; (ii) any act or omission of Protiviti that constitutes the gross negligence, willful misconduct, or fraud of Protiviti, or any act outside the scope of the authority granted to Protiviti hereunder; (iii) any allegation that Protiviti's Services, Deliverables or any material provided by Protiviti pursuant to this Agreement, or Client's permitted use thereof, infringes, misappropriates, or otherwise violates the intellectual property or other proprietary right of a third party; (iv) any tangible personal property damage, personal injury, or death caused by Protiviti; or (v) any failure by Protiviti to comply with any law applicable to it in connection with its Services.

11. **Limitation of Liability.**

   a. IN NO EVENT SHALL PROTIVITI OR CLIENT BE LIABLE TO EACH OTHER OR TO ANY PERSON ASSERTING CLAIMS ON BEHALF OF OR IN THE NAME OF THE OTHER PARTY, WHETHER IN CONTRACT, TORT, OR UNDER ANY WARRANTY OR OTHER THEORY OF LIABILITY, FOR ANY INDIRECT, SPECIAL, PUNITIVE, INCIDENTAL, OR

CONSEQUENTIAL DAMAGES INCURRED BY SUCH PARTY UNDER THIS AGREEMENT, INCLUDING LOST BUSINESS OR PROFITS.

b.  IN NO EVENT SHALL EITHER PARTY'S LIABILITY TO THE OTHER, OR TO ANY PERSON ASSERTING CLAIMS ON BEHALF OF OR IN THE NAME OF THE OTHER PARTY EXCEED, IN THE AGGREGATE FOR ALL CLAIMS, LIABILITY, LOSSES, DAMAGES OR EXPENSES, THREE (3) TIMES THE TOTAL AMOUNT OF FEES PAID AND/OR PAYABLE UNDER THE AGREEMENT IN THE TWELVE (12) MONTH PERIOD IMMEDIATELY PRECEDING THE EVENTS GIVING RISE TO SUCH LIABILITY OR, IF SUCH LIABILITY ARISES SOONER THAN TWELVE (12) MONTHS AFTER THE EFFECTIVE DATE, THEN $1,000,000.

c.  NOTWITHSTANDING THE FOREGOING, NEITHER SECTION 11(A) NOR 11(B) NOR ANY OTHER LIMITATION OR EXCLUSION OF LIABILITY SHALL APPLY WITH RESPECT TO (I) ANY CLAIMS BASED ON OR RELATING TO SECTION 5 OR EXHIBIT B; (II) EITHER PARTY'S GROSS NEGLIGENCE, WILLFUL MISCONDUCT OR FRAUD AS FINALLY JUDICIALLY DETERMINED; OR (III) EITHER PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER.

12. **Engagement Team Restrictions.**  If for any reason any of the employees or subcontractors designated in the applicable Statement of Work is not able to complete this engagement, Protiviti will provide employees or subcontractors with similar qualifications and experience to complete the assignment. For a period commencing as of the date of this Agreement and ending one (1) year from the date that a party's personnel is no longer involved in the Services under this Agreement, neither party shall hire or solicit such personnel.  If either party hires or solicits any of the other party's employees or subcontractors within the proscribed time period above, that hiring party shall pay a fee equal to the annual salary of such hired or solicited employee or subcontractor as liquidated damages.  If either party hires or solicits any of the other party's subcontractor personnel within the proscribed time period above, that party shall pay a fee equal to thirty percent (30%) of such subcontractor personnel's proposed annual compensation, including bonuses, as liquidated damages. Notwithstanding the foregoing, nothing shall prohibit either party from offering employment to:  (i) persons with whom such party had contact with regarding possible employment prior to the date of this Agreement or who contact such party directly without solicitation by such party, (ii) persons who respond to a general solicitation or advertisement that is not specifically directed to such personnel, or (iii) persons who are referred to such party by search firms, employment agencies or other similar entities provided that such entities have not been specifically instructed by such party to solicit personnel.

13. **Workspace.**  Client shall provide workspace for Protiviti personnel at its work sites, as well as occasional administrative support services related to the Services.  Client shall provide Protiviti personnel with any necessary safety orientation and security access for work on Client's premises. In the event the Client is unable to provide reasonable workspace, Protiviti will secure appropriate space and charge Client for such expenses, subject to Client's written pre-approval.

