# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| In re Lakeview Loan Servicing Data Breach Litigation | Case No. 1:22-cv-20955-DPG |

**DECLARATION OF CRAIG A. HOFFMAN**

I, Craig A. Hoffman, declare as follows:

1. I am a Partner at Baker & Hostetler LLP ("BakerHostetler") and I am admitted to practice law in the states of Ohio and Kentucky. BakerHostetler represents Bayview Asset Management, LLC ("Bayview"), Lakeview Loan Servicing, LLC ("Lakeview"), Pingora Loan Servicing, LLC ("Lakeview"), and Community Loan Servicing, LLC ("Community") (collectively, "Defendants") in this litigation. I submit this declaration in opposition to Plaintiffs' efforts to compel Defendants to produce communications with and work product prepared by cybersecurity consultants for BakerHostetler at the direction and with the involvement of BakerHostetler. I have personal knowledge of the matters stated herein, and if called upon to do so, would testify competently thereto.

2. I have practiced law for over twenty-one years. In my practice, I regularly advise clients regarding privacy and data security obligations imposed by contract and law, including data security breach notification laws and lawsuits and regulatory proceedings related to privacy and data security issues. A significant portion of my practice involves advising clients regarding compliance obligations, contractual obligations, and regulatory and litigation risk and liability related to the detection of potential data security incidents.

3. Examples of data security and breach notification laws include the California Consumer Privacy Act ("CCPA") and the California Customer Records Act ("CCRA"). Under the

CCPA, a business faces potential civil liability if it "[violates] the duty to implement and maintain reasonable security procedures and practices" and such violation causes "an unauthorized access and exfiltration, theft, or disclosure" of a consumer's "nonencrypted and nonredacted personal information." *See* Cal. Civ. Code § 1798.150(a)(1); *see also* Dkt. No. 47, Compl., ¶¶ 651–61 (alleging violation of the CCPA). Under the CCRA, a company that "owns, licenses, or maintains Personal Information about a California resident" is required to "implement and maintain reasonable security procedures and practices" and notify persons whose "Personal Information" may have been subject to unauthorized access. *See* Cal. Civ. Code §§ 1798.81.5(b), 1798.82(b); *see also* Compl., ¶¶ 640–50 (alleging violation of the CCRA); *see also* Compl., ¶¶ 781–89 (alleging violation of the Tennessee Identity Theft Deterrence Act of 1999), ¶¶ 807–14 (alleging violation of the Georgia Security Breach Notification Act), ¶¶ 824–32 (alleging violation of the Information Security Breach and Notification Act).

4. Companies like Defendants, which are engaged in interstate commerce, are subject to similar laws throughout the country. Determining a company's obligations and potential liability under laws like the ones described above is a mixed question of law and fact that must be analyzed under state law. Moreover, there are similar laws in many other states, foreign countries and territories, and counsel must determine a company's obligations and potential liability under those laws.

5. After companies notify individuals and regulatory authorities of a data security incident, especially companies of Defendants' size, they can expect to be sued by individuals who receive notification that their personal information may have been subject to unauthorized access. Such companies can also expect to receive inquiries and civil investigative demands from state attorneys general and regulatory agencies.

6. In December 2021, Bayview began an investigation after receiving a third-party report suggesting that there may have been unauthorized access to certain devices in Bayview's network (the "Incident"). Bayview took immediate steps to contain the Incident and engaged BakerHostetler to investigate and advise Bayview and its affiliates regarding their potential obligations under contracts and laws like those described above, and in anticipation of payment demands, indemnification demands, regulatory investigations, and lawsuits.

7. Although I am familiar with forensic investigation methods, I and BakerHostetler do not have the specialized tools, technical skills, and knowledge about network intrusion tactics, techniques, and procedures to personally review Defendants' network to determine what occurred leading up to the Incident. Therefore, we needed to engage a firm with those tools, skills, and knowledge to assist us, so that we could provide legal advice to Defendants regarding potential obligations and in anticipation of demands, regulatory investigations, and lawsuits. An additional area related to this same purpose where we needed technical skills and experience involved understanding the implementation of security tools and their effective operation, as well as a company's overall security program development and enhancement. Therefore, BakerHostetler engaged Mandiant and Protiviti.

