# EXHIBIT E

Deposition Transcript

Case Number: 1:22-cv-20955-DPG
Date: March 2, 2023

In the matter of:

# IN RE: LAKEVIEW LOAN SERVICING DATA BREACH LITIGATION

## Nathan Wilkey



CERTIFIED COPY

Reported by:

Melanie Stinson-Konstantinidis
RPR

Steno
Official Reporters

315 W 9th St.
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(310) 573-8380
NV: FIRM #108F

NATHAN WILKEY
MARCH 02, 2023
JOB NO. 530565

```
 1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
 2
                  CASE NO. 1:22-CV-20955-DPG
 3

 4   In Re: Lakeview Loan Servicing Data Breach
     Litigation,
 5

 6   _____

 7


 8                       VIDEOTAPED

 9             DEPOSITION OF NATHAN WILKEY

10
                       March 2, 2023
11           201 Alhambra Circle, Suite 1100
                   Coral Gables, Florida
12               1:35 p.m. - 5:07 p.m.

13

14

15

16

17

18

19

20

21

22

23

24   Melanie Stinson-Konstantinidis, RPR
     Registered Professional Reporter
25
```

### Page 34

1  involvement with the post-incident
2  investigation?
3           MS. BRADY:  Object to the form.
4           THE WITNESS:  Actions taken, sequence
5      of events.
6  BY MR. LIETZ:
7      Q.  Actions taken as part of the
8  investigation or after the investigation or
9  both?
10          MS. BRADY:  Object to the form.
11          Compound.
12          THE WITNESS:  Can you specificity what
13     you mean by investigation, like what point
14     in time you are referring to?
15 BY MR. LIETZ:
16     Q.  Do you have an understanding that
17 after this data-security incident was
18 discovered, that there was an investigation
19 launched?
20          MS. BRADY:  Object to the form.  Vague
21     as to investigation.
22          THE WITNESS:  Are you referring to the
23     Mandiant investigation?
24 BY MR. LIETZ:
25     Q.  Well, I was asking more broadly first,

### Page 35

1  any investigation.  So do you have an
2  understanding any investigation was launched
3  after the data-security incident was discovered?
4      A.  Yes.
5      Q.  Was the investigation that was
6  launched after the data-security incident was
7  discovered, the Mandiant investigation?
8      A.  There was an investigation performed
9  by Mandiant.
10     Q.  Was there any other investigation
11 performed of which you're aware?
12          MS. BRADY:  Object to the form.
13          THE WITNESS:  There was analysis and
14     investigation performed in addition to the
15     Mandiant investigation.
16 BY MR. LIETZ:
17     Q.  Who performed that additional analysis
18 and investigation?
19     A.  There was investigation performed by
20 the members of the security team as part of
21 their duties.
22     Q.  That's the internal Bayview security
23 team or the internal Lakeview security team or
24 some other security team?
25     A.  This is the Bayview security team.

### Page 36

1      Q.  Are there any other persons or
2  entities who conducted post-incident analysis or
3  investigation of which you are aware?
4      A.  Yes.
5      Q.  Who or what were the entities or
6  persons who performed additional investigation
7  analysis?
8      A.  There was an additional investigation
9  performed by Protiviti.
10     Q.  At whose direction was the Protiviti
11 investigation conducted?
12          MS. BRADY:  Object to the form.
13          What do you mean by direction?
14          THE WITNESS:  At the disc of counsel.
15 BY MR. LIETZ:
16     Q.  Do you have any understanding as to
17 why an additional or a separate investigation
18 was commissioned by Protiviti?
19          MS. BRADY:  Objection to the form.  I
20     instruct you not to answer if that would
21     reveal communications of counsel and
22     determination made my counsel.
23 BY MR. LIETZ:
24     Q.  Do you know when the Protiviti
25 investigation was commenced?

