# EXHIBIT F

```
1              THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF FLORIDA
2
                        MIAMI DIVISION
3
                 CASE NO.:  22-cv-20955-DPG
4

5

6  JENNIFER MORRILL, et al.,     )
                                 )
7          Plaintiffs,           )        October 19, 2023
                                 )
8  v.                            )
                                 )        Pages 1 - 70
9  LAKEVIEW LOAN SERVICING, LLC, )
   et al.,                       )
10         Defendants.           )
   _____/

11

12

13

14                      DISCOVERY HEARING

15          BEFORE THE HONORABLE EDWIN G. TORRES
            UNITED STATES MAGISTRATE CHIEF JUDGE
16

17

18

19
   APPEARANCES:
20
   Counsel on behalf of the Plaintiffs:
21
                ROBBINS GELLLER RUDMAN & DOWD LLP
22              225 NE Mizner Boulevard,
                Suite 720,
23              Boca Raton, FL 33432
                BY:  NICOLLE B. BRITO, ESQ.
24              BY:  ROBIN SCALER, ESQ.
                BY:  STUART DAVIDSON, ESQ.
25
```

```
 1
    APPEARANCES CONTINUED:
 2
    Counsel on behalf of the Defendants:
 3
                    BAKER & HOSTETLER
 4                  200 South Orange Avenue
                    Suite 2300,
 5                  Orlando, FL 32802
                    BY:  JULIE S. BRADY, ESQ.
 6

 7

 8
    Transcribed By:
 9
                    BONNIE JOY LEWIS, R.P.R.
10                  7001 SW 13 Street
                    Pembroke Pines, FL  33023
11                  954-985-8875
                    caselawrptg@gmail.com
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1        (Thereupon, the following proceeding was held:)

2        THE COURTROOM DEPUTY:  The United States District

3   Court for the Southern District of Florida is now in session.

4        The Honorable Chief Magistrate Judge Edwin G. Torres

5   presiding.

6        Calling Case Jennifer Morill, et al., versus Lakeview

7   Loan Servicing LLC, et al.; Case Number 22-cv-20955-Gayles.

8        Counsel, please state your appearances for the record.

9        MS. BRITO:  Good afternoon, Your Honor.

10       Nicolle Brito with Robin Scaler, here with my

11   colleague Stuart Davidson with Robin Scaler on behalf of

12   Plaintiffs.

13       MR. SCALER:  Good afternoon, Your Honor.

14       MS. BRADY:  Julie Brady from Baker Hostetler on behalf

15   of Defendants.  Good afternoon, Your Honor.

16       Good afternoon everybody.  This is a hearing requested

17   by I believe the Plaintiffs in the case.  Let me pull up your

18   materials.  Hold on one second.

19       MS. BRITO:  I believe there is one matter for

20   Plaintiffs and one for the Defendants.

21       THE COURT:  Okay.  I will do the Plaintiffs first and

22   then I will do the Defendants.

23       There are a series of things that you all submitted.

24   Hot off the press every minute here.  Okay.  I think I have

25   everything.  So we will start with the Plaintiffs.

1          MS. BRITO:  Your Honor, we are here today on two

2   motions, Plaintiffs' motion to compel documents claimed as

3   privileged by the Defendants' and Defendants' motion to compel

4   documents responsive to request for production number 7.

5          As a matter of background, Your Honor, this is a cyber

6   security incident involving a breach that occurred between

7   October 27th and December 7th of 2021; December 7th being the

8   date upon which Defendants discovered the breach.

9          THE COURT:  What was that day again?

10         MS. BRITO:  October 27th.

11         THE COURT:  That was the day --

12         MS. BRITO:  Between October 27th and it December 7th

13   of 2021.

14         THE COURT:  That's when the breach was occurring?

15         MS. BRITO:  Correct.

16         THE COURT:  As far as you know.

17         MS. BRITO:  Correct.  As far as Plaintiffs know and

18   December 7th being the date upon which Defendants discovered

19   the date of the breach.

20         THE COURT:  Okay.

21         MS. BRITO:  Defendants are in the business of mortgage

22   servicing.  Bayview being the parent company and Pingora

23   (phonetic) and Lakeview being the subsidiaries.  Customers here

24   are Plaintiffs and information at issue was sensitive

25   information, including but not limited to, Social Security

1   numbers and drivers licenses.

2          So the breach occurs and discoveries were propounded.

3   Defendants respond to discovery and claim privilege over two

4   consulting firms Madiant and Protiviti.  These are two cyber

5   security firms that provide incident response services and

6   security governance, security assessment services.

7          Now in their responses, Defendants go ahead -- the

8   three Defendants -- object based on a work product privilege to

9   23 or 24 of Plaintiffs' requests.

10          And the specific language of these requests state that

11   Madiant and Protiviti provided services for Baker and Hostetler

12   so that work performed rendered advice by Baker and Hostetler

13   and other legal counsel that was a relationship between these

14   two companies and Defense counsel.

15          Based on that, Your Honor, Plaintiffs took a viewpoint

16   that what it seems was that Baker and Hostetler retained these

17   two consulting firms directly almost as ex-consulting experts

18   for this litigation.

19          Well, what it turns out, Your Honor, through the

20   course of litigation that we have discovered was that there was

21   a pre-existing relationship between these two consulting firms

22   and Defendants directly.

23          So as a result of that, Your Honor --

24          THE COURT:  Both firms or just one of them?

25          MS. BRITO:  Both firms.

1          THE COURT:  Okay.

2          MS. BRITO:  Both firms and we have documents that are

3   documents provided to the Court.

4          We have documents -- relationship as far as Plaintiffs

5   are concerned based on information we had to July of 2021 and

6   November of 2021 prior to discovery of the breach.

7          So based on this, Your Honor, and a subsequent

8   discovery -- I'm sorry -- a subsequent privilege log that has

9   been produced as recent as September and October of 2023,

10  Plaintiffs have also discovered that there were direct

11  communications between these consulting firms and Defendants,

12  not including any kind of counsel.

13         So it is just like Plaintiffs to discover that there

14  is far more than just a consulting expert relationship here.

15  There is actually a pre-existing business relationship --

16  ongoing pre-existing business relationship between Defendants

17  and these consulting firms.

18         Based on that, Your Honor, Plaintiffs now bring this

19  dispute related to two categories of documents.  The first

20  being these reports that were generated by these consulting

21  firms and secondly, to these communications between these

22  consulting firms and Defendants directly, not including any

23  counsel.

24         THE COURT:  Okay.  And so as to the first part --

25         MS. BRITO:  Yes.

```
1            THE COURT:  The reports themselves that they are
2   invoking work product for that?
3            MS. BRITO:  Correct.
4            THE COURT:  Because they are saying that the law firm
5   is basically a law firm investigator.
6            Now, it is possible, of course, they may decide to
7   rely on that report for purposes of their defense in this case.
8            MS. BRITO:  Correct.
9            THE COURT:  But let's assume, putting that aside --
10  and I did take a look at some of the cases that you all were
11  citing in your proposed orders.  That was helpful.
12           MS. BRITO:  Yes.
13           THE COURT:  And then, in looking at other cases
14  dealing with this dual purpose stuff, is there any law on this
15  yet?
16           In other words, is there any appellate decision that
17  either from our circuit or from another circuit that guides us
18  on how we should apply that?
19           Because I do see some cases where they compel it and
20  some cases where they don't.
21           MS. BRITO:  Yes.
22           THE COURT:  Some cases say that if it is dual purpose
23  you don't lose the protection.  Other cases say, well, if you
24  would have done a report anyway --
25           MS. BRITO:  Right.
```

8

1        THE COURT:  -- then there is no protection.

2        So are there any appellate cases?

3        MS. BRITO:  Your Honor is getting to the case law on

4   this.  So the Eleventh Circuit is not decided on that.  There

5   are cases for guidance.  One being in the Southern District by

6   Judge Goodman.  It is *Holiday v. Royal Caribbean.*  It discusses

7   the different tasks for work product.

8        Your Honor, yourself, actually decided a case in 2014

9   was *Vencalsur v. Royal Caribbean* (phonetic) and --

10        THE COURT:  What did I say?

11        MS. BRITO:  Which Your Honor employed dual purpose.

12        And then, beyond dual purpose what Your Honor went on

13   to discuss is what is called the because of test.

14        And so where you have dual purpose where there's in

15   anticipation of litigation and you also have a competing

16   business interest you apply this because of test.  The because

17   of test has two prongs.

18        First you have to prepare the document in anticipation

19   of litigation, but the crucial second prong states that the

20   document and/or communication would have been in similar or

21   same format but for the litigation.

22        In a second and other less confusing way is that if

23   you would have generated this document regardless of the

24   litigation in similar or same format, the document does not

25   enjoy work product privilege.

1         And in that particular case, Your Honor, it is

2    factually distinguishing from this case, right?  It has to do

3    with a personal injury claim where they had to undergo an

4    investigation based on that personal injury accident.  Your

5    Honor found that the actual report was privileged.

6         Distinguishing here, Your Honor.  There are several

7    cases that we pointed to in the cyber security context and

8    related to Madiant specifically decided there's two in Virginia

9    which are Dominion Dental, Citi Corp and there's also -- I'm

10   sorry -- Capitol One.  Thank you.

11        And one in Virginia which is *Primera* (phonetic).

12   Those three cases have been decided within the same context

13   which there was a pre-existing business ongoing relationship

14   Defendants and these consulting groups.

15        The Courts employed the because of test and found that

16   the later addition of counsel to this later relationship did

17   not detract from this ongoing business relationship.  And more

18   importantly, that Courts found that this second prong of this

19   because of test was not satisfied because the truth of the

20   matter is that they would have had to do this regardless,

21   right?

22        They had statutory and federal duties to go ahead and

23   comply with and so they had to find the root cause of these

24   incidents and they had to remediate them and because of that

25   they failed the second prong and the Courts found that these

1   reports did not enjoy work product privilege.

2          THE COURT:  What did you say my case was again?

3          MS. BRITO:  *Vencalsur*.  I have copies for Your Honor.

4          THE COURT:  Oh, here it is.  Okay.

5          And then because I was citing -- I have no

6   recollection of this case.  I was citing a series of Court of

7   Appeals cases that said because of the because of test for

8   determining whether a document was prepared in anticipation of

9   litigation may also be used for ordinary business purposes

10  without losing the protected status.