14. **Warranties.**  Protiviti represents and warrants that it (a) shall perform all Services in a professional, diligent, and workmanlike manner; (b) all Services shall materially conform to the specifications as expressly set forth applicable Statement of Work; and (c) Protiviti will comply with all laws applicable to Protiviti in connection with the Services.

EXCEPT AS OTHERWISE EXPRESSLY STATED HEREIN OR IN THE APPLICABLE STATEMENT OF WORK, PROTIVITI MAKES NO WARRANTIES, EXPRESS OR IMPLIED, WHETHER ARISING BY OPERATION OF LAW, COURSE OF PERFORMANCE OR DEALING, CUSTOM, USAGE IN THE TRADE OR PROFESSION OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, THE IMPLIED WARRANTIES OF MERCHANTABILITY, NONINFRINGEMENT AND FITNESS FOR A PARTICULAR PURPOSE.

DocuSign Envelope ID: F2F9289A1A6A5-69B3-8A1DCEAB9891BFA3

15. **Publicity.** Neither party shall use the name of the other party, in part or whole, or any of their trademarks or trade names without the other party's prior written approval.

16. **Proprietary Rights in Deliverables and Data.** Subject to the terms of this Agreement, including Section 6 (Distribution of Deliverables) and Client's fulfillment of all payment obligations hereunder, Protiviti agrees that Client shall exclusively and solely own the copyright and all other right, title, and interest in and to the Deliverables, excluding any Protiviti Proprietary Materials (as defined below) and any third-party software that is incorporated into the Deliverables. To the extent such rights do not automatically vest in Client, Protiviti hereby assigns and transfers all right, title, and interest in and to the Deliverables to Client, excluding any Protiviti Proprietary Materials and third-party software that is incorporated therein. Client acknowledges that as part of performing Services, Protiviti may utilize proprietary copyrights, patents, trade secrets, software, ideas, concepts, know-how, tools, models, processes, methodologies and techniques (including any derivatives, enhancements or modifications thereto) which have been originated or developed by Protiviti, or which have been purchased by, or licensed to, Protiviti (collectively, "**Protiviti Proprietary Materials**"). Client agrees that Protiviti retains all right, title, and interest in the Protiviti Proprietary Materials. Subject to the terms of this Agreement, including Section 6 (Distribution of Deliverables) and Client's fulfillment of all payment obligations hereunder, Protiviti grants and Client accepts a nonexclusive, nontransferable (except in conjunction with a permitted assignment of Client's interest in this Agreement), perpetual, royalty-free, fully paid-up license to use the Protiviti Proprietary Materials solely to the extent necessary to make use of the Deliverables as contemplated by the applicable Statement of Work.

17. **Termination of Agreement.** Client may, at any time, and without cause, terminate this Agreement or one or more Statement(s) of Work upon written notice to Protiviti of not less than fifteen (15) days. If either Party materially breaches any provision of this Agreement or any Statement of Work, the non-breaching Party may, upon written notice to the breaching Party, terminate this Agreement and/or the applicable Statement(s) of Work, in whole or in part, for cause, provided the breaching Party failed to cure the breach within thirty (30) days of receiving written notice thereof from the non-breaching Party. The rights and obligations set forth in Sections 5, 6, 8, 9, 10, 11, 12, 14, 15, 16, 17, 28 and 29 shall survive termination of this Agreement. In the event of such termination, Client will pay Protiviti for all Services rendered and expenses incurred by Protiviti through the date of termination; however, Client shall not be responsible for payment of any Services rendered or expenses incurred after the date of termination. After conclusion of the work contemplated in a Statement of Work or the termination or expiration of a Statement of Work (a "**Prior SOW**"), for so long as Client and Protiviti are actively negotiating a new Statement of Work for Protiviti's provision of additional Services to Client that are substantially similar to those provided under the Prior SOW, the provisions of this Agreement and the Prior SOW, including any payment terms, shall apply to such Services provided by Protiviti prior to the finalization of such new Statement of Work.