8. Mandiant is leading cybersecurity firm with expertise in conducing forensic investigations into data security incidents. *See* https://www.mandiant.com/services/incident-response (accessed Sept. 13, 2023). Mandiant was engaged by BakerHostetler in December 2021 for the benefit of Bayview. *See* Ex. 1, Mandiant Statement of Work, at 1, 7. Pursuant to the Statement of Work, Mandiant agreed to provide professional services "to assist [BakerHostetler] in providing legal advice to [Bayview] with responding to a suspected security incident and in anticipation of litigation that may arise from the incident." *See id.*, ¶ 1.1. BakerHostetler engaged

Mandiant to conduct "computer security incident response support" and "digital forensics, log analysis, and malware analysis support." *See id*. At the start of the engagement, it was not determined whether a report would be requested, which is why the deliverable section states that Mandiant would provide a report regarding the Incident "[if] requested by Counsel." *See id.*, ¶ 2.1.

9. In my experience, investigations are an iterative process as the investigation works backward to determine what occurred. In general, forensic investigation firms working on their own would capably find and follow events of unauthorized activity. But when an investigation is directed by legal counsel there are specific iterative requests to evaluate whether notification obligations exist and to develop a strategy for complying with applicable laws and mitigating adverse regulatory and litigation risk, such as (1) ruling out access to certain segments of a network, applications, or data, and (2) developing direct, circumstantial, and inferential findings to support decisions related to legal obligations when there is not perfect available evidence showing with precision exactly what occurred during the attack.

10. In the spring of 2021, before the Incident, Bayview was taking additional steps to prepare to respond if it detected a security event. Two items that were part of that process were identifying the law firm and forensic firm it would engage in the event of a security incident. Accordingly, Bayview signed an engagement letter with BakerHostetler in May 2021 and an incident response retainer with Mandiant in May 2021.

11. When companies detect a security incident, they want to be able to engage a security firm quickly. There are some scenarios where companies engage a security firm directly and do not request legal advice. And there are some scenarios where companies engage legal counsel and counsel engages a forensic firm to assist the law firm in providing legal advice. By

4

negotiating the terms of a master services agreement and an incident response retainer with a security firm before an incident, a company is prepared to respond quickly (instead of delaying the response while it negotiates the terms of a contract). The law firm and forensic firm are then ready to work together should an incident occur.

12. After Bayview received the third-party report that caused it to begin an investigation, Bayview contacted me late in the evening on December 7, 2021. Bayview then engaged BakerHostetler to provide legal advice regarding the Incident. The next morning, during a call with Bayview and Mandiant, I directed Mandiant to prepare a statement of work specific to the Incident to enable BakerHostetler to engage Mandiant to investigate and assist BakerHostetler in providing legal advice to Bayview.

13. For the next several weeks, I participated in regular calls with Mandiant as it conducted its investigation. During those calls, we discussed the investigation and I asked questions of Mandiant regarding its findings. I also directed Mandiant to conduct areas of inquiry and worked with Mandiant to understand what the forensic artifacts showed as having occurred, so I could apply Mandiant's findings to advise Bayview regarding contractual and regulatory notification obligations, regulatory inquiries, and anticipated litigation, including likely putative class actions.

14. Protiviti is a global consulting firm with expertise in cybersecurity and incident response. Protiviti was engaged by BakerHostetler in January 2022 for the benefit of Bayview. *See* Ex. 2, Protiviti Statement of Work at 3. Protiviti was engaged by BakerHostetler "to obtain and interpret technical data regarding [Bayview's] network for use by [BakerHostetler] in providing legal advice to [Bayview] in anticipation of adverse regulatory proceedings and litigation related to a security incident detected by [Bayview] in December 2021 (the 'Services')." *See id.* at 1.