### Page 37

1      A.  I don't have the exact date.
2      Q.  Was it after the conclusion of the
3  Mandiant investigation?
4      A.  I don't know.
5      Q.  Do you know what the scope of the
6  Proctiviti investigation was?
7          MS. BRADY:  Object to the form.
8          Instruct you not to answer, as the scope is
9          determined by counsel.
10          MR. KLINGER:  The scope is determined
11     by counsel, okay.
12 BY MR. LIETZ:
13     Q.  Do you know --
14          MS. BRADY:  Wait.  Who is taking the
15     deposition?
16          MR. LIETZ:  We can go off the record
17     for a second.
18          THE VIDEOGRAPHER:  It is 2:23 p.m. and
19     we are off the record.
20       (Off-the-record discussion was held.)
21          THE VIDEOGRAPHER:  It is 2:23 p.m. on
22     the record.
23          MR. LIETZ:  Counsel, my esteemed
24     co-counsel points out the scope itself is
25     not protected by the privilege, but the

**Page 38**

```
 1      reasons for the scope are protected.  And,
 2      I guess, we ask you to reconsider your
 3      direction not to -- to instruct the witness
 4      not to answer.
 5           MS. BRADY:  I think there is a proper
 6      question there, but I don't think -- I
 7      think your question as phrased head-on is
 8      privileged.  Can you reask the question or
 9      rephrase your question?
10   BY MR. LIETZ:
11      Q.   I think the question I asked you Mr.
12   Wilkey was:  What was the scope of the
13   Proctiviti investigation?
14           MS. BRADY:  Do you mean what was
15      Proctiviti asked to do?
16           MR. LIETZ:  Yes.
17           MS. BRADY:  Objection.  You can answer
18      to the extent you know.  It's just what
19      they were tasked of doing.
20           THE WITNESS:  I know generally that
21      they were tasked to investigate, but I
22      don't have the specifics of the scope of --
23      specifics scope of the investigation.
24   BY MR. LIETZ:
25      Q.   So, when you say you know generally,
```

**Page 39**

```
 1   you just mean you generally know that were
 2   tasked to investigate or you have a general
 3   knowledge of what they were asked to
 4   investigate?
 5      A.   I generally know they were asked to
 6   investigate the incident.
 7      Q.   Do you have a general knowledge of
 8   what they were asked to investigate?
 9           MS. BRADY:  Objection, asked and
10      answered.
11           THE WITNESS:  Can you repeat your
12      question?
13   BY MR. LIETZ:
14      Q.   Do you have a general knowledge of
15   what they were asked to investigate?
16           MS. BRADY:  Objection, asked and
17      answered.
18           THE WITNESS:  The investigation, yes.
19   BY MR. LIETZ:
20      Q.   What were they asked to investigate?
21      A.   The root cause of the incident.
22      Q.   Was the root cause of the incident
23   ever determined?
24      A.   Yes.
25           MS. BRADY:  Before you ask your next
```

**Page 40**

```
 1      question, can we take a quick break, I have
 2      to speak to him let me talk to Evan.
 3           MR. LIETZ:  Yes, sure.
 4           THE VIDEOGRAPHER:  It's 2:27 p.m. we
 5      are off the record.
 6      (Recess was taken from 2:27 p.m. to 2:31 p.m.)
 7           THE VIDEOGRAPHER:  It's 2:31 p.m. on
 8      the record.
 9   BY MR. LIETZ:
10      Q.   So the next question is:  What was the
11   root cause?
12           MS. BRADY:  Object to the form.
13           You can answer limited to any
14      determination as to what the root cause was
15      for the incident or the cause of the
16      incident.
17           THE WITNESS:  The root cause was
18      identified as primarily an alert that an
19      intrusion on a laptop that was detected and
20      thought to have been stopped, but was not
21      fully removed from the system.
22   BY MR. LIETZ:
23      Q.   Did this root cause start with a
24   Bayview employee clicking on a link in a
25   search-result list?
```