11         MS. BRITO:  Right.

12         THE COURT:  And so the cases that you were just citing

13  to me, one of which is I guess *Primera* and Capitol, how do they

14  work through that?

15         MS. BRITO:  So importantly, Your Honor, in these cases

16  there was a pre-existing ongoing business relationship with

17  Madiant which pre dated the breach.  Thereafter, counsel signed

18  on, but it did not change the nature of the relationship.

19         Also, importantly, many of them, within many of them

20  the scope of work remained the same, which we also have here

21  and now Plaintiffs have not been given the benefit of seeing

22  the statement of work for pre breach and presumably it is being

23  complained as privileged here, but we have now been provided

24  the post breach agreements that have now been attached to Mr.

25  Hoffman's affidavit.

1    THE COURT:  I was going to say I thought I saw that.

2    MS. BRITO:  And that's post breach.  We have not seen

3  pre breach.

4    THE COURT:  Okay.

5    MS. BRITO:  So what we attached in our documents to

6  consider were documents that we found throughout the course of

7  discovery production that has been provided by Defendants.

8    The few documents that have been provided we have been

9  able to piece out some of this scope of work.  I am happy to

10  provide these to the Court.  I have extra copies.  They were

11  provided in our documents to consider.

12    So a comparison of those documents being sought what

13  we have compared to the post breach agreements entered into

14  with Defense counsel show striking similarities.  So it is same

15  or similar to what would have been anticipated pre breach.

16    And therefore, Your Honor, we contend that the second

17  prong of the because of test fails here because regardless of

18  whether there would have been litigation they would have again

19  had to find the root cause of this breach and would have had to

20  remediate it.

21    They are under statutory federal and state statutes

22  that require them to provide adequate security for their

23  customers and also provide notice to their customers.  So,

24  therefore, regardless of whether litigation would have been

25  anticipate, they would have had to take these steps and that is

 1  unlike the *Vencalsar* case.

 2       THE COURT:  Okay.  Now let me ask you this.

 3       Setting this issue aside just for the moment, what do

 4  you anticipate or based on other cases that you may work on,

 5  right?  I mean, and this case, for example, this *Primera* case

 6  seems to be the same entity and the Court compelled it, right?

 7       MS. BRITO:  Yes.

 8       THE COURT:  So how does that the report, for example,

 9  start with that, the report itself, how is that related to or

10  furthers a claim or defense in the litigation itself?

11       MS. BRITO:  You are saying what does the report show

12  us to --

13       THE COURT:  Right.  And how can you use it.

14       MS. BRITO:  The report is essential in that it shows

15  the underlying facts of how the data breach occurred.  It shows

16  what vulnerabilities were within the company.

17       It shows what would could have been done that wasn't.

18  It shows remediation steps that could have been taken as a

19  result of the breach.  That's what these consulting firms are

20  hired for to take a snap is not of your policies and determine

21  weaknesses and also based on what your requirements are.

22       And so to tell you that you have weaknesses here and

23  this is how you are going to improve them and this is how the

24  incident occurred.

25       THE COURT:  Now everything you just identified is a

1  fact in the case.

2          MS. BRITO:  Correct.

3          THE COURT:  And you are entitled to -- there is no

4  doubt that you are entitled to know what the facts are of --

5          MS. BRITO:  Right.

6          THE COURT:  Everything you outlined.

7          How did you find out about it?  What was the

8  penetration?  How was it accomplished?  What did you do after?

9  Everything there is a fact in the case that you are entitled to

10  know, right?

11          So then the question is their response is you are

12  entitled to know those facts, but you are not entitled to get

13  them through a protected document unless there was a

14  substantial need for it independently.

15          MS. BRITO:  Now we're talking about --

16          THE COURT:  What's wrong with that?

17          MS. BRITO:  Undue hardship is what Your Honor, I

18  imagine, is alluding to here.  There's nothing wrong here --

19  but in the cyber security world the precedent has been that

20  these types of reports are not work product privilege because

21  they are business documents generated based on a business

22  relationship.

23          Just because attorneys tend to sign on and cloak these

24  documents with a work product privilege does not necessarily

25  make them privileged based on the established precedent and the

1  work product doctrine test that we just discussed.

2        THE COURT:  Right.  But I guess let me -- I am asking

3  a little different question.  Let's assume I ruled against you

4  on this.

5        MS. BRITO:  We hope not, but yes.

6        THE COURT:  Granted the protective order and does not

7  can compel the protection of the report.

8        MS. BRITO:  Correct.

9        THE COURT:  Obviously you are entitled to know those

10  facts.  They can't hid the facts any differently than the Royal

11  Caribbean people can hide the conclusion of their

12  investigation.

13        MS. BRITO:  Right.

14        THE COURT:  And their assessment of whether or not the

15  person fell as they claim they fell, right?

16        And then, identify what the reason was for their

17  disagreement.  All that is fair game.  The issue is how you get

18  it.

19        MS. BRITO:  Right.

20        THE COURT:  So just to use the analogy now that you

21  have reminded me of this case, the fact that they didn't get

22  the report didn't mean they couldn't get the information.

23        Because in fact what they do the corporate rep

24  discloses the information by reading the report and they will

25  say, well, this is what we concluded.  This is how it happened

1   and this is what we did to fix it, right?

2          You could do that here, couldn't you, right?  Their IT

3   manager, for example, right?  He has fact knowledge as to what

4   occurred both based upon what the report may have concluded as

5   well as his own or her own assessment.  So that person, for

6   example, would be the one that would tell you what they

7   thought, what the investigation concluded, and how they fixed

8   it.

9          So you may end up with sworn testimony that is

10  basically the report.  I am just asking that for the

11  perspective of this type of case.

12         MS. BRITO:  Right.

13         THE COURT:  It is not depriving you of any

14  information.  It is precluding you from one source is one way

15  to put it.  What's wrong with that?

16         MS. BRITO:  Two points come to mind, Your Honor.

17         First, I believe *Vencalsar*, Your Honor, stated that

18  the underlying facts surrounding the case itself, the incident

19  itself were not privileged and were discoverable.

20         THE COURT:  Right.

21         MS. BRITO:  Secondly, what we understand is that

22  Defendants here have actually contracted out these

23  responsibilities and now claimed all sorts of privilege over

24  any kind of access, right, to this type of information.

25         So we are not aware of IT personnel and it has not

1  been identified thus far that would have the information.  But

2  once again if it comes back to -- and I apologize for coming

3  back to this again -- but if it comes back to an underlying

4  business relationship related to these business functions, we

5  still believe that would be discoverable and not privileged.

6  We are unaware at this point for other avenues for accessing

7  that information.

8        THE COURT:  Well, let me ask you this question.  You

9  cited some recent cases with very similar issues.

10       Are you familiar with any data breach cases where the

11 report like this or even in this type of report from this

12 entity was not produced and was not compelled?

13       MS. BRITO:  So Defendants actually cited a few in some

14 of their source materials.

15       THE COURT:  Okay.

16       MS. BRITO:  And one was *Experian* and another one

17 Marriott breach cases.  In those particular cases there was no

18 pre-existing relationship.  In *Experian* there was one, but it

19 dated back to three years prior and it wasn't continuing.  So

20 it distinguishable from the case at hand.

21       THE COURT:  Okay.  And there is no Appellate Court on

22 this topic?

23       MS. BRITO:  Not that I am aware of, Your Honor.

24       THE COURT:  And with respect to the underlying test to

25 apply, obviously I signed a bunch of cases here and there may

17

1  be recent ones, the Eleventh Circuit has not blessed any of

2  this one way or the other?

3          MS. BRITO:  So I can point the Court to *Holiday v.*

4  *Royal Caribbean*, which is a 2020 case decided by Judge Goodman.

5  And in it Judge Goodman actually discusses how the Eleventh

6  Circuit has not reached a consensus and he discusses the

7  different types of tests --

8          THE COURT:  Right.

9          MS. BRITO:  -- that are applicable.

10          THE COURT:  But no Eleventh Circuit or other circuit

11  cases that have deviated from these cases?

12          MS. BRITO:  Not that I am aware of, Your Honor, but if

13  need be I am happy to brief the issue for the Court.

14          THE COURT:  Okay.  Let me stop you there and turn to

15  counsel for the Defendants.

16          MS. BRADY:  Yes, Your Honor.

17          I am going to backtrack in a second, but first I want

18  to address what you raised about Plaintiffs being entitled to

19  the facts.

20          Plaintiffs have the facts.  Plaintiffs know what

21  happened, how the incident occurred, how it was discovered, and

22  what caused the incident.

23          Defendants have produced an incident summary report,

24  which is based on the factual findings by the cyber security

25  firm which even lays out a timeline of exactly how the system

1  was infiltrated and the steps that transpired and what was

2  discovered and when.

3         And I could give Your Honor a copy of that if you

4  would like, but it details from --

5         THE COURT:  Who prepared the document?

6         MS. BRADY:  It was prepared by Bayview based upon the

7  factual information it received from the cyber security firm.

8         THE COURT:  Okay.

9         MS. BRADY:  And in it this has been produced to

10  Plaintiffs and it has been produced earlier in the case and it

11  bears Bates stamp 2038 and it details a timeline for October

12  11th of 2021 when a Bayview employee clicked on a link all the

13  way through to when it was discovered.

14         We have also produced a list of defective devices.

15  They have also deposed all four corporate representatives,

16  which included the chief information security officer of

17  Bayview as well as the vice president at the head of

18  operational risk.  They have testified extensively as to how

19  the incident occurred and what was done in response.

20         So much so that when Plaintiffs subsequently served

21  duplicative 30(b)(6) notices on the other entities we objected

22  to providing duplicative testimony based on our assertion that

23  Lakeview would be testifying on behalf of the other entities

24  and the parties agreed to a stipulation that set forth what the

25  prior testimony covered and that testimony would apply to the

1   other three corporate representatives and this included how the

2   data incident occurred and the subsequent investigations and

3   the actions taken in response.