18. **Governing Law.** This Agreement and the rights and duties of the parties hereunder shall be governed by, and construed in accordance with, the laws of the State of New York, without regard to its conflict of laws provisions. The Parties hereby irrevocably consent to the exclusive jurisdiction of, and venue in, any federal or state court of competent jurisdiction located in the Borough of Manhattan in New York City, New York, for the purpose of adjudicating any matter arising from or in connection with this Agreement. In the event that any litigation or other formal dispute between the parties should arise as the result of any breach or alleged breach of this Agreement or with respect to the transactions contemplated hereby, the prevailing party in said litigation or other formal dispute shall be entitled to recover its costs and reasonable attorneys' fees (through both trial and appellate levels) from the non-prevailing party; provided, however, that in the event a party prevails on some, but not all, of the claims, the court or other adjudicator may in its discretion award attorneys' fees at it sees fit. EACH PARTY HEREBY KNOWINGLY, VOLUNTARILY, AND INTENTIONALLY WAIVES ITS RIGHT TO TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON, OR ARISING OUT OF, UNDER, OR IN CONNECTION WITH THIS AGREEMENT.

19. **Notice.** Unless otherwise specified in the Agreement, all notices or other communications required or desired to be sent to either party shall be in writing and sent by first class mail, postage prepaid, by

375253.1 12/03/2019 6:15:19 PM.

DocuSign Envelope ID: F2F92891-06A5-49B3-BA1D-CEAB9891BFA3

next-day courier or by facsimile, to the attention of the person identified below, at the address shown below or to the facsimile number shown below.  Either party may change such person, address or facsimile number by written notice to the other party.  Notice shall be effective on the fifth (5th) business day after mailing, on the first (1st) day after the date of sending via next-day courier, or on the date of transmission if sent by facsimile (provided that notice shall be effective on the first (1st) business day following the date of transmission if transmission is effected on a non-business day).

| | |
|---|---|
| Protiviti: | Protiviti Inc.<br>Attn:  Patrick Mitchell<br>Managing Director<br>200 East Broward Blvd., Suite 1600<br>Ft. Lauderdale, FL 33301<br>Facsimile: 954-712-3162 |
| cc: | Protiviti Inc.<br>Attn: Legal Department<br>555 Market Street, Suite 1800<br>San Francisco, CA  94105 |
| Client: | Bayview Asset Management, LLC<br>Attn:  Scott Norton<br>4425 Ponce De Leon Blvd., 5th Floor<br>Coral Gables, FL 33146 |
| cc: | Bayview Asset Management, LLC<br>Attn:  Brian Bomstein, General Counsel<br>4425 Ponce De Leon Blvd., 5th Floor<br>Coral Gables, FL 33146 |

20. **Assignment.**  Neither Protiviti nor Client may assign this Agreement, by operation of law or otherwise, without the prior written consent of the other party.  Any assignment in violation of this provision shall be deemed to be null and void.

21. **Business Practices.**  Each party agrees to comply with all equal employment opportunity laws applicable to the party, including, but not limited to, Title VII of the 1964 Civil Rights Act, the Civil Rights Act of 1991, the Americans with Disabilities Act, the affirmative action requirements of Executive Order 11246, the Rehabilitation Act of 1973, as amended, and the Vietnam Era Veterans Readjustment Assistance Act of 1974, as amended. Client authorizes Protiviti and its affiliated entities (and their successors and assigns and contractors) to store and use Client's business contact information wherever they do business, in connection with Protiviti's and its affiliated entities' services and in furtherance of Protiviti's and its affiliated entities' business relationship with Client. Client is responsible for obtaining any consent necessary for such authorization.

22. **Force Majeure.**  Neither party shall be liable for any default or delay in the performance of its obligations (except for payment obligations) under this Agreement if such default or delay is caused by an act of God or other circumstance outside the reasonable control of the party, including, but not limited to, fire, flood, earthquake, natural disasters or other acts of God, terrorist acts, riots, civil disorders, freight embargoes, government action, or the like.