15. Based on findings from the investigation of the Incident, I had questions about Bayview's security measures and I needed assistance from a firm with experience helping companies develop and implement security programs to enable me to provide advice to Bayview regarding its security posture at the time of the attack as well as to develop strategic options to address regulatory inquiries and in anticipation of adverse regulatory proceedings and litigation.

16. Protiviti's work was split into two phases. During the first phase, Protiviti reviewed "[Bayview's] activities that were developed to remediate identified cybersecurity related control weaknesses." As part of this effort, Protiviti would review documentation, interview Bayview personnel, and provide "a high-level written summary of observations" at BakerHostetler's request. *See id.*, ¶ 4. The focus of this analysis was on understanding what conditions allowed the attack to occur and not be detected by security controls, and to assess the steps taken after detection of the Incident to support the provision of legal advice related to applicable contractual and legal obligations related to security and in anticipation of adverse regulatory proceedings and litigation.

17. During the second phase, Protiviti provided a cybersecurity governance assessment, to enable BakerHostetler to provide legal advice and develop strategy in anticipation of regulatory inquiries and litigation, which included the following steps:

- Evaluate existing cybersecurity program using NIST CSF framework (Identify, Protect, Detect, Respond, Recover).

- Review reports from previously perform [sic] assessments related to Bayview cybersecurity program (e.g. annual risk assessments, audit reports, pen testing, vulnerability reports).

- Review current policies regarding information sharing with third parties, email, external file sharing solutions, instant messaging, etc.

- Review assigned roles within Information Security and across the organization to understand current data protection program functions.

- Understand the defined data protection program and roles and responsibilities for information owners within Bayview including how

information owners view the use/transfer/sharing of specific data (e.g., within a specific application or database) and how they evaluate the adequate protection of that information.

- Utilize the NIST CSF framework Capability Maturity Model to identify current state and desired state of the Data Protection Program.

- If requested by Counsel, develop a written report summarizing the items noted above.

*See id.*

18.  There are state and federal laws that require companies to use reasonable security measures to safeguard personal information. For instance, the New York State Department of Financial Services Cyber Security Requirements for Financial Services Companies (23 NYCRR 500) requires entities subject to the law to implement a cybersecurity program designed to protect their information systems by conducting a risk assessment to design appropriate processes and controls. I requested assistance from Protiviti in understanding Bayview's security posture at the time of the attack and in developing strategic advice regarding its posture moving forward after the attack to support the ability to provide legal advice to Bayview related to the Incident and associated regulatory inquiries and litigation.

I declare under penalty of perjury under the law of the United States that the forgoing is true and correct.

Dated: October 16, 2023

_____
Craig A. Hoffman
Baker & Hostetler LLP

# EXHIBIT 1



**Statement of Work**

This Statement of Work is valid when signed before December 31, 2021.

This Statement of Work ("SOW") is made and entered into as of the later of the signature dates below ("SOW Effective Date"), by and between Mandiant and Baker & Hostetler LLP ("Counsel") for the benefit of Bayview Asset Management, LLC ("Customer"). This SOW is governed by the Master Services Agreement (the "Agreement") dated October 4, 2019 between Customer and Mandiant. Capitalized terms used in this SOW will have the meanings given to them in the Agreement. Services performed outside the Americas will be performed and invoiced by Mandiant Ireland Limited, regardless of which Mandiant entity is party to this SOW, and in such cases Mandiant Ireland Limited will be deemed "Mandiant" as set forth in this SOW. Services performed within the Americas will be performed and invoiced by Mandiant, Inc., regardless of which Mandiant entity is party to this SOW, and in such cases Mandiant, Inc. will be deemed "Mandiant" as set forth in this SOW.

# 1. Description of Services

Mandiant agrees to provide services ("Services") as set forth below, as directed by Counsel for the benefit of Customer.