**Page 41**

```
 1      A.   Yes.
 2      Q.   Do you know who that Bayview employee
 3   was?
 4      A.   I do know who that was.
 5      Q.   Who was it?
 6      A.   Their name is Adrian Jarrett.
 7      Q.   Is Adrian Jarrett a man or a woman?
 8      A.   I don't know with certainty.
 9      Q.   Does Adrian Jarrett -- do you know
10   what that person's position is?
11      A.   I do not recall their specific
12   position.
13      Q.   Do you recall what department they
14   work in within Lakeview?
15      A.   I do not.
16      Q.   Do they work within Lakeview?
17      A.   I don't know if they work specifically
18   in Lakeview.
19      Q.   The link that was clicked on, was this
20   in the search result; is that correct?
21           MS. BRADY:  Object to the form.
22           THE MR. NORTON:  Yes, that's correct.
23   BY MR. LIETZ:
24      Q.   Do you know what the nature of the
25   search was?
```

NATHAN WILKEY
MARCH 02, 2023
JOB NO. 530565

Page 42

1   A.   I generally know what the search was
2   about.
3   Q.   What was it about?
4   A.   The search was about road maintenance
5   agreements in Florida.
6   Q.   Why would a person within Lakeview or
7   Bayview, to the extent you know, be making that
8   kind of search?
9        MS. BRADY:  Objection.
10       THE MR. NORTON:  I don't know the
11   specifics of why they would be searching
12   that, but I know it was a work-related
13   search.
14  BY MR. LIETZ:
15   Q.   Do you know what search engine was
16  used?
17   A.   No, I don't.
18   Q.   Was there a preferred or default
19  search engine for Lakeview computers, laptops at
20  that time?
21   A.   I don't know if there's a specific
22  search engine.
23   Q.   Did Lakeview have a policy or
24  procedure in place to enable the safe-search
25  features that are contained in many of the

Page 43

1   search engines?
2        MS. BRADY:  Object to the form.
3        THE WITNESS:  Can you repeat your
4   question?
5   BY MR. LIETZ:
6    Q.   Yes.  I was referring to the time that
7   this link was clicked on.  Did the Bayview --
8   I'm sorry -- the Lakeview business computers
9   have the safe-search features that are common in
10  many of the search engines enabled at the time
11  of this incident?
12       MS. BRADY:  Object to the form.
13       THE WITNESS:  I don't know if that was
14   enabled.
15  BY MR. LIETZ:
16   Q.   Do you know if there was any policy to
17  enable the safe-search features that are common
18  on search engines?
19       MS. BRADY:  Object to the form.
20       THE WITNESS:  Can you repeat your
21   question?
22  BY MR. LIETZ:
23   Q.   Yeah.  At the time of the initial
24  attack vector, was there any policy in place
25  that the safe-search features would be enabled

Page 44

1   on Lakeview laptops and other hardware?
2        MS. BRADY:  Object to the form.
3        THE WITNESS:  I don't know if there
4    was a specific safe-search feature enabled.
5   BY MR. LIETZ:
6    Q.   Is that a good practice to enable safe
7   search features when you are searching on a
8   business computer?
9        MS. BRADY:  Object to the form.
10       Are you asking of his opinion?
11       THE WITNESS:  Bayview employees' web
12   filtering in the search results and links.
13  BY MR. LIETZ:
14   Q.   Was the threat actor ever identified?
15   A.   Identified in what way?
16   Q.   Like who they are, their identity?
17   A.   The threat actor was not identified
18  down to a specific identity or individual.
19   Q.   Was there any sort of designation, I
20  know sometimes there are, like, government
21  designations of threat actors, was there any
22  sort of designation attached to who this
23  particular threat actor was?
24       MS. BRADY:  Object to the form.
25       THE MR. NORTON:  The threat actor was

Page 45

1   unclassified entity.
2   BY MR. LIETZ:
3    Q.   Did this incident involve any form of
4   ransomware at all?
5        MS. BRADY:  Object to the form.
6        THE MR. NORTON:  It did not include
7    ransomware.
8   BY MR. LIETZ:
9    Q.   So, do you know the term initial
10  "attack vector?"
11   A.   Yes.
12   Q.   Is that a term that is used in
13  connection with evaluating events like this?
14   A.   Yes, it could be.
15   Q.   Was there an additional attack vector
16  that was identified here?
17       MS. BRADY:  Object to the form.
18       THE WITNESS:  The initial attack
19   vector would have come from the user
20   downloading a file.
21  BY MR. LIETZ:
22   Q.   Was that file that was downloaded a
23  particular piece of software?
24   A.   The file that was downloaded
25  originally was a zip file.