4            So between the deposition testimony, the incident

5   summary report, the list of defective devices, they know what

6   happened and how it happened.  So no facts are being withheld.

7            Backing up just a little bit just so I can clarify on

8   the record not all the Defendants service mortgages.  Camora

9   Community and Lakeview own mortgage servicing rights.  I

10  believe one of the entities services directly and the others

11  sub service and Bayview does not do mortgage servicing and it

12  is the entity that provides the data sharing and the technology

13  for the other entities, which is why those Bayview officers,

14  the Cisco and vice president and head of operational risk

15  testified on behalf of the first entity that was set for

16  deposition, but on behalf of all the entities.

17           So they do have all the facts.  I presume they are

18  trying to explain the delay in challenging our privilege

19  objections by kind of insinuating that we hid the ball and not

20  producing documents or information as to Madiant and

21  Protiviti's work with the Defendants.

22           And that is not the case and I just wanted to point

23  out that I believe it was stated that in response to 23 of the

24  discovery requests, we took the position that the information

25  sought was privileged.  We included in there and our objections

1  which are attached to Mr. Manari's (phonetic)  -- I just want

2  get an example of one, Your Honor.

3           So, for instance, all documents and communications

4  regarding the data breach between Bayview and any third party

5  request to produce number 56, we include in our response that

6  specifically Bayview asserts privilege over the work performed

7  by Madiant and Protiviti for Baker Hostetler and any advice

8  rendered by Baker Hostetler.

9           So we included that objection, but we didn't withhold

10 other documents from Madiant and Protiviti and for all these

11 other documents we produced documents outside of that protected

12 relationship.  So we have produced documents.

13          As far as a pre-existing relationship -- and Your

14 Honor, there is case law on both sides, as you point out, of

15 the issue as to whether these reports are protected.  It was

16 interesting that we saw in the proposed order from the

17 Plaintiffs that included case law.

18          Mr. Manari's declaration had included case law as well

19 and I had him pull it out because I thought it would be too

20 argumentative.  And I have those cases that I could provide to

21 Your Honor, including In Re *Experian*, which is a case at 217

22 West Law 4325583.

23          I know Plaintiffs are well familiar with it, but that

24 is a case where there was a pre-existing relationship between

25 the entities and the Court found that just because there was a

1  pre-existing relationship that does not mean that a

2  relationship regarding a specific breach or a specific incident

3  is not protected.

4        And that is why we have produced information with and

5  regarding Madiant and Protiviti.  We produced a report that

6  Madiant prepared in 2022 because it was outside this data

7  security incident.

8        But as far as this data security incident, we have

9  provided the declaration of my colleague Craig Hoffman, who as

10  it was stated the breach was discovered on December 7th.  He

11  received a phone call late in the night of December 7th, a

12  phone call with Madiant the next day and Bayview and he stepped

13  in.  He directed the litigation.

14        The statement of work, which was entered three days

15  later, which is Exhibit 1 to Mr. Hoffman's declaration provides

16  that a report would be prepared if requested by counsel and

17  counsel, subsequently there was a report.

18        Mr. Hoffman was heavily involved in this matter from

19  start to finish.  The privilege log was first produced in

20  February 20th of 2023 which contained categorical objections

21  privileged to both Madiant and Protiviti, which is in line with

22  parties stipulated protective order which provided for

23  categorical objections.

24        And then September and October we produced subsequent

25  privilege logs with specific entries when we were making

1   rolling productions.  We produced 58,000 documents already over

2   nine productions.  The Plaintiffs wanted them on a rolling

3   basis.  So as those come out we are making detailed privilege

4   logs.

5           But the fact that Mr. Hoffman is not necessarily

6   included on every documentation between the cyber security

7   firms and Bayview does not mean he is not involved.  It does

8   not mean they are not doing his request or his bequest or at

9   his direction to provide legal services.

10          THE COURT:  Let me stop you real quickly just to probe

11  that a bit.

12          Number one the work product protection for attorney

13  agents, the traditional production assumes that, you know, the

14  classic private investigator that the attorney brings on to

15  help handle a problem that the client has.  The theory being

16  that, well, the investigator is the eyes and the ears of the

17  lawyer and so what the investigator produces and gives to the

18  lawyer she can protect it just like the lawyer had done it him

19  or herself.

20          So that's the classic reason for work product for

21  agents of lawyers, right?  But typically I guess the reason in

22  these cases seem or modern cases in general are a little

23  different is what happens in a situation where a client already

24  retains an investigator directly, right?

25          And then it already has a contractor.  I mean, they

1   are a contractor.  Another word for these entities they are a

2   contractor and they're a contractor on retainer in the event of

3   a data breach to come help and fix it, right?

4           So it is just a contractor like a company.  Like the

5   Defendant would have a contractor for all sorts of things,

6   right?

7           And so, then, I guess the theory is that if you

8   already have a contractor that is going to handle this aspect

9   of your business, why does it make a difference that if you put

10  into the middle of that relationship a lawyer?  I guess,

11  philosophically, why does the work product protection apply in

12  that situation?

13          MS. BRADY:  Sure.  And I need to address -- and I

14  should have addressed this earlier, Madiant and Protiviti are

15  two different entities doing two different services.

16          Madiant is handling the incident response and is the

17  one that had the incident retainer agreement and then Protiviti

18  we can discuss that came in after-the-fact to discuss security

19  enhancements and security response, et cetera.

20          But as far as Madiant what Plaintiff is referring to I

21  presume their argument is based on one of the two documents

22  that was attached to their source materials which was Bayview

23  8191 and data privacy incident response.

24          THE COURT:  Okay.

25          MS. BRADY:  And that provides an Appendix D that

24

1   Madiant has been lined up to respond to an incident response,

2   but then Appendix Exhibit E, next page, Baker Hostetler was

3   also engaged.  Both entities were engaged in March of 2021 to

4   be at the ready should an incident occur.

5           And Mr. Hoffman explains in his affidavit that in a

6   world of cyber security and data breaches and the fact that

7   lawsuits get filed, literally days after the notice goes out,

8   it is a smart move -- that's my words and not him -- but a

9   smart move to line up the law firm and the cyber security and

10  investigate a firm so they can jump on a breach.

11          So they had lined up Madiant and they had lined up

12  Hostetler.  They were retainer agreements for both, but it was

13  Baker Hostetler that was going to direct the response and the

14  investigation to discuss providing legal advice so that Mr.

15  Hoffman could direct Bayview what to do.

16          The investigator are the eyes and the ears and in this

17  instance it is Mr. Hoffman and he is really go good at this,

18  but he does not have quite the technical knowledge that these

19  cyber security companies do to delve into it.

20          So he needed their assistance and their technical

21  expertise in order to render legal advice to Bayview and its

22  subsidiaries knowing that as soon as a notice went out, it was

23  going to inevitably see lawsuits and then there would be

24  regulatory inquiries, mortgage servicing rights heavily

25  regulated.

1         So he needs these entities, specifically as to

2    determining the cause of what went wrong in order to provide

3    legal advice to Bayview.  So it was intended these would

4    operate in tandem.

5         As far as other services that Madiant has provided we

6    have produced that information.  Like I said, we produced as

7    recently a report as recently as October 2022.  I don't want to

8    misspeak.  That was a purple team assessment report dated

9    October 26th of 2022 for Bayview evaluated their capabilities

10   and procedures to detect, prevent, or respond to any future

11   security breaches.

12        So outside the context of this data breach and is the

13   subject of this lawsuit, we are not withholding Madiant and

14   Protiviti documents.  And the request from them -- oh, and if I

15   can address Protiviti really quickly.  That was retained and

16   this is set forth in Mr. Hoffman's affidavit.  They were

17   retained by Mr. Hoffman in January of 2022.

18        I believe the reference Plaintiff is making to a

19   pre-existing relationship with Protiviti is based on a document

20   that was included with the source materials 6878, which is an

21   agenda from an enterprise risk steering committee meeting in

22   July of 2021.

23        And at Page 7 of that agenda, there is a reference to

24   Lakeview, one of the Defendants has engaged a consulting firm

25   Protiviti to review information exchange mechanisms used

1    between business personnel and sub servicers key vendors.

2            And it goes on to say that they were going to evaluate

3    the exchange of sensitive information and that's because, like

4    I said, these are mortgage servicing rights, companies that sub

5    service other companies to collect on the mortgage.

6            So that was dealing with the exchange of information

7    between the entities.  Not as broad as reviewing all of the

8    security measures and procedures and in fact what went wrong

9    and how you could fix it for when you get litigation.

10   Including litigation when you are seeking injunctive relief

11   which that advice is related to and regulatory investigation.

12           So in there --

13           THE COURT:  So, from your point of view, they are on

14   different footing these two entities?

15           MS. BRADY:  Madiant was doing incident response and

16   Protiviti, they had nothing to do with the instance response.

17   They were retained to look at the security that was in place

18   and the security enhancement for the future and that's laid out

19   in Mr. Hoffman 's declaration as well as the statement of

20   works.

21           THE COURT:  And then, with respect to the Madiant one

22   and putting the other one aside for the moment, how do you want

23   to tackle the Primera case?

24           I mean, what would you want to point out about it or

25   how is it wrong or why should I not follow it, I guess is the

1  way to put it.

2      MS. BRADY:  Well, like I said, there are cases that go

3  exactly contrary to that, which that I can provide Your Honor,

4  and also because here, yes, is there a business purpose to

5  providing it to looking into an incident response and figuring

6  out what happened and what went wrong?  Is there a business

7  purpose?  Yes, but that is not the only purpose.

8      And just because there is a business purpose does not

9  mean that there is not also a legal purpose.  And it is funny

10  because she cited from one of your Royal Caribbean cases and I

11  had another one, which was *Button v. Royal Caribbean* from 2013

12  that recognized following the primary motivating purpose test.

13      And in that case, it was found and it was a

14  investigation report about it, an accident on the Royal

15  Caribbean, that at least one of the primary purposes was for a

16  legal purpose.  And the reports are more likely than not

17  generated with litigation as one important reason for their

18  creation and later use.