23. **Severability.**  If any term of the Agreement is found to be illegal, invalid or unenforceable under applicable law, such term shall be excluded to the extent of such illegality, invalidity or unenforceability; all other terms of this Agreement shall remain in full force and effect; and, to the extent permitted and possible, the illegal, invalid or unenforceable term shall be replaced by a term that is legal, valid and enforceable and that comes closest to expressing the intention of such illegal, invalid or unenforceable term.

375253.1 12/03/2019 6:15:19 PM.

DocuSign Envelope ID: F2F9289149A5-49B3-BA1D-CFAB0901BFA3

24. **Waiver.** No waiver shall be deemed to have been made by either party unless it is expressed in writing and signed by the waiving party. The failure of either party to insist in any one or more instances upon strict performance of any of the terms of provisions of this Agreement, or to exercise any option or election herein contained, shall not be construed as a waiver or relinquishment for the future of such terms, provisions, option or election, and no waiver by either party of any one or more of its rights or remedies under this Agreement shall be deemed to be a waiver of any prior or subsequent rights or remedies hereunder or at law.

25. **Headings and Interpretation.** The section headings in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of the Agreement. All parties hereto have participated substantially in the negotiation and drafting of this Agreement and each party hereby disclaims any defense or assertion that any ambiguity herein should be construed against the drafter of the Agreement.

26. **Regulatory Compliance.** Client acknowledges and agrees that it is responsible for its own legal representation and guidance related to the Services or Deliverables, and that it will consult its own legal resources before acting upon any Services or Deliverables. Client further acknowledges and agrees that Protiviti is not a law firm and is not providing legal advice or analysis and that Protiviti has not engaged legal counsel with respect to the Services or Deliverables.

27. **Export Control Laws**. Client hereby acknowledges and agrees that the Services and/or Deliverables may be subject to applicable export control and trade sanction laws, regulations, rules and licenses ("**Export Control Laws**"). Client shall comply with the Export Control Laws and agrees that it alone is responsible for ensuring its compliance with Export Control Laws.

28. **Security, Privacy, Audit.** Protiviti shall adhere to and comply with the obligations and restrictions set forth in Exhibit B.

29. **Insurance**. During the term and, for policies written on a claims basis for two (2) years thereafter, Protiviti shall carry and maintain the insurance coverages described in Exhibit C. Prior to the commencement of the Services and thereafter upon Client's request, Protiviti shall furnish Client with a certificate of insurance evidencing coverage in the amounts and types required by this Agreement. Each of the required insurance policies shall (a) be endorsed with a statement that the coverage may not be canceled, altered, or permitted to lapse or expire without the insurer providing at least thirty (30) days' advance written notice to Client, and (b) provide that the insurer waives any right of subrogation it may have against Client in advance of any loss. The liability policies listed in Exhibit C, except for the Employer's Liability and Professional Liability policies, if any, shall name Client and its directors, employees, agents, and authorized representatives as additional insureds as its or their interests may appear. Protiviti's failure to comply with the terms of this Section shall be considered a material breach of this Agreement. With respect to all insurance requirements required under this Section, Protiviti's insurance carriers shall be licensed or authorized to do business in each state where Services are to be provided, and each such carrier shall maintain a financial rating of "A-VII" or better by A.M. Best Co.

375253.1 12/03/2019 6:15:19 PM.

**EXHIBIT A**

## STATEMENT OF WORK

### *Check one*

☐ **Project** ☐ **Staff Augmentation**

This is a Statement of Work referred to in the Master Services Agreement (the "**Agreement**") dated December 2, 2019, by and between Bayview Asset Management, LLC ("**Client**") and Protiviti Inc. ("**Protiviti**").  This Statement of Work shall be effective upon the date it is signed by both parties.

1.  Engagement Team Leaders and Project Staffing:

2.  Client's Project Manager and Additional Client Contacts: _____

3.  Name of Project: _____

4.  Project Description:

    - Protiviti's Approach
    - Key Tasks
    - Client's Responsibilities

5.  Special Terms and Conditions: _____

    Client will perform the following tasks and provide Protiviti the following information:

    - Maintain senior management sponsorship for the project,
    - Timely access to appropriate personnel for interviewing and review,
    - Maintain overall responsibility for management decisions concerning the project,
    - Provide ongoing direction regarding scope and objectives,
    - Timely Review of Protiviti Deliverables in accordance with the project plan

6.  Fees/Milestones:

7.  Deliverables:

8.  Address for notice (if different or additional to those set forth above):

Executed this _____ day of _____, 201_.