## 1.1. Incident Response

The objective of this professional services engagement is to assist Counsel in providing legal advice to Customer with responding to a suspected security incident and in anticipation of litigation that may arise from the incident. The activities to be performed may include but are not limited to the following:

- Computer security incident response support.
- Digital forensics, log analysis, and malware analysis support.
- Incident remediation assistance.
- Deployment support for Mandiant's incident response technologies.
- Regular status reporting and project management-related activities.
- Reporting and/or presentations associated with findings and recommendations.

Customer acknowledges that Mandiant may use other tools, including cloud-based technologies and email monitoring systems, in the course of performing Services, and agrees that Mandiant may use all such tools in its discretion.

All parties acknowledge that Mandiant can leverage the technology stacks currently installed in Customer's environment during the course of the engagement, if any ("Customer-Owned Technology"). If Mandiant determines that the Customer-Owned Technology cannot adequately support the performance of the Services, additional technology stacks may be deployed in the Customer's environment and, in such case, will be invoiced as set forth in Section 5.

# 2. Deliverables

## 2.1. Incident Response Deliverables

The following Deliverables will be produced for these Services during the course of this engagement:

- Regular Status Reporting: Mandiant will provide regular status reporting that summarizes activities completed, significant findings, issues requiring attention and plans for the next reporting period.
- Incident Response Report: If requested by Counsel, Mandiant will provide a written summary of the incident response results. This typically includes a summary of activity, detailed activity description, supporting analysis, and remediation recommendations.
- Executive Briefing: If requested by Counsel, Mandiant will provide an executive brief that summarizes the incident response, including the investigation and remedial activities.

Any other reports (including intelligence reports), presentations, materials or other written information provided by Mandiant as a result of the Services are Mandiant Materials and will not be considered "Deliverables" as defined in the Agreement.



Statement of Work

## 3. Schedule and Staffing

The scheduling of Services under this SOW will be as mutually agreed to by all parties. The Services under this SOW will be provided within the twelve (12) month period from the SOW Effective Date.

## 4. Services Fees

All work will be performed on a time and materials basis at the rate of ▮▮▮▮▮▮▮▮ for consulting Services performed. In consideration for the Services to be performed by Mandiant, Customer agrees to pay for actual time spent. Travel time related to Services performed onsite will be invoiced ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Invoices will be issued monthly. If Customer is working with an insurer, Customer will be responsible for payment of all fees and expenses, regardless of whether the insurer provides coverage or reimbursement for all or part of the fees and expenses described herein.

Customer will pay all invoices as set forth in the Agreement. All fees are non-cancelable and non-refundable. Customer agrees that this SOW represents the complete, final, and exclusive terms and conditions governing the Services. As such, Mandiant may invoice Customer in advance, unless otherwise stated in this SOW, without the requirement that Customer provide a subsequent purchase order. Any such subsequently issued purchase order shall be for administrative purposes only.

## 5. Technology Fees

Mandiant will determine the technology that is required to support the Services under this SOW. Customer agrees to pay technology fees from the date of delivery at the price per unit quoted in the table below. These fees will be invoiced monthly and charged to the nearest whole month; they are not pro-rated.

| Unit Description | Price per Unit |
|---|---|
| **Endpoint Incident Response Technology** | |
| Cloud up to 100 nodes | ▮▮▮ |
| Cloud up to 1,000 nodes | ▮▮▮ |
| Cloud up to 10,000 nodes | ▮▮▮ |
| Hardware appliance, up to 10,000 nodes | ▮▮▮ |
| Supplemental up to 10,000 nodes | ▮▮▮ |
| **Off-Hours Alert Monitoring** | |
| Endpoint count: up to 500 nodes | ▮▮▮ |
| Endpoint count: up to 1,000 nodes | ▮▮▮ |
| Endpoint count: up to 5,000 nodes | ▮▮▮ |
| Endpoint count: up to 10,000 nodes | ▮▮▮ |
| Endpoint count: up to 20,000 nodes | ▮▮▮ |
| Endpoint count: up to 50,000 nodes | ▮▮▮ |
| Over 50,000 nodes | ▮▮▮ |
| **Network Incident Response Technology** | |