**Page 62**

```
 1   25, 2021?
 2        A.   Yes, that was my understanding.
 3        Q.   But whatever it was that was looked at
 4   and analyzed, whatever information SentinelOne
 5   what disseminating about killing the processes
 6   was incorrect; is that right?
 7             MS. BRADY:  Object to the form.
 8             THE WITNESS:  Based on the subsequent
 9        events, yes, it would appear that
10        SentinelOne had not completely eliminated
11        the threat.
12   BY MR. LIETZ:
13        Q.   Was there any investigation into how
14   that happened had the malignant software nested
15   somewhere that SentinelOne didn't find and root
16   out?
17             MS. BRADY:  Object to the form.
18             THE MR. NORTON:  There -- yes, there
19        was -- that was considered.  I can't speak
20        to or I don't recall the specifics of how
21        it missed it or what remnants led to
22        subsequent activity from the --
23   BY MR. LIETZ:
24        Q.   Do you know if there is a body of
25   records that would be most descriptive of sort
```

**Page 63**

```
 1   of the analysis of the actions that SentinelOne
 2   and its inability to kill the processes?
 3             MS. BRADY:  Object to the form.
 4             Body of records held by whom?
 5   BY MR. LIETZ:
 6        Q.   Well, first broadly, are you aware of
 7   a body of records that has that information in
 8   it?
 9             MS. BRADY:  Object to the form.
10             THE WITNESS:  SentinelOne captures and
11        records its activity and the analysis.
12   BY MR. LIETZ:
13        Q.   I guess maybe what I am getting at is
14   if I wanted to see sort of the results of the
15   investigation into why or how SentinelOne missed
16   killing this process, would I look at the
17   Mandiant report, would I look at SentinelOne's
18   records, would I look at something in Bayview's
19   records, is there some body of records somewhere
20   where basically the investigation and analysis
21   of what SentinelOne did and didn't do and how it
22   potentially missed killing the software could be
23   found?
24             MS. BRADY:  Object to the form,
25        speculation.
```

**Page 64**

```
 1             THE WITNESS:  SentinelOne would be the
 2        tool itself that contained information.
 3        Specifics of alerts were also sent to a
 4        JIRA ticketing system, J-I-R-A ticketing
 5        system for investigation and tracking and
 6        triage.
 7   BY MR. LIETZ:
 8        Q.   Do you know if any of this ended up in
 9   the Mandiant investigation?
10             MS. BRADY:  Object to the form.
11             THE WITNESS:  Any?
12   BY MR. LIETZ:
13        Q.   Any of the records relating to the
14   SentinelOne potentially killing this process,
15   but then not?
16        A.   Mandiant had access to the SentinelOne
17   logs and tool as part of their investigation.
18        Q.   What about Protiviti, did they also
19   have access to these records?
20        A.   I don't know if they had access to
21   those.
22        Q.   Was there any kind of endpoint
23   protection redundancy for SentinelOne
24   potentially not picking up on the initial attack
25   vector here?
```

**Page 65**

```
 1             MS. BRADY:  Object to the form.
 2             THE WITNESS:  There are -- as I
 3        described earlier, multiple tools present
 4        on the endpoint to help from a layered
 5        perspective and detecting anonymous on
 6        endpoint.
 7   BY MR. LIETZ:
 8        Q.   Is there any one or ones of the other
 9   security tools that you talked about earlier
10   that would have had the capacity to alert on the
11   installation of the loading software?
12             MS. BRADY:  Object to the form.
13        Speculation.
14             THE WITNESS:  The Bit 9 application
15        Whitelisting tool is another one that --
16        another of the capabilities that would have
17        been potentially able to stop execution of
18        an unknown process.
19   BY MR. LIETZ:
20        Q.   Was there ever any review done into
21   why the Bit9 software didn't stop this process?
22             MS. BRADY:  Object to the form.
23             THE WITNESS:  I don't know if a
24        specific evaluation was done on Bit9.
25
```