19      So it doesn't matter that they prepared a report

20  because there was also a business purpose.  In the statement of

21  work it makes clear that the statement of work did not provide

22  for a report unless requested by counsel.

23      So do they have a business need to figure out what

24  went wrong and to prevent it?  Yes, but they also have a legal

25  need of being at the ready to respond to litigation which was

1  anticipated to come quickly and which did come quickly.

2          THE COURT:  Well, now, I guess to some extent one

3  distinction, I guess as I am thinking it through, there is a

4  difference between an entity like Royal Caribbean, right?

5          And an entity like your client in a sense that Royal

6  Caribbean's business model does not have as its focus the

7  litigation they may ensue.  In other words, their focus is on

8  transmitting people from point A to point B and entertaining

9  them.  Incidental to that sometimes people fall, right?

10         Here I would think that one of the reasons why these

11 cases are coming out involving data breach litigation, it is a

12 much closer nexus to what the company's primary purpose is in

13 terms of collecting data, using data, and managing data as to

14 this type of problem (inaudible).

15         And so to some extent, as I am thinking it through,

16 the application of the principal in a situation like Royal

17 Caribbean is not really the same.  You are not working in the

18 same environment as you are in a situation like the one that

19 involves your client.  Isn't that fair to say?

20         MS. BRADY:  Yes.  Well, the primary purpose of the

21 Defendants and maybe it was an investment management company,

22 but the primary purpose of the other Defendants is to either

23 provide for a contract for mortgaging servicing rights.

24         THE COURT:  Right.

25         MS. BRADY:  Honestly there's an exchange of

1   information there, but I would think that even the information

2   that customers or tourists provide to Royal Caribbean when they

3   are booking a cruise also include sensitive information.

4        So really any company holds sensitive information.

5   Maybe not loan numbers and stuff like that, but passport

6   information for people on Royal Caribbean, Social Security

7   numbers probably.  And so any company that holds sensitive

8   information, but that's not these entities' business purpose.

9        THE COURT:  But let me rephrase it.

10       In other words, the reason that we apply work product

11  protection when you have an internal security officer at a

12  company whose job it is to be an investigator, right?  That's

13  their job.

14       And so, then, when they are called out to the scene of

15  an accident and they exercise their duty, we give that

16  preliminary work product protection, right?  It's not, you

17  know, impossible to penetrate because there are circumstances

18  where we order them to produce their materials anyway, but

19  there is at least an initial work product protection because

20  they are an in-house investigator and they get sued all the

21  time.

22       Is the entity that we are talking about here, does it

23  really fit that bill?  Can we attribute that as kind of an

24  in-house investigator whose purpose it is entirely to further a

25  legal investigation?

1        MS. BRADY:  No.  I mean, it is not an internal

2   investigator.  It's a third party that is retained because they

3   have the legal expertise to get in there and figure out what

4   happened.

5        THE COURT:  Right.

6        MS. BRADY:  And that leads into for big muscle or to

7   provide legal advice to Bayview on what to do next.  What is

8   your exposure?  How do you remediate?  What is your risk to

9   litigation and regulators.

10       THE COURT:  Isn't their primary purpose also to fix

11  the problem?  To fix the source of the breach and to remediate

12  it?

13       MS. BRADY:  Their primary role is to determine what

14  happened so that the entity, my clients, can fix the issue and

15  prevent it from happening again.

16       THE COURT:  And then, with respect to how that report

17  would be used, obviously you have already told me about, it was

18  used by the lawyer in advising the client what to do.

19            Another example would be in the labor employment

20  field, for example.  You would retain a lawyer to conduct an

21  investigation to determine whether or not an allegation of

22  improper employment behavior is true or not.  And then,

23  ultimately, of course, that information can also be used as a

24  defense to the litigation because as an example of proper

25  responsiveness.

1     It is not possible that this report would be used by

2   the Defendant at trial?

3         MS. BRADY:  I don't think the report itself would be

4   used, no.  There is no intention to make these, you know, these

5   entities testifying experts or anything of the sort.  And

6   again, they have the facts.

7         THE COURT:  Okay.  Well, let me ask you this question.

8         Arguably their best case is the *Primera* case because

9   it is so on point.  What is your best case to show a different

10  analysis that yields a conclusion that you are looking for?

11        MS. BRADY:  I would like to give you -- can I give you

12  three?

13        THE COURT:  Sure.

14        MS. BRADY:  And I took their great idea and I have an

15  amended proposed order which does include case law and that

16  would be for the Court.

17        THE COURT:  Sure.

18        MS. BRADY:  I took your idea.  I can give you the

19  cases or I can give you the case cites, or I can give you the

20  proposed order.  It's the same order as before.  It just

21  includes the cases --

22        THE COURT:  That's fine.

23        MS. BRADY:  -- that we rely on.

24        THE COURT:  Do they have them here.

25        MS. BRADY:  May I approach, Your Honor?

1      THE COURT:  Go ahead and give it to me.

2      MS. BRADY:  And the In Re *Experian* one, is one where

3 there was a pre-existing relationship.  The Marriott cases both

4 did involve my firm and Mr. Hoffman specifically.  And both of

5 those protected the report.

6          And then, in the Maldona (phonetic) case which is out

7 of a District Court in Massachusetts, the Court recognized I

8 cannot imagine not having a technical expert assist an attorney

9 in investigating the facts of a data breach.

10      MR. DAVIDSON:  And Your Honor, just for the record,

11 that was my case.  So I am happy to talk about the facts of the

12 case once counsel is done.

13      THE COURT:  My last case.  They are all (inaudible).

14      MS. BRADY:  Candidly, Your Honor, as you said earlier

15 there are cases that go both ways on this and does not look

16 like there is any controlling decision on it.

17      THE COURT:  Now I think the way *Primera* distinguished

18 the *Experian* case because it was the client who retained

19 Madiant before, right?

20          In other words, here's what they say about *Experian*.

21          The situation was all *Experian* and in that case

22 outside counsel was hired by the company and outside counsel

23 hired Madiant.  I assumed that it would be before the data

24 breach.

25      MS. BRADY:  Yes.

1         THE COURT:  Here *Primera* had already hired Madiant

2    which was performing an ongoing investigation under *Primera*

3    supervision before outside counsel became involved.

4         MS. BRADY:  Well, here Madiant was on a retainer ready

5    to go if there was an incident where he (inaudible), but it

6    wasn't already performing services.  It wasn't already

7    analyzing.  It was a (inaudible) by Mr. Hoffman's affidavit.

8    Madiant was lined up so that there was a cyber security firm

9    ready to go should there be an incident.  They were not

10   previously providing these same services.

11        THE COURT:  In other words -- yes, that's a good

12   question.  Were they performing services prior to December of

13   '21?  Were they billing them for some work that they were

14   doing?

15        MS. BRADY:  I do not believe so, but I would like to

16   confirm that before I state that definitively.  I do not

17   believe so.  I believe it was the statement of work and

18   incident of retainer agreement so they would be ready to go.  I

19   know they provided services subsequently.  I do not believe

20   that they provided services before, but I don't want to say

21   that definitively until I get confirmation from my team.

22        THE COURT:  Okay.

23        MS. BRADY:  I think they were contacted as -- I think

24   they were contacted in the lead up to discovering the cause of

25   the incident when Bayview had reason to suspect there may have

1  been an infiltration.

2          I believe they reached out to them and then reached

3  out to (inaudible), but as far as performing work not related

4  to that incident, that breach, I do not believe so.

5          I think there may be some e-mails the day before to

6  the effect when they started this ongoing process in

7  December 6th or 7th was when they definitively determined there

8  was this intrusion.  But I do not believe that Madiant was

9  providing services outside of this discovery of this incident.

10          THE COURT:  Okay.  I guess we will have to verify

11  that.

12          MS. BRADY:  Yes.

13          THE COURT:  Let me ask you this question.

14          What is your response to the topic I raised with

15  Plaintiffs' counsel that assuming that it is work product

16  protected, they would get the same information anyway or not

17  the same, but equivalent information because the 30(b)(6)

18  witness, for example, or the IT manager for example, in

19  answering questions at a deposition may need to rely upon it or

20  review it in answering the questions to what happened and what

21  did you do.

22          And so, therefore, the issue really is one of the

23  mechanism.  The mechanism of giving the information as opposed

24  to just simply giving a protected document en mass.  So it is

25  really more of a -- to use the Royal Caribbean analogy, that's

1    what they do is they basically take the work protected document

2    and the corporate representative will have it available to rely

3    upon if he or she can't answer a question about a particular

4    fact with respect to the incident.

5           So here, assuming it is work product, if that happens,

6    what's wrong with that?  What's wrong with using that process

7    in lieu of using a work product document?

8           MS. BRADY:  Those 30(b)(6) depositions have all taken

9    place and the information from the security officer and vice

10   president head of operational risk testified they did not need

11   to refer to that document during those depositions.  And like I

12   said, there's an incident summary report which lays out the

13   factual findings.

14          THE COURT:  Who prepared the incident summary report?

15          MS. BRADY:  That was prepared by Bayview.

16          THE COURT:  Okay.

17          MS. BRADY:  Yes.

18          THE COURT:  Okay.  And that document was then turned

19   over?

20          MS. BRADY:  Yes, that has been produced.  That was

21   prepared by Bayview with some direction of counsel, but it's a

22   Bayview document.  It's a Bayview business document that has

23   been produced.

24          THE COURT:  Okay.

25          MS. BRADY:  Would you like me to submit either a

1    supplement, or a statement, or just advise your clerk as to the

2    determination that but for this actual data security incident

3    and the process of discovering it Madiant did not previously

4    provide services?

5          THE COURT:  Just do a notice of supplemental filing.

6          MS. BRADY:  Okay.

7          THE COURT:  And go ahead and make the representation

8    as to what work was Madiant doing in 2019.  What was the data

9    breach, again, 2021?

10         MS. BRADY:  2021.

11         THE COURT:  What work were they doing in 2021 prior to

12   the data breach.