All of the terms, covenants and conditions set forth in the Agreement are incorporated herein by reference as if the same had been set forth herein in full.

**PROTIVITI INC.**                              **BAYVIEW ASSET MANAGEMENT, LLC**

DocuSigned by:
*Patrick J. Mitchell* _____

E4F14BC527FB47A...
Managing Director

DocuSigned by:
*Scott Norton* _____

641D23A83A06415...
Senior Vice President
Head of Internal Audit

DocuSign Envelope ID: F2F92891-06A5-49B3-8A1D-CFAB0801BF43

<u>**EXHIBIT B**</u>

**SECURITY, PRIVACY, AUDIT**

1.  <u>Nonpublic Personal Information</u>.

a.  Protiviti acknowledges and understands that Client may be subject to certain privacy and information security laws, specifically including § 501(b) of the Gramm-Leach-Bliley Act (15 U.S.C. 6801 et seq.), and may be required to comply with related regulations, which may include the "Privacy of Consumer Financial Information" regulation (12 CFR Part 1016), the "Standards for Safeguarding Customer Information" regulation (16 C.F.R., Part 314), and the Interagency Guidelines Establishing Standards for Safeguarding Customer Information (12 C.F.R. Section 208, Appendix D-2) (collectively, the "Privacy Laws"), pursuant to which Client is required to ensure that Protiviti appropriately safeguards all non-public, personally identifiable information, including but not limited to: (i) personal or financial information regarding Client's former, current, or prospective clients, customers, employees, agents, or representatives; (ii) "nonpublic personal information" regarding a "consumer," as those terms are defined by federal law, including, but not limited to, Section 6809(4) of the Gramm-Leach-Bliley Act and its applicable implementing regulations; and (iii) any other personal information protected by applicable state law, including any information that identifies, relates to, describes, is capable of being associated with, or could reasonable be linked, directly or indirectly, with a particular person, household, or other customer of Client (collectively, "Nonpublic Personal Information"), each to the extent it is provided or made available to Protiviti by or on behalf of Client pursuant to this Agreement.

b.  Protiviti shall use such Nonpublic Personal Information only for the purpose of complying with its obligations under this Agreement and not for any other purpose.

c.  Protiviti shall promptly notify Client when it becomes aware of any unauthorized access to Nonpublic Personal Information in Protiviti's possession or control.

d.  Protiviti shall use and process such Nonpublic Personal Information in accordance with privacy and data protection laws and regulations, each as and to the extent applicable to Protiviti in connection with its Services (including as may be applicable to the data subject to the Services), and in the case of any request or demand to Protiviti to disclose such personal information under color of law, Protiviti shall, unless prohibited from doing so by operation of law (i) promptly notify Client of the existence, terms, and circumstances surrounding such request; (ii) reasonably cooperate with Client on any such steps that Client considers advisable; and (iii) if disclosure of the Nonpublic Personal Information is required, exercise commercially reasonable efforts to obtain an order, stipulation, or other reliable assurance that confidential treatment shall be accorded to such portion of the Nonpublic Personal Information to be disclosed.

e.  Protiviti must certify the destruction or return of all Nonpublic Personal Information no later than upon termination of this Agreement, except that Client acknowledges that some Nonpublic Personal Information may be retained in Protiviti's archived, back-up media, which shall remain subject to Protiviti's reasonable archival and back-up policies (to be communicated to Client upon request) and the requirements of this Agreement pertaining to such Nonpublic Personal Information.

f.  Protiviti must not copy Nonpublic Personal Information for third parties or otherwise expose or communicate Nonpublic Personal Information to third parties without the express written consent of Client's senior manager responsible for this Agreement.

g.  At any time during the term of this Agreement, Client may request information regarding Protiviti's privacy/data protection practices and Protiviti will provide Client either with a written copy of such practice(s) or with access to view information evidencing such practice(s) within ten (10) business days of the request, as and to the extent such privacy/data protection

375253.1 12/03/2019 6:15:19 PM.