**Statement of Work**

| Unit Description | Price per Unit |
|---|---|
| 1Gb appliance (Maximum throughput 950Mbps) | |
| 10Gb appliance (Maximum throughput 4.5Gbps) | |
| 10Gb XL appliance (Maximum throughput 9Gbps) | |
| **Cloud-Based Log Analysis Technology** | |
| Instance up to 5,000 events per second, 10TB storage, 30 day retention | |
| Instance up to 10,000 events per second, 20TB storage, 30 day retention | |
| **Email Incident Response Technology – Cloud with AV/AS** | |
| 100-499 inboxes | |
| 500-999 inboxes | |
| 1000-1999 inboxes | |
| 2000-4999 inboxes | |
| 5000-9999 inboxes | |
| >10,000 inboxes | |
| **Managed Defense Continuous Vigilance** | |
| Node count: up to 499 nodes | |
| Node count: up to 999 nodes | |
| Node count: up to 4,999 nodes | |
| Node count: up to 9,999 nodes | |
| Node count: up to 19,999 nodes | |
| Node count: up to 49,999 nodes | |
| Node count: up to 75,999 nodes | |
| Node count: up to 99,999 nodes | |
| Node count: up to 999,999 nodes | |
| **Evidence Storage** | |
| Storage of each physical evidence item | |
| **Other** | |
| Domestic shipping and handling of hardware | |
| International shipping and handling of hardware | |
| Custom Dark Web Search – No Report | |

In addition to the technology listed in the table above, Mandiant may require the use of other tools to facilitate the investigation. Mandiant will request written (emailed) authorization from Customer for any charges related to the use of technologies not detailed in the above table.



**Statement of Work**

# 6. Fee Estimates

Itemized fee estimates are provided in the table below.

| Description | Estimated Quantity | Estimated Cost |
|---|---|---|
| **Professional Services** | | |
| Incident response activities including, but not limited to:<br>• Endpoint sweeping and forensic analysis<br>• Network monitoring and analysis<br>• Log analysis<br>• Malware analysis and reverse engineering<br>• Threat analysis and intelligence<br>• Status reporting | 450 hours | |
| Incident containment planning and support | 50 | |
| Reporting and out-brief including, but not limited to:<br>• Incident Investigation Report<br>• Incident Remediation Report | TBD | |
| **Technology** | | |
| Endpoint Incident Response Technology<br>Cloud up to 1,000 nodes | 2 months | |
| Off-Hours Alert Monitoring<br>Endpoint count: up to 1,00 nodes | 2 months | |
| **Other** | | |
| Custom Dark Web Search – No Report | 1 | |
| **Total Estimated Fees** | | |

# 7. Expenses

Customer shall reimburse for the following expense categories that are directly attributable to work performed under this SOW:

- Travel and living expenses.
- Mileage in company or personal vehicles at the rate approved by the U.S. Internal Revenue Service.
- Computer storage media.
- Postage and courier services.
- Printing, reproduction and binding.
- Any other expenses resulting from the work performed under this SOW.



**Statement of Work**

Upon request Mandiant will provide electronic copies of expense receipts for all expense related items greater than $25. Invoices for expenses will be issued on a monthly basis.

## 8. Assumptions

1. All work activities will be performed without day and time restrictions.
2. If any factor outside Mandiant's control, including those caused by Customer or Customer requirements (such as requirements to refrain from operating technology during specific times), causes delays in implementing technology needed for Mandiant to perform the Services or cause Services to take longer than expected, then notwithstanding any fixed fees, Customer will be invoiced for technology fees for the period of any such delays.
3. Estimated professional fees do not include any hardware, software, licensing, maintenance, or support costs of any Mandiant or other third-party product or service suggested by Mandiant as we conduct the activities outlined within this SOW.
4. Mandiant will provide Deliverables to Customer throughout this engagement. Draft Deliverables are considered final upon confirmation from Customer (written or oral) or ten business days after their submission date from Mandiant to Customer, whichever is earlier.
5. When Mandiant's personnel are performing Services on site at Customer's premises, Customer will allocate appropriate working space and physical access for all Mandiant assigned personnel.
6. Customer represents that all information provided is true and accurate and that Customer owns or is authorized to represent the owners of the systems, facilities, and/or devices described in connection with the services. Customer represents that it has obtained all permissions necessary for Mandiant to perform the services described herein. Customer will hold Mandiant harmless against any claims, disputes, or issues arising or related to foregoing representations.
7. Customer will make available key individuals that can best help plan operations around security event monitoring, analysis, threat intelligence, and incident response.
8. Any changes to the scope of Services or this SOW must be mutually agreed upon in writing by all parties.