Page 126

1   A.   Yes, they have been replaced.
2   Q.   Who is their replacement?
3   A.   Their replacement is Hurricane Labs.
4   Q.   Were there other vendors who were
5   replaced in information security environments?
6   A.   Yes.
7   Q.   Who were they?
8   A.   CompuQuip was replaced by a company
9   called Arete, A-R-E-T-E.
10  Q.   Any other ones?
11  A.   I believe that's it.
12  Q.   Are there any data-security-related
13  measures or remedial actions that Protiviti has
14  recommended that are in the process of being
15  implemented?
16       MS. BRADY:  Object to the form.
17       THE WITNESS:  We have the
18       recommendations from a number of sources,
19       along with our own risk analysis, that have
20       columnated in the enhancements and some of
21       the changes that we've discussed.
22  BY MR. LIETZ:
23  Q.   Can you give me the semi-exhaustive
24  list of entities that have made recommendations?
25  A.   The recommendations have come from

Page 127

1   Mandiant as well as Protiviti and those are part
2   of the primary sources.
3   Q.   Mr. Notron already said fairly
4   definitively that there were no other known
5   information security-related incidents or
6   adverse security events prior to this breach; is
7   that your understanding as well?
8       MS. BRADY:  Object to the form.
9       THE MR. NORTON:  Yes, that is
10      consistent with my understanding.
11  BY MR. LIETZ:
12  Q.   There are some reports online of a
13  ransomware attack in early 2022.  Mr. Norton
14  indicated that those online reports are
15  incorrect and that there was no ransomware
16  attack in early 2022 against Bayview; is that
17  correct?
18      MS. BRADY:  Object to the form.  He
19      can't testify as to what Mr. Norton
20      testified.
21  BY MR. LIETZ:
22  Q.   Was that ransomware attack in early
23  2022 against Bayview?
24  A.   Not to my knowledge.
25  Q.   Are you aware of any online reports of

Page 128

1   ransomware attacks in early 2022 against
2   Bayview?
3       MS. BRADY:  Object to the form.
4       THE MR. NORTON:  I have not seen any
5       of those reports.
6   BY MR. LIETZ:
7   Q.   Is there some sort of program or
8   procedure within Lakeview or Bayview to look
9   online, both on the public web and on the Dark
10  web for evidences of incidents that involved
11  Bayview or Lakeview?
12      MS. BRADY:  Object to the form.
13      THE WITNESS:  Yes, we have
14      capabilities for monitoring Internet and
15      the Dark web.
16  BY MR. LIETZ:
17  Q.   Were there any Dark web searches that
18  were run on behalf of Lakeview, to ascertain any
19  of the exfiltrated data was posted on the Dark
20  web?
21      MS. BRADY:  Object to the form.
22      THE WITNESS:  There was analysis
23      performed on an ongoing basis to identify
24      any data that might surface on the Dark
25      web.

Page 129

1   BY MR. LIETZ:
2   Q.   What was the result of that analysis?
3       MS. BRADY:  Object to the form.
4       THE WITNESS:  They were identified
5       instances of data being posted to Dark
6       websites.
7   BY MR. LIETZ:
8   Q.   Number 16 is the geographic location
9   of the information security team.  I know you're
10  in Utah.  Is the remainder of the information
11  security team spread out across the country or
12  are they centralized in one location, can you
13  characterize for me where they are in the world?
14  A.   Yes, the majority of the team is in
15  Florida or South Florida.  There are a few team
16  members that are in different locations across
17  the country.
18  Q.   In terms of the geographic location of
19  the computer networks, computer systems or
20  devices affected by the data breach, has it been
21  ascertained where those devices are?
22      MS. BRADY:  Object to the form.
23      THE MR. NORTON:  We know where all of
24      our devices and servers are, if that is the
25      question.