13         MS. BRADY:  Okay.

14         THE COURT:  Because what you are suggesting is that

15   they were kind of like your firm.  You were on retainer for

16   this problem, but you were not engaged because there wasn't a

17   problem and it was only when a problem occurred that both the

18   law firms data breach practice --

19         MS. BRADY:  Yes.

20         THE COURT:  -- so to speak.  And the expert or the

21   consultant began working on it because they only began working

22   on it after the problem occurred.

23         MS. BRADY:  That is my understanding that Bayview

24   learned of the incident from a third party.  It's an acronym.

25   Learned of it from a third party and started investigating and

1   may have reached out to (inaudible) at that time.

2          And we are talking a day, two days, three days before

3   the actual determination on it the 6th or the 7th that there

4   was an incident and then contacted Bayview.  But, yes, my

5   understanding is it is limited to it -- there has been an

6   incident or we think an incident which is the incident that we

7   are here for today.

8          But I will confer on that definitively with my team

9   and we will file a notice of supplemental.

10          THE COURT:  Did you want to respond?

11          MS. BRITO:  Yes, Your Honor.  Thank you.

12          And Your Honor, we would like the opportunity to

13   respond to the supplemental filing.

14          THE COURT:  Sure.

15          MS. BRITO:  However, I do believe we can address one

16   point while we are in court.  The Exhibit 1 to Mr. Hoffman's

17   affidavit which is the post breach statement of work entered

18   into Madiant and Baker and Defendants.  It does refer to a

19   master service agreement that was dated October 4th of 2019.

20          So even just based off of this agreement, we know

21   there was a pre-existing relationship between the parties that

22   dated back to, at a minimum, 2019.

23          THE COURT:  Right.  But I guess their point was that

24   with respect to the *Primera* case she was looking at -- it

25   appeared from her opinion that Madiant was performing in an

1    ongoing investigation under the client's supervision before

2    outside counsel became involved.

3            So, basically, it is suggesting what happened was that

4    Madiant started working on it first and then counsel became --

5    so then they hired the Baker Hostetler as well.

6            MS. BRITO:  You know, what is interesting here, Your

7    Honor, we don't have the underlying facts.  We don't have the

8    information.  What we do know, though, based off of Mr.

9    Hoffman's affidavit is that there were separate contracts

10   entered into here.

11           If it were Baker actually directing work, it would

12   have been one contract directed by Baker.  But, instead, based

13   on Mr. Hoffman's affidavit, we know they were separate

14   contracts entered into between Defendants and Madiant and

15   Defendants and Baker.

16           To us, Your Honor, that suggests something more.  Also

17   bringing you back, Your Honor, of the because of test only

18   because these cyber security precedent cases in Virginia and

19   Oregon have utilized the because of test.

20           It is important to note here that if the scope of work

21   does not change really between pre breach and post breach, the

22   Courts have also been inclined to state that the work product

23   privilege does not apply.

24           And based on the limited information we have, if we

25   look at the Madiant post breach contract that was now entered

1  into between the three parties and the pre breach operating

2  standard dated November 14th of 2021, you will see on Page 11

3  -- and Your Honor, I have a copy handy if you need one, but it

4  was included in our source documents and it is

5  Document 000008191.

6         So Page 11 of that document lists three bullet points

7  under the current statement of work that Madiant would provide.

8  And if you look at the Madiant post breach contract, the first

9  three match precisely, Your Honor.

10        So pre breach and post breach, they were providing the

11 same services, which were computer security incident response,

12 digital forensics, log analysis, malware support, and incident

13 remediation.

14        THE COURT:  Did you want to respond to the cases that

15 they were pointing to?

16        MS. BRITO:  I am happy to, Your Honor.

17        So *Experian* that particular case -- and I can't stress

18 this enough, Your Honor.  The pre-existing continuing business

19 relationship is a factor that is weighed on heavily here by all

20 these parts.

21        In *Experian* there was a gap between services provided.

22 Whereas, there was an original assessment provided in 2013 and

23 nothing happened until 2015 in the breach occurred.  And that's

24 why the Court found, among other reasons, the Court found that

25 the work product privilege did apply because there was not a

1  continuing business relationship there.

2       We don't have that here.  And it is interesting to

3  treat Madiant and Protiviti as two different entities here and

4  they are two different entities, but meaning that Defense

5  counsel is pointing to the fact that Madiant was waiting,

6  ready, and willing, and doing nothing, which we disagree with.

7       But Protiviti themselves, Your Honor, in the documents

8  that we have provided, we show a pre-existing relationship that

9  goes back to at least July of 2021.  And they were performing

10  governance assessments and security breach analysis of the

11  security systems for Defendants prior to the breach.

12       I know my colleague, Mr. Davidson, said he actually

13  participated and was part of the *Salara* case and he was happy

14  and willing to respond to that.

15       MR. DAVIDSON:  I think to my colleague's chagrin when

16  I stood up and mentioned that.

17       THE COURT:  What was that case?

18       MR. DAVIDSON:  So that's the *Maldona* case which

19  started out of the Southern District of California and we

20  litigated a third party subpoena to the forensic firm in that

21  case which was Charles Riger Associates.  They are just like

22  Madiant.  Maybe not as topnotch as Madiant, but they are also

23  one that is based in Boston.

24       We objected on privilege grounds.  The Plaintiffs

25  moved to compel and the Judge in that case denied our motion.

1    It's the exact same facts as the other case law that Your Honor

2    found where there was no pre-existing business relationship

3    whatsoever between *Salara* Medical Supplies and Charles Rigor

4    Associates.  They didn't know each other before the data breach

5    occurred.

6           And that is what the Court found was compelling to

7    deny or to uphold work product protection in the case, but as

8    you can see, Your Honor, there is a clear split of authority,

9    but the split of authority is very easily explained.

10          There is pre-existing business relationship cases and

11   that's *Primera*, Dominion Dental, Capitol One and then there is

12   the non pre-existing relationship cases like *Salara* and

13   *Experian*.

14          MS. BRITO:  And Your Honor, the Marriott cases cited

15   by Defense counsel also fall into that pool.  There was no

16   pre-existing relationship in those cases either.

17          MS. BRADY:  Your Honor, if I may real briefly?

18          THE COURT:  Hold on one second.

19          In this Marilyn case, Judge Graham is throwing another

20   wrinkle into it, which he is using Federal Rule 26(b)(4)(d) as

21   applying a rule of decision.

22          MS. BRITO:  Okay.

23          THE COURT:  And he was using Judge Fochola (phonetic)

24   as an expert.  So you have pretty knowledgeable people involved

25   here.

1        And it appears what he was saying was that a company

2    like Madiant, or in this case I think it was Crouch Strike,

3    That that situation triggers 26(b)(4)(d).

4        "A party may not by interrogatories or deposition

5    discover facts known or opinions held by an expert who has been

6    retained by another party in anticipation of litigation or to

7    prepare for trial and who is not expected to be called as a

8    witness at trial."

9        MS. BRITO:  Consulting expert.

10       THE COURT:  Right.  So he basically it appears that he

11   and Judge Fochola, I think, because there was a report -- I

12   guess he used Judge Fochola as a special master.  That seems to

13   be what happened here.  That they thought that that provided an

14   important element of the rule of decision that under the rule

15   that made the difference.

16       What is your take on that?

17       MS. BRITO:  Well, Your Honor, here this is a third

18   party vendor that is not necessarily being used as an expert in

19   this regard.  They were retained directly by Defendants to

20   provide governance services and incident responses services and

21   not retained by counsel to be a consulting expert in this case.

22       Until conveniently, the breach occurred and then they

23   were retained directly by Defendants and not actually the guys

24   that Defendants are operating here to essentially say that

25   Madiant and Protiviti are operating as consulting experts and

1  therefore, any of their reports and communications are not

2  discoverable.

3          We obviously disagree with that based on first, as we

4  have already discussed because of test, the pre-existing

5  business relationship.  But also, Your Honor, you know,

6  throwing this into the mix also that there is also an exception

7  understanding Rule 26(4) documents that are conducted within,

8  or performed, or generated from the ordinary course of

9  business.

10         And so under Rule 26 and it is B-3 and it is committee

11 -- it is from the official committee notes to the rule and a

12 1970 amendment and it says:

13         "Materials prepared in the ordinary course of business

14 pursuant to public requirements unrelated to litigation they

15 are not protected."

16         THE COURT:  But that wouldn't apply here, right?

17 There is no requirement to retain this expert and there is no

18 requirement to prepare the report and disclose it.

19         MS. BRITO:  They are required to provide adequate

20 security to their customers.  It is required by the FTC,

21 Section 5.  It is required by their own privacy policy.  It is

22 required by several statutes cited by the Defendants themselves

23 in California, in Tennessee, and Georgia to name a few.

24         So they would have to do this.  Again, Your Honor,

25 coming back to the because of test, the second prong regardless

1 of litigation, they would have had to conduct this

2 investigation, get to the root cause of this incident and

3 provide remediation for it.

4        And Your Honor, if I may respond to your request

5 earlier as to obtaining sources, or the information from other

6 sources, it is Plaintiffs' argument that obviously this is not

7 privileged.  That said, the underlying facts of the report,

8 they are not privileged themselves.

9        And if the Court would be so inclined, we would be

10 amenable to there being a redaction of any type of legal

11 impressions in the report so long as Plaintiffs had access to

12 the report themselves.

13        THE COURT:  On that point, actually, yes, you raised a

14 point.  On that point directly, their argument is that they

15 have disclosed all that.  That they have given you witnesses

16 and -- what did you call that?

17        MS. BRADY:  The incident summary report.

18        THE COURT:  The incident summary report that basically

19 puts together in a non privileged form.

20        MS. BRITO:  And to read into that, Your Honor --

21        THE COURT:  And they have given that to you.  So you

22 have the information that you otherwise would get through

23 another source.

24        MS. BRITO:  To read into that, Your Honor, counsel

25 herself said this is prepared by Bayview with the assistance of

```
 1   counsel.
 2           THE COURT:  Right.
 3           MS. BRITO:  So to our point, Your Honor, this is
 4   self-serving.