DocuSign Envelope ID: F2E92891-A6A5-49B3-BA1D-CFAB9891BFA3

practices are applicable in connection with Protiviti's Services; provided, however, in the event Protiviti's internal policies prohibit Protiviti from providing Client with either a written copy of such practice(s) or with access to view such information evidencing such practice(s), Protiviti shall in lieu thereof provide Client with a written, executed certification attesting to the existence of such practice(s). Client may monitor (only to the extent such access is through Client's systems) and revoke Protiviti's access to Nonpublic Personal Information at any time, with or without cause.

h. Subject to the provisions of Section 6 below, Protiviti agrees to allow Client to audit Protiviti's information security program as and to the extent relevant to Protiviti's Services to Client hereunder.

i. In the event any breach of privacy, security or confidentiality by Protiviti or its agents requires notification to an individual under any applicable law or other legal requirement, Client will assume responsibility for informing all individuals, and have sole control over the timing, content, and method of notification, and Protiviti will promptly reimburse Client for all reasonable costs and expenses incurred as a result of the breach, including but not limited to, notice, print and mailing costs, and the costs of obtaining credit monitoring services up to one year.

j. Protiviti and Client agree that the obligations set forth in this Section 1 shall survive termination of the Agreement.

k. Protiviti agrees that it shall not retain, use, or disclose any Nonpublic Personal Information for any purpose other than for the specific purpose of performing its obligations contemplated in the Agreement or as otherwise expressly permitted by applicable law. Protiviti represents and warrants that it does not and shall not have any need to retain, use, or disclose any Nonpublic Personal Information in violation of this sub-section (k) in order to satisfy its obligations hereunder. Notwithstanding the above, Protiviti shall not be required to return or destroy Nonpublic Personal Information from its disaster recovery back-ups, however, the confidentiality and use restrictions contained herein shall continue to apply.

2. <u>Information Security</u>.

a. In addition to the foregoing, Protiviti shall implement, monitor, and maintain appropriate administrative, technical, and physical measures, policies, procedures, and safeguards (the "Security Procedures") designed to: (i) ensure the security and confidentiality of Client's Confidential Information and Nonpublic Personal Information in Provider's possession or control; (ii) protect against any anticipated threats or hazards to the security or integrity of Client's Confidential Information and Nonpublic Personal Information in Provider's possession or control; and (iii) protect against unauthorized, unlawful, or accidental access, disclosure, transfer, destruction, loss, alteration, or misuse of Client's Confidential Information and Nonpublic Personal Information in Provider's possession or control. Protiviti shall periodically provide, at Client's written request, current information and documentation confirming Protiviti has satisfied its obligations under the preceding sentence. Protiviti shall identify to Client a Protiviti representative who will serve as a data security contact twenty-four (24) hours a day, seven (7) days a week, 365 days a year. Such representative shall be Patrick Mitchell, who is available at 954-531-2662 or Patrick.mitchell@protiviti.com.

b. The Security Procedures will, at all times during the term of this Agreement, (i) comply with all laws and regulations applicable to Protiviti, (ii) meet or exceed the information security standards and practices that are commonly utilized by the leading service providers in Protiviti's industry that have access to Confidential Information or Nonpublic Personal Information of clients or customers, and (iii) offer at least as much protection to Client's Confidential Information and Nonpublic Personal Information as Protiviti affords to its own confidential information and materials.

c.   Protiviti further agrees that, unless otherwise agreed to by Client in writing, it will not modify the Security Procedures in any way that might reasonably be expected to reduce the overall scope or level of security protections that (i) were in effect as of the Effective Date of this Agreement or (ii) were enhanced or increased after the Effective Date.

d.   If Protiviti becomes aware of any unauthorized access to Client's Confidential Information or Nonpublic Personal Information in Protiviti's possession or control (an "Incident"), Protiviti will take commercially appropriate actions to contain and mitigate the Incident, including notification to Client within 24 hours of determining that the Incident actually occurred (subject to any delay requested by an appropriate law enforcement agency), to enable Client to expeditiously implement its response program. Upon request of Client, Protiviti will cooperate with Client to investigate the nature and scope of any Incident and to take commercially appropriate actions to mitigate, remediate, and otherwise respond to the Incident or associated risks. Without limiting the foregoing, Client shall make all final decisions regarding notification of any Client employees, customers, consumers, government representatives, media, the general public, and/or any other third party of any such Incidents, subject to applicable law.

e.   Protiviti shall notify Client as soon as practicable and without undue delay, if personnel with access to Client's systems and networks leave Protiviti or its subcontractors' employ.