## 9. Contact Information

Customer will provide Mandiant with points of contact information in the following table:

| Business Line Contact | |
|---|---|
| **Name:** | |
| **Title:** | |
| **Email:** | |
| **Phone:** | |
| **Street:** | |
| **City:** | |
| **State:** | |
| **Zip:** | |
| **Payables Contact** | |
| **Name:** | |
| **Title:** | |
| **Email:** | |



**Statement of Work**

| Phone:  |   |
|---------|---|
| Street: |   |
| City:   |   |
| State:  |   |
| Zip:    |   |

| Claim Manager Contact | |
|---|---|
| Name | Matthew Basilotto, Esq. |
| Email | matthew.basilotto@chubb.com |
| Claim # | KY21K3025077 |

## 10. Signatures

Mandiant and Customer have executed this Statement of Work as of the SOW Effective Date.

[Signature Page Follows]

**MANDIANT**®

Statement of Work

**Mandiant, Inc.**

*Joe Zuccaro* (DocuSigned, 87A99893983E4B7...)
Joe Zuccaro
**Name**

VP Commercial Legal Americas
**Title**

12/12/2021 | 10:17 AM PST
**Date**

**Bake**r
*Craig A. Hoffman* (DocuSigned, 834E7BCE8EBB4D7...)
**Signature**
Craig A. Hoffman
**Name**

Partner
**Title**

12/11/2021 | 12:35 PM PST
**Date**

**Bayview Asset Management, LLC**

*Brian Bomstein* (DocuSigned, 77E51620648D4B9...)
**Signature**
Brian Bomstein
**Name**

Senior Vice President
**Title**

12/11/2021 | 12:37 PM PST
**Date**

# EXHIBIT 2

# **STATEMENT OF WORK**

*Check one*

☒   Project    ☐   Staff Augmentation

This is a Statement of Work referred to in the Master Services Agreement (the "**Agreement**") dated December 2, 2019, by and between Bayview Asset Management, LLC. ("**Client**") and Protiviti Inc. ("**Protiviti**").  This Statement of Work is subject to the terms of the Agreement and shall be effective upon the Effective Date (defined below). Pursuant to this Statement of Work, Baker & Hostetler LLP ("Counsel") is engaging Protiviti on behalf of Client to perform the following services to obtain and interpret technical data regarding Client's network for use by Counsel in providing legal advice to Client in anticipation of adverse regulatory proceedings and litigation related to a security incident detected by Client in December 2021 (the "Services").

1. Engagement Team Leaders and Project Staffing:

   | | |
   |---|---|
   | Nick Spinks | Managing Director |
   | David Taylor | Managing Director |
   | Mike Ortlieb | Director |
   | Jonathan Trillos | Associate Director |

   In addition, other senior and staff consultants may be used as necessary to complete the work. Material changes in staffing will be reported to the Client prior to any changes taking effect.