 5           THE COURT:  But how is that different from Madiant?
 6           MS. BRITO:  It's a third party.
 7           Your Honor, it is a third party.  It's an independent
 8   third party hired by Defendants themselves.  Not Defense
 9   counsel.  Defendants themselves to find issues within their
10   security system and help remediate them.
11           And honestly, Your Honor through the Best Evidence
12   Rule that is the best source of information that we have access
13   to.  And a second point, Your Honor, through the course of
14   depositions thus far, Defense counsel, as they have stated and
15   Mr. Marner's affidavit have objected to any sort of mention of
16   Madiant and Protiviti.  So we are also being thwarted the
17   information at that level as well.
18           So it has become very difficult for us to access any
19   type of information regarding Madiant and/or Protiviti.
20           THE COURT:  Well, did you already take the 30(b)(6)?
21           MS. BRITO:  We did.
22           THE COURT:  And --
23           MS. BRITO:  Several.
24           THE COURT:  And then, were they not able to discuss
25   what was learned from that investigation?
```

1           MS. BRITO:  Limited is what we understand.  I know

2    there were objections based on any reference to Madiant and/or

3    Protiviti.  But, again, Your Honor, we subpoenaed Madiant and

4    Protiviti.

5           There was the whole onset of issues related to that.

6    We decided to go ahead and confer with Defendants more about

7    the subpoenas prior to trying to proceed with them.  But we

8    still have not gained true access to the source themselves

9    which are these third party vendors who conducted these

10   analyses.

11          Right.  This is highly technical information in which

12   by the way I don't understand half of, but these experts, these

13   people, these vendors are the ones who actually do have that

14   information available that Plaintiffs frankly need in order to

15   effectively proceed with their case.

16          THE COURT:  Let me ask you this question.

17          MS. BRITO:  Okay.

18          THE COURT:  In order to put on evidence at trial, if

19   they don't want to put on the Madiant people, right, they are

20   going to have to retain another expert who is going to explain

21   everything that we are talking about.  And obviously, do you

22   already know who that expert is?

23          MR. DAVIDSON:  No.

24          THE COURT:  So isn't that an alternative in this

25   situation like this to producing that report because that

1  expert is going to have to analyze the record that has been

2  generated by Bayview and that may include information that was

3  achieved through the Madiant report in reaching a conclusion

4  that, A, this is how it happened and, B, we were not negligent

5  because of this reason, right?

6          There is going to be an opinion that says they did

7  everything they were supposed to do.

8          MS. BRITO:  Right.  With underlying record evidence,

9  Your Honor, that frankly Plaintiffs do not have at this point.

10 Plaintiffs are prejudiced by not having that underlying

11 information that Defendants and defense experts will have at

12 the time of trial of deposition.

13         THE COURT:  What did you want to ask?

14         MS. BRADY:  Just briefly, Your Honor.

15         In fact, I just Brightlined today down from Orlando.

16 So I am like watching my watch.

17         I just want to say two things real briefly.  First in

18 the In Re *Experian* decision, I don't see anything in here.

19 Maybe it was a differentiating factor in the *Primera* case.  I

20 am trying to recall, but I don't see anything in here that

21 based its decision on the fact that they said that the firm had

22 not done any work for the Defendants in three years.

23         I know it speaks of a 2013 analysis, which they said

24 kind of underlined the 2015 breach, but I do not see anything

25 in this decision.  And maybe I missed it in re-scanning it

1  where the Court based this decision on the fact that if any

2  work had been done it had ceased for three years.

3              And then, the only thing I wanted to address --

4              THE COURT:  When you say this decision, you mean

5  *Experian*?

6              MS. BRADY:  *Experian*, yes.

7              And then, one thing I wanted to say, Your Honor, we

8  strongly dispute that we have not provided adequate testimony

9  and adequate information regarding the cause of the incident

10  and the investigation.  And it is part of the supplemental

11  filing if we could lay out the deposition testimony on that if

12  that's a relevant factor for the Court's consideration because

13  our position is they have the facts.

14              THE COURT:  I was just thinking along those lines

15  because to some extent, even if it is work product, more

16  argument they have a substantial need for it based on

17  exceptional circumstances, right?

18              MS. BRADY:  What are those exceptional circumstances?

19              THE COURT:  In a hyper technical case, for example,

20  even though you were telling me, well, we may not call Madiant

21  in the trial, you are going to call an expert, right?  And the

22  expert is going to review the record and what are the chances

23  the expert refuses to review the primary report generated in

24  connection with the investigation?  That's pretty unlikely,

25  don't you think?

1       MS. BRADY:  So none of these cases seem to get in that

2  far to make that determination.

3       THE COURT:  Right, but let's assume -- in other words,

4  (inaudible).  Is that what you are saying?

5       MS. BRADY:  Yes.

6       THE COURT:  But if the case goes to trial you are not

7  going to just put on your IT people.  You are going to put on

8  your expert and what is the chance that that expert is not

9  going to look at that report?  Do you see my point?

10       And so to some extent, even if you win that battle,

11  you are going to have to review that issue at the expert

12  deposition --

13       MS. BRADY:  Maybe at that point it does get if

14  discoverable because you have to produce what had expert relied

15  on.

16       THE COURT:  Right.  Has this ever happened?  Have we

17  not reached that point in these cases in.

18       MR. DAVIDSON:  No, but we said this might be a perfect

19  case to take that far.

20       THE COURT:  Because I don't see how an expert could do

21  this without looking at the primary report.  I'm not too

22  knowledgeable on this, but just generically speaking.

23       MS. BRADY:  And one other thing I wanted to say, Your

24  Honor --

25       THE COURT:  Because in terms of liability, are you

1  basically liable on a negligence theory according to the

2  complaint.

3          MS. BRADY:  That's 22 causes of action and that's --

4          THE COURT:  22.

5          MS. BRADY:  22 on behalf of three dozen Plaintiffs.

6          THE COURT:  Okay.

7          MS. BRADY:  This is a consolidated a number of 23

8  different cases.

9          THE COURT:  Is there a statutory --

10         MS. BRITO:  Yes, Your Honor, they are consumer causes

11 of action and multiple claims.

12         THE COURT:  Okay.

13         MS. BRADY:  And I just wanted to point out that

14 Plaintiffs' proposed order says they wanted to unredact

15 documents regarding the categorical -- number 7 and number 8

16 which are the categorical objections to Madiant and Protiviti

17 respectfully.

18         And then, a certain number and then produce all

19 documents and reports and communications responsive to

20 Plaintiffs' request for production and related to Madiant and

21 Protiviti's work for Defendants, including, but not limited to

22 their investigation of the data breach.

23         I read that as being so broad that their proposed

24 order calls for producing all the reports, all the

25 communications with Madiant and Protiviti regardless of whether

1  counsel was involved and any internal communications about

2  Madiant and Protiviti's work.

3        That seems like you took a more narrow approach on

4  what you were seeking, but that order as drafted seems much

5  more broad to be anything with, about, pertaining to, or

6  concerning Madiant and Protiviti even just internal between

7  counsel and client.

8        MS. BRITO:  Your Honor, to clarify the dispute today

9  is about two categories of documents.  It's the reports

10 generated by Madiant and Protiviti and the communications that

11 we have highlighted.  There are about 20 or so that are direct

12 communications between Madiant and Protiviti and Defendants

13 excluding counsel.

14       THE COURT:  What time is your train?

15       MS. BRADY:  4:41.  I thought you were only giving us a

16 half hour.

17       MS. BRITO:  I think we are the last ones.

18       THE COURT:  You are the last today.

19       MR. DAVIDSON:  We learned our lesson.

20       MS. BRADY:  It's very nice if you haven't tried it.

21       MR. DAVIDSON:  I can also drive you back.

22       THE COURT:  Okay.  Well, I guess to some extent this

23 is one where I am just not going to be able to make a ruling

24 now.  It will probably require a little more thought.  I also

25 want to review this DC case which seems to be one of the most

1  recent ones.

2          The DC case said it was not protected work product.

3  It's *Wengui v. Clark* (phonetic).

4          MS. BRADY:  That's one of Plaintiffs' I believe.

5          MS. BRITO:  Actually that sounds familiar but --

6          THE COURT:  Maybe we found this ourselves.

7          Well, maybe -- I think I would like to get a case

8  driven analysis and that way you can put your supplemental fact

9  that you were going to verify what Madiant's history was with

10 the Defendants and what work was being done in 2021,

11 pre-existing work.

12         Go ahead and put that in a ten-page memo.  And the

13 case that I am looking at is 338 Federal Rule decision 7.  It

14 is written by Judge Bowberg (phonetic) and I also saw that

15 Judge Fochola was relying on this case at one point in that

16 Marriott one.

17         MS. BRADY:  The case name, Your Honor?

18         THE COURT:  It's called Wengui; W-E-N-G-U-I v. Clark

19 PLC.  It also had to do with a security consultant report.

20         MS. BRITO:  And Your Honor, if I may?

21         We actually can't discuss the specifics of it, but we

22 actually just won this issue.  However, with no pre-existing

23 relationship in a case out of New Jersey.  The opinion, itself,

24 is still under seal, but we do have the order for it if Your

25 Honor would like it.

53

1    THE COURT:  How long has it been under seal?  Why
2  would it be under seal?
3    MR. DAVIDSON:  The complicating factor is that the
4  third party is the one that is asserting privilege and -- or
5  the third party that was breached is not the Defendant in the
6  case.
7    THE COURT:  I see.
8    MR. DAVIDSON:  And they are still claiming privilege
9  in intent to appeal that to the District Court from Judge Hamer
10 (phonetic).
11   THE COURT:  I see.  So I will tell you what with that
12 case and then let me get ten pages from you.  And then that
13 will help me put together an order and that way we can adjourn
14 because I don't know the answer to that.
15   MS. BRADY:  And Your Honor, just to clarify, our
16 response, do we also have ten pages to.
17   THE COURT:  Technically the burden is on the party
18 opposing.  So you have the burden on the Defendants' side.  So
19 you file first.
20   MS. BRADY:  Okay.
21   THE COURT:  And then, you can file thereafter.
22   MS. BRADY:  So a legal analysis in addressing when
23 Madiant first started providing services much the and when
24 would you like that by, Your Honor?