3.   <u>Customer Information</u>.  As and to the extent applicable to Protiviti in connection with its Services, Protiviti shall comply with 12 C.F.R. 570 Appendix B, Interagency Guidelines Establishing Information Security Standards and shall implement and maintain adequate information security measures to protect against unauthorized access to or use of Confidential Information of Client, including without limitation that Nonpublic Personal Information relating to the customers and applicants of Client ("Customer Information"), which measures shall include as applicable: (i) access controls on information systems, including controls to authenticate and permit access only to authorized individuals and controls to prevent employees from providing Customer Information to unauthorized individuals who may seek to obtain this information through fraudulent means; (ii) access restrictions at physical locations containing Customer Information, such as buildings, computer facilities, and records storage facilities to permit access only to authorized individuals; (iii) encryption of electronic Customer Information, including while in transit or in storage on networks or systems to which unauthorized individuals may have access; (iv) procedures designed to ensure that information system modifications are consistent with the information security measures; (v) dual control procedures, segregation of duties, and employee background checks for employees with responsibilities for or access to Customer Information or Client's premises or facilities; (vi) monitoring systems and procedures to detect actual and attempted attacks on or intrusions into information systems; (vii) response programs that specify actions to be taken when Protiviti detects unauthorized access to information systems, including, if applicable, prompt reports to Client; (viii) measures to protect against destruction, loss or damage of Customer Information due to potential environmental hazards, such as fire and water damage or technological failures; (ix) training staff to implement the information security measures; and (x) regular testing of key controls, systems and procedures of the information security measures by independent third parties or staff independent of those that develop or maintain the security measures.

4.   <u>Cybersecurity</u>. Protiviti shall maintain a cybersecurity program designed to protect the confidentiality, integrity and availability of Protiviti's information systems.  The program shall be designed to perform the following core cybersecurity functions (at a minimum):

a.   Protiviti shall have policies and procedures for access controls, including use of multi-factor authentication to limit access to relevant information systems and Nonpublic Personal Information.

375253.1 12/03/2019 6:15:19 PM.

DocuSign Envelope ID: F2F928914A6A5-49B5-BA1DCFAB0901BFA3

b. Protiviti shall have policies and procedures for use of encryption to protect Nonpublic Personal Information in transit and at rest.

5. Inspection of Books; Audits.

a. Protiviti shall keep detailed accounts and records of all activities carried out, and all costs and expenses incurred, in the performance of its obligations under this Agreement.  Not more than once each year (unless in response to an Incident, Protiviti's breach of this Exhibit, regulatory request, or if required pursuant to applicable law), upon reasonable written notice to Protiviti of not less than ten (10) days (unless less notice is required for Client to comply with its regulator's requirement) and during normal business hours, Client has the right to audit and verify Protiviti's operating environment which is used to support Client activities and other systems that support the Client activities (including those of any subcontractors) to verify Protiviti's compliance with its obligations under this Agreement.  Client may conduct audit and verification reviews itself or with the assistance of a third party organization (provided that the third party organization executes a confidentiality agreement with Protiviti that contains protections for confidential information at least as restrictive as those in this Agreement), at Client's expense, subject to Section 6(f) below.  All audits shall be performed in a manner intended to minimize disruption to the Parties' respective businesses.  All such audits and verifications may be conducted during the term of this Agreement and for a period of seven (7) years after the termination or expiration of this Agreement.  All audits and verifications shall be subject to such reasonable Protiviti policies and practices (which Protiviti shall provide in advance) as are in effect for Protiviti site visits and audits to maintain the security of Protiviti's site and the confidentiality of information which is proprietary and confidential to Protiviti or its clients.