2. Client's Project Manager and Additional Client Contacts:

   | | |
   |---|---|
   | Richard O'Brien | Chief Operating Officer |
   | Scott Norton | SVP, Head of Internal Audit |

3. Name of Project: 2022 Cybersecurity Advisory Services

4. Project Description:

   The Services will include the following two phases:

   1. Evaluation of on-going Client remediation
   2. Cybersecurity Governance Assessment

   Phase 1: Evaluation of On-Going Client Remediation

   Protiviti will review Client's activities that were developed to remediate identified cybersecurity related control weaknesses.  This effort includes, but is not limited to, the following activities:

   - Review of Client documentation
   - Discussions with Client personnel
   - If requested by Counsel, a high-level written summary of observations

   Phase 2: Cybersecurity Governance Assessment

   - Evaluate existing cybersecurity program using NIST CSF framework (Identify, Protect, Detect, Respond, Recover).
   - Review reports from previously perform assessments related to Bayview cybersecurity program (e.g. annual risk assessments, audit reports, pen testing, vulnerability reports).
   - Review current policies regarding information sharing with third parties, email, external file sharing solutions, instant messaging, etc.

- Review assigned roles within Information Security and across the organization to understand current data protection program functions.
- Understand the defined data protection program and roles and responsibilities for information owners within Bayview including how information owners view the use/transfer/sharing of specific data (e.g., within a specific application or database) and how they evaluate the adequate protection of that information.
- Utilize the NIST CSF framework Capability Maturity Model to identify current state and desired state of the Data Protection Program
- If requested by Counsel, develop a written report summarizing the items noted above.

**Client's Responsibilities**
- Maintain senior management sponsorship for the Project;
- Maintain overall responsibility for management decisions concerning the Project;
- Communicate all aspects of the Project to Client personnel;
- Identify individuals in each process or functional area to be involved in the Project;
- Provide timely access to relevant Client materials, as needed.  Delays and/or failure to provide requested documentation in a timely manner may result in additional fees and expenses;
- Provide timely access to appropriate Client personnel for interviewing, review, and execution of testing procedures.  Delays in scheduling interviews with Client personnel may result in additional fees and expenses;
- In conjunction with Counsel provide ongoing direction regarding Project scope and objectives;
- In conjunction with Counsel, perform timely review of Protiviti work product and deliverables.

5. Special Conditions: Notwithstanding anything to the contrary herein, Counsel understands and agrees that as it relates to Protiviti's liability to Counsel, Protiviti's maximum liability relating to Services rendered under this Statement of Work, regardless of the legal theory asserted (including, but not limited to, breach of contract, warranty, negligence or tort) will be limited in the aggregate for all claims, liability, losses and expenses to the charges paid to Protiviti for the portion of the Services giving rise to liability. In no event shall Protiviti be liable for consequential, indirect, incidental, punitive or special damages of any nature suffered by Counsel (including, but not limited to, lost profits or business opportunity costs), even if it has been advised of their possible existence. The parties agree Protiviti's liability to Client shall be governed by the terms of the Agreement.

6. Fees:

Our fees will be based on the level of staff and time required to complete this assignment, plus out-of-pocket expenses.  Our billing rates for this project would be as follows:

| Protiviti Level | Hourly Rate |
|---|---|
| Managing Director / Senior Director | |
| Director | |
| Associate Director | |
| Senior Manager | |
| Manager | |
| Senior Consultant | |
| Consultant | |

4890-1062-0425.1

Based on the scope and approach outlined above, our estimates of the professional fees are estimated ▮▮▮▮▮▮. Any changes in fee estimates based on changes will be discussed and agree upon with the Client.

Out-of-pocket expenses, such as travel, would be billed at actual cost. We will provide you with monthly billing of our fees and expenses.

7. Deliverables:

Deliverables are described in Section 4 above.

Executed this 18th day of January, 2022.

All of the terms, covenants and conditions set forth in the Agreement are incorporated herein by reference as if the same had been set forth herein in full.

**PROTIVITI INC.**                                                    **BAYVIEW ASSET MANAGEMENT LLC.**

By: *David Taylor* (DocuSigned, 9FE912795D3542E...)       By: *Richard O'Brien* (DocuSigned, C7A66FF240CD4BC...)
**David J. Taylor**                                                      **Richard O'Brien**
**Managing Director**                                                **Chief Operating Officer**

**BAKER & HOSTETLER LLP**

By: *Craig A. Hoffman* (DocuSigned, 834E7BCE8EBB4D7...)
**Craig A. Hoffman**
**Partner**