25   THE COURT:  A week.  When is our cutoff?

1           MR. SCALER:  A week.

2           THE COURT:  April?

3           MS. BRADY:  The motion to dismiss is being heard next

4      week.

5           THE COURT:  How much time would you like, then?

6           MS. BRADY:  Two weeks.

7           MR. SCALER:  Two weeks.

8           THE COURT:  Sure.  That's fine.  I won't rule until I

9      see your response.

10          MS. BRADY:  Okay.

11          MS. BRITO:  It would be two weeks.

12          THE COURT:  And then you wanted to also raise an issue

13     on the Defense side or do you want to postpone that for that

14     briefing?

15          MS. BRITO:  Apologies, Your Honor.  There were two

16     issues at play for Plaintiffs.  I just want to make sure that

17     Your Honor is deferring on both or one was the reports and then

18     the second was the communications that did not --

19          THE COURT:  Right.  And I may end up getting the

20     report or nothing.

21          MS. BRITO:  Thank you, Your Honor.

22          THE COURT:  I understood the scope of the issue.

23          MS. BRITO:  I just wanted to make sure where we were

24     at.

25          THE COURT:  And what was the issue on the Defendants'

1 | side?

2 |        MS. BRADY:  The other one was it was our request to

3 | produce number 7 to Plaintiffs.  We've been going back and

4 | forth for a while on a meet and confer.  We have resolved most

5 | of the issues or decided not to pursue them, but there was one

6 | that is really information we think we need that we have

7 | reached an impasse with Plaintiffs.

8 |        And that is request to produce number 7.  We ask for

9 | all account statements for any credit card account, bank

10 | account, or loan account in your name for the period of

11 | October 1st, 2016, to the present regardless of whether you

12 | allege such account was effected by the incident (inaudible)

13 | and this includes account in your name of more than one person

14 | and this exact request is set out in our submission to the

15 | Court in their objections and responses when they basically

16 | objected overbroad or relevant, seeks documents prior

17 | confidential.

18 |        In back and forth meet and confers Plaintiffs agreed

19 | to produce account statements back to October 1st of 2019, but

20 | only for accounts that they, Plaintiffs, said there was

21 | authorized activity on and all other entries but the authorized

22 | activity would be redacted.

23 |        So it would show this account and Target charge for

24 | $50 and everything else redacted.  The problem with that --

25 |        THE COURT:  And that compromises because you were

1  asking for any and --

2         MS. BRANDY:  All account statements.  And the reason

3  for that is that Plaintiffs claim there was unauthorized

4  activity on they're accounts.

5         THE COURT:  Right.

6         MS. BRADY:  And also because Plaintiffs claim damages

7  for lost time and this is one of their complaint.

8         THE COURT:  Lost time?

9         MS. BRADY:  Lost time in having to review all of their

10 account statements.  There were several Plaintiffs saying they

11 spent two hours a day reviewing all their account statements.

12 Other Plaintiffs said they had spent 70 hours reviewing account

13 statements.  They ever numerous --

14        THE COURT:  70 hours?

15        MS. BRADY:  70, yes.  They have numerous Plaintiffs

16 that allege -- so one Plaintiff in complaint Paragraph 152,

17 Plaintiff Rivera spends approximately two hours every day

18 reviewing her bank statement.

19        Paragraph 347 another Plaintiff spent approximately

20 70 hours monitoring her bank and credit card account.  And

21 another one, Paragraph 394, alleges she spent one hour every

22 day reviewing her bank accounts.

23        So the request for information is and the reason why

24 that limitation is not proper is because, first of all,

25 allowing the production of only to redact the statements that

1  only pertain to accounts that with an alleged authorized charge

2  and removing all other charges does not allow us to vet if that

3  really is an unauthorized charge.

4          It doesn't allow is to see if that Plaintiff spent $50

5  at Target and every month prior or so we are taking their word

6  on it that that was an unauthorized charged in not being able

7  to forensically go through the account statements.

8          Similarly if we see that they've got charges which

9  were with vendors who were also subject to other data breaches

10 that causes a causation issue.  We are trying to prove that

11 fraudulent charges were because of this incident.

12         So while we appreciate them giving us account

13 statements with, you know, redacted one charge, it does not

14 allow us to ferret the merits of their claim or our defenses.

15 And also it does not allow us to assess their claim for lost

16 damages.  You know, if this Plaintiff only gets one account is

17 she really spending two hours every single day looking at her

18 bank accounts.

19         THE COURT:  Over what time period were you asking?

20         MS. BRADY:  We were asking back to October 16th and we

21 agreed to limit that to 2019.

22         THE COURT:  And why are you going that far?  In other

23 words, I thought the breach occurred in '21?

24         MS. BRADY:  The breach occurred in '21 to see if there

25 was a pattern of transactions with the same vendors that they

 1  are then saying this is an unauthorized charge.

 2        THE COURT:  But wouldn't you be able to determine that

 3  from just the '21 statements?

 4        MS. BRADY:  No.  Because how do you know -- they say

 5  oh, this is an unauthorized charge.  I never do business with

 6  Home Depot.  So as a result of this breach, all of a sudden

 7  Home Depot charges are showing up on my invoices and you can go

 8  back and then we agreed to three years before the breach and

 9  wait a second, this Plaintiff goes to Home Depot on a regular

10  basis and now they are all of a sudden saying this is a

11  fraudulent charge.

12        THE COURT:  Okay.

13        MS. BRADY:  So it is really to ferret out their claims

14  and our defenses.

15        THE COURT:  And is your damage theory in part based on

16  them monitoring individual monitoring of their accounts?

17        MS. BRITO:  There is a time loss being claimed based

18  on review of --

19        THE COURT:  What is the biggest source of your damage

20  claim?  What is the biggest injury?

21        MR. DAVIDSON:  Sure.  So, Your Honor, if I could?

22        So generally we have experts that are able to

23  determine have multiple methodologies for determining damages.

24  Lost time has always been for time immemorial been considered

25  principal consequential damages for negligence and the like.

1  The other sources of damages are the deprivation value of their

2  private information that Defendants allegedly let go to a

3  criminal out there and now they are able to use it.  There is

4  dark web breaks, if you will, that go for this information.

5       THE COURT:  Right.

6       MR. DAVIDSON:  So there are multiple sources of

7  damages including, you know, un-reimbursed fraudulent charges

8  and the like.  So it is hard to say that any one is more

9  consequential than the other.

10      THE COURT:  In light of that, how do I preclude her

11 from getting the bank statements -- we can talk about time in a

12 second, but to impeach the Plaintiffs alleged injury?

13      MS. BRITO:  Well, first off, Your Honor, Plaintiffs

14 have a duty to affirmatively prove their case.  They are

15 claiming fraudulent charges.  Specific fraudulent charges and

16 they've attested to that.

17      THE COURT:  Right.

18      MS. BRITO:  So let's just say, right, here we go.  We

19 provide all of these account statements and think about that,

20 Your Honor.  Any and all account statements, credit card, bank,

21 that they went to, Target, Home Depot, if they co-signed a loan

22 for their son, for their spouse, they want all of these

23 accounts.

24       Let's just say that these are provided to Defendants.

25 How are they to know if any of these are fraudulent without

1  actually Plaintiffs attesting to them?  Plaintiffs have

2  attested to the fraudulent charges and have agreed to provide

3  those and have also agreed to provide the statement with the

4  fraudulent charge with the rest redacted.  The volume itself

5  should indicate to them what is happening and what Plaintiffs

6  are reviewing.

7          THE COURT:  What does that mean the volume?

8          MS. BRITO:  The volume of the statements themselves.

9  They are saying that they are spending this time reviewing

10 these documents.  Well, here you have the document with the

11 irrelevant charges redacted.  You have the statement itself

12 showing you this says the voluminous statement that Plaintiffs

13 reviewed with the fraudulent charge indicating the amount of

14 time potentially spent by Plaintiffs reviewing their accounts.

15         THE COURT:  But how would I -- I am missing it.  Maybe

16 it is just late in the day, but how would I be able to make

17 that determination without looking at the account statements

18 and what's in them?

19         MS. BRITO:  What's in them is irrelevant, Your Honor.

20 Again, let's look at the Target charge.  Defendants now have

21 all of the Target charges.  They don't know whether that is

22 fraudulent or not.  They know what Plaintiffs have attested to.

23 Plaintiffs have attested to the fraudulent charges on their

24 account, but without more information from Plaintiffs, they

25 don't know whether it is fraudulent or not.

```
 1        THE COURT:  But part of your damage theory, your
 2   damage theory does not require it be an actual fraudulent
 3   charge, right?
 4        MS. BRITO:  No, but this is what we agreed to provide.
 5   The information, their sensitive information was stolen, but
 6   part of their damages are saying, look, this sensitive
 7   information has been compromised.  This account has been
 8   compromised and here is proof of my account being compromised
 9   and because my account has been compromised, I have had to
10   spend X amount of time reviewing my account.
11        Here's the proof of the fraudulent charge.  Without
12   information from Plaintiffs, Defendants are none the wiser.
13   And also, Your Honor, there is an actual interrogatory
14   addressing this particular issue asking Plaintiffs if they have
15   been subject to any other data breach incidents which is
16   covered for Defendants.
17        THE COURT:  I get that.  That makes sense to me.
18        But, on the other hand if -- I am just trying to think
19   this through.  If you are alleging that following this incident
20   they have had to spend 70 hours a week, a month?
21        MS. BRADY:  A total and I think the others were a
22   total of --
23        THE COURT:  Okay.  Whatever that is.  Say two hours a
24   day to save argument, aren't they entitled to impeach that?
25   Because what if they are exaggerating how much time they claim
```

1  based upon the statements that they have?

2        MS. BRITO:  Well, Your Honor, speaking from

3  experience, I feel like account statements are typically a

4  certain length to be --

5        THE COURT:  I know from experience --

6        MS. BRITO:  However --

7        THE COURT:  I can tell you from experience, my account

8  statement you can read in two seconds.  My wife's --

9        MS. BRITO:  If it was my mom's I could say otherwise.

10 I agree with that.

11       THE COURT:  There is a huge difference between our

12 statements.  So that could be between people who have very few

13 credit card purchases and then others have credit cards for

14 hardly anything and then.