b. Audits and inspections shall be limited to information relating to Protiviti's performance hereunder, and may include, without limitation: (i)  Protiviti's practices and procedures; (ii)  Protiviti's computer systems which are used to support Client activities; (iii)  Protiviti's controls, security measures, and procedures; (iv)  Protiviti's disaster recovery and back-up procedures; (v) any matter necessary to enable Client to meet requirements of law; (vi) Protiviti's compliance with the requirements of this Agreement; (vii) billing data and records; and (viii) Protiviti's procedures to maintain the confidentiality of Client's Confidential Information.

c. Without limiting the foregoing, Protiviti shall provide access to Client, its auditors (including internal audit staff), inspectors, regulators, consultants, and other representatives, to: (i) facilities where any Services or other obligations of Protiviti pursuant to this Agreement are being performed; (ii) personnel performing any of Protiviti's obligations hereunder; and (iii) data and records in the possession of Protiviti relating to its performance hereunder.  Client and Client's designees shall adhere to Protiviti's customary security and safety policies.

d. Protiviti shall assist Client's auditors (including internal audit staff), regulators, consultants, and other representatives as is reasonably required. Protiviti shall reasonably cooperate with Client or its designees in connection with audit functions and with regard to examinations by regulatory authorities and shall, on a timely basis, furnish each with information reasonably requested.

e. In no event shall Client while conducting audits and investigations materially interfere with Protiviti's ability to perform its obligations under this Agreement or conduct its other operations in the ordinary course of business.

f. Client shall bear its expenses relating to any audit performed under this provision; provided, however, if any such inspection reveals that any invoice or payment has not been rendered or made in accordance with the terms of this Agreement, resulting in an overcharge to Client of ten percent (10%) or more of the aggregate charges being audited,  Protiviti  shall reimburse Client for its reasonable internal costs and external expenses in connection with any audit up to a maximum of ten thousand dollars ($10,000.00) without prejudice to any other remedies or claims of Client.  In no event shall Client be obligated to pay to Protiviti any costs or expenses

DocuSign Envelope ID: F2F92891-0GA5-49B3-8A1D-CFAB0801BFA3

incurred by Protiviti in assisting the completion of the audits contemplated under this Agreement.

g.  Following an audit or examination by Client, Client may (in its sole discretion) request an exit conference with Protiviti to determine Protiviti's factual concurrence with issues identified in the review.

h.  Upon Client's written request, Protiviti shall provide to Client a copy of Protiviti's most recent SOC2 (the "Audit Report") which Audit Report is and shall be treated as Protiviti Confidential Information, and Protiviti shall complete other Protiviti oversight materials if and as reasonably requested by Client.  At Client's request, Protiviti shall use Client's secure Protiviti management portal when sharing the Audit Report and completing oversight material.  At all times during the term of this Agreement and for as long as Protiviti controls any Client data, Protiviti's performance hereunder shall not be performed in a manner that offers less security than that described in such Audit Report.

375253.1 12/03/2019 6:15:19 PM.

**EXHIBIT C**

**INSURANCE REQUIREMENTS**

| Required Coverage Type | Required Coverage Amount |
|---|---|
| Workers Compensation | As prescribed by statute or other jurisdiction in which is work is to be performed |
| Employer's Liability | • $1 million bodily injury each accident<br><br>• $1 million bodily injury by disease, policy limit<br><br>• $1 million bodily injury by disease, each employee |
| Commercial General Liability | $1 million each occurrence and $2 million in the aggregate, covering bodily injury, property damage, personal injury, blanket contractual liability and completed operations |
| Excess Liability Insurance | $4 million per occurrence and in the aggregate (Umbrella Form) over the Employer's, Commercial General, and Commercial Auto Liability |
| Employee Dishonesty/Crime Insurance | $1 million per act or series of acts |
| Professional Liability  Insurance | $1 million per claim |
| Commercial Auto Liability | $1 million combined single limit covering all owned, non-owned and hired automobiles, if the use of automobiles is required |
| Cybersecurity coverage | $5 million per claim |

If the Services require Protiviti or any of its property to be located on the Client's premises, Protiviti shall also carry All Risk Property insurance on all of its property located on the Client's premises in an amount equal to the replacement value of Protiviti's property.

375253.1 12/03/2019 6:15:19 PM.