15       MS. BRITO:  Absolutely.

16       THE COURT:  And another person uses their credit card

17 from 9:00 a.m. to 9:00 p.m.  I don't know.  If that's an

18 element of your damage how do I stop them from impeaching --

19       MS. BRITO:  The substance of the accounts themselves

20 is irrelevant.  It is also overbroad here.

21        These particular Plaintiffs have already had their

22 information compromised at the hands of these Defendants.  They

23 are already wary.  We feel this is a fishing expedition.  We

24 don't even know if those supposed charges are in there or not.

25 They don't know.

1          And so here we are putting these Plaintiffs who have

2     already had their information compromised subject to this

3     additional scrutiny which is, in fact, going to discourage and

4     deter many of them from continuing with the litigation.

5          We feel it is overbreadth.  We feel it is irrelevant

6     and we don't believe they are entitled to it.

7          THE COURT:  If you were not seeking that type of

8     damage and you were seeking -- what I normally thought was that

9     you would be seeking like monitoring companies to come in and

10    advise you --

11         MS. BRITO:  We are.

12         THE COURT:  I get all that, but if that is part of

13    your damage right now, I just don't see how I can deny them the

14    production of what the Plaintiffs have.

15         I can narrow the scope of the time.  That I can do

16    because I think 2016 is completely excessive.  In fact, I am

17    trying to figure out why anything more than 2021 because the

18    breach occurred in the summer or -- when did it occur?

19         MS. BRITO:  October to December of 2021.

20         THE COURT:  And it was disclosed.

21         The Plaintiffs wouldn't have been doing anything

22    necessarily.  Although, I guess to some extent 2021 is highly

23    relevant and 2022 is highly relevant, but how do I preclude

24    them from getting that?

25         MS. BRITO:  Well, Your Honor, for us it is really the

1   substance.  Not the volume.  We have already agreed to redact

2   these accounts.  They don't necessarily need to see what --

3            THE COURT:  How do I know how much time it takes

4   without seeing what is the content?

5            MS. BRITO:  Because you see the line item.  It is

6   redacted.  There is a line through it that is blocking the

7   actual substance of the material, but you have the document

8   itself.  So you can see what is in there.

9            THE COURT:  I don't know how I would do that.  I don't

10  know how I would make a factual finding on how much time this

11  took without seeing what the charges are.

12           MS. BRITO:  I guess --

13           THE COURT:  I'm a juror.  I'm not a Judge.  I'm a

14  juror.  You are coming to me and you are saying this took --

15           MS. BRITO:  Right.

16           THE COURT:  -- two hours a day to review.

17           MS. BRITO:  Right.

18           THE COURT:  How do I do that without looking at what

19  the charges were?

20           MS. BRITO:  I am envisioning my own statement.

21            There's a line item.  There are line items, right?  We

22  don't need to divulge the substance of the line item itself,

23  but there is a line item for each charge.

24            So without knowing the substance, which is what really

25  matters here because it is an insane invasion of a privacy, but

1  without knowing that you see a line for each charge that has

2  been generated.

3          Based on that you have the volume of the statement.

4  You know that that person, whether it was five, ten, it was

5  your wife, it was twenty pages, you know that that person spent

6  X amount of time going through 20 pages versus five pages of

7  charges of a line items that have been redacted.  They don't

8  need to know the substance of the information.  They have the

9  document themselves.

10         THE COURT:  Is that fair as long as you have an

11 indication of the purchases were made for some things?  Would

12 that be adequate?

13         MS. BRADY:  That's only for accounts that the

14 statements that they are already producing because they are

15 saying it was a fraudulent charge on that account.

16         These Plaintiffs are not alleging they spent two hours

17 or 70 hours reviewing just the account statement where there

18 has been a fraudulent charge before.  They are saying all --

19         THE COURT:  I think she is agreeing with that, but

20 what she is saying is she wants to leave the description, the

21 particulars of the items so that if this was a credit card

22 statement, you could determine the time to review them by

23 eliminating -- but they want for privacy reasons to take the

24 time to redact the item itself.

25         MS. BRADY:  I mean --

1        THE COURT:  Personal hygiene product, they want to be

2   able to delete that, but you still have an entry and you have a

3   cost.  So they just want to delete -- so then you could

4   determine time involved.

5        MS. BRADY:  You could say this account is five pages

6   versus this one is 50 and it takes longer than five, but I

7   don't think they are agreeing to produce every account

8   statement.  I think what she is talking about is just the

9   account statements where there has been a fraudulent charge

10  with everything --

11       THE COURT:  Let's start one at a time.

12       Say I am granting you every account statement in the

13  world.  They want to be able to redact the items purchased.

14       MS. BRADY:  That helps with knowing the time that was

15  spent in the lost time analysis.

16       THE COURT:  Right.

17       MS. BRADY:  That doesn't help for us being able to

18  determine whether that is a fraudulent charge.

19       THE COURT:  But what if they don't have a fraudulent

20  charge?  Not every Plaintiff is going to have a fraudulent

21  charge, correct?

22       MR. SCALER:  Correct.

23       THE COURT:  So those Plaintiffs who are not claiming a

24  fraudulent charge.

25       MS. BRADY:  As to those Plaintiffs who are not

1  claiming a fraudulent charge --

2          THE COURT:  Correct.

3          MS. BRADY:  If they are claiming lost time I would be

4  happy to review their statements, but we need to know what the

5  quantum of their statement is.

6          THE COURT:  The what?

7          MS. BRADY:  What the quantum of their statement is.

8          THE COURT:  But you don't need to know whether they

9  are buying personal hygiene products versus antiperspirant.

10          MS. BRADY:  If they are not claiming a false charge,

11  no.

12          THE COURT:  Okay.  So for that category -- let's take

13  it one at a time.  So there are multiple categories.  For that

14  category, I am going to compel production for any accounts in

15  the Plaintiffs' possession which are not seeking retribution

16  for a fraudulent charge for 2021 and 2022.  And you may redact

17  the items purchased and you will obviously redact the credit

18  card number obviously, right?

19          So does that help you?  Is that what you are looking

20  for on the Plaintiffs' side?

21          MS. BRITO:  Sorry, Your Honor.  Just to clarify.

22          So for those where there has been a fraudulent charge

23  or there has not?

24          THE COURT:  Has not.

25          MS. BRITO:  Okay.  So these account statements need to

1  be produced for 2020 and 2021, you are saying?

2           THE COURT:  No.  2021 and 2022.

3           MS. BRITO:  Okay.  So before and after.

4           THE COURT:  And you can redact the charges of the name

5  of the item.

6           MS. BRITO:  The item, the line item itself.

7           THE COURT:  But you have to include the amount because

8  that has to be able to show the time involved in reviewing.  So

9  there has to be some part of the charge that you identify.  The

10  amount is not privileged.

11          So the only thing that would be privileged would be

12  the vendor or the item type, right?  So the left side of the

13  statement, you know what a statement looks like.  The left side

14  of the statement you can redact.  The right part of the

15  statement you don't redact.

16          MS. BRITO:  Your Honor, if I may?

17          Can we limit this to those Plaintiffs who are seeking

18  lost time only?

19          THE COURT:  Yes because that would be the reason for

20  it --

21          MS. BRITO:  That's what Your Honor is compelling us?

22          THE COURT:  Right.

23          MS. BRITO:  Now the other issue, I take it, Your

24  Honor.

25          THE COURT:  That's one category.

1           Lost time not claiming a fraudulent charge that the

2    statements must be produced, but I am allowing you to redact

3    individual item designations so that way it is sufficient for

4    the jury to see how voluminous these statements are.

5           So the amounts, to make it clear, the amounts of each

6    item are not to be redacted.  You will use that as the

7    designator.  Okay.  Now that's one category.

8           MS. BRITO:  The issue here, Your Honor, the request

9    reads all accounts for any credit card account, bank account,

10   or loan account in your name and/or in the name of someone else

11   included with you.

12          THE COURT:  Well, I am saying you don't need to know

13   that part of it.  For the individual person.  To make it

14   easier.  Don't worry about what the request said.

15          For any Plaintiff of their account of any kind because

16   it could be a bank account.  It could be a credit card.

17          MS. BRITO:  Existing, open, how do we catch that?

18          THE COURT:  Whatever the Plaintiff is going to claim.

19   If the Plaintiff is claiming lost time, what would the account

20   be -- if you only have one account you are to the going to have

21   a lot of damages.  If you are like my wife and you have ten

22   accounts, right, that's a lot of time.

23          MS. BRITO:  Your wife reminds me of my mother.

24          THE COURT:  It depends on the Plaintiff.

25          MS. BRITO:  So we tie this to the lost time.

1    THE COURT:  Right.

2    MS. BRITO:  It is basically lost time being claimed

3  what accounts are you looking at.

4    THE COURT:  Right.  Let's do that.

5    MS. BRITO:  That's for non fraudulent.

6    THE COURT:  As to the fraudulent one I am going to let

7  you work it out.  Now that you have my ruling and I could give

8  the Defense an opportunity to leave town, I think you can work

9  out what the obvious solution is for the fraudulent ones.

10    But if you can't work it out, then give me amended

11  proposed orders.  You are the Plaintiff and you already know I

12  am going to have to compel some things.  You give me your

13  proposal.  Defense, you give me your proposal and whatever is

14  the most reasonable I will adopt.  How is that?

15    MS. BRITO:  Thank you, Your Honor.  We appreciate your

16  time.

17    MS. BRADY:  Thank you, Your Honor.

18    THE COURT:  We'll adjourn on that note.

19    (Thereupon, the proceedings concluded.)

20

21

22

23

24

25

1

2                              CERTIFICATE

3

4        I hereby certify that the foregoing transcript is an

5   accurate transcript of the audio recorded proceedings in the

6   above-entitled matter.

7

8

9
    10/27/23                        Bonnie Joy Lewis,
10                         Registered Professional Reporter
                             CASE LAW REPORTING, INC.
11                          7001 Southwest 13 Street,
                           Pembroke Pines, Florida 33023
12                              954-985-8875

13

14

15

16

17

18

19

20

21

22

23

24

25