**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

**CASE NO. 1:22-CV-20955-DPG**

| | |
|---|---|
| In re Lakeview Loan Servicing Data Breach Litigation | DEMAND FOR JURY TRIAL |

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs Mark Arthur, Jorge Gonzalez, Robert Keach, Cindy Villanueva, Deborah Hamilton, Michael Kassem, Beth Berg, Savannah Farley, Thomas Lapenter, Hardik Sevak, Peter Wojciechowski, Kimberley Rowton, Jessica Valente-Brodrick, Denise Scott, Nilsa Misencik, David Kraus, John McMahon, Shannon Thomas, Mathew Myers, Jay Saporta, Albert Brumitt, David Cunningham, Linda Kim, Maureen Keach, Pedro Rubio, and Norma Grossman ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Amended Consolidated Class Action Complaint against Lakeview Loan Servicing, LLC ("Lakeview"), Pingora Loan Servicing, LLC ("Pingora"), Community Loan Servicing, LLC ("Community Loan"), and Bayview Asset Management LLC ("Bayview") (collectively, "Defendants"), and allege as follows:

**I. INTRODUCTION**

1.      This is a class action arising out of Defendants' failure to secure the sensitive personal information of consumer borrowers for whom Defendants performed services, resulting in one of the largest data breaches to date in the 2020s.

2.      Lakeview, Pingora, and Community Loan are mortgage loan servicers and Bayview

subsidiaries. Lakeview is the fourth largest mortgage loan servicer in the United States.[1]

3.    Lakeview, Pingora, and Community Loan obtain various personally identifying data of their customers—current and former mortgagors, as well as mortgage applicants—in furtherance of services performed on the customers' behalf.

4.    Each Defendant failed to adhere to industry-standard data security measures, breaching duties owed to the owners of the data. No Defendant adequately protected their current and former customers' sensitive, personally identifiable information—including names, addresses, dates of birth, Social Security numbers, loan numbers, financial and bank account information, and, for some, additional information provided in connection with a loan application, loan modification, or other items regarding loan servicing (collectively, "PII").

5.    On or around October 25, 2021, an intruder gained entry to Defendants' linked network systems and then accessed and exfiltrated the PII stored therein (the "Data Breach"). In early December 2021, Bayview, Lakeview, Pingora, and Community Loan identified this "security incident involving unauthorized access to [their] file servers."[2] Bayview, Lakeview, Pingora, and Community Loan determined that "an unauthorized person obtained access to files on [their] file storage servers from October 25, 2021 to December 7, 2021."[3]

6.    Bayview, Lakeview, Pingora, and Community Loan worked together to conduct an internal review process that, by January 31, 2022, generated a preliminary list of individuals affected by the Data Breach. Bayview, Lakeview, Pingora, and Community Loan jointly determined that the unauthorized actor accessed and exfiltrated the PII of at least 2,537,261 current

---

[1]    *See* Lakeview homepage, Lakeview.com, https://lakeview.com (last visited Jan. 12, 2024).

[2]    Exhibit ("Ex.") 1 (sample "Notification Letters" sent to the California Attorney General's Office).

[3]    *Id*.

and former Lakeview customers (including Plaintiffs Jorge Gonzalez, Cindy Villanueva, Deborah Hamilton, Beth Berg, Savannah Farley, Hardik Sevak, Peter Wojciechowski, Jessica Valente-Brodrick, Denise Scott, Nilsa Misencik, John McMahon, Shannon Thomas, Mathew Myers, and Pedro Rubio). Lakeview reported the results of Defendants' investigation to various state attorneys general on March 18, 2022.

7.      On June 23, 2022, Lakeview reported that an additional 100,796 Lakeview customers were affected. By November 1, 2022, Bayview, Lakeview, Pingora, and Community Loan had identified a total of 3,920,444 Lakeview customers affected by the Data Breach.

8.      Bayview, Lakeview, Pingora, and Community Loan also jointly determined that 1,405,383 Pingora customers were affected by the Data Breach (including Plaintiffs Mark Arthur, Robert Keach, Michael Kassem, Thomas Lapenter, Kimberley Rowton, David Kraus, Jay Saporta, and Maureen Keach), and that 444,534 Community Loan customers were affected (including Plaintiffs Albert Brumitt, David Cunningham, and Linda Kim).

9.      All told, at least five million Americans were victims of the Data Breach.[4] The current and former customers of Lakeview, Pingora, and Community Loan who were victims of the Data Breach are the "Class Members" for purposes of this litigation.

10.     On or around March 16, 2022, Lakeview began notifying Plaintiffs and Class Members of the Data Breach. On or around April 6, 2022, Pingora also began notifying Plaintiffs and Class Members. Lakeview issued additional notices beginning in June 2022. On or around May 16, 2022, Community Loan began notifying Plaintiffs and Class Members of the Data Breach.

---

[4]    Indiana    Attorney    General    Todd    Rokita,    *Security    Breaches*,    IN.gov., https://www.in.gov/attorneygeneral/consumer-protection-division/id-theft-prevention/security-breaches/#:~:text=The%20Office%20can%20seek%20up,acquired%20by%20the%20wrong%20person (last visited Jan. 12, 2024).

11.     In their notices of the Data Breach, Lakeview, Pingora, and Community Loan recognized that each victim now faces a present and continuing risk of identity theft and fraud, offering Plaintiffs and Class Members limited identity theft protection through Kroll, LLC ("Kroll"), a company that Defendants referred to as a "fraud specialist." Despite the risk that will remain for the lives of Plaintiffs and Class Members, Defendants only offered identity protection services for one year or, in certain cases, two years. These services offered by Defendants are woefully insufficient to protect Plaintiffs and Class Members from the lifelong ramifications of having their highly confidential PII accessed, acquired, exfiltrated, and/or published on the internet.

12.     Lakeview, Pingora, and Community Loan also advised Plaintiffs and Class Members to spend their own time mitigating the fallout from the Data Breach by remaining "vigilant for incidents of fraud or identity theft by reviewing your account statements and free credit reports for any unauthorized activity."[5]

13.     Defendants' negligent and careless acts and inaction resulted in an abject failure to protect the PII of Plaintiffs and Class Members. Documents produced in discovery reveal a classic instance of "group think": individuals responsible for cyber security at each Bayview subsidiary wrongly assumed—but did not verify—that Bayview was taking adequate data security precautions, even as individuals responsible for cyber security at Bayview wrongly assumed—but did not verify—that the subsidiaries were taking adequate data security precautions. In fact, none of the Defendants was taking the necessary, mandatory steps to safeguard and monitor the effectiveness of their electronic security defenses that should have protected Plaintiffs' and Class Members' sensitive information.

---

[5] Ex. 1.

14.     Defendants allowed the deficient security measures and declined to address them despite recognizing they were not doing nearly enough to safeguard consumer PII. Prior to the Data Breach, Bayview acknowledged the ███████████████████████████████████████ ██████████████████████████████[7] When it came to Bayview's electronic security environment, Bayview recognized ██████████████████████[8] Also prior to the Data Breach, a third-party security vendor ████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████.[9] The result of Bayview's inaction, as one Bayview information security executive admitted in the wake of the Data Breach, was ███████████████████████ ████████████████████"[10]

15.     Bayview—the parent company of Lakeview, Pingora, and Community Loan—is ultimately responsible for the data security of the entire enterprise. Bayview's Security Operations Center (the "Bayview SOC") is set up to "protect[] the Bayview brand and assets."[11] The Bayview SOC's responsibilities include ensuring: "the monitoring and analysis of incidents to protect People, Technologies and Process addressing all security incidents and ensuring timely escalation"; "daily management, administration & maintenance of security devices to achieve operational effectiveness"; and "threat management, threat modeling, identify threat vectors and

---

[6]   BAYVIEW000033873-876 at -873; *see also* BAYVIEW000127506-509.

[7]   BAYVIEW000127486.

[8]   BAYVIEW000011422-427 at -422.

[9]   BAYVIEW000002010-011; *see also* BAYVIEW000006898-907 at -900, -906.

[10]  BAYVIEW000147612-614 at -612.

[11]  Security Operations Center Manager at Bayview Asset Management, Salary.com, https://www.salary.com/job/bayview-asset-management/security-operations-center-manager/j202204210224596678566 (last visited Jan. 12, 2024).

develop use cases for security monitoring."[12] Analysts within the Bayview SOC are to "perform daily incident response triage communicating accordingly as needed."[13] Their duties include "[c]onduct[ing] proactive monitoring, investigation, and mitigation of security incidents" and "[e]nhanc[ing] security operations, analytics, threat hunting, and security orchestration and automation capabilities."[14]

16.     Additionally, a "research team" at Bayview relies on engineers to "develop, maintain, and enhance the various databases used to monitor the performance of consumer loans, to improve data pipelines for efficient uploading and downloading of data, to clean the data for use by the research and trading teams, and to help automate reporting data and visualization."[15] These data analysts also "[i]ntegrate data from multiple sources to meet business requirements."[16]

17.     Lakeview, like Bayview, relies on the Bayview research team for data integration and management. Like Bayview, Lakeview invites job applicants to apply for positions on the Bayview research team.[17]

18.     Lakeview, Pingora, and Community Loan work closely with Bayview on data security matters. The Chief Compliance Officers of Bayview, Lakeview, Pingora, and Community Loan are all ████████████████████████████████████████

---

[12]  *Id.*

[13]  Security Operations Center Analyst at Bayview Asset Management, Salary.com, https://www.salary.com/job/bayview-asset-management/security-operations-center-analyst/j202204210224598508691 (last visited Jan. 12, 2024).

[14]  *Id.*

[15]  Data Engineer at Bayview Asset Management, DataYoshi.com https://www.datayoshi.com/offer/388090/data-engineer (last visited Jan. 12, 2024).

[16]  *Id.*

[17]  Loan Data Engineer at Lakeview Loan Services, Talentify.com, https://lakeview-loan-servicing.talentify.io/job/data-engineer-coral-gables-florida-lakeview-loan-servicing-4505?currentPage=3 (last visited July 29, 2022).



[18] The ███████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████ [19]

19.     Regardless of whether it was initially collected and/or maintained by Bayview, Lakeview, Pingora, or Community Loan, Plaintiffs' and Class Members' confidential PII was among the "Bayview . . . assets"[20] that Defendants were obligated—but failed—to protect.

20.     By obtaining, collecting, using, and deriving benefits from Plaintiffs' and Class Members' PII, each Defendant assumed legal, statutory, and equitable duties to these individuals to safeguard and protect the PII from unauthorized access. Bayview, Lakeview, Pingora, and Community Loan each have admitted that the unencrypted PII accessed and exfiltrated in the Data Breach includes such highly sensitive information as names, dates of birth, addresses, loan numbers, financial or bank account information, and Social Security numbers.[21]

21.     The exposed PII of Plaintiffs and Class Members can be and in certain cases has already been sold to other identity thieves or on the dark web—a hidden network of black-market websites that serves as a "haven for all kinds of illicit activity (including the trafficking of stolen

---

[18]   BAYVIEW000147258 at 7261.

[19]   BAYVIEW000147258 at 7260-7261.

[20]   Security Operations Center Manager at Bayview Asset Management, Salary.com, https://www.salary.com/job/bayview-asset-management/security-operations-center-manager/j202204210224596678566 (last visited Jan. 12, 2024).

[21]   *See* BAYVIEW000000354; New Hampshire Dep't of Justice, Office of the Attorney General, *Security Breach Notifications*, https://www.doj.nh.gov/consumer/security-breaches/ (last visited Jan. 12, 2024); *see also* Letter from Baker & Hostetler LLP to Attorney General John Formella (Apr. 6, 2022), https://www.doj.nh.gov/consumer/security-breaches/documents/pingora-loan-servicing-20220406.pdf.

personal information captured through means such as data breaches or hacks).”[22] Plaintiffs John McMahon and Jay Saporta, for example, were informed after the Data Breach that their information has been found on the dark web. Cyber criminals now can indefinitely access, offer for sale, and use the unencrypted, unredacted PII of Plaintiffs and Class Members for nefarious ends. The permanent loss of their Social Security numbers and other PII exposes Plaintiffs and Class Members to an ongoing, lifetime risk of identity theft.

22.     Bayview, Lakeview, Pingora, and Community Loan understood the need to protect the privacy of their customers and use security measures to protect their customers’ information from unauthorized disclosure. Bayview, Lakeview, Pingora, and Community Loan further understood the importance of safeguarding PII because they are sophisticated financial entities whose business function is to maintain private and sensitive consumer information. Yet Bayview, Lakeview, Pingora, and Community Loan disregarded the rights of Plaintiffs and Class Members by failing to implement adequate and reasonable measures to ensure that Plaintiffs’ and Class Members’ PII was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate policies and protocols for the encryption and protection of data, even for internal use. As a result, the PII of Plaintiffs and Class Members was compromised and exfiltrated by an unknown and unauthorized third party.

23.     Contrary to industry-standard practices, Bayview improperly failed to encrypt Plaintiffs’ and Class Members’ PII, failed to delete it after it no longer needed to be retained, stored it in a vulnerable, internet-accessible environment, failed to monitor and detect its movement from Bayview’s network to the internet in real time, and failed to monitor or audit the practices of

---

[22] *Ellen Sirull, Paid Content: What is the dark web*? FOX NEWS (Mar. 27, 2018), https://www.foxnews.com/tech/paid-content-what-is-the-dark-web.

Bayview's cybersecurity vendors. Nor were these Bayview's only serious lapses: it also improperly failed to include CobaltStrike—the software the attacker used—on the emergency threat feed or to test its "use cases," thereby allowing the attacker to remain on Bayview's network undetected. And Bayview failed to properly integrate Sentinel One—an all-important threat detection and response tool—into its Security Information and Events Management System. Had Bayview implemented such expected measures, the Data Breach could have been prevented or mitigated.

24.     Lakeview, Pingora, and Community Loan each wrongly assumed—but did little, if anything, to verify—that Bayview was ensuring the security of the confidential data in their possession. These mortgage servicer Defendants failed to ensure that Plaintiffs' and Class Members' PII was encrypted, that Bayview deleted the PII after it no longer needed to be retained, or that Bayview monitored and detected movement of the PII from Bayview's network to the internet in real time, while disregarding that Bayview was storing the PII it in a vulnerable, internet-accessible environment. These Defendants also failed to monitor or audit the cybersecurity practices of Bayview and its cybersecurity vendors, continued to accept and store PII even after they knew or should have known of the Data Breach, and unreasonably delayed in providing notice of the Data Breach to Plaintiffs and Class Members, who were consequently prevented from taking timely self-protection measures.

25.     Until notified of the Data Breach, Plaintiffs and Class Members had no idea that their PII had been compromised and that they were—and will continue indefinitely to be—at significant risk of identity theft and other forms of personal, social, and financial harm.

26.     Plaintiffs bring this action on behalf of all persons whose PII was compromised in the Data Breach. Plaintiffs and the Class have suffered actual and present injuries as a direct result

of the Data Breach, including: (a) theft of their PII; (b) costs associated with the detection and prevention of identity theft for their respective lifetimes; (c) costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the consequences of the Data Breach; (d) invasion of privacy; (e) the present and/or imminent injury arising from actual and/or potential fraud and identity theft posed by their personal data being placed in the hands of the ill-intentioned hackers and/or criminals; (f) damages to and diminution in value of their personal data entrusted to Bayview, Lakeview, Pingora, and Community Loan on the understanding that Bayview, Lakeview, Pingora, and Community Loan would safeguard their PII against theft and prevent access to and misuse of their personal data by others; and (g) the present and continuing risk to their PII, which remains in the possession of Defendants, and which is subject to further injurious breaches, so long as Bayview, Lakeview, Pingora, and Community Loan fail to undertake appropriate and adequate measures to protect the PII. At a minimum, Plaintiffs and Class Members are entitled to damages, identity theft insurance and credit repair services for their respective lifetimes to protect themselves from identity theft and fraud, and injunctive relief tailored to address the vulnerabilities exploited in the Data Breach and to protect their PII from a future breach, together with a Court order directing the destruction of all PII for which Bayview, Lakeview, Pingora, and Community Loan cannot demonstrate a reasonable and legitimate purpose to continue to possess.

## II. PARTIES

### *Plaintiff Mark Arthur*

27.     Plaintiff Mark Arthur is a resident and citizen of Washington.

28.     Plaintiff Arthur received a letter dated November 4, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on

Pingora's network. The compromised files contained his name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff Jorge Gonzalez*

29.      Plaintiff Jorge Gonzalez is a resident and citizen of Texas.

30.      Plaintiff Gonzalez received a letter dated March 18, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network. The compromised files contained his name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff Robert Keach*

31.      Plaintiff Robert Keach is a resident and citizen of California.

32.      Plaintiff Robert Keach received a letter dated April 6, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network. The compromised files contained his name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff Cindy Villanueva*

33.      Plaintiff Cindy Villanueva is a resident and citizen of California.

34.      Plaintiff Villanueva received a letter from Defendant Lakeview dated March 17, 2022 concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network. The compromised files contained her name, address, loan number, Social Security number, and may have also included information provided in connection with a loan

application, loan modification, or other items regarding loan servicing.

### *Plaintiff Deborah Hamilton*

35.     Plaintiff Deborah Hamilton is a resident and citizen of Georgia.

36.     Plaintiff Hamilton received a letter dated March 18, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network. The compromised files contained her name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff Michael Kassem*

37.     Plaintiff Michael Kassem is a resident and citizen of Georgia.

38.     Plaintiff Kassem received a letter dated April 6, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network. The compromised files contained his name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff Beth Berg*

39.     Plaintiff Beth Berg is a resident and citizen of Illinois.

40.     Plaintiff Berg received a letter dated March 21, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network. The compromised files contained her name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff Savannah Farley*

41. Plaintiff Farley is a resident and citizen of Indiana.

42. Plaintiff Farley received a letter dated March 18, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network. The compromised files contained her name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### Plaintiff Thomas Lapenter

43. Plaintiff Thomas Lapenter is a resident and citizen of New Jersey.

44. Plaintiff Lapenter received a Data Breach notification letter dated April 6, 2022 from Defendant Pingora. The letter stated that unauthorized actors gained access to files on Pingora's network. The compromised files contained his name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### Plaintiff Hardik Sevak

45. Plaintiff Hardik Sevak is a resident and citizen of New York.

46. Plaintiff Sevak received a letter dated March 16, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network. The compromised files contained his name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### Plaintiff Peter Wojciechowski

47. Plaintiff Peter Wojciechowski is a resident and citizen of Florida.

48. Plaintiff Wojciechowski received a letter from Defendant Lakeview dated March

18, 2022 concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network. The compromised files contained his name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### Plaintiff Kimberley Rowton

49.     Plaintiff Kimberley Rowton is a resident and citizen of Virginia.

50.     Plaintiff Rowton received a letter dated April 6, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network. The compromised files her name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### Plaintiff Jessica Valente-Brodrick

51.     Plaintiff Jessica Valente-Brodrick is a resident and citizen of Arizona.

52.     Plaintiff Jessica Valente-Brodrick's husband received a letter dated March 16, 2022 from Defendant Lakeview concerning the Data Breach, but Defendant did not send her a separate, additional letter. The letter stated that unauthorized actors gained access to files on Lakeview's network. The compromised files contained her husband's name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### Plaintiff Denise Scott

53.     Plaintiff Denise Scott is a resident and citizen of Florida.

54.     Plaintiff Scott received a letter dated March 18, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on

Lakeview's network. The compromised files contained her name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff Nilsa Misencik*

55.     Plaintiff Nilsa Misencik is a resident and citizen of South Carolina.

56.     Plaintiff Misencik received a letter dated March 18, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network. The compromised files contained her name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff David Kraus*

57.     Plaintiff David Kraus is a resident and citizen of Pennsylvania.

58.     Plaintiff Kraus received a letter dated April 6, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network. The compromised files contained his name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff John McMahon*

59.     Plaintiff John McMahon is a resident and citizen of Maryland.

60.     Plaintiff McMahon received a letter dated March 16, 2022 from Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network. The compromised files contained his name, address, loan number, Social Security number, and may have also included information provided in connection with a loan

application, loan modification, or other items regarding loan servicing.

### *Plaintiff Shannon Thomas*

61.     Plaintiff Shannon Thomas is a resident and citizen of Ohio.

62.     On or around March 18, 2022, Plaintiff Thomas received a letter from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network. The compromised files contained her name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff Mathew Myers*

63.     Plaintiff Mathew Myers is a resident and citizen of Texas.

64.     Plaintiff Myers received a letter dated March 18, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network. The compromised files contained his name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff Jay Saporta*

65.     Plaintiff Jay Saporta is a resident and citizen of California.

66.     Plaintiff Saporta received a letter dated April 6, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network. The compromised files contained his name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff Albert Brumitt*

67.    Plaintiff Albert Brumitt is a resident and citizen of Illinois.

68.    Plaintiff Brumitt received a letter dated August 16, 2022 from Defendant Community Loan concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Community Loan's network. The compromised files contained his name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff David Cunningham*

69.    Plaintiff David Cunningham is a resident and citizen of Illinois.

70.    Plaintiff Cunningham received a letter dated October 17, 2022 from Defendant Community Loan concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Community Loan's network. The compromised files contained his name and Social Security number information, and, potentially, information he provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff Linda Kim*

71.    Plaintiff Linda Kim is a resident and citizen of California.

72.    Plaintiff Linda Kim received a letter dated October 17, 2022 from Defendant Community Loan concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Community Loan's network. The compromised files contained her name and Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### *Plaintiff Maureen Keach*

73.    Plaintiff Maureen Keach is a resident and citizen of California.

74.     Plaintiff Maureen Keach received a letter dated April 6, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network. The compromised files contained her name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### Plaintiff Pedro Rubio

75.     Plaintiff Pedro Rubio is a resident and citizen of California.

76.     Plaintiff Pedro Rubio received a letter dated March 17, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network. The compromised files contained his name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### Plaintiff Norma Grossman

77.     Plaintiff Norma Grossman is a resident and citizen of the State of California.

78.     Plaintiff Norma Grossman received a letter dated April 6, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network. The compromised files contained her name, address, loan number, Social Security number, and may have also included information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

### Defendant Bayview Asset Management, LLC

79.     Defendant Bayview Asset Management, LLC is an investment management services company organized under the laws of Florida and headquartered at 4425 Ponce de Leon Blvd., Coral Gables, FL 33146.

80.     Bayview is the parent company of Defendants Lakeview, Pingora, and Community Loan and, as such, controls these entities and is responsible for their electronic security and the security of the consumer information maintained by or on behalf of Lakeview, Pingora, and Community Loan.

### Defendant Lakeview Loan Servicing, LLC

81.     Defendant Lakeview Loan Servicing, LLC is a private mortgage loan servicer organized under the laws of Florida and headquartered at 4425 Ponce de Leon Blvd., Coral Gables, FL 33146, with its principal place of business in Coral Gables, Florida.

82.     Lakeview is a Delaware limited liability company. It is wholly owned by Bayview MSR Opportunity Corp., an affiliate of Bayview Asset Management, LLC and a Delaware corporation with its principal place of business in Coral Gables, Florida.

### Defendant Pingora Loan Servicing, LLC

83.     Defendant Pingora Loan Servicing, LLC is a private mortgage loan servicer organized under the laws of Delaware and headquartered at 1819 Wazee Street, 2nd Floor, Denver, CO 80202, with its principal place of business in Denver, Colorado.

84.     Pingora is wholly owned by Bayview Asset Management, LLC.

### Defendant Community Loan Servicing, LLC

85.     Defendant Community Loan Servicing, LLC is a private mortgage loan servicer organized under the laws of Delaware and headquartered at 4425 Ponce de Leon Blvd., Coral Gables, FL 33146.

86.     Community Loan is wholly owned by Bayview Asset Management, LLC.

### III. JURISDICTION AND VENUE

87.     This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C.

§ 1332(d)(2), because this is a class action involving more than 100 Class Members and because

the amount in controversy exceeds $5,000,000 exclusive of interest and costs. Moreover, the

minimal diversity requirement is met as Plaintiffs, Class Members, and Defendants are citizens of

different states.

88.     The Court has personal jurisdiction over Defendants Lakeview, Community Loan,

and Bayview because, personally or through their agents, Lakeview, Community Loan, and

Bayview operated, conducted, engaged in, or carried on a business or business venture in Florida;

had offices in Florida; committed tortious acts in Florida; and/or breached a contract in Florida by

failing to perform acts required by the contract to be performed in Florida. Defendants Lakeview,

Community Loan, and Bayview are also headquartered in Coral Gables, Florida.

89.     The Court has personal jurisdiction over Defendant Pingora because, personally or

through its relationship to and the control over it exercised by Bayview, Pingora operated,

conducted, engaged in, or carried on a business or business venture in Florida; committed tortious

acts in Florida; and/or breached a contract in Florida by failing to perform acts required by the

contract to be performed in Florida.

90.     Venue is proper in this district under 28 U.S.C. §§ 1391(a)(1), 1391(b)(1),

1391(b)(2), and 1391(c)(2) as a substantial part of the events giving rise to the claims emanated

from activities within this district, and Defendants Lakeview, Community Loan, and Bayview

conduct substantial business in this district and reside in this district. Further, decisions regarding

the management of the information security of Plaintiffs' and Class Members' PII were made by

Bayview within this district, Defendants maintain Plaintiffs' and Class Members' PII in this district, and the harm caused to Plaintiffs and Class Members emanated from this district.

## IV. FACTUAL ALLEGATIONS

### *Background on Defendants and Their Corporate Structure and Duties to Protect PII*

91.     Incorporated in 2008, Bayview is a privately-owned firm that provides discretionary investment management services to private pooled investment vehicles. Bayview focuses on investments in mortgage credit, including whole loans, mortgage-backed securities, mortgage servicing rights, and mortgage-related assets.[23]

92.     In its corporate policies, "Bayview" or "the Firm" refers to itself as Bayview Asset Management, LLC together with its affiliated group of companies, including Community Loan, Lakeview, and Pingora.[24]



BAYVIEW000002164.

---

[23]    BAYVIEW000008204-238 at -210.
[24]    BAYVIEW000002314-327 at -316.

93.     Bayview manages asset management-type portfolios, including the Lakeview portfolio.[25]

94.     Lakeview owns the servicing rights to millions of Americans' mortgage loans. It partners with various servicing partners to process payments, manage escrow arrangements, and provide customer service for more than 1.4 million individuals' existing mortgages per year.[26]

95.     In July 2017, Bayview acquired Pingora Holdings, L.P. and its wholly-owned subsidiary, Pingora Loan Servicing, LLC, from Annaly Capital Management, Inc. to expand its presence in the mortgage loan industry.

96.     Pingora sources mortgage loan servicing acquisitions for Lakeview.[27]

97.     Community Loan Servicing, LLC, another wholly-owned Bayview subsidiary, maintains a loan servicing platform. For approximately 20 years, Community Loan has provided primary, component, and special mortgage loan servicing for residential and commercial loans owned by Bayview and its affiliates and to certain third parties.[28] Bayview "provides primary servicing, third-party component servicing, and special servicing." *Id.*

98.     As of autumn 2021, Bayview provided core IT and other services for Lakeview, Pingora, and Community Loan.[29]

99.     Plaintiffs and Class Members received or applied for mortgage-related services from Lakeview, Pingora, or Community Loan, or their mortgage loans or the servicing rights and responsibilities for those loans were acquired by Lakeview, Pingora, or Community Loan. As a

---

[25]  Deposition Transcript of Julio Aldecocea ("Aldecocea Dep.") 27:4-17 (Mar. 2, 2023).

[26]  *Id.*

[27]  Aldecocea Dep. 25:9-12.

[28]  BAYVIEW000005825-921 at -832.

[29]  BAYVIEW000030187; BAYVIEW000002314; Deposition Transcript of Christina Arroyo Maymi ("Arroyo Maymi Dep.") 17:8-14 (June 29, 2023).

result, Plaintiffs were required to entrust some of their most sensitive and confidential information to the care of Defendants in exchange for mortgage services. The information they provided includes names, addresses, loan numbers, Social Security numbers, and additional information provided in connection with a loan application or loan modification, or as necessary for loan servicing. Much of the information Plaintiffs and Class Members entrusted to Lakeview, Pingora, and Community Loan is static, does not change, and can be used to commit myriad financial crimes.

100.    In providing services to Plaintiffs and Class Members, Lakeview, Pingora, and Community Loan generated and retained additional sensitive personal information about Plaintiffs and Class Members, including information concerning loan services and information provided to Lakeview, Pingora, and Community Loan by their affiliates and sub-servicers.

101.    Sophisticated companies like Defendants are aware of the different types of threat actors operating across the internet and the types of criminal acts that cyber thieves employ for profit. Accordingly, it is imperative that Defendants guard against those criminal exploits.

102.    Plaintiffs and Class Members, as current and former customers of Defendants or their affiliates, relied on Defendants to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this sensitive information.

103.    Defendants had a duty to adopt reasonable measures to protect Plaintiffs' and Class Members' PII from involuntary disclosure to third parties. Defendants collected, maintained, and profited from information that they knew to be private and sensitive, and they were aware of the consequences to Plaintiffs and Class Members if they failed to adequately protect that information. Defendants breached their duty to Plaintiffs and Class Members and permitted an attacker to access

Defendants' systems for nearly two months without detection.

***Defendants Suffered a Massive Data Breach That Went Undetected for Months***

104.    On or around October 27, 2021, an intruder gained unauthorized access to Bayview's network.[30] Bayview's IT Security team did not discover the intrusion until on or around December 6, 2021.[31] Before that discovery, the intruder accessed and exfiltrated approximately eight to 20 Terabytes of data, including the PII of 3,920,444 current and former Lakeview customers, 1,405,383 current and former Pingora customers, and 444,534 Community Loan customers.[32]

105.    The breach stemmed from an incident on ████████, 2021, when a ████████



[33]

106.    On ████████, 2021, ████████████████████████████████████████████

---

[30] Ex. 3 (sample "Notice of Data Breach" sent to Maine Attorney General's Office); *see also* California Department of Justice, *Submitted Breach Notification Sample*, https://oag.ca.gov/ecrime/databreach/reports/sb24-552339 (last visited Jan. 12, 2024 (Pingora); California Department of Justice, *Submitted Breach Notification Sample*, https://oag.ca.gov/ecrime/databreach/reports/sb24-551822 (last visited Jan. 12, 2024) (Lakeview); *see* BAYVIEW000001986.

[31] *Id.*

[32] Office of the Maine Attorney General, *Data Breach Notifications*, https://apps.web.maine.gov/online/aeviewer/ME/40/3d0c184e-e78c-4123-8ce8-8535f71facd3.shtml (last visited Jan. 12, 2024) (initially reporting 2,537,261 impacted individuals); Indiana Attorney General Todd Rokita, *Security Breaches*, IN. gov., https://www.in.gov/attorneygeneral/consumer-protection-division/id-theft-prevention/security-breaches/#:~:text=The%20Office%20can%20seek%20up,acquired%20by%20the%20wrong%20person (last visited Jan. 12, 2024).

[33] BAYVIEW000002036.



107.    At the time of the Data Breach, ███████████████████████

██████████████████████████████[37] An ████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████[38] Additionally, one of the ██████

███████████████████████████████████████████████████████████████

████████████████.[39] Bayview's failure to include CobaltStrike on the emergency threat

feed, or to test its "use cases," allowed the hacker to remain on Bayview's network undetected.

108.    Although ████████████████████████████████████████

███████████████████████████████████████████████████[40] Eventually,

Bayview's third-party vendor Compuquip Cybersecurity ("Compuquip") created security alerts on

October 25, 2021, and November 8, 2021, which were ultimately addressed on November 10,

---

[34]   BAYVIEW000002036-038 at -036.

[35]   BAYVIEW000007223-233 at -224.

[36]   BAYVIEW000002036-038 at -036; *see also* BAYVIEW000002158-163 at -160, -163 ████████████████████████████████████ BAYVIEW000019979; BAYVIEW000019980.

[37]   BAYVIEW00002012-020 at -014.

[38]   *Id.*

[39]   BAYVIEW000002012 at 2014-15; BAYVIEW000114332.

[40]   BAYVIEW000002036.

2021. Nearly another month went by before the breach was finally mitigated on December 7, 2021.

109.   Evidence in this case reveals that, at the time of the Data Breach, ███████
████████████████████████████████████████████████████████████████████
█████████████████████████████████████████ a security solution
that helps organizations recognize and address potential security threats and vulnerabilities before
they have a chance to disrupt a business's operations and is an industry-standard data security
control.

110.   Bayview engaged ReliaQuest, LLC ("ReliaQuest"), a third-party security vendor,
to monitor the SIEM, and engaged Compuquip to monitor Sentinel One. At the time of the Data
Breach, Bayview had no system in place to consistently communicate findings and patterns
between ReliaQuest and Compuquip.

111.   On ██████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
███████████████████████████████[42]

112.   That day, Bayview finally began to investigate the Data Breach and ███████
████████████████████████████████████████████████████████████████████
████████████████████████[43]

113.   Bayview then contacted ████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████ related to the Data

---

[41]   BAYVIEW000100830-833 at -831.
[42]   BAYVIEW000010129-132 at -132.
[43]   BAYVIEW000002036-038 at -037.

Breach.[44]

114.    On December 9, 2021, Bayview notified 

115.    During

116.    On

117.    On or around

.[49] After

118.    On or around March 18, 2022, Lakeview reported the Data Breach to the Attorneys

General offices of California,[51] Maine,[52] Massachusetts,[53] and Vermont, among other states.[54] On

---

[44]  Ex. 12 (ECF 136, Ex. B.1).

[45]  BAYVIEW000002012-020 at -014.

[46]  *Id.*

[47]  *Id.*

[48]  BAYVIEW000002036-038 at -037;  *see  also*  BAYVIEW000002158-163  (email correspondence with FBI and Secret Service).

[49]  BAYVIEW000019980.

[50]  BAYVIEW000136711-727; BAYVIEW000136728-747.

[51]  Ex. 1.

[52]  Ex. 3.

[53]  Ex. 4 (sample "Notice of Data Breach" sent to Massachusetts Attorney General's Office).

[54]  Ex. 5 (sample "Notice of Data Breach" sent to Vermont Attorney General's Office).

or around that date, it also began notifying Plaintiffs and Class Members of the Data Breach.

119.    Beginning on or around March 16, 2022, Lakeview sent Plaintiffs and Class Members a form "Notice of Data Breach" substantially similar to the letters sent to the state Attorneys General.[55] Lakeview sent another round of notices on June 23, 2022 following Lakeview's discovery of an additional 100,796 victims.

120.    Lakeview's breach notification letters slightly varied in length and detail provided. The sample letter to the California Attorney General's Office stated in part:

> Lakeview Loan Servicing, LLC ("Lakeview") understands the importance of protecting the information we maintain. We are writing to inform you of an incident that involved some of your information. This notice explains the incident, measures we have taken, and steps that you may consider taking.
>
> **What Happened?**
>
> Lakeview owns the servicing rights to your mortgage loan. A security incident involving unauthorized access to our file servers was identified in early December 2021. Steps were immediately taken to contain the incident, notify law enforcement, and a forensic investigation firm was engaged. The investigation determined that an unauthorized person obtained access to files on our file storage servers from October 27, 2021 to December 7, 2021. The accessed files were then reviewed by our investigation team to identify the content.
>
> **What Information Was Involved?**
>
> On January 31, 2022, the review process generated a preliminary list of individuals, including you, whose name, address, loan number, and Social Security number were included in the files. We then took extensive measures to review that list to ensure accuracy and prepare the list to be used to mail notification letters. For some, the accessed files may also have included information provided in connection with a loan application, loan modification, or other items regarding loan servicing. The additional loan related information in the files is not the same for all individuals.
>
> **What We Are Doing.**
>
> We regret that this incident occurred and apologize for any inconvenience. Additional steps are being taken to further enhance our existing security

---

[55]    *See* Ex. 1.

measures.[56]

121.    Lakeview admitted in the sample letter that unauthorized third persons accessed and actually removed PII from its network systems. The exfiltrated PII included information about current and former customers of Lakeview and its affiliates, including, without limitation: "name[s], address[es], loan number[s], and Social Security number[s]" and, for some, "information provided in connection with a loan application, loan modification, or other items regarding loan servicing."[57] Much of this PII is static, cannot change, and can be used to commit myriad financial crimes.

122.    Pingora began notifying its customers of the Data Breach on April 1, 2022 through letters substantially similar to the Lakeview notification letters.[58]

123.    Community Loan began sending such notifications on May 16, 2022.

124.    Kroll continued to mail out notifications on behalf of all Defendants through at least October 17, 2022.

125.    Plaintiffs' and Class Members' unencrypted PII has already been leaked onto the dark web—as evidenced by the dark web notifications received by multiple Plaintiffs and described below. Unauthorized individuals can now access the PII of Plaintiffs and Class Members and use that information to commit fraudulent acts in their names.

126.    Defendants did not use reasonable security procedures and practices suitable or adequate to protect the sensitive, unencrypted information they were maintaining for consumers.

---

[56]    *Id.* at 1.

[57]    *Id.*

[58]    *See* New Hampshire Dep't of Justice, Office of the Attorney General, *Security Breach Notifications*, https://www.doj.nh.gov/consumer/security-breaches/ (last visited Jan. 12, 2024); *see also* Letter from Baker & Hostetler LLP to Attorney General John Formella (Apr. 6, 2022), https://www.doj.nh.gov/consumer/security-breaches/documents/pingora-loan-servicing-20220406.pdf.

Defendants' gross carelessness allowed cybercriminals to access the PII of approximately 5,813,905 individuals.

### *Defendants Well Understood their Duty to Safeguard the PII in Their Possession*

127.    All Defendants are sophisticated financial entities that knew or should have known that PII—especially Social Security numbers—is an invaluable commodity and a frequent target of hackers.

128.    There were a record 1,802 data breaches in 2022, and 1,862 data breaches in 2021, surpassing 2020's total of 1,108 and the previous record of 1,506 set in 2017.

129.    Further, there have been many recent high profile data breaches of other industry-leading companies, including Microsoft (250 million records; December 2019), Wattpad (268 million records; June 2020), Facebook (267 million users; April 2020), Estee Lauder (440 million records; January 2020), Whisper (900 million records; March 2020), and Advanced Info Service (8.3 billion records; May 2020).

130.    Defendants knew or should have known that their electronic records, containing Social Security numbers, among other valuable personal information, would be and/or had been targeted by cybercriminals.

131.    Bayview was aware of previous data breaches affecting mortgage providers. In March 2021, Flagstar Bank ("Flagstar") suffered a data breach impacting 1.5 million customers, many of whom were Lakeview's, Pingora's, and Community Loan's borrowers. In ███████

████████████████████████████████████████████████████

████████████████████████████████████████████████████ [59]

132.    Around the same time, ███████████████████████████████

---

[59]    BAYVIEW000127669-673 at -670.



133.     Cyberattacks have become so prevalent and problematic that the FBI and Secret

Service regularly issue warnings to potential targets so they are aware of and take appropriate

measures to prepare for and are able to thwart such an attack. Defendants neglected to do so.

### Bayview

134.     Bayview knew that the PII it maintained was a target of data thieves and that it had

a duty to protect Plaintiffs' and Class Members' PII from unauthorized access.

135.     Under its ██████████████████████████ that:



136.     A ████████████████████████████████████████

---

60   BAYVIEW000046204-205 at -204; BAYVIEW000122391-393 at -393.

61   BAYVIEW000010847-858 at -852

62   *Id.*

63   *Id.*

64   *Id.*

65   *Id.*

██████████████████████████████████[66]

137.    Under its policies and procedures, Bayview implemented network security, with an

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████[67]

**Lakeview**

138.    Lakeview knew that the PII it maintained was a target of data thieves and that it had a duty to protect Plaintiffs' and Class Members' PII from unauthorized access.

139.    Lakeview posts its Privacy Policy on its website.[68] This Policy promises consumers that Lakeview will "protect your personal information from unauthorized access and use, [and] use security measures that comply with federal law. These measures include computer safeguards and secured files and buildings."[69] The Privacy Policy further acknowledges that Lakeview collects data directly from consumers when they pay bills, apply for a loan, or provide income or employment information.[70]

140.    The Privacy Policy also states that Lakeview will not share its customers' non-public, personal information with affiliates, non-affiliates, and joint marketing partners "unless we first provide you with further privacy choices."[71]

141.    Lakeview participates in data security meetings organized by Bayview and attended by its affiliates. For example, the ████████████████████████████████████████

---

[66]   BAYVIEW000005066-071 at -071.
[67]   BAYVIEW000002314-327 at -322.
[68]   *See* Ex. 2.
[69]   *Id.*
[70]   *Id.*
[71]   BAYVIEW000006566-574 at 6572.

 [72] Lakeview's Chief Compliance Officer is ███████████████. [73]

142.     Lakeview's Chief Compliance Officer also regularly participates in data security meetings with Bayview officials. ████████████████████████████████████████████████████████████████ [74] ████████████████████████████████████████ [75]

**Pingora**

143.     Pingora knew that the PII it maintained was a target of data thieves and that it had a duty to protect Plaintiffs' and Class Members' PII from unauthorized access.

144.     A Pingora ████████████████████████████████████ ████████████████████████████████████████ and states that ████████████████████████████████████ ████████████████████████████████████████ [76]

145.     At all relevant times, Pingora has continued to provide a similar "Privacy Notice" to the borrowers whose loans it services. [77]

---

[72]   BAYVIEW000147258 at 7258, 7260.
[73]   BAYVIEW000147258 at 7261.
[74]   BAYVIEW000126991 at 6993.
[75]   BAYVIEW000006189-200 at -189.
[76]   BAYVIEW000004233-4332 at -4314.
[77]   *E.g.*, BAYVIEW000003106.

146.    Further, Pingora participates in data security meetings organized by Bayview and attended by its affiliates, ██████████████████████.[78] Pingora's Chief Compliance Officer ████████████████████.[79]

147.    Pingora's Chief Compliance Officer also regularly participates in data security meetings with Bayview officials. ████████████████████████████ ████████████████████████████."[80] Pingora's Chief Compliance Officer was ████████████████████████.[81]

**Community Loan**

148.    Community Loan knew that the PII it maintained was a target of data thieves and that it had a duty to protect Plaintiffs' and Class Members' PII from unauthorized access.

149.    Community Loan's Privacy Policy, posted online, states that "[w]e use commercially reasonable security measures to protect the information we have obtained, in accordance with federal and state regulations."[82]

150.    According to the same policy, Community Loan uses "advanced data-encryption and storage technology to protect your sensitive personal information," and "industry-standard encryption to protect data in transit and at rest. Our internal policies and procedures impose a number of standards to safeguard the confidentiality of personal information, prohibit the unlawful disclosure of personal information, and limit access to personal information."[83]

151.    Additionally, Community Loan informs borrowers that, "[t]o protect your personal

---

[78]   BAYVIEW000147258 at 7260.
[79]   BAYVIEW000147258 at 7261.
[80]   BAYVIEW000126991 at 6993.
[81]   BAYVIEW000006189-200 at -189.
[82]   https://communityloanservicing.com/privacy/(last accessed Jan. 18, 2024).
[83]   *Id.*

information from unauthorized access and use, we use security measures that comply with federal law. These measures include computer safeguards and secured files . . . ."[84]

152.    Further, Community Loan participates in data security meetings organized by Bayview and attended by its affiliates, including ██████████.[85] Community Loan's Chief Compliance Officer ████████████.[86]

153.    Community Loan's Chief Compliance Officer also regularly participates in data security meetings with Bayview officials. ████████████████████ ████████████████████████████ ██████."[87] Community Loan's Chief Compliance Officer was ████████████ ████████████████[88]

154.    Community Loan compliance officers participated in, reviewed, and discussed the results of data security audits conducted by Bayview.[89]

***Personal Identifiable Information Commands Substantial Value on the Black Market***

155.    PII is valuable to criminals, as evidenced by the prices they will pay for it on the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information is sold at prices ranging from $40 to $200, and bank details have a price range of $50 to $200.[90] Experian reports that a stolen credit or debit card number can sell for $5

---

[84]   BAYVIEW000171495-97 at -496.
[85]   BAYVIEW000147258 at -7260.
[86]   BAYVIEW000147258 at -7261.
[87]   BAYVIEW000126991 at -6993.
[88]   BAYVIEW000006189-200 at -189.
[89]   BAYVIEW000006189-200 at -190.
[90]   Anita George, *Your Personal Data Is for Sale on the Dark Web. Here's How Much It Costs,* Digital Trends (Oct. 16, 2019) https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.

to \$110 on the dark web.[91] Criminals also can purchase access to entire sets of information obtained from company data breaches from \$900 to \$4,500.[92]

156.    Social Security numbers are among the most sensitive kind of personal information that is subject to hacking and theft because they may be put to a variety of fraudulent uses and are extremely difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, when they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[93]

157.    What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against potential misuse of a Social Security number is not permitted; an individual instead must show evidence of actual, ongoing fraud to obtain a new number.

158.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the

---

[91]   Brian Stack, *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian (Dec. 6, 2017) https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[92]   *In the Dark*, VPNOverview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

[93]   Social Security Administration, *Identity Theft and Your Social Security Number*, July 2021, https://www.ssa.gov/pubs/EN-05-10064.pdf.

new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[94]

159.    Thus, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, in that situation, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change: names, dates of birth, financial history, and Social Security numbers.

160.    This data commands a much higher price on the black market than other PII. Martin Walter, senior director at cybersecurity firm RedSeal, Inc., explained "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x in price on the black market."[95]

161.    The PII of Plaintiffs and Class Members was taken by hackers to engage in identity theft and/or to sell it to other criminals who will purchase the PII for that purpose. Among other forms of fraud, identity thieves armed with fraudulently obtained Social Security numbers may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

162.    The fraudulent activity resulting from the Data Breach may not come to light for years. There also may be a time lag between when harm occurs and when the victim discovers it, as well as between when PII is stolen or sold and when it is misused. According to the U.S.

---

[94]    Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

[95]    Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, NETWORKWORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[96]

163.    At all relevant times, Defendants knew, or reasonably should have known, of the importance of safeguarding Lakeview's, Pingora's, and Community Loan's current and former customers' PII, including Social Security numbers and financial account information, and of the foreseeable consequences that would occur if Defendants' data security system was breached, including the significant costs that would be imposed on their customers as a result of such a breach.

164.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their PII. Plaintiffs and Class Members relied on Defendants to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

165.    Plaintiff and Class Members now face years of needing to continuously monitor their financial and personal records. Plaintiff and Class Members are incurring and will continue to incur such damage, including valuable lost time, in addition to any fraudulent use of their PII, for their respective lifetimes.

166.    Defendants were, or should have been, fully aware of the unique type and the significant volume of data on their network, comprising millions of individuals' detailed and confidential personal information and, thus, the significant number of individuals who would be

---

[96]   United States Government Accountability Office, Report to Congressional Requesters, *Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, at 29 (June 2007), http://www.gao.gov/new.items/d07737.pdf.

harmed by the exposure of the unencrypted data.

167.    In recognition of this risk—but failing to address the lifetime exposure to identity theft—Defendants have offered identity monitoring services for only a limited time through Kroll (one year or, for a more limited subset of victims in particular states, two years). The offered services are woefully inadequate to protect Plaintiffs and Class Members from the present and continuing threats they face for years to come, particularly in light of the highly sensitive nature of the stolen PII.

168.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendants' failure to implement or maintain adequate data security measures for the PII of Lakeview's, Pingora's, and Community Loan's current and former customers.

### *Defendants Knew Before the Data Breach That Their Data Security Was Inadequate*

169.    As a condition of receiving services from Lakeview, Pingora, and Community Loan, Defendants (by way of their affiliate mortgage lenders) require that consumers entrust them with highly confidential PII. Thus, Defendants acquired, collected, and stored the PII of Lakeview's, Pingora's, and Community Loan's current and former customers.

170.    By obtaining, collecting, and storing Plaintiffs' and Class Members' PII, Defendants assumed legal and equitable duties and knew or should have known that they were responsible for protecting Plaintiffs' and Class Members' PII from disclosure. Defendants not only breached those duties but their internal documents show that, prior to the Data Breach, they were aware of—yet failed to address—flashing red flags of deficiencies in their electronic security defenses.

171.    Despite the prevalence of public announcements of data breach and adverse data security incidents—and their own internal recognition of serious inadequacies in their information security systems—Defendants failed to take appropriate steps to protect the PII of Plaintiffs and

Class Members from being compromised. Defendants could have prevented this Data Breach by properly securing and encrypting Plaintiffs' and Class Members' PII. Defendants also could have limited the harm from the breach by destroying data, including old data that Defendants had no legal right or responsibility to retain.

**Bayview**



172.    Bayview ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . . . ."[97] And yet, as of the date of the Data Breach, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮"[99]

173.    Bayview knew its security posture was insufficient and failed to timely implement proposed security measures to its environment. For example, Bayview IT employees proposed a network segmentation project in both 2020 and 2021, but Bayview did not undertake the needed segmentation until after the Data Breach. Benefits of network segmentation include securing traffic and providing a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮[100]

174.    Prior to the Data Breach, Bayview knew or should have known that it needed clearer organizational structure and responsibility for maintaining the PII of Defendants'

---

[97]    BAYVIEW000006189-200 at -190.
[98]    BAYVIEW000002010-011 at -010; *see also* BAYVIEW000006898-907 at -900, -906.
[99]    BAYVIEW000033873-876 at -873 (emphasis added); *see also* BAYVIEW000127506-509
[100]   BAYVIEW000038066-070 at -068; *see also* BAYVIEW000048948-949.

customers. Internal documents reveal a classic instance of "group think" and organizational inertia.

In ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ „101 ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████ „102

175.    Around the same time, Lakeview, Pingora, and Community Loan staff were participating in their own meetings with Bayview to review data security topics and policies. The agendas for these meetings included items that recognized the urgent need to reform the data security policies and protocols of the enterprise, including: ████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████ [103] The meeting agendas also referred to pressing policy goals for Defendants' data security apparatus, such as ████████████████

---

[101] BAYVIEWEW000138037-8038 at -8037.

[102] BAYVIEW000138039-8040 at -8039.

[103]    BAYVIEW000031240-1241    at    -1240;    BAYVIEW00126859-6860    at    -6859;
BAYVIEW000126861-6862 at -6861.

176.    Bayview also was keenly aware of inadequacies related to its data security vendors. For example, in an August 17, 2021 email discussing ████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████ [105]

177.    Prior to the breach, Bayview employees further conceded that Bayview's privacy protocols ████████████████████ [106]

178.    Also prior to the breach, Bayview employees ████████████████████████

████████████████████████████████████ [107]

179.    ████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████ [108]

---

[104]    BAYVIEW000031240-1241   at   -1240;   BAYVIEW00126859-6860   at   -6859; BAYVIEW000126861-6862 at -6861.

[105]    BAYVIEW000011422-427 at -422 (emphasis added).

[106]    BAYVIEW000127486 (emphasis added).

[107]    BAYVIEW000138033.

[108]    BAYVIEW000148153-180 at -156.

Neither Bayview nor its subsidiaries Lakeview, Pingora, or Community Loan ████████ ████████████████████████████████ prior to the Data Breach.

180.    At the time of the Data Breach, Bayview had ████████████████████████ ███████████████████████████████████████. As of October 11, 2021, Bayview ███████████████████████████████████████[109] Similarly deficient, Bayview's information security event logging lacked proper tools to identify potential threats.

181.    Likewise, in its December 2021 End of Year Report, distributed to Bayview's Chief Executive Officer and Chief Compliance Officer, Bayview's Chief Information Officer ██ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████████████

182.    In Bayview's ████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ██████████████████████████████████████████████████ ████████████████████████████████[112] All areas were related to malicious acts, including the threat of theft of customer data.

183.    Just days before the Data Breach, in ████████████████████████ ██████████████████████████████████████████████████

---

[109]  BAYVIEW000100830-833 at -832.

[110]  BAYVIEW000087865-866 at -865.

[111]  BAYVIEW000008204-238 at -223 (emphasis added).

[112]  *Id.* at -209.



██████████████████████████████████████████████.[113]

184.   In █████████████████████████████████████

████████████████████████████████████████████████

██████.[114]   Among ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████[116]

185.   ████████████████████████████████████████

████████████████████████████████████████████████

██████████████████ ████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████[118]

186.   Defendants did not follow ██████████████████████.

---

[113]  BAYVIEW000002010-011; *see also* BAYVIEW000006898-907 at -900, -906.

[114] BAYVIEW000002578 at slide 3.

[115] *Id*.

[116] *Id*. at slide 4.

[117] *Id*. at slide 7.

[118] *Id*. at slide 3.

187.   Additionally, ███████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████ [119] The ████████████████████

███████████████████████████████████████████████████

███████ [120]

188.   Even after suffering the Data Breach in autumn 2021, Bayview and its affiliates'

electronic security policies and protocols remained deficient. In an internal email exchange ████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████ "[121]

189.   ████████████████████████████████████████

████ [122] A Pingora ████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████ [123]

190.   ████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████ [124]

191.   As of September 2022, Bayview's data retention policies remained substandard. In

[119]   BAYVIEW000088360; *see also* BAYVIEW000006189-200 at -191.

[120]   *Id.* (emphasis added).

[121]   BAYVIEW000147612-614 at -612 (emphasis added).

[122]   BAYVIEW000006915 at 6916.

[123]   BAYVIEW000125645 at 125648-49.

[124]   BAYVIEW000002012-020 at -019-020.

an internal email, ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ [125]

192.     A year after the Data Breach, Bayview officials still were calling for business

segmentation and appropriate PII safeguards. Minutes from ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ [126] For his

part, ███████████████████████████████████████████████████

██████████████████████ [127]

193.     Thus, even after the Data Breach had demonstrated the inadequacy of Bayview's

and its affiliates' data security measures, Defendants still had not made the necessary technical

changes, such as periodically deleting PII, limiting access to PII, and clearly delineating areas of

responsibility among Bayview and its affiliate entities to avoid confusion over data security.

194.     Defendants also failed to comply with basic financial services industry standards

for protecting consumer information. For example, prior to the Data Breach, neither Bayview nor

its Defendant affiliates had a Chief Information and Security Officer ("CISO"). That role was

established by Bayview only after the Data Breach, and there is currently only one CISO—████

████—who oversees data security for Bayview, Lakeview, Pingora, and Community Loan. [128]

195.     By failing to take adequate, industry-standard, recommended steps to safeguard its

customers' PII, Bayview breached legal and equitable duties owed to Plaintiffs and Class

---

[125] BAYVIEW000100276-277 at -276.

[126] BAYVIEW000006915-16 at -16

[127] *Id.* (emphasis added).

[128] Deposition Transcript of ████████████ ("████████.") 14:16-22, 15:6-9, 124:3-8 (Mar. 2, 2023).

Members.

**Lakeview**

196.    Lakeview acquired, collected, and stored the PII of its prior and current customers as a precondition for providing services related to their mortgages.

197.    Lakeview used the Bayview network to upload and store the PII of its customers. Although Bayview managed the network, Lakeview made decisions as to what data was saved, where it was saved, for how long it was saved, and which individuals had permission to access it.

198.    Despite having this level of control over its customers PII, Lakeview did not periodically delete PII for which it no longer had a legitimate business interest in retaining; nor did it instruct Bayview to do so.[129]

199.    In █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[130]

200.    Lakeview did not encrypt the PII it stored on Bayview's network, and knew or should have known that such PII was not encrypted.[131] Bayview's IT department decided what encryption software to use, but Lakeview itself determined which data on its system needed to be encrypted. Lakeview's flagrant failure to encrypt its customers' Social Security numbers and other highly confidential PII exposed this information to unnecessary risk and allowed hackers to obtain it.

201.    Even after Lakeview knew or should have known about the Data Breach, it

---

[129]  BAYVIEW000100276-277 at -276; BAYVIEW000147612-614 at -612.
[130]  BAYVIEW000006915 at 6916.
[131]  BAYVIEW000002010-011 at -010.

continued to maintain unencrypted PII of its customers on its servers instead of deleting it.[132]

**Community Loan**

202.     Community Loan acquired, collected, and stored the PII of its prior and current customers as a precondition for providing services related to their mortgages.

203.     Community Loan used the Bayview network to upload and store the PII of its customers. Although Bayview managed the network, Community Loan made decisions as to what data was saved, where it was saved, for how long it was saved, and which individuals had permission to access it.

204.     Despite having this level of control over its customers PII, Community Loan did not periodically delete PII for which it no longer had a legitimate business interest in retaining; nor did it instruct Bayview to do so.[133]

205.     Community Loan did not encrypt the PII it stored on Bayview's network, and knew or should have known that such PII was not encrypted.[134] Bayview's IT department decided what encryption software to use, but Community Loan itself determined which data on its system needed to be encrypted. Community Loan's flagrant failure to encrypt its customers' PII exposed their information to unnecessary risk and allowed hackers to exfiltrate their data.

206.     Even after Community Loan knew or should have known about the Data Breach, it continued to maintain its customers' unencrypted PII on its servers instead of deleting it.[135]

---

[132]   BAYVIEW000100276-277 at -276; BAYVIEW000147612-614 at -612.
[133]   BAYVIEW000100276-277 at -276; BAYVIEW000147612-614 at -612.
[134]   BAYVIEW000002010-011 at -010.
[135]   BAYVIEW000100276-277 at -276; BAYVIEW000147612-614 at -612.

**Pingora**

207.    Pingora acquired, collected, and stored the PII of its prior and current customers as a precondition for providing services related to their mortgages.

208.    Pingora used the Bayview network to upload and store the PII of its customers. Although Bayview managed the network, Pingora made decisions as to what data was saved, where it was saved, for how long it was saved, and which individuals had permission to access it.

209.    Despite having this level of control over its customers PII, Pingora did not periodically delete PII for which it no longer had a legitimate business interest in retaining; nor did it instruct Bayview to do so.[136]

210.    Pingora knew or should have known that it had no business interest in retaining its customers PII, and that maintaining it without encryption posed a dire security risk. For example, a ███████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████ Pingora's ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████[137] The ██████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████████ ████████████████████ . . . ,"[138]

211.    Mortgage servicers transmit files to Pingora on a daily basis which are ingested into Pingora's databases. Pingora acknowledged that ██████████████████████████████████

---

[136]  BAYVIEW000100276-277 at -276; BAYVIEW000147612-614 at -612.

[137]  BAYVIEW000125645 at 125648-49.

[138]  *Id*.

███████████████████████████████████████████

████████████████████ [139]

212.     Pingora did not encrypt the PII it stored on Bayview's network, and knew or should have known that such PII was not encrypted.[140] Bayview IT decided what encryption software to use, but Pingora determined which data on its system needed to be encrypted. Pingora's flagrant failure to encrypt its customers' PII exposed their information to unnecessary risk and allowed hackers to exfiltrate their data.

213.     Even after Pingora knew or should have known about the Data Breach, it continued to maintain its customers' unencrypted PII on its servers instead of deleting it.[141]

***Defendants' Inadequate Data Security Measures Failed to Comply with Regulations and Industry Practices***

214.     Defendants' inadequate security measures violated applicable rules, regulations, and standards regarding data security. By not taking adequate security measures, Defendants Bayview, Lakeview, Pingora, and Community Loan violated the Gramm-Leach-Bliley Act ("GLBA"), 15 U.S.C. § 6801, *et seq*., and the industry best practices that the GLBA requires for financial institutions.

215.     The GLBA defines a financial institution as "any institution the business of which is engaging in financial activities as described in Section 1843(k) of Title 12 [The Bank Holding Company Act of 1956]." 15 U.S.C. § 6809(3)(A). Defendants qualify as financial institutions under this definition and hence are subject to the GLBA.

216.     Defendants collect nonpublic PII, as defined by 15 U.S.C. § 6809(4)(A), 16 C.F.R.

---

[139] *Id.*

[140] BAYVIEW000002010-011 at -010.

[141] BAYVIEW000100276-277 at -276; BAYVIEW000147612-614 at -612.

§ 313.3(n) and 12 C.F.R. § 1016.3(p)(1). Accordingly, during the relevant period Defendants were subject to the requirements of the GLBA, 15 U.S.C. § 6801.1, *et seq.*, and are subject to numerous rules and regulations promulgated under the GLBA.

217.    The GLBA Privacy Rule became effective on July 1, 2001. *See* 16 C.F.R. Part 313. Since the enactment of the Dodd-Frank Act on July 21, 2010, the CFPB became responsible for implementing the Privacy Rule. In December 2011, the CFPB restated the implementing regulations in an interim final rule that established the Privacy of Consumer Financial Information, Regulation P, 12 C.F.R. § 1016 ("Regulation P"), with the final version taking effect on October 28, 2014.

218.    Accordingly, Defendants' conduct is governed by the Privacy Rule prior to December 30, 2011, and by Regulation P after that date.

219.    Further, the Safeguards Rule, which implements Section 501(b) of the GLBA, 15 U.S.C. § 6801(b), requires financial institutions to protect the security, confidentiality, and integrity of customer information by developing a comprehensive written information security program that contains reasonable administrative, technical, and physical safeguards, including: (1) designating one or more employees to coordinate the information security program; (2) identifying reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information, and assessing the sufficiency of any safeguards in place to control those risks; (3) designing and implementing information safeguards to control the risks identified through risk assessment, and regularly testing or otherwise monitoring the effectiveness of the safeguards' key controls, systems, and procedures; (4) overseeing service providers and requiring them by contract to protect the security and confidentiality of customer information; and (5) evaluating and adjusting the information security program in light of the results of testing and

monitoring, changes to the business operation, and other relevant circumstances. 16 C.F.R. §§ 314.3 and 314.4. As alleged herein, Defendants violated the Safeguard Rule.

220.   Defendants failed to assess reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information.

221.   Defendants' conduct resulted in myriad failures to follow GLBA-mandated rules and regulations, many of which are also industry standard. Among such deficient practices, the Defendants failed to implement (or inadequately implemented) information security policies or procedures such as effective employee training, sufficient endpoint threat detection and response systems, regular reviews of audit logs and records, proper encryption and storage of customers' PII, and other similar measures to protect the confidentiality of the PII Defendants maintained in their data systems.

222.   Defendants' security failures also demonstrate that they failed to honor their express and implied promises, including by failing to:

    a.   maintain an adequate data security system to reduce the risk of data breaches and cyberattacks;

    b.   adequately protect borrowers' PII from unauthorized disclosure;

    c.   implement policies and procedures to prevent, detect, contain, and correct security violations;

    d.   implement procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports;

    e.   protect against any reasonably anticipated threats or hazards to the security or integrity of PII; and

    f.   effectively train all members of their workforce on the policies and procedures

with respect to PII as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of PII.

223.     Had Defendants implemented such data security protocols, the consequences of the Data Breach could have been avoided, or at least significantly reduced (inasmuch as the exposure could have been detected earlier); the amount of PII compromised could have been greatly reduced; and affected consumers could have been notified—and taken self-protection and mitigating actions—much sooner.

224.     Defendants' practices also violated the FTC Act, 15 U.S.C. § 45. The FTC has brought enforcement actions under the FTC Act against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

225.     The FTC has interpreted Section 5 of the FTC Act to encompass failures to appropriately store and maintain personal data. Similarly, the body of law created by the FTC and generated by its enforcement actions recognizes that failure to restrict access to information and failure to segregate access to information may violate the FTC Act.

226.     Defendants' failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

## V. PLAINTIFF-SPECIFIC ALLEGATIONS

### *Plaintiff Mark Arthur's Experience*

227.     Plaintiff Mark Arthur did not use Pingora's services when he took out a mortgage

on his home. To his knowledge, Pingora has never serviced his mortgage and he has never willingly provided any of his PII to Pingora. Instead, as a condition to receiving loan services from his mortgage originator and servicers, whom he believes provided his PII to Pingora, Plaintiff Arthur provided his PII to those mortgage originators and servicers, which they provided to Pingora. The PII was then entered into Pingora's database and maintained by Pingora on Bayview's network.

228.    Plaintiff Arthur greatly values his privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Arthur took reasonable steps to maintain the confidentiality of his PII.

229.    Plaintiff Arthur received a letter dated November 4, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network that contained his name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

230.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Arthur faces, Defendant Pingora offered him a one-year subscription to a credit monitoring service. Plaintiff Arthur has not signed up for the program as he does not trust Defendant's chosen vendor with his PII. Additionally, Plaintiff Arthur does not believe this is sufficient to protect his identity from the ongoing risks of theft he faces.

231.    Since learning of the Data Breach, Plaintiff Arthur has spent additional time reviewing his bank statements, credit cards, and reviewing his emails for fraud alerts. Since November 2022, he has spent approximately five hours reviewing his bank, credit and debit card statements; and reviewing his emails for fraud alerts or otherwise suspicious account activity.

Moreover, Plaintiff expended this time at Pingora's direction. In the notice letter Plaintiff received, Pingora directed Plaintiff to spend time mitigating his losses by "reviewing your account statements and free credit reports for unauthorized activity."

232. Plaintiff Arthur has experienced an increase of other spam calls, text messages, and emails after the Data Breach, receiving new spam emails daily.

233. Plaintiff Arthur plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

234. Additionally, Plaintiff Arthur is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

235. Plaintiff Arthur stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently and periodically chooses unique usernames and passwords for his various online accounts.

236. Plaintiff Arthur has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### *Plaintiff Jorge Gonzalez's Experience*

237. Plaintiff Gonzalez used Lakeview's services when his home mortgage was transferred to Lakeview. As a condition to receiving loan services from Lakeview, Plaintiff Gonzalez provided Lakeview with his PII, which was then entered into Lakeview's database and maintained by Lakeview on Bayview's network.

238. Plaintiff Gonzalez greatly values his privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Gonzalez took reasonable

steps to maintain the confidentiality of his PII.

239.    Plaintiff Gonzalez received a letter dated March 18, 2022, from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network that contained his name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

240.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Gonzalez faces, Defendant Lakeview offered him a one-year subscription to a credit monitoring service. Plaintiff Gonzalez signed up for the program on April 6, 2022, in an attempt to mitigate the harms he suffered as a result of the Data Breach. Plaintiff Gonzalez froze his credit and opened an account with the FTC to report fraud and obtain a Recovery Plan from Identity Theft the day after he received the Notice of Data Breach. Plaintiff Gonzalez changed his passwords and contacted his bank. Plaintiff Gonzalez has also purchased Experian credit monitoring at a cost of $34.99 per month, and Zandar Insurance at a cost of $145 per year.

241.    Since the Data Breach, Plaintiff Gonzalez experienced identity fraud in the form of fraudulent financial accounts opened using his information. For example, on or around April 11, 2022, Plaintiff Gonzalez received a Chime Visa Debit card that he had not applied for. Similarly, in April 2022, Plaintiff Gonzalez received notice of a Wells Fargo account that had fraudulently been opened around March 26, 2022, using his PII. On or around July 14, 2022, Plaintiff Gonzalez received an email notification welcoming him to a checking account that he had not opened. On or around August 13, 2022, Plaintiff Gonzalez received a notification from his Experian credit monitoring service, which advised him that his Social Security number had been used to open a Defendants 360 account.

242.     As a result of the opening of these unauthorized accounts, Plaintiff Gonzalez was required to contact the respective institutions to immediately close each of the accounts. Plaintiff Gonzalez also filed police reports about these fraudulent accounts. He reasonably believes the unauthorized accounts were opened as a result of the Data Breach given that these incidents occurred relatively soon after the Data Breach, and he had experienced no other previous incidents like this.

243.     Plaintiff Gonzalez has had to close three unauthorized financial accounts that were fraudulently opened using his PII. He spent considerable time in connection with closing these accounts, filing police reports, contacting the Social Security office and USAA Bank Services about the Data Breach and the subsequent identity theft, contacting the FTC and opening an account with identitytheft.gov, freezing his credit reports, and taking other actions in response to the Data Breach. Since learning of the Data Breach, Plaintiff Gonzalez has spent additional time reviewing his bank statements, credit cards, and credit monitoring reports.

244.     Plaintiff Gonzalez estimates that he spent approximately 15 hours on the foregoing mitigation steps. Plaintiff expended this time at Lakeview's direction. In the notice letter Plaintiff received, Lakeview directed Plaintiff to spend time mitigating his losses by "reviewing your account statements and free credit reports for unauthorized activity."

245.     Plaintiff Gonzalez plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

246.     Plaintiff Gonzalez also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Lakeview in exchange for mortgage services.

247.   Plaintiff Gonzalez has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially with his Social Security number now in the hands of criminals.

248.   Because of the Data Breach, Plaintiff Gonzalez is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

249.   Additionally, Plaintiff Gonzalez is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

250.   Plaintiff Gonzalez stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently and periodically chooses unique usernames and passwords for his various online accounts.

251.   Plaintiff Gonzalez has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### *Plaintiff Robert Keach's Experience*

252.   As a condition to receiving loan services from his mortgage originator and servicers, whom he believes provided his PII to Pingora, Plaintiff Keach provided his PII to those mortgage originators and servicers. The PII was then provided to Pingora and entered into Pingora's database and maintained by Pingora on Bayview's network.

253.   Plaintiff Keach greatly values his privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Keach took reasonable steps to maintain the confidentiality of his PII.

254.   Plaintiff Keach received a letter dated April 6, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on

Pingora's network that contained his name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

255.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Keach faces, Defendant Pingora offered him a one-year subscription to a credit monitoring service. Plaintiff Keach has signed up for the program but does not believe it is sufficient to protect his identity from the ongoing risks of theft he faces into the indefinite future. Plaintiff also signed up for McAfee and Avast around April 6, 2022.

256.    In December 2021, Plaintiff Keach experienced identity fraud in the form of an unauthorized $413 charge for a "security plan" through "Geek Squad"; and in April 2022 he had an unauthorized charge of $284.99 from Norton LifeLock. He believes these unauthorized charges are a result of the Data Breach given that they occurred after the Data Breach, and he had experienced no previous fraudulent charges.

257.    Since learning of the Data Breach, Plaintiff Keach has spent additional time reviewing his bank statements, credit cards, and reviewing his emails for fraud alerts. Since April 2022, he has spent approximately one hour every day reviewing his bank, credit and debit card statements; and reviewing his emails for fraud alerts or otherwise suspicious account activity. Plaintiff expended this time at Pingora's direction. In the notice letter Plaintiff received, Pingora directed Plaintiff to spend time mitigating his losses by "reviewing your account statements and free credit reports for unauthorized activity."

258.    Plaintiff Keach has experienced an increase in spam calls, text messages and emails since the Data Breach.

259.    Plaintiff Keach has received numerous emails showing transactions and invoices

using his name and email, for which he is not responsible.

260.     Plaintiff Keach plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

261.     Plaintiff Keach also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Pingora in exchange for mortgage services.

262.     Plaintiff Keach has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially with his Social Security number now in the hands of criminals.

263.     Because of the Data Breach, Plaintiff Keach is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

264.     Additionally, Plaintiff Keach is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

265.     Plaintiff Keach stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently and periodically chooses unique usernames and passwords for his various online accounts.

266.     Plaintiff Keach has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

267.     Pursuant to § 1798.150(b) of the CCPA, Plaintiff Keach gave written notice to Defendant Pingora and Bayview of their specific violations of § 1798.150(a) by certified mail

dated April 14, 2022.[142] Pingora responded on April 29, 2022 but failed to cure.[143] Bayview has not responded.

### *Plaintiff Cindy Villanueva's Experience*

268.    Plaintiff Villanueva took out a loan to purchase her home. The original servicer was Dignified Home Loans. On or around December 6, 2019, Lakeview purchased the mortgage. As a condition to providing Plaintiff Villanueva loan services, Lakeview required access to Plaintiff Villanueva's PII, which it received and entered into its database on Bayview's network to maintain.

269.    Plaintiff Villanueva greatly values her privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Villanueva took reasonable steps to maintain the confidentiality of her PII.

270.    Plaintiff Villanueva received a letter dated March 17, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network that contained her name, address, loan number, Social Security number, and, potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

271.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Villanueva faces, Defendant Lakeview offered her a one-year subscription to a credit monitoring service.

272.    In or around April 2022, Plaintiff Villanueva discovered that an individual in Washington was attempting to purchase approximately $900 worth of electronics using her

---

[142] Ex. 6 (R. Keach, M. Keach, and Saporta CCPA Notice).
[143] Ex. 7 (CCPA Responses).

Amazon account. Later the same month, Plaintiff Villanueva was notified that a second subscription to Amazon was opened in her name and her account was charged $150.

273.     Later the same month, Plaintiff Villanueva received a call from a man purporting to be an Amazon employee, who claimed that someone had tried to purchase a phone with her Amazon account, and tried to convince her to open two Bitcoin accounts. Later that day, Plaintiff Villanueva received alerts from her bank that someone had attempted to open two new accounts in her name, requiring her to call her bank and later drive to the bank location in person.

274.     Plaintiff Villanueva has also experienced various unauthorized deductions continuously appearing in her checking account. Plaintiff Villanueva cancelled her debit card and requested a new one to stop the unauthorized charges.

275.     Plaintiff Villanueva spent considerable time addressing the unauthorized Amazon account and debit card charges.

276.     Since learning of the Data Breach, Plaintiff Villanueva has spent additional time reviewing her bank statements and credit cards. Every day, she reviews her Amazon account information and bank, credit card and debit card statements. She often has to go to her bank to dispute unauthorized charges. Plaintiff Villanueva expended this time at Lakeview's direction. In the notice letter Plaintiff Villanueva received, Lakeview directed Plaintiff Villanueva to spend time mitigating her losses by "reviewing your account statements and free credit reports for unauthorized activity."

277.     Plaintiff Villanueva has experienced an increase in spam calls, text messages, and emails after the Data Breach. As a result of this increase in spam, Plaintiff Villanueva stopped using her Hotmail email address.

278.    Plaintiff Villanueva plans to take additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

279.    Additionally, Plaintiff Villanueva is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

280.    Plaintiff Villanueva stores any documents containing her PII in a safe and secure location or destroys the documents. Moreover, she diligently and periodically chooses unique usernames and passwords for her various online accounts.

281.    Plaintiff Villanueva has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

282.    On April 29, 2022 Plaintiff Villanueva transmitted a 30-day Notice of Claim pursuant to Cal. Civ. Code § 1798.150 to Defendant Lakeview alleging it violated the CCPA and demanding it cure such violation within 30 calendar days of the date of her Notice of Claim.

283.    Lakeview never responded to Plaintiff Villanueva's Notice of Claim.

***Plaintiff Deborah Hamilton's Experience***

284.    Plaintiff Hamilton took out a loan to purchase her home. The original servicer was Fairway Independent Mortgage. Lakeview purchased the mortgage. As a condition to providing Plaintiff Hamilton loan services, Lakeview required access to Plaintiff Hamilton's PII, which it received and entered into its database on Bayview's network to maintain.

285.    Plaintiff Hamilton greatly values her privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Hamilton took reasonable steps to maintain the confidentiality of her PII.

286.    Plaintiff Hamilton received a letter dated March 18, 2022, from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network that contained her name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

287.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Hamilton faces, Defendant Lakeview offered her a one-year subscription to a credit monitoring service. Plaintiff Hamilton signed up for the program in an attempt to mitigate the harms she suffered as a result of the Data Breach. She also purchased LifeLock identity theft protection at an annual cost of $339 per year on or around July 25, 2022. On or around July 2023, Plaintiff Hamilton renewed LifeLock at an additional fee of $349 because the monitoring service, Kroll, provided by Lakeview only lasted for one year.

288.    On or around February 23, 2022, Plaintiff Hamilton experienced identity fraud in the form of an unauthorized charge of $508 on her payment card. As a result, she was required to file a police report in response to the fraudulent charge. She believes the unauthorized charge is a result of the Data Breach given that it occurred relatively soon after the Data Breach, and she had no other previous fraudulent charges on her card.

289.    Since learning of the Data Breach, Plaintiff Hamilton has spent additional time reviewing her bank statements and credit card statements. Plaintiff Hamilton estimates she has spent approximately 10 hours per month responding to the Data Breach, including: reviewing her bank, credit, and debit card statements; attempting to obtain reimbursement of the $508 unauthorized charge; filing a police report about the fraudulent charge; and calling Lakeview to confirm the Data Breach and obtain further information. Plaintiff expended this time at Lakeview's

direction. In the notice letter Plaintiff received, Lakeview directed Plaintiff to spend time mitigating her losses by "reviewing your account statements and free credit reports for unauthorized activity."

290.    Plaintiff Hamilton plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

291.    Plaintiff Hamilton also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant Lakeview in exchange for mortgage services.

292.    Plaintiff Hamilton has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially with her Social Security number now in the hands of criminals.

293.    Because of the Data Breach, Plaintiff Hamilton is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

294.    Additionally, Plaintiff Hamilton is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

295.    Plaintiff Hamilton stores any documents containing her PII in a safe and secure location or destroys the documents. Moreover, she diligently and periodically chooses unique usernames and passwords for her various online accounts.

296.    Plaintiff Hamilton has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

*Plaintiff Michael Kassem's Experience*

297.    Plaintiff Kassem used Pingora's services when his home mortgage was transferred to Pingora. As a condition to receiving loan services from Pingora, Plaintiff Kassem's PII was provided to Pingora, which was then entered into Pingora's database and maintained by Pingora on Bayview's network.

298.    Plaintiff Kassem greatly values his privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Kassem took reasonable steps to maintain the confidentiality of his PII.

299.    Plaintiff Kassem received a letter dated April 6, 2022, from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network that contained his name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

300.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Kassem faces, Defendant Pingora offered him a one-year subscription to a credit monitoring service. Plaintiff Kassem signed up for the program in an attempt to mitigate the harms he suffered as a result of the Data Breach. Plaintiff Kassem has also purchased Experian credit monitoring at a cost of $25 per month because he does not believe the program offered by Pingora is sufficient.

301.    Since the Data Breach, Plaintiff Kassem experienced identity fraud in the form of unemployment fraud. In or around December 2021, Plaintiff Kassem was notified by the Georgia Department of Labor that someone had filed a fraudulent unemployment claim using his Social Security number. As a result, he was required to contact the Department of Labor concerning the

fraudulent unemployment claim. He also filed a police report concerning the incident. Plaintiff Kassem had to drive to the police station to file the police report concerning fraudulent unemployment claim and estimates that he expended approximately $12 in gas money as a result. Plaintiff Kassem believes the fraudulent unemployment claim is a result of the Data Breach given that it occurred relatively soon after the Data Breach, and he has had no previous experiences of fraudulent unemployment claims being filed using his PII.

302.    On June 20, 2022, Plaintiff Kassem's PayPal account was used without authorization. On September 24, 2022, Plaintiff Kassem's Regions bank account was accessed without authorization. On June 19, 2022, and September 10, 2022, his Truist bank account was accessed without authorization. On September 9, 2022, his Wells Fargo bank account was accessed without authorization. Plaintiff believes these unauthorized actions are a result of the Data Breach due to the proximity in time.

303.    Plaintiff Kassem locked his accounts with Equifax, Transunion and Experian on September 6, 2022.

304.    Plaintiff Kassem spent considerable time in connection with reporting the fraudulent unemployment claim and coordinating with the Department of Labor about the issue; filing a police report; researching and signing up for credit monitoring; placing a freeze on his credit reports; reviewing his bank statements, credit card statements, and credit monitoring reports; carefully reviewing his emails and other personal information for suspicious activity; and taking other steps in an attempt to mitigate the harm caused as a result of the Data Breach.

305.    Plaintiff Kassem estimates that he has spent more than 40 hours on the foregoing mitigation steps. Plaintiff expended this time at Pingora's direction. In the notice letter Plaintiff received, Pingora directed Plaintiff to spend time mitigating his losses by "reviewing your account

statements and free credit reports for unauthorized activity."

306.    Plaintiff Kassem plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

307.    Plaintiff Kassem also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Pingora in exchange for mortgage services.

308.    Plaintiff Kassem has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially with his Social Security number now in the hands of criminals.

309.    Because of the Data Breach, Plaintiff Kassem is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

310.    Additionally, Plaintiff Kassem is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

311.    Plaintiff Kassem stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently and periodically chooses unique usernames and passwords for his various online accounts.

312.    Plaintiff Kassem has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### Plaintiff Beth Berg's Experience

313.    Lakeview was the servicer for the residential mortgage on Plaintiff Berg's home. As a condition to receiving loan services from Lakeview, Plaintiff Berg provided her PII which

was then entered into Lakeview's database and maintained by Lakeview on Bayview's network.

314.    Plaintiff Berg greatly values her privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Berg took reasonable steps to maintain the confidentiality of her PII.

315.    Plaintiff Berg received a letter dated March 21, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network that contained her name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

316.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Berg faces, Defendant Lakeview offered her a one-year subscription to a credit monitoring service.

317.    Following the Data Breach, an unauthorized individual opened a checking account in Plaintiff Berg's name with Bank of America. On or about March 4, 2022, Plaintiff Berg received a Bank of America credit card in the mail containing her name. Shortly after, Plaintiff Berg received a letter from Bank of America asking her to call the bank as a result of "suspicious activity." She later learned that someone obtained a cash advance in her name from Bank of America in the amount of $3,500 (which included an additional $200 in fees). This money was then deposited in the fraudulent checking account that had been opened in her name. Plaintiff Berg directed Bank of America to freeze the checking account and close the credit card. She then contacted credit reporting agencies and was told that if she did not make a payment on the fraudulently obtained credit card, her credit score would decrease by approximately 25 to 100 points. As a result, Plaintiff Berg was forced to make a payment of $57 toward the credit card

balance to avoid a negative impact on her credit score. This payment was never refunded.

318.    In February 2022, an unauthorized actor filed a 2021 federal tax return in her name and fraudulently obtained an approximately $19,000 tax refund. The tax refund was deposited in an online bank account, which the unauthorized actor closed shortly thereafter. As a result, Plaintiff Berg was forced to file a corrected 2021 tax return, and she still has not received the tax refund owed to her. Plaintiff Berg had to schedule an in-office appointment to meet with an IRS agent regarding this fraud. During the appointment, she discovered that someone had also filed a claim for 2022 using her information.

319.    On March 18, 2023, Plaintiff Berg was notified by email that BMO Bank declined an application for a checking account. On March 25, 2023, Plaintiff Berg received a letter from Barclays informing her of five checking accounts and five savings accounts fraudulently opened in her name on or around March 14, 2023.

320.    Plaintiff Berg believes the fraud she suffered was a result of the Data Breach, including given the timing of the Data Breach, the types of data impacted, and her diligence in maintaining PII in a secure manner.

321.    Plaintiff Berg was forced to spend significant time dealing with the fraudulent activity in her name, including approximately 80 phone calls with Bank of America, three trips to a local Bank of America branch (which required her to utilize her own vehicle and fuel), several communications with the IRS, and the filing of a police report. In total, Plaintiff Berg estimates that she spent over 100 hours dealing with the fraud committed against her.

322.    Plaintiff Berg purchased layered protection ESET, which she renews for $120 a year. After the Data Breach, in 2022, Plaintiff Berg added protection for her phone on her ESET plan.

323.     Plaintiff Berg plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

324.     Plaintiff Berg also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant Lakeview in exchange for mortgage services.

325.     Plaintiff Berg has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially with her Social Security number now in the hands of criminals.

326.     Because of the Data Breach, Plaintiff Berg is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

327.     Additionally, Plaintiff Berg is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Berg stores any documents containing her PII in a safe and secure location or destroys the documents.

328.     Plaintiff Berg has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### Plaintiff Savannah Farley's Experience

329.     Lakeview was the servicer for the residential mortgage on Plaintiff Farley's home. As a condition to receiving loan services from Lakeview, Plaintiff Farley provided her PII which was then entered into Lakeview's database and maintained by Lakeview on Bayview's network.

330.     Plaintiff Farley greatly values her privacy and PII, especially in connection with

receiving loan and other financial services. Prior to the Data Breach, Plaintiff Farley took reasonable steps to maintain the confidentiality of her PII.

331.    Plaintiff Farley received a letter dated March 18, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network that contained her name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

332.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Farley faces, Defendant Lakeview offered her a one-year subscription to a credit monitoring service. After receiving the letter, Plaintiff Farley signed up for this service. Plaintiff Farley also purchased credit monitoring through Experian, which required an initial payment of approximately $30 and monthly charges thereafter of $5.99.

333.    In November 2021, Plaintiff Farley experienced fraud in the form of approximately 80 unauthorized charges on her credit card. Plaintiff Farley learned of this fraud after attempting to use her credit card and having her purchase declined as a result of the fraudulent activity, of which she previously had been unaware. Because her card was frozen as a result of the unauthorized charges, Plaintiff Farley was unable to purchase Easter gifts for her children. After learning of the fraudulent charges, she spent several hours communicating with her bank via phone and email over the course of several weeks. She was also required to take time off work to file a police report on or around April 27, 2022, concerning the fraud on her account. Plaintiff also placed a fraud alert on her Transunion account on April 27, 2022.

334.    Plaintiff Farley believes the fraud was a result of the Data Breach given the timing, the type of data impacted, her diligence in maintaining her PII in a safe and secure manner, and

the fact that, to her knowledge, she has never before been a victim of identity theft or fraud.

335.    Since learning of the Data Breach, Plaintiff Farley has spent (and will continue to spend) additional time reviewing her bank statements and credit cards. Plaintiff Farley expended this time at Lakeview's direction. In the notice letter Plaintiff Farley received, Lakeview directed Plaintiff Farley to spend time mitigating her losses by "reviewing your account statements and free credit reports for unauthorized activity."

336.    Plaintiff Farley plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

337.    Plaintiff Farley also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant Lakeview in exchange for mortgage services.

338.    Plaintiff Farley has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially with her Social Security number now in the hands of criminals.

339.    Because of the Data Breach, Plaintiff Farley is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

340.    Plaintiff Farley is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source. Plaintiff Farley stores any documents containing her PII in a safe and secure location or destroys the documents.

341.    Plaintiff Farley has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### *Plaintiff Thomas Lapenter's Experience*

342.     Plaintiff Lapenter took out a loan in or around December 2018 to purchase his home. The original loan servicer was Mr. Cooper. He then refinanced with Rocket Mortgage, from which Pingora purchased the mortgage. As a condition to providing Plaintiff Lapenter loan services, Pingora accessed his PII, which it then entered into its database and maintained on Bayview's network.

343.     Plaintiff Lapenter greatly values his privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Lapenter took reasonable steps to maintain the confidentiality of his PII.

344.     Plaintiff Lapenter received a letter dated April 6, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network that contained his name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

345.     Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Lapenter faces, Defendant Pingora offered him a one-year subscription to a credit monitoring service. Plaintiff Lapenter did not sign up for the subscription. Plaintiff Lapenter instead signed up and paid for a monthly subscription for identity protection services through LifeLock in or about April or May 2022. He also paid to have his credit frozen. Plaintiff purchased Discover credit monitoring services on April 19, 2022, and instituted a credit freeze.

346.     Since October 2021, Plaintiff Lapenter has noticed suspicious bank activities and has had accounts opened under his name without authorization. Specifically, Plaintiff Lapenter learned that someone submitted a fraudulent loan application to his bank in his name when he

received a loan denial letter in the mail then contacted his bank. Plaintiff Lapenter received another letter from his bank on or around May 6, 2022, stating that the loan application had been investigated and was considered to be fraudulent. Plaintiff Lapenter reasonably believes that this fraudulent loan application was related to the Data Breach, including because it occurred just after the Data Breach. Also, the bank confirmed that the person used Plaintiff Lapenter's Social Security number on the application—information that was exposed in the Data Breach.

347.    Plaintiff Lapenter has spent approximately 20 hours contacting credit bureaus, banks, freezing his credit, purchasing identity theft services that he trusts, and monitoring credit reports. Plaintiff Lapenter expended this time at Pingora's direction. In the notice letter Plaintiff Lapenter received, Pingora directed Plaintiff Lapenter to spend time mitigating his losses by "reviewing your account statements and free credit reports for unauthorized activity."

348.    Plaintiff Lapenter plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

349.    Plaintiff Lapenter also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Pingora in exchange for mortgage services.

350.    Plaintiff Lapenter has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially with his Social Security number now in the hands of criminals.

351.    Because of the Data Breach, Plaintiff Lapenter is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

352.    Additionally, Plaintiff Lapenter has spent $15 per month on his identity theft

protection services, and he has also spent money to place credit freezes on his and his wife's credit reports. The credit freezes have made it more difficult for Plaintiff Lapenter to get loans for his business.

353.   Plaintiff Lapenter is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

354.   Plaintiff Lapenter stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently and periodically chooses unique usernames and passwords for his various online accounts.

355.   Plaintiff Lapenter has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### *Plaintiff Hardik Sevak's Experience*

356.   Plaintiff Sevak used Lakeview's services when Lakeview acquired his mortgage on his home in Floral Park, New York. As a condition to receiving loan services from Lakeview, Plaintiff Sevak's PII was provided to Lakeview, which was then entered into Lakeview's database and maintained by Lakeview on Bayview's network.

357.   Plaintiff Sevak greatly values his privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Sevak took reasonable steps to maintain the confidentiality of his PII.

358.   Plaintiff Sevak received a letter dated March 16, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network that contained his name, address, loan number, and Social Security number.

359.   Recognizing the present, immediate, and substantially increased risk of harm

Plaintiff Sevak faces, Defendant Lakeview offered him a one-year subscription to a credit monitoring service.

360.    In December 2021, Plaintiff Sevak experienced identity fraud in the form of an unauthorized third party attempting to secure financing in his name from Synchrony Bank. As a result, he contacted the bank to stop the fraudulent activity. He believes the unauthorized financing is a result of the Data Breach given that it occurred after the Data Breach, and he had no other previous fraudulent activity. From December 2021 through June 2022, Plaintiff Sevak received four calls from Experian regarding unauthorized individuals who were attempting to open lines of credit in his name.

361.    Since learning of the Data Breach Plaintiff Sevak has had to sign up for credit monitoring, identity theft and loss protection, including insurance against identity theft and identity restoration services. Plaintiff Sevak froze his credit shortly after the incident. He now uses services provided by Credit Karma, Experian, and Transunion to protect his identity.

362.    Since learning of the Data Breach, Plaintiff Sevak has spent additional time reviewing his credit reports, bank statements and credit cards. Since the Data Breach, Plaintiff Sevak's information has been used by at least one unauthorized individual who attempted to open multiple fraudulent accounts and/or lines of credit in his name. As a result, he has spent approximately 250 hours resolving issues related to these fraudulent accounts, including but not limited to: reviewing his bank, credit and debit card statements; reviewing his emails for credit alerts; and reviewing his credit reports for any unauthorized charges. Plaintiff Sevak devoted this time at Lakeview's direction. In the notice letter Plaintiff received, Lakeview directed Plaintiff Sevak to spend time mitigating his losses by "reviewing your account statements and free credit reports for unauthorized activity."

363.    Plaintiff Sevak has experienced an increase in spam calls, text messages and emails since the Data Breach. The spam calls often included alarming personal details, which further contributed to Plaintiff Sevak's concern for his personal privacy and the safety of his identity. Moreover, following the Data Breach he received four phone calls from Experian regarding unauthorized individuals who were attempting to open lines of credit in his name.

364.    Plaintiff Sevak plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

365.    Plaintiff Sevak also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Lakeview in exchange for mortgage services.

366.    Plaintiff Sevak has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially with his Social Security number now in the hands of criminals.

367.    Because of the Data Breach, Plaintiff Sevak is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

368.    Additionally, Plaintiff Sevak is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

369.    Plaintiff Sevak stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently and periodically chooses unique usernames and passwords for his various online accounts.

370.    Plaintiff Sevak has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### *Plaintiff Peter Wojciechowski's Experience*

371.    Plaintiff Wojciechowski took out a loan to purchase his home through Pulte Homes, a home builder. Lakeview purchased the mortgage two months later, in or around August 2021. As a condition to providing Plaintiff Wojciechowski loan services, Lakeview required access to his PII, which it then entered into its database and maintained on Bayview's network.

372.    Plaintiff Wojciechowski greatly values his privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Wojciechowski took reasonable steps to maintain the confidentiality of his PII.

373.    Plaintiff Wojciechowski received a letter dated March 18, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network that contained his name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

374.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Wojciechowski faces, Defendant Lakeview offered him a one-year subscription to a credit monitoring service. Plaintiff Wojciechowski signed up for the one-year subscription on or around April 13, 2022. Plaintiff Wojciechowski placed a credit freeze with all three credit bureaus on or around May 19, 2022.

375.    Plaintiff Wojciechowski experienced a fraud attempt on his United Services Automobile Association ("USAA") account where his name, date of birth, routing, and checking

account information were compromised.

376.    Since October 2021, Plaintiff Wojciechowski has noticed suspicious bank activities. Specifically, he incurred a fraudulent Apple Store charge of $708 on or around May 18, 2022. A woman in Florida used Plaintiff Wojciechowski's account and routing number to perform an electronic funds transfer and purchased an Apple iPhone. He discovered the unauthorized activity by checking his bank accounts every morning. He spent approximately 12 hours disputing the charge on the phone with USAA. On or around November 7, 2022, there was a fraudulent charge on Plaintiff's American Express card at a Sam's store in Arkansas for over $520.

377.    Plaintiff Wojciechowski spent approximately 12 hours with USAA related to the fraudulent ACH transaction, six hours freezing his credit, and approximately 70 hours actively monitoring his bank and credit card account information. Plaintiff Wojciechowski spent approximately four to five hours on the phone with American Express dealing with the fraudulent Sam's charge. He expended this time at Lakeview's direction. In the notice letter Plaintiff Wojciechowski received, Lakeview directed him to spend time mitigating his losses by "reviewing your account statements and free credit reports for unauthorized activity."

378.    Plaintiff Wojciechowski plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

379.    Plaintiff Wojciechowski also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Lakeview in exchange for mortgage services.

380.    Plaintiff Wojciechowski has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially

with his Social Security number now in the hands of criminals.

381.    Because of the Data Breach, Plaintiff Wojciechowski is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

382.    Additionally, Plaintiff Wojciechowski is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

383.    Plaintiff Wojciechowski stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently and periodically chooses unique usernames and passwords for his various online accounts.

384.    Plaintiff Wojciechowski has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### Plaintiff Kimberley Rowton's Experience

385.    Plaintiff Rowton used Pingora's services when her home mortgage was transferred to Pingora. As a condition to receiving loan services from Pingora, Plaintiff Rowton's PII was provided to Pingora, which was then entered into Pingora's database and maintained by Pingora on Bayview's network.

386.    Plaintiff Rowton greatly values her privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Rowton took reasonable steps to maintain the confidentiality of her PII.

387.    Plaintiff Rowton received a letter dated April 6, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network that contained her name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other

items regarding loan servicing.

388.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Rowton faces, Defendant Pingora offered her a one-year subscription to a credit monitoring service. Plaintiff Rowton signed up for the program on or around May 20, 2022, in an attempt to mitigate the harms she suffered as a result of the Data Breach. Plaintiff Rowton also placed a fraud alert on her credit through all three credit bureaus in early 2022. Plaintiff instituted a credit freeze with Transunion on April 19, 2022, with Experian on June 17, 2022, and with Equifax on January 28, 2022. Plaintiff Rowton signed up for an AOL Advantage Plan, for which she pays $27.99 a month. On or around October 24, 2023, Plaintiff Rowton had to purchase another phone due to the large amount of spam she continued to receive.

389.    An unauthorized person opened a cable account on or around November 18, 2022, in Plaintiff Rowton's name. She subsequently filed a police report.

390.    Since the dates of the Data Breach, Plaintiff Rowton experienced identity fraud in the form of fraudulent transfers from her financial account. In January 2022, Plaintiff Rowton became aware that someone had used her PII to access one of her investment accounts and fraudulently transferred more than $11,000 from it. Plaintiff Rowton contacted the investment institution to try to receive reimbursement and has filed a complaint with the FBI about the incident. To date, Plaintiff Rowton has not received reimbursement for the funds she lost due to the Data Breach. Plaintiff Rowton believes the fraudulent transfer of funds from her account using her PII is a result of the Data Breach given that it occurred relatively soon after the Data Breach and that she had never before experienced a fraudulent financial transfer.

391.    On or around January 18, 2022, someone hacked into Plaintiff Rowton's cell phone account and paid with her saved credit card to switch access to another phone number and to

receive two-factor authentication codes. Plaintiff Rowton believes this incident was a result of the Data Breach given that it occurred relatively soon after the Data Breach and that she had never experienced a fraudulent financial transfer before.

392.    In addition to the more than $11,000 in funds that have been stolen from Plaintiff Rowton, she has also spent considerable time addressing the impacts of the Data Breach. Plaintiff Rowton estimates she has spent more than 40 hours responding to the Data Breach, including through attempting to receive reimbursement for her stolen funds; filing a report with the FBI about the fraudulent account transfer; signing up for credit monitoring; freezing her credit reports; reviewing her bank statements and other account statements; reviewing her credit monitoring reports; closely monitoring all activity involving her PII; and taking other necessary actions in response to the Data Breach.

393.    Plaintiff Rowton expended this time at Pingora's direction. In the notice letter Plaintiff received, Pingora directed Plaintiff to spend time mitigating her losses by "reviewing your account statements and free credit reports for unauthorized activity."

394.    Plaintiff Rowton had finally retired in August 2021 and is now concerned about her ability to provide for herself in the aftermath of having lost a considerable portion of her retirement savings.

395.    Plaintiff Rowton plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

396.    Plaintiff Rowton also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant Pingora in exchange for mortgage services.

397.     Plaintiff Rowton has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially with her Social Security number now in the hands of criminals.

398.     Because of the Data Breach, Plaintiff Rowton is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

399.     Additionally, Plaintiff Rowton is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

400.     Plaintiff Rowton stores any documents containing her PII in a safe and secure location or destroys the documents. Moreover, she diligently and periodically chooses unique usernames and passwords for her various online accounts.

401.     Plaintiff Rowton has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### *Plaintiff Jessica Valente-Brodrick's Experience*

402.     Plaintiff Valente-Brodrick used Lakeview's services when she and her husband took out a mortgage on their home. As a condition to receiving loan services from Lakeview, Plaintiff Valente-Brodrick and her husband provided PII to Lakeview, which was then entered into Lakeview's database and maintained by Lakeview on Bayview's network.

403.     Plaintiff Valente-Brodrick greatly values her privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Valente-Brodrick took reasonable steps to maintain the confidentiality of her PII.

404.     Plaintiff Valente-Brodrick's husband received a letter dated March 16, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained

access to files on Lakeview's network that contained her name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

405.     Recognizing the present, immediate, and substantially increased risk of harm she and her husband face, the Brodricks purchased identity theft monitoring prevention from Norton LifeLock which costs $299.88 annually. Plaintiff Valente-Brodrick signed up for InfoArmor through Allstate on or around July 1, 2022.

406.     In recent months, Plaintiff Valente-Brodrick has experienced identity fraud in the form of an unauthorized Wells Fargo account being opened in her name. She has also experienced several phishing attempts and suspicious activity, including receiving fake order and shipping alerts. She believes these events are a result of the Data Breach given that they occurred relatively soon after the Data Breach, and she had experienced no fraudulent activity or persistent phishing attempts prior to the Data Breach.

407.     Since learning of the Data Breach, Plaintiff Valente-Brodrick has spent additional time reviewing her bank statements and credit cards. Moreover, Plaintiff expended this time at Lakeview's direction. In the notice letter her husband received, Lakeview directed Plaintiff Valente-Brodrick to spend time mitigating her losses by "reviewing your account statements and free credit reports for unauthorized activity."

408.     Plaintiff Valente-Brodrick has experienced an increase in spam calls, text messages, and emails since the Data Breach.

409.     Plaintiff Valente-Brodrick plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

410.     Plaintiff Valente-Brodrick also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant Lakeview in exchange for mortgage services.

411.     Plaintiff Valente-Brodrick has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially with her Social Security number now in the hands of criminals.

412.     Because of the Data Breach, Plaintiff Valente-Brodrick is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

413.     Additionally, Plaintiff Valente-Brodrick is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

414.     Plaintiff Valente-Brodrick stores any documents containing her PII in a safe and secure location or destroys the documents. Moreover, she diligently and periodically chooses unique usernames and passwords for her various online accounts.

415.     Plaintiff Valente-Brodrick has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

***Plaintiff Denise Scott's Experience***

416.     Plaintiff Scott used Lakeview's services when she took out a mortgage on her home. As a condition to receiving loan services from Lakeview, Plaintiff Scott provided Lakeview with her PII, which was then entered into Lakeview's database and maintained by Lakeview on Bayview's network.

417.     Plaintiff Scott greatly values her privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Scott took reasonable steps

to maintain the confidentiality of her PII.

418.  Plaintiff Scott received a letter dated March 18, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network that contained her name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

419.  Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Scott faces, Defendant Lakeview offered her a one-year subscription to a credit monitoring service.

420.  In January 2022, Plaintiff Scott experienced identity fraud when someone fraudulently accessed her mortgage account and altered her payment settings. As a result, Plaintiff Scott received a letter from Lakeview that they were foreclosing on her home. Additionally, Plaintiff Scott incurred late fees totaling $213.80.

421.  In February 2022, Plaintiff Scott experienced additional identity fraud when someone attempted to charge $790 on her American Express credit card. As a result, she spent time closing this card and replacing it. On April 15, 2022, Plaintiff Scott incurred an unauthorized charge of $15 for an Amazon Prime account, even though she does not have such an account.

422.  Since learning of the Data Breach, Plaintiff Scott has spent additional time reviewing her bank statements and credit cards. Since January 2022, she has spent approximately 40 hours dealing with the fraud attempts and attempting to mitigate the impacts of the Data Breach. Moreover, Plaintiff expended this time at Lakeview's direction. In the notice letter Plaintiff Scott received, Lakeview directed Plaintiff to spend time mitigating her losses by "reviewing your account statements and free credit reports for unauthorized activity."

423.     On or around April 5, 2022, Plaintiff Scott instituted a credit freeze with Experian and Transunion.

424.     Plaintiff Scott plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

425.     Plaintiff Scott also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant in exchange for mortgage services.

426.     Plaintiff Scott has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially with her Social Security number now in the hands of criminals.

427.     Because of the Data Breach, Plaintiff Scott is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

428.     Additionally, Plaintiff Scott is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

429.     Plaintiff Scott stores any documents containing her PII in a safe and secure location or destroys the documents.

430.     Plaintiff Scott has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' possession, and is protected and safeguarded from future breaches.

### Plaintiff Nilsa Misencik's Experience

431.     Plaintiff Misencik used Lakeview's services when she took out a mortgage on her home. As a condition to receiving loan services from Lakeview, Plaintiff Misencik provided

Lakeview with her PII, which was then entered into Lakeview's database and maintained by Lakeview on Bayview's network.

432.    Plaintiff Misencik greatly values her privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Misencik took reasonable steps to maintain the confidentiality of her PII.

433.    Plaintiff Misencik received a letter dated March 18, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network that contained her name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

434.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Misencik faces, Defendant Lakeview offered her a one-year subscription to a credit monitoring service.

435.    On or around November 5, 2021, Plaintiff Misencik received a notification that a credit card she did not apply for had been denied. In November 2021, Plaintiff Misencik received a Montgomery Ward bill noting that someone in Miami was using her information. In February 2022, Plaintiff Misencik experienced identity fraud in the form of an unauthorized application and denial of a credit card from Bank of America. She believes the credit card application is a result of the Data Breach because it occurred relatively soon after the Data Breach.

436.    Plaintiff Misencik also received a bill for an unauthorized purchase of a home appliance. Upon calling the biller, Plaintiff Misencik learned that the appliance seller had her date of birth, full name, Social Security number, address and phone number—information compromised in the Data Breach.

437.     In or around January and February 2022, Plaintiff Misencik placed a fraud alert on her credit report. At or around that same time, Plaintiff Misencik instituted a credit freeze with Experian.

438.     Since learning of the Data Breach, Plaintiff Misencik has spent additional time reviewing her bank statements and credit cards. Since February 2022, she has spent several hours reviewing her bank, credit and debit card statements; dealing with fraudulent purchases; and spending time on the phone dealing with the unauthorized credit card application and other unauthorized charges. Plaintiff expended this time at Lakeview's direction. In the notice letter Plaintiff received, Lakeview directed Plaintiff to spend time mitigating her losses by "reviewing your account statements and free credit reports for unauthorized activity."

439.     Plaintiff Misencik plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

440.     Plaintiff Misencik also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant Lakeview in exchange for mortgage services.

441.     Plaintiff Misencik has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially with her Social Security number now in the hands of criminals.

442.     Because of the Data Breach, Plaintiff Misencik is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

443.     Additionally, Plaintiff Misencik is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

444.    Plaintiff Misencik has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### Plaintiff David Kraus's Experience

445.    Plaintiff Kraus used Pingora's services when he took out a mortgage on his home. As a condition to receiving loan services from Pingora, Plaintiff Kraus provided Pingora with his PII, which was then entered into Pingora's database and maintained by Pingora on Bayview's network.

446.    Plaintiff Kraus greatly values his privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Kraus took reasonable steps to maintain the confidentiality of his PII.

447.    Plaintiff Krauss received a letter dated April 6, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network that contained his name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

448.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Kraus faces, Defendant Pingora offered him a one-year subscription to a credit monitoring service.

449.    In April 2022, Plaintiff Kraus experienced identity fraud in the form of unauthorized charges on his credit card in the amount of $250 and $2,563. As a result, he had to obtain a new card. On or around April 13, 2022, Plaintiff Kraus received a call from his bank notifying him that his credit card was used without his authorization. He believes the unauthorized

charges on his debit card are a result of the Data Breach because they occurred relatively soon after the Data Breach, and he had no other previous fraudulent charges on his card.

450.    On or around April 13, 2022, Plaintiff Kraus's computer was hacked and its operation held hostage by ransomware.

451.    Plaintiff Kraus placed a fraud alert on his credit through Transunion on or around April 19, 2022.

452.    Since learning of the Data Breach, Plaintiff Kraus has spent additional time reviewing his bank statements and credit cards. Since February 2022, he has spent approximately 40 hours reviewing his bank, credit, and debit card statements; procuring a new credit card; speaking with government officials; and speaking with bank employees. Plaintiff Kraus expended this time at Pingora's direction. In the notice letter Plaintiff received, Pingora directed Plaintiff to spend time mitigating his losses by "reviewing your account statements and free credit reports for unauthorized activity."

453.    Plaintiff Kraus has experienced an increase in spam calls, text messages and emails since the Data Breach.

454.    Plaintiff Kraus plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

455.    Plaintiff Kraus also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Pingora in exchange for mortgage services.

456.    Plaintiff Kraus has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially

with his Social Security number now in the hands of criminals.

457.    Because of the Data Breach, Plaintiff Kraus is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

458.    Additionally, Plaintiff Kraus is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

459.    Plaintiff Kraus has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, and is protected and safeguarded from future breaches.

### Plaintiff John McMahon's Experience

460.    Plaintiff McMahon used Lakeview's services when he took out a mortgage on his home. As a condition to receiving loan services from Lakeview, Plaintiff McMahon provided Lakeview with his PII, which was then entered into Lakeview's database and maintained by Lakeview on Bayview's network.

461.    Plaintiff McMahon greatly values his privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff McMahon took reasonable steps to maintain the confidentiality of his PII.

462.    Plaintiff McMahon received a letter dated March 16, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network that contained his name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

463.     Recognizing the present, immediate, and substantially increased risk of harm Plaintiff McMahon faces, Defendant Lakeview offered him a one-year subscription to a credit monitoring service. After receiving the letter, Plaintiff McMahon signed up for this service.

464.     On January 25, 2022, Plaintiff McMahon received a notification from the credit monitoring service that he maintained through Discover informing him that his Social Security number was "compromised." The alert further stated: "We have located your Social Security number on a Dark Web site." Plaintiff believes that this was a result of the Data Breach given the timing of the notification, his diligence in storing and maintaining his PII in a secure manner, and the fact that, to his knowledge, he has not been the subject of any other data breaches involving his Social Security number.

465.     As a result of the Data Breach and notification that his PII is on the dark web, Plaintiff McMahon was forced to cancel all of his credit cards and have them reissued, a process that took significant time.

466.     Since learning of the Data Breach, Plaintiff McMahon has suffered a further loss of time (and continues to spend a considerable amount of time) on issues related to this Data Breach, such as monitoring accounts and credit scores. He also spent considerable time implementing an alert with one of the major credit bureaus, and intends to spend time taking additional steps to protect his PII. Plaintiff expended this time at Lakeview's direction. In the notice letter Plaintiff McMahon received, Lakeview directed him to spend time mitigating his losses by "reviewing your account statements and free credit reports for unauthorized activity."

467.     Plaintiff McMahon plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

468.     Plaintiff McMahon also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Lakeview in exchange for mortgage services.

469.     Plaintiff McMahon has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially with his Social Security number now in the hands of criminals.

470.     Because of the Data Breach, Plaintiff McMahon is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

471.     Plaintiff McMahon is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

472.     Plaintiff McMahon stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently and periodically chooses unique usernames and passwords for his various online accounts.

473.     Plaintiff McMahon has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### Plaintiff Shannon Thomas's Experience

474.     Plaintiff Thomas took out a mortgage loan for property in Ohio. At all times relevant to this Complaint, Defendant Lakeview was the servicer of Plaintiff Thomas's mortgage loan. As a condition to providing Plaintiff Thomas loan services, Lakeview accessed Plaintiff Thomas's PII, which it then entered into its database and maintained on Bayview's network.

475.     Plaintiff Thomas greatly values her privacy and PII, especially in connection with receiving loan and financial services. Plaintiff Thomas takes reasonable steps to maintain the

confidentiality of her PII.

476.    Plaintiff Thomas received a letter on or around March 18, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network that contained her name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

477.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Thomas faces, Defendant Lakeview offered her a one-year subscription to a credit monitoring service.

478.    Plaintiff Thomas signed up for Norton LifeLock on or around March 30, 2022, for which she originally paid $15.99 per month. Her payments have since increased to $24.99 per month.

479.    Since October 2021, as a direct result of the Data Breach, Plaintiff Thomas has already had to spend time and energy protecting and monitoring her identity and credit. Plaintiff Thomas spent time reviewing bank accounts and statements, changing passwords related to her business and personal accounts, reviewing her credit reports from all three credit bureaus, and she will have to spend additional time and energy in the future continuing to monitor and protect her identity and credit. Plaintiff Thomas expended this time at Lakeview's direction. In the notice letter Plaintiff Thomas received, Defendant Lakeview directed her to spend time mitigating her losses by "reviewing your account statements and free credit reports for unauthorized activity."

480.    Additionally, Plaintiff Thomas has spent money out of pocket to address the Data Breach, including by purchasing LifeLock Advantage.

481.    Plaintiff Thomas has experienced an increase in spam calls, text messages, and

emails since the Data Breach.

482.   Plaintiff Thomas plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

483.   Plaintiff Thomas also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant Lakeview in exchange for mortgage services.

484.   Plaintiff Thomas has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially with her Social Security number now in the hands of criminals.

485.   Because of the Data Breach, Plaintiff Thomas is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

486.   Additionally, Plaintiff Thomas is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

487.   Plaintiff Thomas stores any documents containing her PII in a safe and secure location or destroys the documents. Moreover, she diligently and periodically chooses unique usernames and passwords for her various online accounts.

488.   Plaintiff Thomas has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants Lakeview's possession, is protected and safeguarded from future breaches.

### Plaintiff Mathew Myers's Experience

489.   Plaintiff Myers used Lakeview's services when Lakeview acquired his mortgage on his home in August 2019. As a condition to receiving loan services from Lakeview, Plaintiff

Myers's PII was provided to Lakeview, which was then entered into Lakeview's database and maintained by Lakeview on Bayview's network.

490.    Plaintiff Myers greatly values his privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Myers took reasonable steps to maintain the confidentiality of his PII.

491.    Plaintiff Myers received a letter dated March 18, 2022 from Defendant Lakeview concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Lakeview's network that contained his name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

492.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Myers faces, Defendant Lakeview offered him a one-year subscription to a credit monitoring service. Plaintiff Myers has not signed up for the program, as he does not trust that Lakeview's chosen vendor can protect his information. He instead signed up for credit monitoring and identity theft protection services through LifeLock, Credit Karma, Transunion, and Norton in order to protect his information. Plaintiff Myers signed up for LifeLock in April 2022, for which he pays $17.31 a month. He signed up for Nomorobo on or around May 24, 2022, for which he pays $19.99 a year. Plaintiff froze his credit on or around May 18, 2022. Plaintiff then unfroze his credit on or around July 26, 2022, to shop for mortgages, and refroze his credit on February 14, 2023.

493.    Further, since learning of the Data Breach, Plaintiff Myers has spent additional time reviewing his credit reports, bank statements and credit cards. Since April 2022, he has spent approximately one to two hours every day reviewing his bank, credit and debit card statements;

reviewing his emails for credit alerts; and reviewing his credit reports for any unauthorized charges. Moreover, Plaintiff expended this time at Lakeview's direction. In the notice letter Plaintiff received, Lakeview directed Plaintiff to spend time mitigating his losses by "reviewing your account statements and free credit reports for unauthorized activity."

494.    Plaintiff Myers has experienced an increase in spam calls, text messages, and emails since the Data Breach.

495.    As a result of the Data Breach, Plaintiff Myers had to sign up and pay for the service "Nomorobo" to address the influx of spam calls, at a cost of $19.99 per year.

496.    Plaintiff Myers plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

497.    Plaintiff Myers also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Lakeview in exchange for mortgage services.

498.    Plaintiff Myers has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially with his Social Security number now in the hands of criminals.

499.    Because of the Data Breach, Plaintiff Myers is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

500.    Additionally, Plaintiff Myers is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

501.    Plaintiff Myers stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently and periodically chooses unique

usernames and passwords for his various online accounts.

502.    Plaintiff Myers has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### Plaintiff Jay Saporta's Experience

503.    Plaintiff Saporta originally secured a mortgage for his home from Mutual of Omaha, and the mortgage was originally serviced by PHH Mortgage. Plaintiff only became aware that Pingora had acquired his PII after he received the April 6, 2022 letter from Pingora alerting him that his PII had been compromised in the Data Breach. As a condition to providing Plaintiff Saporta loan services, Pingora required access to his PII, which it received and entered into its database to maintain on Bayview's network.

504.    Plaintiff Saporta greatly values his privacy and the confidentiality of his PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Saporta took reasonable steps to maintain the confidentiality of his PII.

505.    Plaintiff Saporta received a letter dated April 6, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network that contained his name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

506.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Saporta faces, Defendant Pingora offered him a one-year subscription to a credit monitoring service.

507.    In or around May 2022, Plaintiff Saporta learned from TurboTax that his

information had appeared on the dark web.

508.   Since learning of the Data Breach, Plaintiff Saporta took considerable efforts to mitigate its impact—at Defendant Pingora's direction—including but not limited to: researching the Data Breach; reviewing credit reports and financial account statements for any indications of actual or attempted identity theft or fraud; placing a fraud alert on his credit report with all three credit report agencies due to the Data Breach, which costs him approximately $15 per month; and reviewing the credit monitoring service offered by Pingora. Plaintiff Saporta activated Credit Lock on or around April 10, 2022. He also froze his credit on or around April 10, 2022.

509.   Plaintiff Saporta plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

510.   Plaintiff Saporta also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Pingora in exchange for mortgage services.

511.   Plaintiff Saporta has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially with his Social Security number now in the hands of criminals.

512.   Because of the Data Breach, Plaintiff Saporta is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

513.   Additionally, Plaintiff Saporta is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

514.   Plaintiff Saporta stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently and periodically chooses unique

usernames and passwords for his various online accounts.

515.    Plaintiff Saporta has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

516.    Pursuant to § 1798.150(b) of the CCPA, Plaintiff Jay Saporta gave written notice to Defendants Bayview and Pingora of their specific violations of § 1798.150(a) by certified mail dated April 14, 2022. Pingora responded on April 29, 2022 but failed to cure. Bayview has not responded.

### *Plaintiff Albert Brumitt's Experience*

517.    Defendant Community Loan is the servicer of Plaintiff Brumitt's mortgage loan. As a condition to receiving loan services from his Community Loan, Plaintiff Brumitt provided Community Loan with his PII, which was then entered into Community Loan's database and maintained by Community Loan on Bayview's network.

518.    Plaintiff Brumitt greatly values his privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Brumitt took reasonable steps to maintain the confidentiality of his PII.

519.    Plaintiff Brumitt received a letter dated August 16, 2022, from Defendant Community Loan concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Community Loan's network. The compromised files contained his name and Social Security number, and, potentially, information he provided in connection with a loan application, loan modification, or other items regarding loan servicing.

520.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Brumitt faces, Defendant Community Loan offered him a one-year subscription to a credit

monitoring service.

521.    Since learning of the Data Breach, Plaintiff Brumitt has spent additional time reviewing his bank statements and credit cards. Nearly every single day since learning of the Breach, Plaintiff calls his bank and reviews his financial records and all charges with the clerk. This process takes roughly an hour every day. Plaintiff Brumitt expended this time at Community Loan's direction. In the notice letter he received, Community Loan directed Plaintiff to spend time mitigating his losses by "reviewing your account statements and free credit reports for unauthorized activity."

522.    Plaintiff Brumitt has also experienced an increase in spam calls, text messages, and emails since the Data Breach.

523.    Plaintiff Brumitt plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

524.    Plaintiff Brumitt also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Community Loan in exchange for mortgage services.

525.    Plaintiff Brumitt has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially with his Social Security number now in the hands of criminals.

526.    Because of the Data Breach, Plaintiff Brumitt is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

527.    Additionally, Plaintiff Brumitt is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

528.     Plaintiff Brumitt stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently and periodically chooses unique usernames and passwords for his various online accounts.

529.     Plaintiff Brumitt has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### Plaintiff David Cunningham's Experience

530.     Defendant Community Loan is the servicer of Plaintiff Cunningham's mortgage loan. As a condition to receiving loan services from his Community Loan, Plaintiff Cunningham provided Community Loan with his PII, which was then entered into Community Loan's database and maintained by Community Loan on Bayview's network.

531.     Plaintiff Cunningham greatly values his privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Cunningham took reasonable steps to maintain the confidentiality of his PII.

532.     Plaintiff Cunningham received a letter dated October 17, 2022 from Defendant Community Loan concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Community Loan's network. The compromised files contained his name and Social Security number, and, potentially, information he provided in connection with a loan application, loan modification, or other items regarding loan servicing.

533.     Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Cunningham faces, Defendant Community Loan offered him a one-year subscription to a credit monitoring service.

534.     After the Data Breach, Plaintiff Cunningham experienced identity fraud. In or

around January 2023, an unauthorized person attempted to open a Bank of America account in Plaintiff Cunningham's name. Plaintiff Cunningham believes this to be a result of the Data Breach due to the proximity in time.

535.    Since learning of the Data Breach, Plaintiff Cunningham has spent additional time reviewing his bank statements and credit cards. Plaintiff Cunningham expended this time at Community Loan's direction. In the notice letter Plaintiff Cunningham received, Community Loan directed Plaintiff to spend time mitigating his losses by "reviewing your account statements and free credit reports for unauthorized activity."

536.    Plaintiff Cunningham has experienced an increase in spam calls, text messages, and emails since the Data Breach.

537.    Plaintiff Cunningham plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his depository, credit, and other accounts for any unauthorized activity.

538.    Plaintiff Cunningham also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Community Loan in exchange for mortgage services.

539.    Plaintiff Cunningham has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially with his Social Security number now in the hands of criminals.

540.    Because of the Data Breach, Plaintiff Cunningham is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

541.    Additionally, Plaintiff Cunningham is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

542.     Plaintiff Cunningham stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he diligently and periodically chooses unique usernames and passwords for his various online accounts.

543.     Plaintiff Cunningham has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

### *Plaintiff Linda Kim's Experience*

544.     As a condition to receiving loan services from her mortgage originator and servicers, whom Plaintiff Linda Kim believes provided her PII to Community Loan, she provided her PII to those mortgage originators and servicers, which they provided to Community Loan. Her PII was then entered into Community Loan's database and maintained by Community Loan on Bayview's network.

545.     Plaintiff Kim greatly values her privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Kim took reasonable steps to maintain the confidentiality of her PII.

546.     Plaintiff Kim received a letter dated October 17, 2022 from Defendant Community Loan concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Community Loan's file servers. The compromised files contained her name and Social Security number, and may have also included information Plaintiff Kim provided in connection with a loan application, loan modification, or other items regarding loan servicing.

547.     Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Kim faces, Defendant Community Loan offered her a one-year subscription to a credit

monitoring service. Plaintiff Kim has signed up for the program but does not believe this is sufficient to protect her identity from the ongoing risks of fraud and theft she faces.

548.    Since learning of the Data Breach, Plaintiff Kim has spent additional time reviewing her bank statements, credit cards, and reviewing her emails for fraud alerts. Since October 2022, she has spent several hours in total reviewing her bank, credit and debit card statements; and reviewing her emails for fraud alerts or otherwise suspicious account activity. Moreover, Plaintiff expended this time at Community Loan's direction. In the notice letter Plaintiff received, Community Loan directed Plaintiff to spend time mitigating her losses by "reviewing [her] account statements and free credit reports for unauthorized activity."

549.    Plaintiff Kim has experienced an increase of other spam calls, text messages, and emails after the Data Breach.

550.    Plaintiff Kim plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

551.    Plaintiff Kim also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant Community Loan in exchange for mortgage services.

552.    Plaintiff Kim has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially with her Social Security number now in the hands of criminals.

553.    Because of the Data Breach, Plaintiff Kim is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

554.     Additionally, Plaintiff Kim is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

555.     Plaintiff Kim stores any documents containing her PII in a safe and secure location or destroys the documents. Moreover, she diligently and periodically chooses unique usernames and passwords for her various online accounts.

556.     Plaintiff Kim has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

557.     On October 31, 2022 Plaintiff Kim transmitted a 30-day Notice of Claim pursuant to Cal. Civ. Code § 1798.150 to Defendants Bayview and Community Loan alleging they violated the CCPA and demanding they cure such violation within 30 calendar days of the date of her Notice of Claim. Although Bayview and Community Loan responded to Plaintiff Kim's Notice of Claim, they did not cure their CCPA violations.

### *Plaintiff Maureen Keach's Experience*

558.     Plaintiff Maureen Keach never used Pingora's services when she took out a mortgage on her home. To her knowledge, Pingora has never serviced her mortgage and she has never willingly provided any of her PII to Pingora.

559.     As a condition to receiving loan services from her mortgage originator and servicers, whom she believes provided her PII to Pingora, Plaintiff Keach provided her PII to those mortgage originators and servicers, which they provided to Pingora. The PII was then entered into Pingora's database and maintained by Pingora on Bayview's network.

560.     Plaintiff Keach greatly values her privacy and PII, especially in connection with receiving loan and financial services. Prior to the Data Breach, Plaintiff Keach took reasonable

steps to maintain the confidentiality of her PII.

561.    Plaintiff Keach received a letter dated April 6, 2022 from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network that contained her name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

562.    Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Keach faces, Defendant Pingora offered her a one-year subscription to a credit monitoring service. Plaintiff Keach has signed up for the program but does not believe this is sufficient to protect her identity from the ongoing risks of theft she faces.

563.    In December 2021, Plaintiff Keach experienced identity fraud in the form of an unauthorized $413 charge for a "security plan" through "Geek Squad"; she also received an unauthorized $451 bill for MacAfee service at approximately the same time; and in April 2022 incurred an unauthorized charge of $284.99 from Norton LifeLock. She believes these unauthorized charges are a result of the Data Breach given that they occurred relatively soon after the Data Breach, and she experienced no previous fraudulent charges.

564.    Since learning of the Data Breach, Plaintiff Keach has spent additional time reviewing her bank statements, credit cards, and reviewing her emails for fraud alerts. Since April 2022, she has spent approximately one hour every day reviewing her bank, credit and debit card statements, and reviewing her emails for fraud alerts or otherwise suspicious account activity. Moreover, Plaintiff Keach expended this time at Pingora's direction. In the notice letter Plaintiff Keach received, Pingora directed Plaintiff to spend time mitigating her losses by "reviewing your account statements and free credit reports for unauthorized activity."

565.    Plaintiff Keach has experienced an increase of other spam calls, text messages and emails after the Data Breach.

566.    Further, Plaintiff Keach has received numerous emails showing transactions and invoices using her name and email, for which she is not responsible.

567.    Plaintiff Keach plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

568.    Plaintiff Keach also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant Pingora in exchange for mortgage services.

569.    Plaintiff Keach has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially with her Social Security number now in the hands of criminals.

570.    Because of the Data Breach, Plaintiff Keach is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

571.    Additionally, Plaintiff Keach is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

572.    Plaintiff Keach stores any documents containing her PII in a safe and secure location or destroys the documents. Moreover, she diligently and periodically chooses unique usernames and passwords for her various online accounts.

573.    Plaintiff Keach has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

574.     On April 14, 2022, Plaintiff Keach transmitted a 30-day Notice of Claim pursuant to Cal. Civ. Code § 1798.150 to Defendants Bayview and Pingora alleging they violated the CCPA and demanding they cure such violation within 30 calendar days of the date of her Notice of Claim. Pingora responded to the Notice of Claim but did not cure its CCPA violations.

575.     Bayview never responded to Plaintiff Keach's Notice of Claim.

***Plaintiff Pedro Rubio's Experience***

576.     Plaintiff Pedro Rubio took out a loan to purchase his home. The original servicer of Plaintiff Rubio's mortgage was Lakeview. As a condition to providing Plaintiff Rubio mortgage services, Lakeview required access to his personal information and PII, including but not limited to his name, marital status, date of birth, Social Security number, employment information, and other common items asked when applying for credit. This PII was entered into and maintained in Lakeview's database on Bayview's network.

577.     Plaintiff Rubio greatly values his privacy and PII, especially in connection with receiving financial services, including loan or mortgage services. Prior to the Data Breach, Plaintiff Rubio took reasonable steps to maintain the confidentiality of his PII.

578.     Plaintiff Rubio received a letter dated March 17, 2022 from Defendant Lakeview concerning the Data Breach. The letter from Lakeview stated that unauthorized actors gained access to files on Lakeview's network in early December 2021. The compromised files contained Plaintiff Rubio's name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

579.     Recognizing the present, immediate, and substantially increased risk of harm, including fraud and identity theft, which Plaintiff Rubio now faces as a result of the Data Breach,

Defendant Lakeview's letter offered a one-year membership to a third-party identity monitoring service. Plaintiff Rubio elected not to sign up for the identity monitoring service offered in Lakeview's letter.

580.    Since learning of the Data Breach, Plaintiff Rubio has spent additional time reviewing his bank statements, credit cards, and financial accounts. Plaintiff Rubio has spent time reviewing his accounts and credit information, and spent time to freeze his credit to mitigate damages caused by the Data Breach. He expended this time, which would otherwise be spent on other activities, at Lakeview's direction, as the notice letter he received from Lakeview directed him to spend time mitigating his damages by "reviewing your account statements and free credit reports for unauthorized activity."

581.    Plaintiff Rubio also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant Pingora in exchange for mortgage services.

582.    Plaintiff Rubio has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially with her Social Security number now in the hands of criminals.

583.    Plaintiff Rubio believed his PII would be protected from unauthorized access and disclosure, including anxiety about unauthorized parties viewing, selling, and/or using his PII for purposes of identity theft and fraud. Plaintiff is very concerned about identity theft and fraud, as well as the consequences of such identity theft and fraud resulting from the Data Breach.

584.    Plaintiff Rubio plans to spend additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing his accounts and credit information for any unauthorized activity.

585.     Plaintiff Rubio also suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that he entrusted to Defendant Lakeview in order to obtain services from Defendant Lakeview, which was compromised in and as a result of the Data Breach.

586.     Plaintiff Rubio has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII, especially with his Social Security number now in the hands of criminals.

587.     Because of the Data Breach, Plaintiff Rubio is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

588.     Plaintiff Rubio is very careful about sharing his PII. He has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

589.     Plaintiff Rubio stores any documents containing his PII in a safe and secure location or destroys the documents. Moreover, he chooses unique usernames and passwords for his various online accounts.

590.     Plaintiff Rubio has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future data breaches and unauthorized access, disclosure, and/or exfiltration to unauthorized third parties.

591.     Pursuant to § 1798.150(b) of the CCPA, Plaintiff Rubio gave written notice to Defendant Lakeview of its specific violations of § 1798.150(a) by certified mail dated April 13, 2022. Lakeview responded on April 29, 2022 but failed to cure.

*Plaintiff Norma Grossman's Experience*

592.     Plaintiff Grossman took out a loan to purchase her home. The original servicer was Alterra Home Loans, a subsidiary of Panorama Mortgage Group, LLC. At some point Pingora acquired Plaintiff Grossman's home mortgage. As a condition to receiving loan services from Pingora, Plaintiff Grossman's PII was provided to Pingora, which was then entered into Pingora's database and maintained by Pingora on Bayview's network.

593.     Plaintiff Grossman greatly values her privacy and PII, especially in connection with receiving loan and other financial services. Prior to the Data Breach, Plaintiff Grossman took reasonable steps to maintain the confidentiality of her PII.

594.     Plaintiff Grossman received a letter dated April 6, 2022, from Defendant Pingora concerning the Data Breach. The letter stated that unauthorized actors gained access to files on Pingora's network that contained her name, address, loan number, Social Security number, and potentially, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

595.     Recognizing the present, immediate, and substantially increased risk of harm Plaintiff Grossman faces, Defendant Pingora offered her a one-year subscription to a credit monitoring service. Plaintiff Grossman signed up for the program in an attempt to mitigate the harms he suffered as a result of the Data Breach.

596.     Since the Data Breach, Plaintiff Grossman estimates that she has spent at least 10 hours responding to the Data Breach, including reviewing bank statements and other financial documents, as well as driving to the bank to change her financial account information that was exposed in the Data Breach. This time was spent at Pingora's direction in the Notice Letter, in

which Pingora directed Plaintiff "to be vigilant for incidents of fraud or identity theft by reviewing your account statements . . . ."

597.    Plaintiff Grossman plans on taking additional time-consuming, necessary steps to help mitigate the harm caused by the Data Breach, including continually reviewing her depository, credit, and other accounts for any unauthorized activity.

598.    Plaintiff Grossman also suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that she entrusted to Defendant Pingora in order to obtain services from Defendant Pingora, which was compromised in and as a result of the Data Breach.

599.    Plaintiff Grossman has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from her PII, especially with her Social Security number now in the hands of criminals.

600.    Because of the Data Breach, Plaintiff Grossman is at a substantial present risk and will continue to be at an increased risk of identity theft and fraud for years to come.

601.    Plaintiff Grossman is very careful about sharing her PII. She has never knowingly transmitted unencrypted PII over the internet or any other unsecured source.

602.    Plaintiff Grossman stores any documents containing her PII in a safe and secure location and destroy the documents when she no longer needs them. Moreover, she diligently and periodically chooses unique usernames and passwords for her various online accounts.

603.    Plaintiff Grossman has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Defendants' possession, is protected and safeguarded from future breaches.

604.     Pursuant to § 1798.150(b) of the CCPA, Plaintiff Norma Grossman gave written notice to Defendant Pingora of its specific violations of § 1798.150(a) by certified mail dated June 6, 2022. Pingora has not responded.

### Plaintiffs' Injuries and Damages

605.     As a direct and proximate result of Defendants' conduct, Plaintiffs and Class Members are presently experiencing and will continue experiencing actual harm from fraud and identity theft.

606.     Plaintiffs and Class Members are presently experiencing substantial risk of out-of-pocket fraud losses, such as loans and accounts opened in their names, fraudulent charges, tax return fraud, utility bills opened in their names, and similar identity theft.

607.     Plaintiffs and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their PII as potential fraudsters could use that information to target such schemes more effectively to Plaintiffs and Class Members.

608.     Plaintiffs and Class Members are also incurring, and may continue incurring for the remainder of their lifetimes, out-of-pocket costs for protective measures such as identity theft protection and credit monitoring fees (for any credit monitoring obtained in addition to or in lieu of the inadequate monitoring offered by Defendants), credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

609.     Plaintiffs and Class Members also suffered damage to or depreciation of their PII when it was acquired by the cyber thieves in the Data Breach. Numerous courts have recognized such damages in cases such as this one.

610.     Plaintiffs and Class Members have spent and will continue to spend significant amounts of time to monitor their financial and other accounts and records for misuse. Defendants'

own notice of data breach instructs Plaintiffs and Class Members regarding the time that they will need to spend monitoring their own accounts and statements.

611.    Plaintiffs and Class Members have suffered actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

a.   Finding fraudulent loans, insurance claims, tax returns, and/or government benefit claims;

b.   Purchasing credit monitoring and identity theft prevention;

c.   Placing "freezes" and "alerts" with credit reporting agencies;

d.   Spending time on the phone with or at a financial institution or government agency to dispute fraudulent charges and/or claims;

e.   Contacting financial institutions and closing or modifying financial accounts; and

f.   Closely reviewing and monitoring Social Security, medical insurance accounts, bank accounts, payment card statements, and credit reports for unauthorized activity for years to come.

612.    Moreover, Plaintiffs and Class Members have an interest in ensuring that their PII, which is believed to remain in the possession of Defendants, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing sensitive and confidential personal, health, and/or financial information is not accessible online, that access to such data is password-protected, and that such data is properly encrypted.

613.     As a direct and proximate result of Defendants' actions and inaction, Plaintiffs and

Class Members have suffered a loss of privacy and face a substantial and present risk of harm.

### VI. CLASS ALLEGATIONS

614.     Pursuant to Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2), 23(b)(3), 23(c)(4) and/or

23(c)(5), Plaintiffs bring this Action on behalf of themselves and the following Class and

constituent Subclasses, subject to amendment as appropriate:

> All individuals in the United States whose PII was accessed or exfiltrated during the Data Breach (the "Class");

> All individuals residing in California whose PII was accessed or exfiltrated during the Data Breach (the "California Subclass");

> All individuals residing in Florida whose PII was accessed or exfiltrated during the Data Breach (the "Florida Subclass");

> All individuals residing in Illinois whose PII was accessed or exfiltrated during the Data Breach (the "Illinois Subclass");

> All individuals residing in New York whose PII was accessed or exfiltrated during the Data Breach (the "New York Subclass");

> All individuals residing in Washington whose PII was accessed or exfiltrated during the Data Breach (the "Washington Subclass").

615.     Excluded from the Class and the Subclasses are the following individuals and/or

entities: Defendants and Defendants' parents, subsidiaries, members, affiliates, officers and

directors, and any entity in which a Defendant has a controlling interest; all individuals who make

a timely election to be excluded from this proceeding using the correct protocol for opting out; any

and all federal, state or local governments, including but not limited to their departments, agencies,

divisions, bureaus, boards, sections, groups, counsels and/or subdivisions; and all Judges assigned

to hear any aspect of this litigation, as well as their immediate family members and staff.

616.     Plaintiffs reserve the right to modify or amend the definitions of the Class and

Subclasses before the Court determines whether class certification is appropriate.

617.   <u>Numerosity</u>. Consistent with Fed. R. Civ. P. 23(a)(1), the Class Members are so numerous that their joinder is impracticable. Defendants' public statements indicate that the number of Class Members exceeds two and a half million. The number and identities of Class Members can be readily ascertained through Defendants' records.

618.   <u>Commonality</u>. Consistent with Fed. R. Civ. P. 23(a)(2) and (b)(3), questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These questions include, without limitation:

a.   Whether Defendants failed to adequately safeguard the PII of Plaintiffs and Class Members;

b.   Whether and to what extent Defendants had a duty to protect the PII of Plaintiffs and Class Members;

c.   Whether Defendants had duties not to disclose the PII of Plaintiffs and Class Members to an unauthorized third party;

d.   Whether Defendants had a duty not to use the PII of Plaintiffs and Class Members for non-business purposes;

e.   Whether and when Defendants learned of the Data Breach;

f.   Whether Defendants adequately, promptly, and accurately informed Plaintiffs and Class Members that their PII had been compromised;

g.   Whether Defendants failed to implement and maintain reasonable security procedures and practices adequate to protect the information compromised in the Data Breach, considering its nature and scope;

h.   Whether Defendants have adequately addressed and fixed the vulnerabilities which

permitted the Data Breach to occur;

i.  Whether Defendants Lakeview, Community Loan, and Pingora breached contracts with other entities, the terms and conditions of which provide for the safeguarding of Plaintiffs' and Class Members' PII for their benefit;

j.  Whether Defendants engaged in unfair, unlawful, or deceptive practices, including by failing to safeguard the PII of Plaintiffs and Class Members;

k.  Whether Bayview violated state statutes as alleged herein;

l.  Whether Lakeview violated state statutes as alleged herein;

m.  Whether Community Loan violated state statutes as alleged herein;

n.  Whether Pingora violated state statutes as alleged herein;

o.  Whether Plaintiffs and Class Members are entitled to damages or restitution as a result of Defendants' wrongful conduct; and

p.  Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

619.   Typicality. Consistent with Fed. R. Civ. P. 23(a)(3), Plaintiffs' claims are typical of those of other Class Members because all had their PII compromised in the Data Breach due to Defendants' unlawful conduct, and their claims arise under the same legal doctrines.

620.   Conduct Generally Applicable to the Class. As provided under Fed. R. Civ. P. 23(b)(2), Defendants have acted or failed to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible, compliant standards of conduct in relation to the Class and making final injunctive and corresponding declaratory relief appropriate with respect to the Class as a whole. Defendants' policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs challenge these policies by

reference to Defendants' conduct with respect to the Class as a whole.

621.  <u>Adequacy of Representation</u>. Consistent with Fed. R. Civ. P. 23(a)(4), Plaintiffs will fairly and adequately represent and protect the interests of the Class Members. No Plaintiff has a conflict of interest with any other Member of the Class. Plaintiffs seek no relief that is antagonistic or adverse to the Members of the Class, and the infringement of rights and the damages they have suffered are typical of other Class Members. Plaintiffs also have retained counsel experienced in complex class action litigation, and they intend to prosecute this action vigorously.

622.  <u>Superiority and Manageability</u>. Consistent with Fed. R. Civ. P. 23(b)(3), class treatment is superior to all other available methods for the fair and efficient adjudication of this controversy. Among other things, it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Moreover, class action treatment will permit the adjudication of relatively modest claims by Class Members who could not individually afford to litigate a complex claim against large corporations such as Defendants. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

623.  Particular issues, such as questions related to Defendants' liability, are also appropriate for certification under Fed. R. Civ. P. 23(c)(4) because the resolution of such common issues will materially advance the resolution of this matter and the parties' interests therein.

624.  Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1), in that the prosecution of separate actions by the individual Class Members would create a risk of inconsistent

or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. Prosecution of separate actions by Class Members also would create the risk of adjudications with respect to individual Class Members that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

625.    Certification of subclasses under Fed. R. Civ. P. 23(c)(5) also is warranted. Certification of the Subclasses defined in this Complaint will ensure that each of the different counts proceeds against the appropriate Defendant(s) and that claims arising under state statutes are brought on behalf of Class Members residing in those states.

**COUNT I**
**NEGLIGENCE**
**On Behalf of All Plaintiffs and the Class or, Alternatively, the Subclasses**
**Against All Defendants**

626.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 625.

**All Defendants—Foreseeability**

627.    Prior to the Data Breach, each Defendant knew or should have known that threat attackers were targeting banks and other financial services entities such as Defendants in an effort to obtain personally identifiable information and misuse it to commit fraud and identity theft, particularly when stored in an internet-accessible environment, in at least the following respects:

     a.   Bayview, Lakeview, Pingora, and Community Loan were aware of previous data breaches that had targeted banks and mortgage providers, including breaches that affected information of their own customers;

     b.   Hackers are known to routinely attempt to steal such information and use it for nefarious purposes; and

122

c.   Publicly available industry warnings regarding threat attackers' efforts to obtain such information for ransom or misuse were widely and readily available to Defendants.

**Bayview—Duty, Breach, and Causation**

628.   Prior to the Data Breach, Bayview knowingly and intentionally acquired the PII of Plaintiffs and Class Members, including their Social Security numbers, from Lakeview, Community Loan, Pingora, and others.

629.   In knowingly and intentionally acquiring the PII of Plaintiffs and Class Members, Bayview assumed a duty to use reasonable care, including implementing reasonable security practices and procedures, to safeguard the PII of Plaintiffs and Class Members against unauthorized access, acquisition, and misuse.

630.   Bayview failed to use reasonable care by storing the PII of Plaintiffs and Class Members in an internet-accessible environment under the following circumstances:

a.   The PII of Plaintiffs and Class Members was not encrypted.

b.   The PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, including the PII of Plaintiffs and Class Members with whom Defendants had not had a relationship for years, was not removed from Defendants' network.

c.   The movement of the PII of Plaintiffs and Class Members from Bayview's network to the internet was not monitored and detected in real time.

d.   Bayview failed to include CobaltStrike on the emergency threat feed or test its "use cases," allowing the threat attacker to remain on Bayview's network undetected.

e.  Sentinel One—the all-important threat detection and response tool—was not feeding into Bayview's SIEM System.

631.  Under like circumstances, a reasonably careful person would have done the following:

a.  Encrypted the PII.

b.  Removed from Defendant's network the PII that Defendant had no reasonable need to store in an internet-accessible environment, including the PII of individuals with whom Defendant had not had a relationship for years.

c.  Monitored and detected in real time the movement of the PII from the network to the internet.

d.  Included CobaltStrike on the emergency threat feed or tested its "use cases," thereby preventing the threat attacker from remaining on the network undetected.

e.  Ensured Sentinel One was feeding into the SIEM system.

632.  Bayview's conduct also constituted negligence per se. As stated herein, Bayview is a financial institution subject to the requirements of the GLBA, 15 U.S.C. § 6801, *et seq*., and the FTC Act, 15 U.S.C. § 41, *et seq*. The GLBA required Bayview to take several preventive security measures to protect Plaintiffs' and Class Members' data, including:

a.  maintaining an adequate data security system to reduce the risk of data breaches and cyber attacks;

b.  adequately protecting Plaintiffs' and Class Members' PII;

c.  implementing policies and procedures to prevent, detect, contain, and correct security violations;

d.  implementing procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports;

e.  protecting against any reasonably anticipated threats or hazards to the security or integrity of PII; and

f.  effectively training all members of their workforce on the policies and procedures with respect to PII as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of PII.

633.    By failing to take the above security measures, Bayview breached duties imposed under federal law, rules, and regulations.

634.    Bayview's negligence directly and in natural and continuous sequence produced or contributed substantially to producing Plaintiffs' and Class Members' damage because of the following:

a.  Bayview's failure to encrypt the PII of Plaintiffs and Class Members allowed the threat attacker to acquire their PII.

b.  Bayview's failure to remove from Defendants' network the PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, including the PII of Plaintiffs and Class Members with whom Defendants had not had a relationship for years, allowed the threat attacker to acquire their PII.

c.  Bayview's failure to monitor in real time the movement of the PII of Plaintiffs and Class Members from Bayview's network to the internet allowed the threat attacker to exfiltrate the PII without detection and therefore without any attempt to halt the exfiltration before its completion.

    d.  Bayview's failure to include CobaltStrike on the emergency threat feed or test its "use cases," allowed the threat attacker to remain on the network undetected.

    e.  Bayview's failure to ensure Sentinel One was feeding into Bayview's SIEM system impeded the detection of CobaltStrike activity.

635.   But for Bayview's negligence, the damage to Plaintiffs and Class Members would not have occurred because of the following:

    a.  If Bayview had encrypted the PII of Plaintiff and Class Members, the threat attacker would not have acquired their PII.

    b.  If Bayview had removed from Defendants' network the PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, the threat attacker would not have acquired their PII.

    c.  If Bayview had monitored in real time the movement of the PII of Plaintiffs and Class Members from Defendant's network to the internet, the exfiltration of the PII could have been halted before its completion.

    d.  If Bayview had included CobaltStrike on the emergency threat feed or tested its "use cases," the threat attacker would have been prevented from remaining on the network undetected.

    e.  If Bayview had ensured Sentinel One was feeding into Bayview's SIEM, the CobaltStrike activity would have been detected.

636.   Bayview's negligence was a legal cause of damage to Plaintiffs and Class Members, even if it operated in combination with the acts of the threat attacker, because the acts

of and the harmed caused by the threat attacker were reasonably foreseeable, and Bayview's negligence contributed substantially to producing such damage to Plaintiffs and Class Members.

**Lakeview—Duty, Breach, and Causation**

637.   Prior to the Data Breach, Lakeview knowingly and intentionally acquired the PII of Plaintiffs and Class Members, including their Social Security numbers, either directly or indirectly from Plaintiffs and Class Members.

638.   In knowingly and intentionally entrusting the PII of Plaintiffs and Class Members to Bayview and relying on Bayview to safeguard the PII from unauthorized access, acquisition, and misuse, Lakeview assumed a duty to use reasonable care, including requiring, verifying, and ensuring that Bayview safeguarded the PII of Plaintiffs and Class Members against unauthorized access, acquisition, and misuse.

639.   Lakeview failed to use reasonable care by entrusting the PII to Bayview under the following circumstances:

    a.   Lakeview did not require, verify, or ensure that the PII of Plaintiffs and Class Members was encrypted.

    b.   Lakeview did not require, verify, or ensure that the PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, including the PII of Plaintiffs and Class Members with whom Lakeview had not had a relationship for years, was not removed from Defendants' network.

    c.   Lakeview did not require, verify, or ensure that the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet was monitored and detected in real time.

   d.  Lakeview failed to encrypt the data in its own possession.

   e.  Lakeview did not require, verify, or ensure that Bayview included CobaltStrike on the emergency threat feed or tested its "use cases," allowing the threat attacker to remain on Defendants' network undetected.

   f.  Lakeview did not require, verify, or ensure that Sentinel One—the all-important threat detection and response tool—was feeding into Bayview's SIEM System.

640.   Under like circumstances, a reasonably careful person would have done the following:

   a.  Required, verified, and ensured that the PII was encrypted.

   b.  Required, verified, and ensured that the PII that Defendants had no reasonable need to store in an internet-accessible environment, including PII of Plaintiffs and Class Members with whom Lakeview had not had a relationship for years, was removed from Defendants' network.

   c.  Required, verified, and ensured that the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet was monitored and detected in real time.

   d.  Required, verified, and ensured that Bayview included CobaltStrike on the emergency threat feed or tested its "use cases," thereby preventing the threat attacker from remaining on Defendants' network undetected.

   e.  Required, verified, and ensured that Sentinel One—the all-important threat detection and response tool—was feeding into Bayview's SIEM System.

641.    Lakeview's conduct also constituted negligence per se. As stated herein, Lakeview is a financial institution subject to the requirements of the GLBA, 15 U.S.C. § 6801, *et seq*., and the FTC Act, 15 U.S.C. § 41, *et seq*. The GLBA required Lakeview to take several preventative security measures to protect Plaintiffs' and Class Members' data, including:

    a.  maintaining an adequate data security system to reduce the risk of data breaches and cyber attacks;

    b.  adequately protecting Plaintiffs' and Class Members' PII;

    c.  implementing policies and procedures to prevent, detect, contain, and correct security violations;

    d.  implementing procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports;

    e.  protecting against any reasonably anticipated threats or hazards to the security or integrity of PII; and

    f.  effectively training all members of their workforce on the policies and procedures with respect to PII as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of PII.

642.    By failing to take the above security measures, Lakeview breached duties imposed under federal law, rules, and regulations.

643.    Lakeview's negligence directly and in natural and continuous sequence produced or contributed substantially to producing Plaintiffs' and Class Members' damage because of the following:

a.  Lakeview's failure to require, verify, and ensure that Bayview encrypted the PII of Plaintiffs and Class Members allowed the threat attacker to acquire their PII.

b.  Lakeview's failure to require, verify, and ensure that Bayview removed from Defendants' network the PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, including the PII of Plaintiffs and Class Members with whom Defendants had not had a relationship for years, allowed the threat attacker to acquire their PII.

c.  Lakeview's failure to require, verify, and ensure that Bayview monitored in real time the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet allowed the threat attacker to exfiltrate the PII without detection and therefore without any attempt to halt the exfiltration before its completion.

d.  Lakeview's failure to require, verify, and ensure that Bayview included CobaltStrike on the emergency threat feed or tested its "use cases," allowed the threat attacker to remain on the network undetected.

e.  Lakeview's failure to require, verify, and ensure that Bayview ensured Sentinel One was feeding into Bayview's SIEM system impeded the detection of CobaltStrike activity.

f.  Lakeview's failure to encrypt the data in its own possession.

644.    But for Lakeview's negligence, the damage to Plaintiffs and Class Members would not have occurred because of the following:

a. If Lakeview had required, verified, and ensured encryption of the PII of Plaintiff and Class Members, the threat attacker would not have acquired their PII.

b. If Lakeview had required, verified, and ensured that Bayview removed from Defendants' network the PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, the threat attacker would not have acquired their PII.

c. If Lakeview had required, verified, and ensured that Bayview monitored in real time the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet, the exfiltration of the PII could have been halted before its completion.

d. If Lakeview had required, verified, and ensured that Bayview had included CobaltStrike on the emergency threat feed or tested its "use cases," the threat attacker would have been prevented from remaining on the network undetected.

e. If Lakeview had required, verified, and ensured that Bayview ensured Sentinel One was feeding into Bayview's SIEM, the CobaltStrike activity would have been detected.

645.   Lakeview's negligence was a legal cause of damage to Plaintiffs and Class Members, even if it operated in combination with the acts of the threat attacker, because the acts of and the harmed caused by the threat attacker were reasonably foreseeable, and Lakeview's negligence contributed substantially to producing such damage to Plaintiffs and Class Members.

**Community Loan—Duty, Breach, and Causation**

646.     Prior to the Data Breach, Community Loan knowingly and intentionally acquired the PII of Plaintiffs and Class Members, including their Social Security numbers, either directly or indirectly from Plaintiffs and Class Members.

647.     In knowingly and intentionally entrusting the PII of Plaintiffs and Class Members to Bayview and relying on Bayview to safeguard the PII from unauthorized access, acquisition, and misuse, Community Loan assumed a duty to use reasonable care, including requiring, verifying, and ensuring that Bayview safeguarded the PII of Plaintiffs and Class Members against unauthorized access, acquisition, and misuse.

648.     Community Loan failed to use reasonable care by entrusting the PII to Bayview under the following circumstances:

     a.  Community Loan did not require, verify, or ensure that the PII of Plaintiffs and Class Members was encrypted.

     b.  Community Loan did not require, verify, or ensure that the PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, including the PII of Plaintiffs and Class Members with whom Community Loan had not had a relationship for years, was not removed from Defendants' network.

     c.  Community Loan did not require, verify, or ensure that the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet was monitored and detected in real time.

     d.  Community Loan failed to encrypt the data in its own possession.

    e.   Community Loan did not require, verify, or ensure that Bayview included CobaltStrike on the emergency threat feed or tested its "use cases," allowing the threat attacker to remain on Defendants' network undetected.

    f.   Community Loan did not require, verify, or ensure that Sentinel One—the all-important threat detection and response tool—was feeding into Bayview's SIEM System.

649.   Under like circumstances, a reasonably careful person would have done the following:

    a.   Required, verified, and ensured that the PII was encrypted.

    b.   Required, verified, and ensured that the PII that Defendants had no reasonable need to store in an internet-accessible environment, including PII of Plaintiffs and Class Members with whom Community Loan had not had a relationship for years, was removed from Defendants' network.

    c.   Required, verified, and ensured that the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet was monitored and detected in real time.

    d.   Required, verified, and ensured that Bayview included CobaltStrike on the emergency threat feed or tested its "use cases," thereby preventing the threat attacker from remaining on Defendants' network undetected.

    e.   Required, verified, and ensured that Sentinel One—the all-important threat detection and response tool—was feeding into Bayview's SIEM System.

650.   Community Loan's conduct also constituted negligence per se. As stated herein, Community Loan is a financial institution subject to the requirements of the GLBA, 15 U.S.C. §

6801, *et seq*., and the FTC Act, 15 U.S.C. § 41, *et seq*. The GLBA required Community Loan to take several preventative security measures to protect Plaintiffs' and Class Members' data, including:

      a.  maintaining an adequate data security system to reduce the risk of data breaches and cyber attacks;

      b.  adequately protecting Plaintiffs' and Class Members' PII;

      c.  implementing policies and procedures to prevent, detect, contain, and correct security violations;

      d.  implementing procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports;

      e.  protecting against any reasonably anticipated threats or hazards to the security or integrity of PII; and

      f.  effectively training all members of their workforce on the policies and procedures with respect to PII as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of PII.

651.    By failing to take the above security measures, Community Loan breached duties imposed under federal law, rules, and regulations.

652.    Community Loan's negligence directly and in natural and continuous sequence produced or contributed substantially to producing Plaintiffs' and Class Members' damage because of the following:

      a.  Community Loan's failure to require, verify, and ensure that Bayview encrypted the PII of Plaintiffs and Class Members allowed the threat attacker to acquire their PII.

    b.   Community Loan's failure to require, verify, and ensure that Bayview removed from Defendants' network the PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, including the PII of Plaintiffs and Class Members with whom Defendants had not had a relationship for years, allowed the threat attacker to acquire their PII.

    c.   Community Loan's failure to require, verify, and ensure that Bayview monitored in real time the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet allowed the threat attacker to exfiltrate the PII without detection and therefore without any attempt to halt the exfiltration before its completion.

    d.   Community Loan's failure to require, verify, and ensure that Bayview included CobaltStrike on the emergency threat feed or tested its "use cases," allowed the threat attacker to remain on the network undetected.

    e.   Community Loan's failure to require, verify, and ensure that Bayview ensured Sentinel One was feeding into Bayview's SIEM system impeded the detection of CobaltStrike activity.

    f.   Community Loan's failure to encrypt the data in its own possession.

653.    But for Community Loan's negligence, the damage to Plaintiffs and Class Members would not have occurred because of the following:

    a.   If Community Loan had required, verified, and ensured encryption of the PII of Plaintiff and Class Members, the threat attacker would not have acquired their PII.

b. If Community Loan had required, verified, and ensured that Bayview removed from Defendants' network the PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, the threat attacker would not have acquired their PII.

c. If Community Loan had required, verified, and ensured that Bayview monitored in real time the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet, the exfiltration of the PII could have been halted before its completion.

d. If Community Loan had required, verified, and ensured that Bayview had included CobaltStrike on the emergency threat feed or tested its "use cases," the threat attacker would have been prevented from remaining on the network undetected.

e. If Community Loan had required, verified, and ensured that Bayview ensured Sentinel One was feeding into Bayview's SIEM, the CobaltStrike activity would have been detected.

654.    Community Loan's negligence was a legal cause of damage to Plaintiffs and Class Members, even if it operated in combination with the acts of the threat attacker, because the acts of and the harmed caused by the threat attacker were reasonably foreseeable, and Community Loan's negligence contributed substantially to producing such damage to Plaintiffs and Class Members.

**Pingora—Duty, Breach, and Causation**

655.    Prior to the Data Breach, Pingora knowingly and intentionally acquired the PII of Plaintiffs and Class Members, including their Social Security numbers, either directly or indirectly from Plaintiffs and Class Members.

656.    In knowingly and intentionally entrusting the PII of Plaintiffs and Class Members to Bayview and relying on Bayview to safeguard the PII from unauthorized access, acquisition, and misuse, Pingora assumed a duty to use reasonable care, including requiring, verifying, and ensuring that Bayview safeguarded the PII of Plaintiffs and Class Members against unauthorized access, acquisition, and misuse.

657.    Pingora failed to use reasonable care by entrusting the PII to Bayview under the following circumstances:

      a.  Pingora did not require, verify, or ensure that the PII of Plaintiffs and Class Members was encrypted.

      b.  Pingora did not require, verify, or ensure that the PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, including the PII of Plaintiffs and Class Members with whom Pingora had not had a relationship for years, was not removed from Defendants' network.

      c.  Pingora did not require, verify, or ensure that the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet was monitored and detected in real time.

      d.  Pingora failed to encrypt the data in its own possession.

e. Pingora did not require, verify, or ensure that Bayview included CobaltStrike on the emergency threat feed or tested its "use cases," allowing the threat attacker to remain on Defendants' network undetected.

f. Pingora did not require, verify, or ensure that Sentinel One—the all-important threat detection and response tool—was feeding into Bayview's SIEM System.

658.    Under like circumstances, a reasonably careful person would have done the following:

a. Required, verified, and ensured that the PII was encrypted.

b. Required, verified, and ensured that the PII that Defendants had no reasonable need to store in an internet-accessible environment, including PII of Plaintiffs and Class Members with whom Pingora had not had a relationship for years, was removed from Defendants' network.

c. Required, verified, and ensured that the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet was monitored and detected in real time.

d. Required, verified, and ensured that Bayview included CobaltStrike on the emergency threat feed or tested its "use cases," thereby preventing the threat attacker from remaining on Defendants' network undetected.

e. Required, verified, and ensured that Sentinel One—the all-important threat detection and response tool—was feeding into Bayview's SIEM System.

659.    Pingora's conduct also constituted negligence per se. As stated herein, Pingora is a financial institution subject to the requirements of the GLBA, 15 U.S.C. § 6801, *et seq*., and the

FTC Act, 15 U.S.C. § 41, *et seq*. The GLBA required Pingora to take several preventative security measures to protect Plaintiffs' and Class Members' data, including:

    a.  maintaining an adequate data security system to reduce the risk of data breaches and cyber attacks;

    b.  adequately protecting Plaintiffs' and Class Members' PII;

    c.  implementing policies and procedures to prevent, detect, contain, and correct security violations;

    d.  implementing procedures to regularly review records of information system activity, such as audit logs, access reports, and security incident tracking reports;

    e.  protecting against any reasonably anticipated threats or hazards to the security or integrity of PII; and

    f.  effectively training all members of their workforce on the policies and procedures with respect to PII as necessary and appropriate for the members of their workforce to carry out their functions and to maintain security of PII.

660.    By failing to take the above security measures, Pingora breached duties imposed under federal law, rules, and regulations.

661.    Pingora's negligence directly and in natural and continuous sequence produced or contributed substantially to producing Plaintiffs' and Class Members' damage because of the following:

    a.  Pingora's failure to require, verify, and ensure that Bayview encrypted the PII of Plaintiffs and Class Members allowed the threat attacker to acquire their PII.

    b.  Pingora's failure to require, verify, and ensure that Bayview removed from Defendants' network the PII of Plaintiffs and Class Members that Defendants

had no reasonable need to store in an internet-accessible environment, including the PII of Plaintiffs and Class Members with whom Defendants had not had a relationship for years, allowed the threat attacker to acquire their PII.

c.   Pingora's failure to require, verify, and ensure that Bayview monitored in real time the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet allowed the threat attacker to exfiltrate the PII without detection and therefore without any attempt to halt the exfiltration before its completion.

d.   Pingora's failure to require, verify, and ensure that Bayview included CobaltStrike on the emergency threat feed or tested its "use cases," allowed the threat attacker to remain on the network undetected.

e.   Pingora's failure to require, verify, and ensure that Bayview ensured Sentinel One was feeding into Bayview's SIEM system impeded the detection of CobaltStrike activity.

f.   Pingora's failure to encrypt the data in its own possession.

662.    But for Pingora's negligence, the damage to Plaintiffs and Class Members would not have occurred because of the following:

a.   If Pingora had required, verified, and ensured encryption of the PII of Plaintiff and Class Members, the threat attacker would not have acquired their PII.

b.   If Pingora had required, verified, and ensured that Bayview removed from Defendants' network the PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, the threat attacker would not have acquired their PII.

c. If Pingora had required, verified, and ensured that Bayview monitored in real time the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet, the exfiltration of the PII could have been halted before its completion.

d. If Pingora had required, verified, and ensured that Bayview had included CobaltStrike on the emergency threat feed or tested its "use cases," the threat attacker would have been prevented from remaining on the network undetected.

e. If Pingora had required, verified, and ensured that Bayview ensured Sentinel One was feeding into Bayview's SIEM, the CobaltStrike activity would have been detected.

663. Pingora's negligence was a legal cause of damage to Plaintiffs and Class Members, even if it operated in combination with the acts of the threat attacker, because the acts of and the harmed caused by the threat attacker were reasonably foreseeable, and Pingora's negligence contributed substantially to producing such damage to Plaintiffs and Class Members.

**Damages**

664. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) actual identity theft, including unauthorized charges; (ii) the loss of the opportunity to control how their PII is used; (iii) the compromise, publication, and/or theft of their PII, including the exposure of their PII on the dark web and the substantial risk of future harm; (iv) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiffs' and Class Members' respective lifetimes; (v) lost opportunity costs

associated with effort expended and the loss of productivity addressing and attempting to mitigate the present and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from tax fraud and other identity theft; (vi) costs associated with placing freezes on credit reports; (vii) the present and continuing risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the current and former customers' PII in their continued possession; (viii) damages consisting of the cost of identity theft protection services for the remainder of the lives of Plaintiffs and Class Members; and (ix) present and future costs in the form of time, effort, and money that will be expended to prevent, detect, contest, and repair the impact of the compromise of PII resulting from the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

665.    Additionally, as a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered and will suffer the continued risk of exposure of their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PII in their continued possession.

666.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members are now at an increased risk of identity theft or fraud.

667.    As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members are entitled to and demand actual, consequential, and nominal damages and injunctive relief to be determined at trial.

## COUNT II
## BREACH OF CONTRACT (THIRD-PARTY BENEFICIARY)
**On behalf of All Plaintiffs and the Class or, Alternatively, the Subclasses**
**Against Lakeview, Community Loan, and Pingora**

668.    Plaintiffs re-allege and incorporate by reference herein all of the allegations contained in paragraphs 1 through 625.

**Lakeview**

669.    Lakeview entered into written contracts with various financial institutions and entities from which it obtained the PII of Plaintiffs and Class Members.

670.    Lakeview and these entities intended that Plaintiffs and Class Members, as borrowers required to provide their confidential PII, benefit from these contracts.

671.    The contracts required Lakeview to safeguard the PII of Plaintiffs and Class Members, including as follows:

    a.    The contracts required Lakeview to acknowledge that all non-public personal information of a consumer or customer of the other party which was made available to Lakeview in connection with the contracts, or which became available to Lakeview in connection with the contracts, was to be protected by Lakeview from unauthorized use and disclosure.

    b.    The contracts required Lakeview to take all reasonable measures, including without limitation such measures as it takes to safeguard its own confidential information, to ensure the security and confidentiality of all information provided to it by the other party, to protect against all threats or hazards to the security or integrity of the information, and to protect against unauthorized access to or use of the information.

c. The contracts required Lakeview to maintain an information security program that includes administrative, technical and physical safeguards designed to protect the security and confidentiality of the confidential information disclosed by the other party.

d. The contracts required Lakeview to conduct testing for vulnerability and penetration of its computer systems in accordance with industry standards.

e. The contracts required Lakeview to meet or exceed industry standards as a means to protect any information concerning consumers and to prevent any compromise of Lakeview's information systems, computer networks or data files.

672.    The circumstances under which the contracts were entered include the following:

a. The other parties to the contracts needed a servicer for loans issued to Plaintiffs and Class Members.

b. The other parties to the contracts intended to entrust the PII of Plaintiffs and Class Members to Lakeview and sought assurance that Lakeview would safeguard their PII.

673.    The apparent purposes the parties to the contracts were trying to accomplish included the following:

a. Obtain and provide servicing of loans issued to Plaintiffs and Class Members.

b. Ensure that Lakeview safeguarded the PII of Plaintiffs and Class Members.

674.    Lakeview breached the contracts as follows:

a. Failing to require, verify, or ensure that the PII of Plaintiffs and Class Members was encrypted.

b. Failing to require, verify, or ensure that the PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, including the PII of Plaintiffs and Class Members with whom Lakeview had not had a relationship for years, was not removed from Defendants' network.

c. Failing to require, verify, or ensure that the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet was monitored and detected in real time.

d. Failing to require, verify, or ensure that Bayview included CobaltStrike on the emergency threat feed or tested its "use cases," allowing the threat attacker to remain on Defendants' network undetected.

e. Failing to require, verify, or ensure that Sentinel One—the all-important threat detection and response tool—was feeding into Bayview's SIEM System.

675.    Lakeview's breaches of the contracts caused the PII of Plaintiffs and Class Members to be acquired by the threat actor and misused as a result of that acquisition.

676.    But for Lakeview's breaches of the contracts, the PII of Plaintiffs and Class Members would not have been acquired by the threat actor and misused as a result of that acquisition.

**Community Loan**

677.    Community Loan entered into written contracts with various financial institutions and entities from which it obtained the PII of Plaintiffs and Class Members.

678.    Community Loan and these entities intended that Plaintiffs and Class Members, as borrowers required to provide their confidential PII, benefit from these contracts.

679.    The contracts required Community Loan to safeguard the PII of Plaintiffs and Class Members, including as follows:

    a.   The contracts required Community Loan to acknowledge that all non-public personal information of a consumer or customer of the other party which was made available to Community Loan in connection with the contracts, or which became available to Community Loan in connection with the contracts, was to be protected by Community Loan from unauthorized use and disclosure.

    b.   The contracts required Community Loan to take all reasonable measures, including without limitation such measures as it takes to safeguard its own confidential information, to ensure the security and confidentiality of all information provided to it by the other party, to protect against all threats or hazards to the security or integrity of the information, and to protect against unauthorized access to or use of the information.

    c.   The contracts required Community Loan to maintain an information security program that includes administrative, technical and physical safeguards designed to protect the security and confidentiality of the confidential information disclosed by the other party.

    d.   The contracts required Community Loan to conduct testing for vulnerability and penetration of its computer systems in accordance with industry standards.

    e.   The contracts required Community Loan to meet or exceed industry standards as a means to protect any information concerning consumers and to prevent any compromise of Community Loan's information systems, computer networks or data files.

680.    The circumstances under which the contracts were entered include the following:

    a.   The other parties to the contracts needed a servicer for loans issued to Plaintiffs and Class Members.

    b.   The other parties to the contracts intended to entrust the PII of Plaintiffs and Class Members to Community Loan and sought assurance that Community Loan would safeguard their PII.

681.    The apparent purposes the parties to the contracts were trying to accomplish included the following:

    a.   Obtain and provide servicing of loans issued to Plaintiffs and Class Members.

    b.   Ensure that Community Loan safeguarded the PII of Plaintiffs and Class Members.

682.    Community Loan breached the contracts as follows:

    a.   Failing to require, verify, or ensure that the PII of Plaintiffs and Class Members was encrypted.

    b.   Failing to require, verify, or ensure that the PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, including the PII of Plaintiffs and Class Members with whom Community Loan had not had a relationship for years, was not removed from Defendants' network.

    c.   Failing to require, verify, or ensure that the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet was monitored and detected in real time.

    d.   Failing to require, verify, or ensure that Bayview included CobaltStrike on the emergency threat feed or tested its "use cases," allowing the threat attacker to remain on Defendants' network undetected.

683.    Failing to require, verify, or ensure that Sentinel One—the all-important threat detection and response tool—was feeding into Bayview's SIEM System.

684.    Community Loan's breaches of the contracts caused the PII of Plaintiffs and Class Members to be acquired by the threat actor and misused as a result of that acquisition.

685.    But for Community Loan's breaches of the contracts, the PII of Plaintiffs and Class Members would not have been acquired by the threat actor and misused as a result of that acquisition.

**Pingora**

686.    Pingora entered into written contracts with various financial institutions and entities from which it obtained the PII of Plaintiffs and Class Members.

687.    Pingora and these entities intended that Plaintiffs and Class Members, as borrowers required to provide their confidential PII, benefit from these contracts.

688.    The contracts required Pingora to safeguard the PII of Plaintiffs and Class Members, including as follows:

    a.   The contracts required Pingora to acknowledge that all non-public personal information of a consumer or customer of the other party which was made available to Pingora in connection with the contracts, or which became available to Pingora in connection with the contracts, was to be protected by Pingora from unauthorized use and disclosure.

148

b. The contracts required Pingora to take all reasonable measures, including without limitation such measures as it takes to safeguard its own confidential information, to ensure the security and confidentiality of all information provided to it by the other party, to protect against all threats or hazards to the security or integrity of the information, and to protect against unauthorized access to or use of the information.

c. The contracts required Pingora to maintain an information security program that includes administrative, technical and physical safeguards designed to protect the security and confidentiality of the confidential information disclosed by the other party.

d. The contracts required Pingora to conduct testing for vulnerability and penetration of its computer systems in accordance with industry standards.

e. The contracts required Pingora to meet or exceed industry standards as a means to protect any information concerning consumers and to prevent any compromise of Pingora's information systems, computer networks or data files.

689. The circumstances under which the contracts were entered include the following:

a. The other parties to the contracts needed a servicer for loans issued to Plaintiffs and Class Members.

b. The other parties to the contracts intended to entrust the PII of Plaintiffs and Class Members to Pingora and sought assurance that Pingora would safeguard their PII.

690.   The apparent purposes the parties to the contracts were trying to accomplish included the following:

    a.   Obtain and provide servicing of loans issued to Plaintiffs and Class Members.

    b.   Ensure that Pingora safeguarded the PII of Plaintiffs and Class Members.

691.   Pingora breached the contracts as follows:

    a.   Failing to require, verify, or ensure that the PII of Plaintiffs and Class Members was encrypted.

    b.   Failing to require, verify, or ensure that the PII of Plaintiffs and Class Members that Defendants had no reasonable need to store in an internet-accessible environment, including the PII of Plaintiffs and Class Members with whom Pingora had not had a relationship for years, was not removed from Defendants' network.

    c.   Failing to require, verify, or ensure that the movement of the PII of Plaintiffs and Class Members from Defendants' network to the internet was monitored and detected in real time.

    d.   Failing to require, verify, or ensure that Bayview included CobaltStrike on the emergency threat feed or tested its "use cases," allowing the threat attacker to remain on Defendants' network undetected.

692.   Failing to require, verify, or ensure that Sentinel One—the all-important threat detection and response tool—was feeding into Bayview's SIEM System.

693.   Pingora's breaches of the contracts caused the PII of Plaintiffs and Class Members to be acquired by the threat actor and misused as a result of that acquisition.

694.     But for Pingora's breaches of the contracts, the PII of Plaintiffs and Class Members would not have been acquired by the threat actor and misused as a result of that acquisition.

**Damages**

695.     As a direct and proximate result of Lakeview's, Community Loan's, and Pingora's above-described breaches, Plaintiffs and Class Members have suffered (and will continue to suffer): ongoing, imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; loss of the confidentiality of the stolen confidential data; the illegal sale of the compromised data on the dark web; damages consisting of the cost of identity theft protection services for the remainder of the lives of Plaintiffs and Class Members; additional time spent scrutinizing bank statements, credit card statements, and credit reports; expenses and/or time spent initiating fraud alerts and credit freezes; decreased credit scores and ratings; lost work time; and other economic and non-economic harm including present and future costs in the form of time, effort and money that will be expended to prevent, detect, contest and repair the impact of the compromise of PII resulting from the Data Breach for the remainder of the lives of Plaintiffs and Class Members.

696.     As a direct and proximate result of Lakeview's, Community Loan's, and Pingora's breaches of contract, Plaintiffs and Class Members are at an increased risk of identity theft or fraud.

697.     As a direct and proximate result of Lakeview's, Community Loan's, and Pingora's breaches of contract, Plaintiffs and Class Members are entitled to and demand actual, consequential, and nominal damages and injunctive relief, to be determined at trial.

## COUNT III

**VIOLATIONS OF CALIFORNIA'S CONSUMER PRIVACY ACT,**
**Cal. Civ. Code § 1798.100, *et seq*. (2020) ("CCPA")[144]**
**On Behalf of Plaintiffs Robert Keach, Cindy Villanueva, Pedro Rubio, Norma Grossman,**
**Maureen Keach, Linda Kim, and Jay Saporta and the California Subclass**
**Against All Defendants**

698.    Plaintiffs Robert Keach, Cindy Villanueva, Pedro Rubio, Norma Grossman, Maureen Keach, Linda Kim, and Jay Saporta ("Plaintiffs," for purposes of this Count) and the California Subclass re-allege and incorporate paragraphs 1 through 625 as if fully set forth herein.

699.    Plaintiffs Cindy Villanueva and Pedro Rubio bring this claim on behalf of themselves and the California Subclass against Defendants Bayview and Lakeview.

700.    Plaintiffs Robert Keach, Maureen Keach, Norma Grossman, and Jay Saporta bring this claim on behalf of themselves and the California Subclass against Defendants Bayview and Pingora.

701.    Plaintiff Linda Kim brings this claim on behalf of herself and the California Subclass against Defendants Bayview and Community Loan.

702.    Section 1798.150(a)(1) of the CCPA provides, "[a]ny consumer whose nonencrypted or nonredacted personal information, as defined by [Cal. Civ. Code section 1798.81.5(d)(1)(A)] . . . is subject to an unauthorized access and exfiltration, theft, or disclosure as a result of the business's violation of the duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the personal information may institute a civil action for" statutory or actual damages, injunctive or declaratory relief, and any other relief the court deems proper.

---

[144] The CCPA went into effect in 2020 and was amended in 2023. Plaintiffs' citations herein are to the 2020 version, which was the operative version of the statute, to which Defendants were subject, when the Data Breach occurred.

703.     Plaintiffs and the California Subclass Members are consumers and California residents as defined by Cal. Civ. Code section 1798.140(g).

**Bayview**

704.     Bayview is a "business" as defined by Cal. Civ. Code § 1798.140(c)(1) because it is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners that collects consumers' personal information or on the behalf of which that information is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information, that does business in the State of California . . . [and] [h]as annual gross revenues in excess of twenty-five million dollars ($25,000,000) . . . [and] alone or in combination, annually buys, receives for the business's commercial purposes, sells, or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices."[145]

705.     Bayview collects personal information from, among other sources, consumers whose loans are serviced by Bayview and by its affiliated companies Pingora, Lakeview, and Community Loan.

706.     Bayview, Pingora, Lakeview, and Community Loan jointly determine the purposes and means of processing consumers' personal information. Lakeview, Community Loan, and Pingora obtain personal information from their customers for the purpose of servicing their loans. In turn, Lakeview, Community Loan, and Pingora share this personal information with their parent company, Bayview, which in coordination with Lakeview, Community Loan, and Pingora, assists

---

[145]                                        https://rocketreach.co/bayview-asset-management-llc-profile_b5c2a8a1f42e0f27#:~:text=What%20is%20the%20annual%20revenue,was%20%24928%20million%20in%202023 (last visited Jan. 16, 2024).

with the technical aspects of processing and storing the information so that it can be used by all of these entities to service loans and manage portfolios of mortgages.

707.   Bayview provides data security and storage services for the personal information obtained from the customers of its subsidiaries Lakeview, Community Loan, and Pingora. Bayview, Lakeview, Community Loan, and Pingora regularly communicate and work together to determine how this personal information is processed, including through implementation of software and other technical updates, and the purposes—including loan servicing and mortgage portfolio management—for which this information is used. Hence, Bayview, Lakeview, Community Loan, and Pingora jointly determined both the purpose and the means of processing Plaintiffs' data.

708.   Plaintiffs' and California Subclass Members' personal information, as defined by Civil Code section 1798.140(o), was subject to unauthorized access and exfiltration, theft, or disclosure. The Data Breach described herein exposed, without limitation, names, addresses, loan numbers, Social Security numbers, and, for some California Subclass Members, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

709.   Bayview knew, or should have known, that its network computer systems and data security practices were inadequate to safeguard PII and that the risk of a data breach or theft was highly likely.

710.   Bayview failed to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect PII by:

　　　a.   failing to encrypt the PII of Plaintiffs and California Subclass Members;

b.  failing to delete the PII of Plaintiffs and Class Members after it was no longer necessary to retain the PII;

c.  storing Plaintiffs' and California Subclass Members' PII in an internet-accessible environment when such storage was unnecessary;

d.  continuing to accept and store PII after it knew or should have known about the Data Breach;

e.  failing to monitor and detect the movement of the PII of Plaintiffs and California Subclass Members from Bayview's network to the internet in real time;

f.  failing to monitor the practices of its cybersecurity vendors;

g.  failing to include CobaltStrike—the software the attackers used—on the emergency threat feed or test its "use cases," allowing the threat attacker to remain on Bayview's network undetected;

h.  failing to properly integrate Sentinel One—the all-important threat detection and response tool—into Bayview's Security Information and Events Management System; and

i.  unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and California Subclass Members from taking timely self-protection measures.

711.   The Data Breach occurred as a result of Bayview's failure to implement and maintain reasonable security procedures and practices for protecting the exposed information given its nature. Bayview also failed to monitor its systems to identify suspicious activity, and allowed unauthorized access to Plaintiffs' and California Subclass Members' PII.

712.     Bayview violated section 1798.150(a) of the CCPA, Cal. Civ. Code § 1798.150(a), by failing to prevent Plaintiffs' and California Subclass Members' PII from unauthorized access, exfiltration, theft, or disclosure as a result of Bayview's violations of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the PII.

713.     Plaintiffs and the California Subclass Members suffered damage and losses as a direct and proximate result of Bayview's conduct described above.

## Lakeview

714.     Lakeview is a "business" as defined by Cal. Civ. Code § 1798.140(c)(1) because it is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners that collects consumers' personal information or on the behalf of which that information is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information, that does business in the State of California . . . [and] [h]as annual gross revenues in excess of twenty-five million dollars ($25,000,000) . . . [and] alone or in combination, annually buys, receives for the business's commercial purposes, sells, or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices."[146]

715.     Lakeview collects personal information from, among other sources, the consumers whose loans are serviced by Lakeview and its affiliated companies: Bayview, Pingora, and Community Loan.

---

[146] https://www.zoominfo.com/c/lakeview-loan-servicing-llc/354955782 (last visited Jan. 16, 2024).

716.     Lakeview, Bayview, Pingora, and Community Loan jointly determine the purposes and means of processing consumers' personal information. Lakeview, Community Loan, and Pingora obtain personal information from their customers for the purpose of servicing their loans. In turn, Lakeview, Community Loan, and Pingora share this personal information with their parent company, Bayview, which in coordination with Lakeview, Community Loan, and Pingora, assists with the technical aspects of processing and storing the information so that it can be used by all of these entities to service loans and manage portfolios of mortgages.

717.     Bayview provides data security and storage services for the personal information obtained from the customers of its subsidiaries Lakeview, Community Loan, and Pingora. Lakeview, Bayview, Community Loan, and Pingora regularly communicate and work together to determine how this personal information is processed, including through implementation of software and other technical updates, and the purposes—including loan servicing and mortgage portfolio management—for which this information is used. For example, the Chief Compliance Officers from Bayview, Lakeview, Community Loan, and Pingora all ████████████████ ██████████████████████████ ██ █████████████████████████ ████████████████████████████████████████ .[148] Hence, Lakeview, Bayview, Community Loan, and Pingora jointly determined both the purpose and the means of processing Plaintiffs' data.

718.     Plaintiffs' and California Subclass Members' personal information, as defined by Civil Code section 1798.140(o), was subject to unauthorized access, exfiltration, theft, or disclosure. The Data Breach described herein exposed, without limitation, name, address, loan

---

[147]  BAYVIEW000147258 at 7261.
[148]  BAYVIEW000122966.

number, and Social Security number, and, for some California Subclass Members, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

719.    Lakeview knew, or should have known, that its network computer systems and data security practices were inadequate to safeguard PII and that the risk of a data breach or theft was highly likely.

720.    Lakeview failed to implement and maintain reasonable security procedures by:

    a.  failing to require, verify, or ensure that the PII of Plaintiffs and California Subclass Members was encrypted;

    b.  failing to delete the PII of Plaintiffs and California Subclass Members after it was no longer necessary to retain the PII;

    c.  storing Plaintiffs' and California Subclass Members' PII in an internet-accessible environment when such storage was unnecessary;

    d.  continuing to accept and store PII after it knew or should have known of the Data Breach;

    e.  failing to monitor the cybersecurity practices of Bayview;

    f.  failing to monitor the practices of its cybersecurity vendors; and

    g.  unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and California Subclass Members from taking timely self-protection measures.

721.    The Data Breach occurred as a result of Lakeview's failure to implement and maintain reasonable security procedures and practices for protecting the exposed information

given its nature. Lakeview failed to monitor its systems to identify suspicious activity, and allowed unauthorized access to Plaintiffs' and California Subclass Members' PII.

722.   Lakeview violated section 1798.150(a) of the CCPA, Cal. Civ. Code § 1798.150(a), by failing to prevent Plaintiffs' and the California Subclass Members' PII from unauthorized access, exfiltration, theft, or disclosure as a result of Lakeview's violations of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the PII.

723.   Plaintiffs and the California Subclass Members suffered damage and losses as a direct and proximate result of Lakeview's conduct described above.

**Community Loan**

724.   Community Loan is a "business" as defined by Cal. Civ. Code § 1798.140(c)(1) because it is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners, that collects consumers' personal information, or on the behalf of which that information is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information, that does business in the State of California . . . [and] [h]as annual gross revenues in excess of twenty-five million dollars ($25,000,000) . . . [and] alone or in combination, annually buys, receives for the business's commercial purposes, sells, or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices."[149]

---

[149]   Community Loan Servicing, ZoomInfo, https://www.zoominfo.com/c/community-loan-servicing-llc/527507430 (last visited Jan. 16, 2024).

725.     Community Loan collects personal information from, among other sources, the consumers whose loans are serviced by Community Loan and its affiliated companies: Pingora, Lakeview, and Bayview.

726.     Community Loan, Bayview, Pingora, and Lakeview jointly determine the purposes and means of processing consumers' personal information. Community Loan, Lakeview, and Pingora obtain personal information from their customers for the purpose of servicing their loans. In turn, Community Loan, Lakeview, and Pingora share this personal information with their parent company, Bayview, which in coordination with Community Loan, Lakeview, and Pingora, assists with the technical aspects of processing and storing the information so that it can be used by all of these entities to service loans and manage portfolios of mortgages.

727.     Bayview provides data security and storage services for the personal information obtained from the customers of its subsidiaries Community Loan, Lakeview, and Pingora. Community Loan, Bayview, Lakeview, and Pingora regularly communicate and work together to determine how this personal information is processed, including through implementation of software and other technical updates, and the purposes—including loan servicing and mortgage portfolio management—for which this information is used. For example, the Chief Compliance Officers from Bayview, Lakeview, Community Loan, and Pingora all ███████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
██████.[151] Hence, Lakeview, Bayview, Community Loan, and Pingora jointly determined both the purpose and the means of processing Plaintiffs' data.

---

[150]  BAYVIEW000147258 at 7261.
[151]  BAYVIEW000122966.

728.    Plaintiffs' and California Subclass Members' personal information, as defined by Civil Code section 1798.140(o), was subject to unauthorized access, exfiltration, theft, or disclosure. The Data Breach described herein exposed, without limitation, name, address, loan number, and Social Security number, and, for some California Subclass Members, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

729.    Community Loan knew, or should have known, that its network computer systems and data security practices were inadequate to safeguard PII and that the risk of a data breach or theft was highly likely.

730.    Community Loan failed to implement and maintain reasonable security procedures by:

a.   failing to require, verify, or ensure that the PII of Plaintiffs and California Subclass Members was encrypted;

b.   failing to delete the PII of Plaintiffs and California Subclass Members after it was no longer necessary to retain the PII;

c.   storing Plaintiffs' and California Subclass Members' PII in an internet-accessible environment when such storage was unnecessary;

d.   continuing to accept and store PII after it knew or should have known of the Data Breach;

e.   failing to monitor the cybersecurity practices of Bayview;

f.   failing to monitor the practices of its cybersecurity vendors; and

g.  unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and California Subclass Members from taking timely self-protection measures.

731.   The Data Breach occurred as a result of Community Loan's failure to implement and maintain reasonable security procedures and practices for protecting the exposed information given its nature. Community Loan also failed to monitor its systems to identify suspicious activity, and allowed unauthorized access to Plaintiffs' and California Subclass Members' PII.

732.   Community Loan violated section 1798.150(a) of the CCPA, Cal. Civ. Code § 1798.150(a), by failing to prevent Plaintiffs' and the California Subclass Members' PII from unauthorized access and exfiltration, theft, or disclosure as a result of Community Loan's violations of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the PII.

733.   Plaintiffs and the California Subclass Members suffered damage and losses as a direct and proximate result of Community Loan's conduct described above.

**Pingora**

734.   Pingora is a "business" as defined by Cal. Civ. Code § 1798.140(c)(1) because it is a "sole proprietorship, partnership, limited liability company, corporation, association, or other legal entity that is organized or operated for the profit or financial benefit of its shareholders or other owners that collects consumers' personal information or on the behalf of which that information is collected and that alone, or jointly with others, determines the purposes and means of the processing of consumers' personal information, that does business in the State of California . . . [and it] alone or in combination, annually buys, receives for the business's commercial

purposes, sells, or shares for commercial purposes, alone or in combination, the personal information of 50,000 or more consumers, households, or devices."

735.    Pingora collects personal information from, among other sources, the consumers whose loans are serviced by Pingora and its affiliated companies: Community Loan, Lakeview, and Bayview.

736.    Pingora, Lakeview, Bayview, and Community Loan jointly determine the purposes and means of processing consumers' personal information. Pingora, Lakeview, and Community Loan obtain personal information from their customers for the purpose of servicing their loans. In turn, Pingora, Lakeview, and Community Loan share this personal information with their parent company, Bayview, which in coordination with Pingora, Lakeview, and Community Loan, assists with the technical aspects of processing and storing the information so that it can be used by all of these entities to service loans and manage portfolios of mortgages.

737.    Bayview provides data security and storage services for the personal information obtained from the customers of its subsidiaries Pingora, Lakeview, and Community Loan. Pingora, Lakeview, Bayview, and Community Loan regularly communicate and work together to determine how this personal information is processed, including through implementation of software and other technical updates, and the purposes—including loan servicing and mortgage portfolio management—for which this information is used. For example, the Chief Compliance Officers from Bayview, Lakeview, Community Loan, and Pingora all participate on Bayview's Enterprise Risk Management Steering Committee.[152] Bayview also hired a third-party consulting company, Protiviti, to map out the locations of data held by Lakeview, Pingora, and Community Loan.[153]

---

[152]   BAYVIEW000147258 at 7261.
[153]   BAYVIEW000122966.

Hence, Lakeview, Bayview, Community Loan, and Pingora jointly determined both the purpose and the means of processing Plaintiffs' data.

738.    Plaintiffs' and California Subclass Members' personal information, as defined by Civil Code section 1798.140(o), was subject to unauthorized access, exfiltration, theft, or disclosure. The Data Breach described herein exposed, without limitation, name, address, loan number, and Social Security number, and, for some California Subclass Members, information provided in connection with a loan application, loan modification, or other items regarding loan servicing.

739.    Pingora knew, or should have known, that its network computer systems and data security practices were inadequate to safeguard PII and that the risk of a data breach or theft was highly likely.

740.    Pingora failed to implement and maintain reasonable security procedures by:

a.  failing to require, verify, or ensure that the PII of Plaintiffs and Class Members was encrypted;

b.  failing to delete the PII of Plaintiffs and Class Members after it was no longer necessary to retain the PII;

c.  storing Plaintiffs' and Class Members' PII in an internet-accessible environment when such storage was unnecessary;

d.  continuing to accept and store PII after it knew or should have known of the Data Breach;

e.  failing to monitor the cybersecurity practices of Bayview;

f.  failing to monitor the practices of its cybersecurity vendors; and

g.  unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and Class Members from taking timely self-protection measures.

741.    The Data Breach occurred as a result of Pingora's failure to implement and maintain reasonable security procedures and practices for protecting the exposed information given its nature. Pingora failed to monitor its systems to identify suspicious activity, and allowed unauthorized access to Plaintiffs' and California Subclass Members' PII.

742.    Pingora violated section 1798.150(a) of the CCPA, Cal. Civ. Code § 1798.150(a), by failing to prevent Plaintiffs' and the California Subclass Members' PII from unauthorized access and exfiltration, theft, or disclosure as a result of Pingora's violations of its duty to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the PII.

743.    Plaintiffs and the California Subclass Members suffered damage and losses as a direct and proximate result of Pingora's conduct described above.

### Entitlement to Statutory Damages and Other Relief

744.    In view of the foregoing, Plaintiffs and California Subclass members are entitled to relief under Cal. Civ. Code § 1798.150(a) including, but not limited to, statutory damages in an amount not less than one hundred dollars ($100) and not greater than seven hundred and fifty dollars ($750) per consumer per incident or actual damages, whichever is greater; injunctive or declaratory relief; any other relief the Court deems proper; and attorneys' fees and costs, including as provided under Cal. Code Civ. P. § 1021.5.

**Notice of CCPA Violation**

745.     As detailed in the following paragraphs, each Plaintiff provided the relevant Defendant(s) with written notice of its specific violations of the CCPA, and each Defendant had more than 30 days to cure those violations before the filing of this complaint. Defendants have

████████████████████████████████████████

████████████████████████████████████████

████████████████████████.[154]

746.     Pursuant to § 1798.150(b) of the CCPA, Plaintiff Robert Keach gave written notice to Defendant Pingora and Bayview of their specific violations of § 1798.150(a) by certified mail dated April 14, 2022.[155] Pingora responded on April 29, 2022 but failed to cure.[156] Bayview did not respond within 30 days as required by the statute and failed to cure.

747.     Pursuant to § 1798.150(b) of the CCPA, Plaintiff Cindy Villanueva gave written notice to Defendant Lakeview of its specific violations of § 1798.150(a) by certified mail dated April 29, 2022.[157] Lakeview failed to cure and did not respond within the required 30 days.

748.     Pursuant to § 1798.150(b) of the CCPA, Plaintiff Pedro Rubio gave written notice to Defendant Lakeview of its specific violations of § 1798.150(a) by certified mail dated April 13, 2022.[158] Lakeview responded on April 29, 2022 but failed to cure.[159]

---

[154]  *E.g.*, Ex. 13 (BAYVIEW000147612-7614).

[155]  Ex. 6 (R. Keach, M. Keach, and Saporta CCPA Notice).

[156]  Ex. 7 (CCPA Responses).

[157]  Ex. 8 (Villanueva CCPA Notice).

[158]  Ex. 9 (Rubio CCPA Notice).

[159]  Ex. 7 (CCPA Responses).

749.     Pursuant to § 1798.150(b) of the CCPA, Plaintiff Norma Grossman gave written notice to Defendant Pingora of its specific violations of § 1798.150(a) by certified mail dated June 6, 2022.[160] Pingora failed to cure and did not respond within the required 30 days.

750.     Pursuant to § 1798.150(b) of the CCPA, Plaintiff Maureen Keach gave written notice to Defendants Pingora and Bayview of their specific violations of § 1798.150(a) by certified mail dated April 14, 2022.[161] Pingora responded on April 29, 2022 but failed to cure.[162] Bayview failed to cure and did not respond within the required 30 days.

751.     Pursuant to § 1798.150(b) of the CCPA, Plaintiff Linda Kim gave written notice to Defendants Bayview and Community Loan of their specific violations of § 1798.150(a) by certified mail dated October 31, 2022.[163] Bayview and Community Loan responded on November 10, 2022 but failed to cure.[164]

752.     Pursuant to § 1798.150(b) of the CCPA, Plaintiff Jay Saporta gave written notice to Defendants Bayview and Pingora of their specific violations of § 1798.150(a) by certified mail dated April 14, 2022.[165] Pingora responded on April 29, 2022 but failed to cure.[166] Bayview has not responded.

---

[160]  Ex. 10 (Grossman CCPA Notice).

[161]  Ex. 6 (R. Keach, M. Keach, and Saporta CCPA Notice ).

[162]  Ex. 7 (CCPA Responses).

[163]  Ex. 11 (Kim CCPA Notice).

[164]  Ex. 7 (CCPA Responses).

[165]  Ex. 6 (R. Keach, M. Keach, and Saporta CCPA Notice).

[166]  Ex. 7 (CCPA Responses).

<u>COUNT IV</u>
**VIOLATION OF CALIFORNIA'S CUSTOMER RECORDS ACT ("CCRA"),**
**Cal. Civ. Code § 1798.80, *et seq*.**
**On Behalf of Plaintiffs Robert Keach, Cindy Villanueva, Pedro Rubio, Norma Grossman,**
**Maureen Keach, Linda Kim, and Jay Saporta and the California Subclass**
**Against All Defendants**

753.    Plaintiffs Robert Keach, Cindy Villanueva, Pedro Rubio, Norma Grossman, Maureen Keach, Linda Kim, and Jay Saporta ("Plaintiffs," for purposes of this Count) and the California Subclass re-allege and incorporate paragraphs 1 through 625 as if fully set forth herein.

754.    Plaintiffs Cindy Villanueva and Pedro Rubio bring this claim on behalf of themselves and the California Subclass against Defendants Bayview and Lakeview.

755.    Plaintiffs Robert Keach, Maureen Keach, Norma Grossman, and Jay Saporta bring this claim on behalf of themselves and the California Subclass against Defendants Bayview and Pingora.

756.    Plaintiff Linda Kim brings this claim on behalf of herself and the California Subclass against Bayview and Community Loan.

757.    "[T]o ensure that Personal Information about California residents is protected," the California Legislature enacted Cal. Civ. Code § 1798.81.5, which requires that any business that "owns, licenses, or maintains Personal Information about a California resident shall implement and maintain reasonable security procedures and practices appropriate to the nature of the information, to protect the Personal Information from unauthorized access, destruction, use, modification, or disclosure."

758.    Furthermore, businesses that maintain computerized data that includes PII are required to "notify the owner or licensee of the information of the breach of the security of the data immediately following discovery, if the personal information was, or is reasonably believed to have been, acquired by an unauthorized person." Cal. Civ. Code § 1798.82(b). Among other

168

requirements, the security breach notification must include "the types of Personal Information that were or are reasonably believed to have been the subject of the breach." Cal. Civ. Code § 1798.82.

759.    The Data Breach was a breach of security within the meaning of section 1798.82. PII stolen in the Data Breach, such as name, address, loan number, Social Security number, and other items regarding loan servicing, constitutes "personal information" within the meaning of section 1798.80(e).

760.    Plaintiffs and California Subclass Members owned PII that was maintained by Bayview, Lakeview, Community Loan, and/or Pingora and that was the subject of the Data Breach. *See* Cal. Civ. Code § 1798.2.

**Bayview**

761.    Bayview is a business within the meaning of Cal. Civ. Code § 1798.80. Bayview is a corporation organized, chartered, or holding a license or authorization certificate under the laws of Florida.

762.    Bayview owns, licenses, or maintains personal information about Californians under Cal. Civ. Code § 1798.81.5(a)(1). Such PII includes, but is not limited to, the first and last names and Social Security numbers of Plaintiffs and the California Subclass Members, along with loan numbers and other information that would permit access to Plaintiffs' and the California Subclass Members' financial accounts. *See* Cal. Civ. Code §§ 1798.81.5(d)(1)(A)(i) and (iii).

763.    Because Plaintiffs' and California Subclass Members' PII was acquired by unauthorized persons during the Data Breach, Bayview had an obligation to disclose the Data Breach immediately following its discovery to the owners or licensees of the PII (*i.e.*, Plaintiffs and the California Subclass Members) as mandated by Cal. Civ. Code § 1798.82.

764.    The Data Breach occurred from October 27, 2021 to December 7, 2021, and was discovered by Bayview on December 6, 2021, but Bayview did not disclose the Breach to Class Members until March 16, 2022.[167]

765.    By failing to disclose the Data Breach immediately following its discovery, Bayview violated Cal. Civ. Code § 1798.82.

766.    Bayview's failure to timely notify Plaintiffs and California Subclass Members of the breach of their PII prevented them from taking the following remedial measures to mitigate their losses and damage from the Data Breach: (1) purchasing identity protection, monitoring, and recovery services; (2) flagging asset, credit, and tax accounts for fraud, including by reporting the theft of their Social Security numbers to financial institutions, credit agencies, and the IRS; (3) purchasing or otherwise obtaining credit reports; (4) placing or renewing fraud alerts on a quarterly basis; (5) intensively monitoring loan data and public records; and (6) taking other steps to protect themselves and attempt to avoid or recover from identity theft.

767.    As a direct and proximate result of Bayview's violations of Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiffs and California Subclass Members suffered damages, as described above and as will be proven at trial.

**Lakeview**

768.    Lakeview is a business within the meaning of Cal. Civ. Code § 1798.80. Lakeview is a corporation organized, chartered, or holding a license or authorization certificate under the laws of Florida.

769.    Lakeview owns, licenses, or maintains personal information about Californians, as required by Cal. Civ. Code § 1798.81.5(a)(1). Such PII includes, but is not limited to, the first and

---

[167] Ex. 14 (BAYVIEW000002036).

last names and Social Security numbers of Plaintiffs and California Subclass Members, along with loan numbers and other information that would permit access to Plaintiffs' and California Subclass Members' financial accounts. *See* Cal. Civ. Code §§ 1798.81.5(d)(1)(A)(i) and (iii).

770.     Because Lakeview reasonably believed that Plaintiffs' and California Subclass Members' PII was acquired by unauthorized persons during the Data Breach, Lakeview had an obligation to disclose the Data Breach immediately following its discovery to the owners or licensees of the PII (*i.e.*, Plaintiffs and the California Subclass Members) as mandated by Cal. Civ. Code § 1798.82.

771.     The Data Breach occurred from October 27, 2021 to December 7, 2021, and was discovered by Lakeview on December 6, 2021, but Lakeview did not disclose the Breach to Class Members until March 16, 2022.

772.     By failing to disclose the Data Breach immediately following its discovery, Lakeview violated Cal. Civ. Code § 1798.82.

773.     Lakeview's failure to timely notify Plaintiffs and California Subclass Members of the breach of their PII prevented them from taking the following remedial measures to mitigate their losses and damage from the Data Breach: (1) purchasing identity protection, monitoring, and recovery services; (2) flagging asset, credit, and tax accounts for fraud, including by reporting the theft of their Social Security numbers to financial institutions, credit agencies, and the IRS; (3) purchasing or otherwise obtaining credit reports; (4) placing or renewing fraud alerts on a quarterly basis; (5) intensively monitoring loan data and public records; and (6) taking other steps to protect themselves and attempt to avoid or recover from identity theft.

774. As a direct and proximate result of Lakeview's violations of Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiffs and California Subclass Members suffered damages, as described above and as will be proven at trial.

**Community Loan**

775. Community Loan is a business within the meaning of Cal. Civ. Code § 1798.80. Community Loan is a corporation organized, chartered, or holding a license or authorization certificate under the laws of Delaware.

776. Community Loan owns, licenses, or maintains personal information about Californians, as required by Cal. Civ. Code § 1798.81.5(a)(1). Such PII includes, but is not limited to, the first and last names and Social Security numbers of Plaintiffs and California Subclass Members, along with loan numbers and other information that would permit access to Plaintiffs' and California Subclass Members' financial accounts. *See* Cal. Civ. Code §§ 1798.81.5(d)(1)(A)(i) and (iii).

777. Because Community Loan reasonably believed that Plaintiffs' and California Subclass Members' PII was acquired by unauthorized persons during the Data Breach, Community Loan had an obligation to disclose the Data Breach immediately following its discovery to the owners or licensees of the PII (*i.e.*, Plaintiffs and the California Subclass Members) as mandated by Cal. Civ. Code § 1798.82.

778. The Data Breach occurred from October 27, 2021 to December 7, 2021, and was discovered by Community Loan on December 6, 2021, Community Loan did not disclose the Breach to Class Members until March 16, 2022.

779. By failing to disclose the Data Breach immediately following its discovery, Community Loan violated Cal. Civ. Code § 1798.82.

780.     Community Loan's failure to timely notify Plaintiffs and California Subclass Members of the breach of their PII prevented them from taking the following remedial measures to mitigate their losses and damage from the Data Breach: (1) purchasing identity protection, monitoring, and recovery services; (2) flagging asset, credit, and tax accounts for fraud, including by reporting the theft of their Social Security numbers to financial institutions, credit agencies, and the IRS; (3) purchasing or otherwise obtaining credit reports; (4) placing or renewing fraud alerts on a quarterly basis; (5) intensively monitoring loan data and public records; and (6) taking other steps to protect themselves and attempt to avoid or recover from identity theft.

781.     As a direct and proximate result of Community Loan's violations of Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiffs and California Subclass Members suffered damages, as described above and as will be proven at trial.

**Pingora**

782.     Pingora is a business within the meaning of Cal. Civ. Code § 1798.80. Pingora is a corporation organized, chartered, or holding a license or authorization certificate under the laws of Delaware.

783.     Pingora owns, licenses, or maintains personal information about Californians, as required by Cal. Civ. Code § 1798.81.5(a)(1). Such PII includes, but is not limited to, the first and last names and Social Security numbers of Plaintiffs and California Subclass Members, along with loan numbers and other information that would permit access to Plaintiffs' and California Subclass Members' financial accounts. *See* Cal. Civ. Code §§ 1798.81.5(d)(1)(A)(i) and (iii).

784.     Because Pingora reasonably believed that Plaintiffs' and California Subclass Members' PII was acquired by unauthorized persons during the Data Breach, Pingora had an obligation to disclose the Data Breach immediately following its discovery to the owners or

licensees of the PII (*i.e.*, Plaintiffs and the California Subclass Members) as mandated by Cal. Civ. Code § 1798.82.

785.    The Data Breach occurred from October 27, 2021 to December 7, 2021, and was discovered by Pingora on December 6, 2021, Pingora did not disclose the Breach to Class Members until March 16, 2022.

786.    By failing to disclose the Data Breach immediately following its discovery, Pingora violated Cal. Civ. Code § 1798.82.

787.    Pingora's failure to timely notify Plaintiffs and California Subclass Members of the breach of their PII prevented them from taking the following remedial measures to mitigate their losses and damage from the Data Breach: (1) purchasing identity protection, monitoring, and recovery services; (2) flagging asset, credit, and tax accounts for fraud, including by reporting the theft of their Social Security numbers to financial institutions, credit agencies, and the IRS; (3) purchasing or otherwise obtaining credit reports; (4) placing or renewing fraud alerts on a quarterly basis; (5) intensively monitoring loan data and public records; and (6) taking other steps to protect themselves and attempt to avoid or recover from identity theft.

788.    As a direct and proximate result of Pingora's violations of Cal. Civ. Code §§ 1798.81.5 and 1798.82, Plaintiffs and California Subclass Members suffered damages, as described above and as will be proven at trial.

789.    Plaintiffs and California Subclass Members seek relief under Cal. Civ. Code § 1798.84, including damages, injunctive relief, and any other relief deemed appropriate by the Court.

**COUNT V**

**UNLAWFUL AND UNFAIR CONDUCT IN VIOLATION OF
CALIFORNIA'S UNFAIR COMPETITION LAW,
Cal. Bus. & Prof. Code § 17200, *et seq*. ("UCL")
On Behalf of Plaintiffs Robert Keach, Cindy Villanueva, Pedro Rubio, Norma Grossman,
Maureen Keach, Linda Kim, and Jay Saporta and the California Subclass
Against All Defendants**

790.    Plaintiffs Robert Keach, Cindy Villanueva, Pedro Rubio, Norma Grossman, Maureen Keach, Linda Kim, and Jay Saporta ("Plaintiffs," for purposes of this Count) and the California Subclass, re-allege and incorporate paragraphs 1 through 625 as if fully set forth herein.

791.    Plaintiffs Cindy Villanueva and Pedro Rubio bring this claim on behalf of themselves and the California Subclass against Defendants Bayview and Lakeview.

792.    Plaintiffs Robert Keach, Maureen Keach, Norma Grossman, and Jay Saporta bring this claim on behalf of themselves and the California Subclass against Defendants Bayview and Pingora.

793.    Plaintiff Linda Kim brings this claim on behalf of herself and the California Subclass against Defendants Bayview and Community Loan.

794.    Plaintiffs lack an adequate remedy at law and assert this claim in the alternative to their other California statutory counts. There is no guarantee that Defendants will not continue the same deficient security practices that caused the Data Breach, and Defendants' continued possession of Plaintiffs' and California Subclass Members' PII presents the risk that they will be harmed again.

795.    The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

**Bayview**

796.    Bayview's conduct is unlawful, in violation of the UCL, because it violates the CCPA and the CCRA.

797.    Bayview's conduct is substantially unfair, predatory, and contrary to California's and the nation's legislatively declared public policy in favor of protecting the privacy and security of personal and confidential information. *See* S. Rep. No. 100-500 at 7-8 (1988) (finding that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems . . . create[s] privacy interests that directly affect the ability of people to express their opinions, to join in association with others, and to enjoy the freedom and independence that the Constitution was established to safeguard."); California Bill Analysis, A.B. 375 Assem. (June 27, 2021) (noting that "[t]he unregulated and unauthorized disclosure of personal information and the resulting loss of privacy can have devastating effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to the destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.").

798.    Bayview's unfair business acts and practices include:

a.    failing to adequately secure the personal information of Plaintiffs and California Subclass Members from disclosure to unauthorized third parties or for improper purposes;

b.    enabling the disclosure of personal and sensitive facts about Plaintiffs and California Subclass Members in a manner highly offensive to a reasonable person;

c.   enabling the disclosure of personal and sensitive facts about Plaintiffs and California Subclass Members without their informed, voluntary, affirmative, and clear consent;

d.   failing to encrypt the PII of Plaintiffs and California Subclass Members;

e.   failing to delete the PII of Plaintiffs and California subclass Members after it was no longer necessary to retain the PII;

f.   storing Plaintiffs' and California Subclass Members' PII in an internet-accessible environment when such storage was unnecessary;

g.   continuing to accept and store PII after it knew or should have known of the Data Breach;

h.   failing to monitor and detect the movement of the PII of Plaintiffs and California Subclass Members from Bayview's network to the internet in real time;

i.   failing to monitor the practices of its cybersecurity vendors;

j.   failing to include CobaltStrike—the software the attackers used—on the emergency threat feed or test its "use cases," allowing the threat attacker to remain on Bayview's network undetected;

k.   failing to properly integrate Sentinel One—the all-important threat detection and response tool—into Bayview's Security Information and Events Management System; and

l.   unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and California Subclass Members from taking timely self-protection measures.

799.     The gravity of harm resulting from Bayview's unfair conduct outweighs any potential utility. The failure to adequately safeguard personal, sensitive information harms the public at large and is part of a common and uniform course of wrongful conduct.

800.     The harm from Bayview's conduct was not reasonably avoidable by consumers. The individuals affected by Bayview were required to provide their PII as part of their relationship with Bayview and its subsidiaries. Plaintiffs and California Subclass Members did not know of, and had no reasonable means of discovering, that their information would be exposed to hackers through inadequate data security measures. Nor did any member of the California Subclass have any means of preventing the Data Breach.

801.     There were reasonably available alternatives that would have furthered Bayview's business interests of managing and storing consumer loan data, such as implementing best practices in cybersecurity defense.

802.     As a direct and proximate result of Bayview's unfair methods of competition and unfair acts or practices, Plaintiffs and California Subclass Members lost money or property because their sensitive personal information experienced a diminution of value and because they paid out of pocket for credit monitoring, fraud alerts, or other identity theft protection services and devoted additional time—which they otherwise would or could have devoted to pecuniary gain—to expending additional time to monitor their credit reports and financial accounts for fraudulent activity.

**Lakeview**

803.     Lakeview's conduct is unlawful, in violation of the UCL, because it violates the CCPA and the CCRA.

804.     Lakeview's conduct is substantially unfair, predatory, and contrary to California's and the nation's legislatively declared public policy in favor of protecting the privacy and security of personal and confidential information. *See* S. Rep. No. 100-500 at 7-8 (1988) (finding that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems . . . create[s] privacy interests that directly affect the ability of people to express their opinions, to join in association with others, and to enjoy the freedom and independence that the Constitution was established to safeguard."); California Bill Analysis, A.B. 375 Assem. (June 27, 2021) (noting that "[t]he unregulated and unauthorized disclosure of personal information and the resulting loss of privacy can have devastating effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to the destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.").

805.     Lakeview's unfair business acts and practices include:

a.  failing to adequately secure the personal information of Plaintiffs and California Subclass Members from disclosure to unauthorized third parties or for improper purposes;

b.  enabling the disclosure of personal and sensitive facts about Plaintiffs and California Subclass Members in a manner highly offensive to a reasonable person;

c.  enabling the disclosure of personal and sensitive facts about Plaintiffs and California Subclass Members without their informed, voluntary, affirmative, and clear consent;

d.  failing to require, verify, or ensure that the PII of Plaintiffs and California Subclass Members was encrypted;

     e.   failing to delete the PII of Plaintiffs and California Subclass Members after it was no longer necessary to retain the PII;

     f.   storing Plaintiffs' and California Subclass Members' PII in an internet-accessible environment when such storage was unnecessary;

     g.   continuing to accept and store PII after it knew or should have known of the Data Breach;

     h.   failing to monitor the cybersecurity practices of Bayview;

     i.   failing to monitor the practices of its cybersecurity vendors; and

     j.   unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and California Subclass Members from taking timely self-protection measures.

806.    The gravity of harm resulting from Lakeview's unfair conduct outweighs any potential utility. The failure to adequately safeguard personal, sensitive information harms the public at large and is part of a common and uniform course of wrongful conduct.

807.    The harm from Lakeview's conduct was not reasonably avoidable by consumers. The individuals affected by Lakeview were required to provide their PII as part of their relationship with Lakeview. Plaintiffs and California Subclass Members did not know of, and had no reasonable means of discovering, that their information would be exposed to hackers through inadequate data security measures. Nor did any member of the California Subclass have any means of preventing the Data Breach.

808.    There were available alternatives that would have furthered Lakeview's business interests of managing and storing consumer loan data, such as implementing best practices in cybersecurity defense.

809.     As a direct and proximate result of Lakeview's unfair methods of competition and unfair acts or practices, Plaintiffs and California Subclass Members lost money or property because their sensitive personal information experienced a diminution of value and because they paid out of pocket for credit monitoring, fraud alerts, or other identity theft protection services and devoted additional time—which they otherwise would or could have devoted to pecuniary gain—to expending additional time to monitor their credit reports and financial accounts for fraudulent activity.

**Community Loan**

810.     Community Loan's conduct is unlawful, in violation of the UCL, because it violates the CCPA and the CCRA.

811.     Community Loan's conduct is substantially unfair, predatory, and contrary to California's and the nation's legislatively declared public policy in favor of protecting the privacy and security of personal and confidential information. *See* S. Rep. No. 100-500 at 7-8 (1988) (finding that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems . . . create[s] privacy interests that directly affect the ability of people to express their opinions, to join in association with others, and to enjoy the freedom and independence that the Constitution was established to safeguard."); California Bill Analysis, A.B. 375 Assem. (June 27, 2021) (noting that "[t]he unregulated and unauthorized disclosure of personal information and the resulting loss of privacy can have devastating effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to the destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.").

812.     Community Loan's unfair business acts and practices include:

a.  failing to adequately secure the personal information of Plaintiffs and California Subclass Members from disclosure to unauthorized third parties or for improper purposes;

b.  enabling the disclosure of personal and sensitive facts about Plaintiffs and California Subclass Members in a manner highly offensive to a reasonable person;

c.  enabling the disclosure of personal and sensitive facts about Plaintiffs and California Subclass Members without their informed, voluntary, affirmative, and clear consent;

d.  failing to require, verify, or ensure that the PII of Plaintiffs and California Subclass Members was encrypted;

e.  failing to delete the PII of Plaintiffs and California Subclass Members after it was no longer necessary to retain the PII;

f.  storing Plaintiffs' and California Subclass Members' PII in an internet-accessible environment when such storage was unnecessary;

g.  continuing to accept and store PII after it knew or should have known of the Data Breach;

h.  failing to monitor the cybersecurity practices of Bayview;

i.  failing to monitor the practices of its cybersecurity vendors; and

j.  unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and California Subclass Members from taking timely self-protection measures.

813.     The gravity of harm resulting from Community Loan's unfair conduct outweighs any potential utility. The failure to adequately safeguard personal, sensitive information harms the public at large and is part of a common and uniform course of wrongful conduct.

814.     The harm from Community Loan's conduct was not reasonably avoidable by consumers. The individuals affected by Community Loan were required to provide their PII as part of their relationship with Community Loan. Plaintiffs and California Subclass Members did not know of, and had no reasonable means of discovering, that their information would be exposed to hackers through inadequate data security measures. Nor did any member of the California Subclass have any means of preventing the Data Breach.

815.     There were reasonably available alternatives that would have furthered Community Loan's business interests of managing and storing consumer loan data, such as implementing best practices in cybersecurity defense.

816.     As a direct and proximate result of Community Loan's unfair methods of competition and unfair acts or practices, Plaintiffs and California Subclass Members lost money or property because their sensitive personal information experienced a diminution of value and because they paid out of pocket for credit monitoring, fraud alerts, or other identity theft protection services and devoted additional time—which they otherwise would or could have devoted to pecuniary gain—to expending additional time to monitor their credit reports and financial accounts for fraudulent activity.

**Pingora**

817.     Pingora's conduct is unlawful, in violation of the UCL, because it violates the CCPA and the CCRA.

818.     Pingora's conduct is substantially unfair, predatory, and contrary to California's and the nation's legislatively declared public policy in favor of protecting the privacy and security of personal and confidential information. *See* S. Rep. No. 100-500 at 7-8 (1988) (finding that "the trail of information generated by every transaction that is now recorded and stored in sophisticated record-keeping systems . . . create[s] privacy interests that directly affect the ability of people to express their opinions, to join in association with others, and to enjoy the freedom and independence that the Constitution was established to safeguard."); California Bill Analysis, A.B. 375 Assem. (June 27, 2021) (noting that "[t]he unregulated and unauthorized disclosure of personal information and the resulting loss of privacy can have devastating effects for individuals, ranging from financial fraud, identity theft, and unnecessary costs to personal time and finances, to the destruction of property, harassment, reputational damage, emotional stress, and even potential physical harm.").

819.     Pingora's unfair business acts and practices include:

a.   failing to adequately secure the personal information of Plaintiffs and California Subclass Members from disclosure to unauthorized third parties or for improper purposes;

b.   enabling the disclosure of personal and sensitive facts about Plaintiffs and California Subclass Members in a manner highly offensive to a reasonable person;

c.   enabling the disclosure of personal and sensitive facts about Plaintiffs and California Subclass Members without their informed, voluntary, affirmative, and clear consent;

d.   failing to require, verify, or ensure that the PII of Plaintiffs and California Subclass Members was encrypted;

e.   failing to delete the PII of Plaintiffs and California Subclass Members after it was no longer necessary to retain the PII;

f.   storing Plaintiffs' and California Subclass Members' PII in an internet-accessible environment when such storage was unnecessary;

g.   continuing to accept and store PII after it knew or should have known of the Data Breach;

h.   failing to monitor the cybersecurity practices of Bayview;

i.   failing to monitor the practices of its cybersecurity vendors; and

j.   unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and California Subclass Members from taking timely self-protection measures.

820.   The gravity of harm resulting from Pingora's unfair conduct outweighs any potential utility. The failure to adequately safeguard personal, sensitive information harms the public at large and is part of a common and uniform course of wrongful conduct.

821.   The harm from Pingora's conduct was not reasonably avoidable by consumers. The individuals affected by Pingora were required to provide their PII as part of their relationship with Pingora. Plaintiffs and California Subclass Members did not know of, and had no reasonable means of discovering, that their information would be exposed to hackers through inadequate data security measures. Nor did any member of the California Subclass have any means of preventing the Data Breach.

822.    There were reasonably available alternatives that would have furthered Pingora's business interests of managing and storing consumer loan data, such as implementing best practices in cybersecurity defense.

823.    As a direct and proximate result of Pingora's unfair methods of competition and unfair acts or practices, Plaintiffs and California Subclass Members lost money or property because their sensitive personal information experienced a diminution of value and because they paid out of pocket for credit monitoring, fraud alerts, or other identity theft protection services and devoted additional time—which they otherwise would or could have devoted to pecuniary gain—to expending additional time to monitor their credit reports and financial accounts for fraudulent activity.

824.    Plaintiffs and the California Subclass accordingly seek relief under the UCL including, but not limited to, restitution to Plaintiffs and the California Subclass of money or property that the Defendants acquired by means of their unfair business practices, restitutionary disgorgement of all profits accruing to Defendants because of their unfair business practices, declaratory relief, attorneys' fees and costs, and injunctive or other equitable relief.

## COUNT VI
## VIOLATION OF THE FLORIDA DECEPTIVE AND
## UNFAIR TRADE PRACTICES ACT,
### Fla. Stat. § 501.201, *et seq.* ("FDUTPA")
### On Behalf of Plaintiffs and the Class or, Alternatively, on Behalf of Plaintiffs
### Wojciechowski and Scott and the Florida Subclass
### Against All Defendants

825.    Plaintiffs and Class Members re-allege and incorporate paragraphs 1 through 625 as if fully set forth herein.

826.    Plaintiffs bring this claim on behalf of themselves and the Class against all Defendants. Alternatively, Plaintiffs Wojciechowski and Scott ("Plaintiffs," for purposes of this

Count) and the Florida Subclass re-allege and incorporate paragraphs 1 through 625 as if fully set forth herein, and bring this claim on behalf of themselves and the Florida Subclass against Defendants Bayview and Lakeview.

827.    The FDUPTA prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce hereby declared unlawful." Fla. Stat. § 501.204(1).

828.    Pursuant to Fla. Stat. § 501.202, requires such claims under the FDUTPA be "construed liberally" by the courts "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce."

829.    Plaintiffs and the Class Members, as "individual[s]," are "consumer[s]" as defined by the FDUTPA. *See* Fla. Stat. § 501.203(7).

**Bayview**

830.    Bayview, on behalf of and in cooperation with its subsidiaries, obtained and stored the PII of Plaintiffs and Class Members for the purpose of allowing its subsidiaries to service loans and manage portfolios of mortgages.

831.    Bayview offered, provided, or sold services in Florida and engaged in trade or commerce directly or indirectly affecting the consuming public, within the meaning of the FDUTPA. *See* Fla. Stat. § 501.203.

832.    Bayview's offer, provision, and sale of services at issue in this case are "consumer transaction[s]" and Plaintiffs' and Class Members' PII is the subject of those "consumer transactions." *See* Fla. Stat. § 501.212.

833. Plaintiffs and Class Members paid for or otherwise availed themselves and received services from Bayview and its affiliates, primarily for personal, family, or household purposes.

834. Bayview's acts and practices were done in the course of Bayview's and its affiliates' businesses of offering, providing, and servicing loans throughout Florida and the United States.

835. The unfair, unconscionable, and unlawful acts and practices of Bayview alleged herein, and in particular the decisions regarding data security, emanated and arose within the State of Florida, within the scope of the FDUTPA.

836. Defendant Bayview, headquartered in and operating and out of Florida, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1), including but not limited to the following:

   a. failing to adequately secure the personal information of Plaintiffs and Class Members from disclosure to unauthorized third parties or for improper purposes;

   b. enabling the disclosure of personal and sensitive facts about Plaintiffs and Class Members in a manner highly offensive to a reasonable person;

   c. enabling the disclosure of personal and sensitive facts about Plaintiffs and Class Members without their informed, voluntary, affirmative, and clear consent;

   d. failing to encrypt the PII of Plaintiffs and Class Members;

   e. failing to delete the PII of Plaintiffs and Class Members after it was no longer necessary to retain the PII;

   f. storing Plaintiffs' and Class Members' PII in an internet-accessible environment when such storage was unnecessary;

g.   continuing to accept and store PII after it knew or should have known of the Data Breach;

h.   failing to monitor and detect the movement of the PII of Plaintiffs and Class Members from Bayview's network to the internet in real time;

i.   failing to monitor the practices of its cybersecurity vendors;

j.   failing to include CobaltStrike—the software the attackers used—on the emergency threat feed or test its "use cases," allowing the threat attacker to remain on Bayview's network undetected;

k.   failing to properly integrate Sentinel One—the all-important threat detection and response tool—into Bayview's Security Information and Events Management System; and

l.   unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and Class Members from taking timely self-protection measures.

837.   These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including, but not limited to, the FTC Act, 15 U.S.C. § 41, *et seq*., and the FDUTPA, Fla. Stat. § 501.171(2).

838.   Bayview knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiffs' and Class Members' PII and that the risk of a data breach or theft was high.

**Lakeview**

839.   Lakeview serviced loans obtained by Plaintiffs and Class Members.

840.     Lakeview offered, provided, or sold services in Florida and engaged in trade or commerce directly or indirectly affecting the consuming public, within the meaning of the FDUTPA. *See* Fla. Stat. § 501.203.

841.     Lakeview's offer, provision, and sale of services at issue, including mortgage loan servicing, in this case are "consumer transaction[s]" and Plaintiffs' and Class Members' PII is the subject of those "consumer transactions." *See* Fla. Stat. § 501.212.

842.     Plaintiffs and Class Members paid for or otherwise availed themselves and received services from Lakeview, primarily for personal, family, or household purposes.

843.     Lakeview engaged in the conduct alleged in this Complaint, entering into transactions intended to result, and which did result, in the procurement or provision of loan services to or for Plaintiffs and Class Members.

844.     Lakeview's acts and practices were done in the course of Lakeview's business of offering, providing, and servicing loans throughout Florida and the United States.

845.     The unfair, unconscionable, and unlawful acts and practices of Lakeview alleged herein, and in particular the decisions regarding data security, emanated and arose within the State of Florida, within the scope of the FDUTPA.

846.     Defendant Lakeview, headquartered in and operating and out of Florida, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1), including but not limited to the following:

   a.   failing to adequately secure the personal information of Plaintiffs and Class Members from disclosure to unauthorized third parties or for improper purposes;

   b.   enabling the disclosure of personal and sensitive facts about Plaintiffs and Class Members in a manner highly offensive to a reasonable person;

c. enabling the disclosure of personal and sensitive facts about Plaintiffs and Class Members without their informed, voluntary, affirmative, and clear consent;

d. failing to require, verify, or ensure that the PII of Plaintiffs and Class Members was encrypted;

e. failing to delete the PII of Plaintiffs and Class Members after it was no longer necessary to retain the PII;

f. storing Plaintiffs' and Class Members' PII in an internet-accessible environment when such storage was unnecessary;

g. continuing to accept and store PII after it knew or should have known of the Data Breach;

h. failing to monitor the cybersecurity practices of Bayview;

i. failing to monitor the practices of its cybersecurity vendors; and

j. unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and Class Members from taking timely self-protection measures.

847.    These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including, but not limited to, the FTC Act, 15 U.S.C. § 41, *et seq*., and the FDUTPA, Fla. Stat. § 501.171(2).

848.    Lakeview knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiffs' and Class Members' PII and that the risk of a data breach or theft was high.

**Pingora**

849.    Pingora serviced loans obtained by Plaintiffs and Class Members.

850.    Pingora offered, provided, or sold services in Florida and engaged in trade or commerce directly or indirectly affecting the consuming public, within the meaning of the FDUTPA. *See* Fla. Stat. § 501.203.

851.    Pingora's offer, provision, and sale of services at issue, including mortgage loan servicing, in this case are "consumer transaction[s]" and Plaintiffs' and Class Members' PII is the subject of those "consumer transactions." *See* Fla. Stat. § 501.212.

852.    Plaintiffs and Class Members paid for or otherwise availed themselves and received services from Pingora, primarily for personal, family, or household purposes.

853.    Pingora engaged in the conduct alleged in this Complaint, entering into transactions intended to result, and which did result, in the procurement or provision of loan services to or for Plaintiffs and Class Members.

854.    Pingora's acts and practices were done in the course of Pingora's business of offering, providing, and servicing loans throughout Florida and the United States.

855.    The unfair, unconscionable, and unlawful acts and practices of Pingora alleged herein, and in particular the decisions regarding data security, emanated and arose within the State of Florida, within the scope of the FDUTPA.

856.    Defendant Pingora, operating in and out of Florida, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1), including but not limited to the following:

      a.    failing to adequately secure the personal information of Plaintiffs and Class Members from disclosure to unauthorized third parties or for improper purposes;

b.   enabling the disclosure of personal and sensitive facts about Plaintiffs and Class Members in a manner highly offensive to a reasonable person;

c.   enabling the disclosure of personal and sensitive facts about Plaintiffs and Class Members without their informed, voluntary, affirmative, and clear consent;

d.   failing to require, verify, or ensure that the PII of Plaintiffs and Class Members was encrypted;

e.   failing to delete the PII of Plaintiffs and Class Members after it was no longer necessary to retain the PII;

f.   storing Plaintiffs' and Class Members' PII in an internet-accessible environment when such storage was unnecessary;

g.   continuing to accept and store PII after it knew or should have known of the Data Breach;

h.   failing to monitor the cybersecurity practices of Bayview;

i.   failing to monitor the practices of its cybersecurity vendors; and

j.   unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and Class Members from taking timely self-protection measures.

857.   These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including, but not limited to, the FTC Act, 15 U.S.C. § 41, *et seq*., and the FDUTPA, Fla. Stat. § 501.171(2).

858.     Pingora knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiffs' and Class Members' PII and that the risk of a data breach or theft was high.

## Community Loan

859.     Community Loan serviced loans obtained by Plaintiffs and Class Members.

860.     Community Loan offered, provided, or sold services in Florida and engaged in trade or commerce directly or indirectly affecting the consuming public, within the meaning of the FDUTPA. *See* Fla. Stat. § 501.203.

861.     Community Loan's offer, provision, and sale of services at issue, including mortgage loan servicing, in this case are "consumer transaction[s]" and Plaintiffs' and Class Members' PII is the subject of those "consumer transactions." *See* Fla. Stat. § 501.212.

862.     Plaintiffs and Class Members paid for or otherwise availed themselves and received services from Community Loan, primarily for personal, family, or household purposes.

863.     Community Loan engaged in the conduct alleged in this Complaint, entering into transactions intended to result, and which did result, in the procurement or provision of loan services to or for Plaintiffs and Class Members.

864.     Community Loan's acts and practices were done in the course of Community Loan's business of offering, providing, and servicing loans throughout Florida and the United States.

865.     The unfair, unconscionable, and unlawful acts and practices of Community Loan alleged herein, and in particular the decisions regarding data security, emanated and arose within the State of Florida, within the scope of the FDUTPA.

866.    Defendant Community Loan, headquartered in and operating out of Florida, engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of Fla. Stat. § 501.204(1), including but not limited to the following:

 a. failing to adequately secure the personal information of Plaintiffs and Class Members from disclosure to unauthorized third parties or for improper purposes;

 b. enabling the disclosure of personal and sensitive facts about Plaintiffs and Class Members in a manner highly offensive to a reasonable person;

 c. enabling the disclosure of personal and sensitive facts about Plaintiffs and Class Members without their informed, voluntary, affirmative, and clear consent;

 d. failing to require, verify, or ensure that the PII of Plaintiffs and Class Members was encrypted;

 e. failing to delete the PII of Plaintiffs and Class Members after it was no longer necessary to retain the PII;

 f. storing Plaintiffs' and Class Members' PII in an internet-accessible environment when such storage was unnecessary;

 g. continuing to accept and store PII after it knew or should have known of the Data Breach;

 h. failing to monitor the cybersecurity practices of Bayview;

 i. failing to monitor the practices of its cybersecurity vendors; and

 j. unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and Class Members from taking timely self-protection measures.

867.    These unfair, unconscionable, and unlawful acts and practices violated duties imposed by laws, including, but not limited to, the FTC Act, 15 U.S.C. § 41, *et seq*., and the FDUTPA, Fla. Stat. § 501.171(2).

868.    Community Loan knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiffs' and Class Members' PII and that the risk of a data breach or theft was high.

869.    Plaintiffs have standing to pursue this claim because as a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiffs and Class Members have been "aggrieved" by Defendants' violations of the FDUTPA and bring this action to obtain a declaratory judgment that Defendants' acts or practices violate the FDUTPA. *See* Fla. Stat. § 501.211(1)-(2).

870.    Moreover, as a direct result of Defendants' knowing violations of the FDUTPA, Plaintiffs are at a substantial present and imminent risk of identity theft. Defendants still possess Plaintiffs' and Class Members' PII, and some Plaintiffs' PII has been both accessed and misused by unauthorized third parties, which is evidence of a substantial and imminent risk of future identity theft for Plaintiffs and Class Members.

871.    Plaintiffs bring this action on behalf of themselves and Class Members for the relief requested above and for the public benefit to promote the strong public interest in the provision of truthful, fair information to allow consumers to make informed purchasing decisions and to protect Plaintiffs, Class Members and the public from Defendants' unfair methods of competition and unfair, unconscionable, and unlawful practices. Defendants' wrongful conduct as alleged in this Complaint has had widespread impact on the public at large.

872.    The above unfair, unconscionable, and unlawful practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to

Plaintiffs and Class Members that they could not reasonably avoid and that outweighs any conceivable benefits from Defendants' violations.

873.   Defendants' actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

874.   Plaintiffs and Class Members seek relief under the FDUTPA, Fla. Stat. §§ 501.201, *et seq*., including, but not limited to, a declaratory judgment that Defendants' actions and/or practices violate the FDUTPA.

875.   Plaintiffs and Class Members are also entitled to recover actual damages as set forth above, to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper. *See* Fla. Stat. § 501.211.

**COUNT VII**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS**
**PRACTICES ACT ("ICFA"),**
**815 Ill. Comp. Stat. Ann. 505, *et seq.***
**On behalf of Plaintiffs Berg, Brumitt, and Cunningham and the Illinois Subclass**
**Against Defendants Bayview, Lakeview, and Community Loan**

876.   Plaintiffs Beth Berg, Albert Brumitt, and David Cunningham ("Plaintiffs," for purposes of this Count) and the Illinois Subclass re-allege and incorporate paragraphs 1 through 625 as if fully set forth herein.

877.   Plaintiff Beth Berg brings this claim on behalf of herself and the Illinois Subclass against Defendants Bayview and Lakeview.

878.   Plaintiffs Albert Brumitt and David Cunningham bring this claim on behalf of themselves and the Illinois Subclass against Defendants Bayview and Community Loan.

879.     The ICFA prohibits "unfair methods of competition and unfair or deceptive acts or practices . . . in the conduct of any trade or commerce . . . whether any person has in fact been misled, deceived, or damaged." 815 Ill. Comp. Stat. Ann. 505/2.

880.     Plaintiffs and the Illinois Subclass Members are "person[s]" as defined by the ICFA. *See* 815 Ill. Comp. Stat. Ann. 505/1(c).

881.     Plaintiffs and Illinois Subclass Members are "consumers" under the ICFA because they paid for or otherwise availed themselves of and received consumer lending services from Defendants.

882.     Alternatively or additionally, Plaintiffs and Illinois Subclass Members are "consumers" in view of their relevant factual nexus to Defendants. Defendants' challenged conduct—servicing loans and collecting borrowers' PII without implementing adequate data security precautions—involves trade practices directed to the market generally. Plaintiffs' and Illinois Subclass Members' relevant actions were those of consumers in that they obtained loans and provided their PII for the purpose of servicing those loans. Defendants' trade practices at issue concern not only Plaintiffs, but all individuals whose PII Defendants obtained. Defendants' inadequate data security practices involve consumer protection and the concerns of consumers in that Plaintiffs and Illinois Subclass Members were required to provide their PII for their loans to be serviced by Defendants, after which Defendants' deficient security measures compromised the confidentiality of the PII. The requested relief would benefit consumers generally by, among other things, compensating them for the damage done by Defendants' unlawful trade practices and enjoining Defendants from continuing to maintain consumers' PII without sufficient safeguards against its unauthorized exposure.

**Bayview**

883.    Bayview engaged in the conduct of "trade or commerce" as defined by 815 Ill. Comp. Stat. Ann. 505/1(f). The ICFA defines "trade or commerce" as "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed . . . ." *Id*. The definition "shall also include any trade or commerce directly or indirectly affecting the people of this State." *Id*.

884.    Bayview, on behalf of and in cooperation with its subsidiaries, obtained and stored the PII of Plaintiffs and Illinois Subclass Members for the purpose of allowing its subsidiaries to service loans and manage portfolios of mortgages.

885.    Bayview offered, provided, or sold services in Illinois and engaged in trade or commerce directly or indirectly affecting the people of Illinois, within the meaning of the ICFA. *See* 815 Ill. Comp. Stat. Ann. 505/1(f); 815 Ill. Comp. Stat. Ann. 505/2.

886.    Plaintiffs and Illinois Subclass Members paid for or otherwise availed themselves and received services from Bayview, primarily for personal, family, or household purposes.

887.    Bayview's acts and practices were done in the course of it and its affiliates' businesses of offering, providing, and servicing loans throughout Illinois and the United States.

888.    The unfair and unlawful acts and practices of Bayview alleged herein, and in particular the decisions regarding data security, emanated and arose within the State of Illinois, within the scope of the ICFA.

889.    Defendant Bayview, operating in Illinois, engaged in unfair acts or practices in the conduct of trade or commerce, in violation of 815 Ill. Comp. Stat. Ann. 505/2, including but not limited to the following:

a. failing to adequately secure the personal information of Plaintiffs and Illinois Subclass Members from disclosure to unauthorized third parties or for improper purposes;

b. enabling the disclosure of personal and sensitive facts about Plaintiffs and Illinois Subclass Members in a manner highly offensive to a reasonable person;

c. enabling the disclosure of personal and sensitive facts about Plaintiffs and Illinois Subclass Members without their informed, voluntary, affirmative, and clear consent;

d. failing to encrypt the PII of Plaintiffs and Illinois Subclass Members;

e. failing to delete the PII of Plaintiffs and Illinois Subclass Members after it was no longer necessary to retain the PII;

f. storing Plaintiffs' and Illinois Subclass Members' PII in an internet-accessible environment when such storage was unnecessary;

g. continuing to accept and store PII after it knew or should have known of the Data Breach;

h. failing to monitor and detect the movement of the PII of Plaintiffs and Illinois Subclass Members from Bayview's network to the internet in real time;

i. failing to monitor the practices of its cybersecurity vendors;

j. failing to include CobaltStrike—the software the attackers used—on the emergency threat feed or test its "use cases," allowing the threat attacker to remain on Bayview's network undetected;

k.   failing to properly integrate Sentinel One—the all-important threat detection and response tool—into Bayview's Security Information and Events Management System; and

l.   unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and Illinois Subclass Members from taking timely self-protection measures.

890.   These unfair and unlawful acts and practices violated duties imposed by laws, including, but not limited to, the FTC Act, 15 U.S.C. § 41, *et seq*., and the ICFA, 815 Ill. Comp. Stat. Ann. 505/2.

891.   Bayview knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiffs' and Illinois Subclass Members' PII and that the risk of a data breach or theft was high.

**Lakeview**

892.   Lakeview engaged in the conduct of "trade or commerce" as defined by 815 Ill. Comp. Stat. Ann. 505/1(f). The ICFA defines "trade or commerce" as "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed . . . ." *Id*. The definition "shall also include any trade or commerce directly or indirectly affecting the people of this State." *Id*.

893.   Lakeview serviced loans obtained by Plaintiffs and Illinois Subclass Members.

894.   Lakeview offered, provided, or sold services in Illinois and engaged in trade or commerce directly or indirectly affecting the people of Illinois, within the meaning of the ICFA. *See* 815 Ill. Comp. Stat. Ann. 505/1(f); 815 Ill. Comp. Stat. Ann. 505/2.

895.    Plaintiffs and Illinois Subclass Members paid for or otherwise availed themselves and received services from Lakeview, primarily for personal, family, or household purposes.

896.    Lakeview engaged in the conduct alleged in this Complaint, entering into transactions intended to result, and which did result, in the procurement or provision of loan services to or for Plaintiffs and Illinois Subclass Members.

897.    Lakeview's acts and practices were done in the course of Lakeview's business of offering, providing, and servicing loans throughout Illinois and the United States.

898.    The unfair and unlawful acts and practices of Lakeview alleged herein, and in particular the decisions regarding data security, emanated and arose within the State of Illinois, within the scope of the ICFA.

899.    Defendant Lakeview, operating in Illinois, engaged in unfair acts or practices in the conduct of trade or commerce, in violation of 815 Ill. Comp. Stat. Ann. 505/2, including but not limited to the following:

   a.   failing to adequately secure the personal information of Plaintiffs and Illinois Subclass Members from disclosure to unauthorized third parties or for improper purposes;

   b.   enabling the disclosure of personal and sensitive facts about Plaintiffs and Illinois Subclass Members in a manner highly offensive to a reasonable person;

   c.   enabling the disclosure of personal and sensitive facts about Plaintiffs and Illinois Subclass Members without their informed, voluntary, affirmative, and clear consent;

   d.   failing to require, verify, or ensure that the PII of Plaintiffs and Illinois Subclass Members was encrypted;

e. failing to delete the PII of Plaintiffs and Illinois Subclass Members after it was no longer necessary to retain the PII;

f. storing Plaintiffs' and Illinois Subclass Members' PII in an internet-accessible environment when such storage was unnecessary;

g. continuing to accept and store PII after it knew or should have known of the Data Breach;

h. failing to monitor the cybersecurity practices of Bayview;

i. failing to monitor the practices of its cybersecurity vendors; and

j. unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and Illinois Subclass Members from taking timely self-protection measures.

900. These unfair and unlawful acts and practices violated duties imposed by laws, including, but not limited to, the FTC Act, 15 U.S.C. § 41, *et seq*., and the ICFA, 815 Ill. Comp. Stat. Ann. 505/2.

901. Lakeview knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiffs' and Illinois Subclass Members' PII and that the risk of a data breach or theft was high.

**Community Loan**

902. Community Loan engaged in the conduct of "trade or commerce" as defined by 815 Ill. Comp. Stat. Ann. 505/1(f). The ICFA defines "trade or commerce" as "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed . . . ." *Id*. The definition "shall also include any trade or commerce directly or indirectly affecting the people of this State." *Id*.

903.   Community Loan serviced loans obtained by Plaintiffs and Illinois Subclass Members.

904.   Community Loan offered, provided, or sold services in Illinois and engaged in trade or commerce directly or indirectly affecting the people of Illinois, within the meaning of the ICFA. *See* 815 Ill. Comp. Stat. Ann. 505/1(f); 815 Ill. Comp. Stat. Ann. 505/2.

905.   Plaintiffs and Illinois Subclass Members paid for or otherwise availed themselves and received services from Community Loan, primarily for personal, family, or household purposes.

906.   Community Loan engaged in the conduct alleged in this Complaint, entering into transactions intended to result, and which did result, in the procurement or provision of loan services to or for Plaintiffs and Illinois Subclass Members.

907.   Community Loan's acts and practices were done in the course of Community Loan's business of offering, providing, and servicing loans throughout Illinois and the United States.

908.   The unfair and unlawful acts and practices of Community Loan alleged herein, and in particular the decisions regarding data security, emanated and arose within the State of Illinois, within the scope of the ICFA.

909.   Defendant Community Loan, operating in Illinois, engaged in unfair acts or practices in the conduct of trade or commerce, in violation of 815 Ill. Comp. Stat. Ann. 505/2, including but not limited to the following:

      a.   failing to adequately secure the personal information of Plaintiffs and Illinois Subclass Members from disclosure to unauthorized third parties or for improper purposes;

b.   enabling the disclosure of personal and sensitive facts about Plaintiffs and Illinois Subclass Members in a manner highly offensive to a reasonable person;

c.   enabling the disclosure of personal and sensitive facts about Plaintiffs and Illinois Subclass Members without their informed, voluntary, affirmative, and clear consent;

d.   failing to require, verify, or ensure that the PII of Plaintiffs and Illinois Subclass Members was encrypted;

e.   failing to delete the PII of Plaintiffs and Illinois Subclass Members after it was no longer necessary to retain the PII;

f.   storing Plaintiffs' and Illinois Subclass Members' PII in an internet-accessible environment when such storage was unnecessary;

g.   continuing to accept and store PII after it knew or should have known of the Data Breach;

h.   failing to monitor the cybersecurity practices of Bayview;

i.   failing to monitor the practices of its cybersecurity vendors; and

j.   unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiffs and Illinois Subclass Members from taking timely self-protection measures.

910.   These unfair and unlawful acts and practices violated duties imposed by laws, including, but not limited to, the FTC Act, 15 U.S.C. § 41, *et seq*., and the ICFA, 815 Ill. Comp. Stat. Ann. 505/2.

911.    Community Loan knew or should have known that its computer system and data security practices were inadequate to safeguard Plaintiffs' and Illinois Subclass Members' PII and that the risk of a data breach or theft was high.

912.    Plaintiffs have standing to pursue this claim because as a direct and proximate result of Bayview's, Lakeview's, and Community Loan's violations of the ICFA, Plaintiffs and Illinois Subclass Members have suffered pecuniary losses, among other actual damages. *See* 815 Ill. Comp. Stat. Ann. 505/10a.

913.    Plaintiffs also have standing to pursue this claim because, as a direct result of Bayview's, Lakeview's, and Community Loan's knowing violations of the ICFA, Plaintiffs are at a substantial present and imminent risk of identity theft. Bayview, Lakeview, and/or Community Loan still possess Plaintiffs' and Illinois Subclass Members' PII, and some of Plaintiffs' PII has been both accessed and misused by unauthorized third parties, which is evidence of a substantial and imminent risk of future identity theft for Plaintiffs and all Illinois Subclass Members.

914.    The above unfair and unlawful practices and acts by Bayview, Lakeview, and Community Loan were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiffs and Illinois Subclass Members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

915.    Bayview's, Lakeview's, and Community Loan's actions and inactions in engaging in the unfair and unlawful practices described herein were negligent, knowing, and willful, and/or wanton and reckless.

916.    Plaintiffs and Illinois Subclass Members therefore seek relief under the ICFA, 815 Ill. Comp. Stat. Ann. 505, *et seq.*, including, but not limited to, actual damages as set forth above and a declaratory judgment that Defendants' actions and/or practices violate the ICFA.

917.    Plaintiffs and Illinois Subclass Members are also entitled to recover the costs of this action (including reasonable attorneys' fees), and such other relief as the Court deems just and proper. *See* 815 Ill. Comp. Stat. Ann. 505/10a.

**COUNT VIII**
**VIOLATIONS OF THE NEW YORK GENERAL BUSINESS LAW ("GBL"),**
**N.Y. Gen. Bus. Law § 349, *et seq*.**
**On Behalf of Plaintiff Hardik Sevak and the New York Subclass**
**Against Defendant Lakeview**

918.    Plaintiff Hardik Sevak ("Plaintiff" for purposes of this count) and the New York Subclass re-allege and incorporate paragraphs 1 through 625 as if fully set forth herein.

919.    Plaintiff Hardik Sevak brings this claim on behalf of himself and the New York Subclass against Defendant Lakeview.

920.    The GBL prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce . . . ." N.Y. Gen. Bus. Law § 349.

921.    Lakeview serviced loans obtained by Plaintiff and New York Subclass Members.

922.    Plaintiff and New York Subclass Members paid for or otherwise availed themselves and received services from Lakeview, primarily for personal, family, or household purposes.

923.    Lakeview engaged in the conduct alleged in this Complaint, entering into transactions intended to result, and which did result, in the procurement or provision of loan services to or for Plaintiff and New York Subclass Members.

924.    Lakeview's acts and practices were done in the course of Lakeview's business of offering, providing, and servicing loans throughout New York and the United States.

925.    Lakeview engaged in deceptive acts or practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of N.Y. Gen. Bus. Law § 349, including:

a. failing to adequately secure the personal information of Plaintiff and New York Subclass Members from disclosure to unauthorized third parties or for improper purposes;

b. enabling the disclosure of personal and sensitive facts about Plaintiff and New York Subclass Members in a manner highly offensive to a reasonable person;

c. enabling the disclosure of personal and sensitive facts about Plaintiff and New York Subclass Members without their informed, voluntary, affirmative, and clear consent;

d. failing to require, verify, or ensure that the PII of Plaintiff and New York Subclass Members was encrypted;

e. failing to delete the PII of Plaintiff and New York Subclass Members after it was no longer necessary to retain the PII;

f. storing Plaintiff's and New York Subclass Members' PII in an internet-accessible environment when such storage was unnecessary;

g. continuing to accept and store PII after it knew or should have known of the Data Breach;

h. failing to monitor the cybersecurity practices of Bayview;

i. failing to monitor the practices of its cybersecurity vendors;

j. unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiff and New York Subclass Members from taking timely self-protection measures;

k.  misrepresenting that it would protect the privacy and confidentiality of Plaintiff's and New York Subclass Members' PII, including by implementing and maintaining reasonable security measures;

l.  omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiff's and New York Subclass Members' PII; and

m.  omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiff's and New York Subclass Members' PII, including duties imposed by the FTC Act, and N.Y. Gen. Bus. Law § 899-aa.

926.  Lakeview's material misrepresentations include its statements in its Privacy Policy provided to borrowers that Lakeview would "maintain commercially reasonable security measures" to protect Plaintiff's and New York Subclass Members' PII from "unauthorized access," when it failed to do so, and that Lakeview would "use industry-standard encryption to protect data" when, in fact, it was storing unencrypted PII, including unencrypted Social Security numbers. Lakeview's representations and omissions regarding its data security were material because they were likely to deceive reasonable consumers about the adequacy of Lakeview's data security and ability to safeguard its consumers' confidential PII—matters of importance to a reasonable consumer transacting under the circumstances.

927.  Lakeview's representations and omissions caused injury to Plaintiff. Had Plaintiff known that Lakeview's data security was inadequate to prevent the unauthorized disclosure of his PII, Plaintiff would not have provided his PII to Lakeview. Reasonable and ordinary means,

including written communications via U.S. mail, of notifying Plaintiff of its inadequate data security were available to Lakeview.

928.   As a direct and proximate result of Lakeview's deceptive and unlawful acts and practices, Plaintiff and New York Subclass Members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including from fraud and identity theft; time and expenses related to monitoring their financial accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PII.

929.   Lakeview's deceptive and unlawful acts and practices complained of herein affected the public interest and consumers at large.

930.   The above deceptive and unlawful practices and acts by Lakeview caused substantial injury to Plaintiff and New York Subclass Members that they could not reasonably avoid.

931.   Plaintiff and New York Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages as set forth above or statutory damages of $50 (whichever is greater), treble damages, injunctive relief, and attorney's fees and costs.

### COUNT IX
**VIOLATION OF THE WASHINGTON CONSUMER PROTECTION ACT ("CPA")**
**RCW 19.86.010, *et seq.*,**
**On Behalf of Plaintiff Mark Arthur and the Washington Subclass**
**Against Defendants Bayview and Pingora**

932.   Plaintiff Mark Arthur ("Plaintiff" for purposes of this count) and the Washington Subclass Members re-allege and incorporate paragraphs 1 through 625 as if fully set forth herein.

933.   Plaintiff brings this claim on behalf of himself and the Washington Subclass Members against Defendants Bayview and Pingora.

934.     The Washington State Consumer Protection Act, RCW 19.86.020 (the "CPA") prohibits any "unfair or deceptive acts or practices" in the conduct of any trade or commerce as those terms are described by the CPA and relevant case law.

**Bayview**

935.     Bayview is a "person" as described in RWC 19.86.010(1).

936.     Bayview engages in "trade" and "commerce" as described in RWC 19.86.010(2) in that it engages in the sale of services and commerce directly and indirectly affecting the people of the State of Washington.

937.     Bayview, on behalf of and in cooperation with its subsidiaries, obtained and stored the PII of Plaintiff and Washington Subclass Members for the purpose of allowing its subsidiaries to service loans and manage portfolios of mortgages.

938.     Plaintiff and Washington Subclass Members paid for or otherwise availed themselves and received services from Bayview, primarily for personal, family, or household purposes.

939.     Bayview's acts and practices were done in the course of it and its affiliates' businesses of offering, providing, and servicing loans throughout Washington and the United States.

940.     Bayview engaged in unlawful and unfair practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of the CPA, including:

      a.   failing to adequately secure the personal information of Plaintiff and Washington Subclass Members from disclosure to unauthorized third parties or for improper purposes;

b.  enabling the disclosure of personal and sensitive facts about Plaintiff and Washington Subclass Members in a manner highly offensive to a reasonable person;

c.  enabling the disclosure of personal and sensitive facts about Plaintiff and Washington Subclass Members without their informed, voluntary, affirmative, and clear consent;

d.  failing to encrypt the PII of Plaintiff and Washington Subclass Members;

e.  failing to delete the PII of Plaintiff and Washington Subclass Members after it was no longer necessary to retain the PII;

f.  storing Plaintiff's and Washington Subclass Members' PII in an internet-accessible environment when such storage was unnecessary;

g.  continuing to accept and store PII after it knew or should have known of the Data Breach;

h.  failing to monitor and detect the movement of the PII of Plaintiff and Washington Subclass Members from Bayview's network to the internet in real time;

i.  failing to monitor the practices of its cybersecurity vendors;

j.  failing to include CobaltStrike—the software the attackers used—on the emergency threat feed or test its "uses cases," allowing the threat attacker to remain on Bayview's network undetected;

k.  failing to properly integrate Sentinel One—the all-important threat detection and response tool—into Bayview's Security Information and Events Management System; and

l. unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiff and Washington Subclass Members from taking timely self-protection measures.

941. By reason of the above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Bayview engaged in unlawful and unfair practices within the meaning, and in violation, of the CPA.

942. Bayview's above-described wrongful actions, inaction, omissions, and want of ordinary care also constitute "unfair or deceptive acts or practices" in violation of the CPA in that Bayview's wrongful conduct is substantially injurious to numerous citizens and was and is able capable of causing such harm.

943. Likewise, Bayview's acts, practices, and omissions harm the public interest because they injured numerous citizens and were and are able capable of causing such harm.

944. The gravity of Bayview's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Bayview's legitimate business interests other than engaging in the above-described wrongful conduct.

**Pingora**

945. Pingora is a "person" as described in RWC 19.86.010(1).

946. Pingora engages in "trade" and "commerce" as described in RWC 19.86.010(2) in that it engages in the sale of services and commerce directly and indirectly affecting the people of the State of Washington.

947. Plaintiff and Washington Subclass Members paid for or otherwise availed themselves and received services from Pingora, primarily for personal, family, or household purposes.

948.   Pingora engaged in the conduct alleged in this Complaint, entering into transactions intended to result, and which did result, in the procurement or provision of loan services to or for Plaintiff and Washington Subclass Members.

949.   Pingora's acts and practices were done in the course of Pingora's business of offering, providing, and servicing loans throughout Washington and the United States.

950.   Pingora engaged in unlawful and unfair practices in the conduct of its business, trade, and commerce or furnishing of services, in violation of the CPA, including:

    a.   failing to adequately secure the personal information of Plaintiff and Washington Subclass Members from disclosure to unauthorized third parties or for improper purposes;

    b.   enabling the disclosure of personal and sensitive facts about Plaintiff and Washington Subclass Members in a manner highly offensive to a reasonable person;

    c.   enabling the disclosure of personal and sensitive facts about Plaintiff and Washington Subclass Members without their informed, voluntary, affirmative, and clear consent;

    d.   failing to require, verify, or ensure that the PII of Plaintiff and Washington Subclass Members was encrypted;

    e.   failing to delete the PII of Plaintiff and Washington Subclass Members after it was no longer necessary to retain the PII;

    f.   storing Plaintiff's and Washington Subclass Members' PII in an internet-accessible environment when such storage was unnecessary;

g.  continuing to accept and store PII after it knew or should have known of the Data Breach;

h.  failing to monitor the cybersecurity practices of Bayview;

i.  failing to monitor the practices of its cybersecurity vendors; and

j.  unreasonably delaying in providing notice of the Data Breach and thereby preventing Plaintiff and Washington Subclass Members from taking timely self-protection measures.

951.   By reason of the above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Pingora engaged in unlawful and unfair practices within the meaning, and in violation, of the CPA.

952.   Pingora's above-described wrongful actions, inaction, omissions, and want of ordinary care also constitute "unfair or deceptive acts or practices" in violation of the CPA in that Pingora's wrongful conduct is substantially injurious to numerous citizens and was and is able capable of causing such harm.

953.   Likewise, Pingora's acts, practices, and omissions harm the public interest because they injured numerous citizens and were and are able capable of causing such harm.

954.   The gravity of Pingora's wrongful conduct outweighs any alleged benefits attributable to such conduct. There were reasonably available alternatives to further Pingora's legitimate business interests other than engaging in the above-described wrongful conduct.

955.   Plaintiff and the Washington Subclass seek all monetary and non-monetary relief allowed by law, including actual damages as set forth above, treble damages, injunctive relief, and attorney's fees and costs.

<u>**COUNT X**</u>
**DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**
**On Behalf of All Plaintiffs and the Class**
**Against All Defendants**

956.    Plaintiffs re-allege and incorporate paragraphs 1 through 625 as if fully set forth herein.

957.    Plaintiffs bring this count on behalf of themselves and the Class. This count is brought against all Defendants.

958.    The Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq*., authorizes this Court to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

959.    Defendants owe duties of care to Plaintiffs and Class Members which require them to adequately secure their PII.

960.    Defendants still possess Plaintiffs' and Class members' PII.

961.    Defendants do not specify in their Data Breach notification letters what steps they have taken to prevent a similar breach from occurring again.

962.    Plaintiffs and Class Members are at risk of harm due to the exposure of their PII and Defendants' failures to address the security failings that lead to such exposure.

963.    An actual controversy has arisen in the wake of the Data Breach regarding Defendants' present and prospective common law and other duties to reasonably safeguard Plaintiffs' and Class Members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and the Class from further data breaches that compromise their PII.

964.    Plaintiffs and the Class, therefore, seek a declaration that (1) each of Defendants' existing security measures do not comply with their obligations and duties of care to provide reasonable security procedures and practices appropriate to the nature of the information to protect consumers' Personal Information, and (2) to comply with their duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

    a.  Engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

    b.  Engaging third-party security auditors and internal personnel to run automated security monitoring;

    c.  Auditing, testing, and training their security personnel regarding any new or modified procedures;

    d.  Segmenting user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of Defendants' systems;

    e.  Conducting regular database scanning and security checks;

    f.  Routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

    g.  Purchasing credit monitoring services for Plaintiffs and Class Members for their respective lifetimes; and

h.  Meaningfully educating Plaintiffs and Class Members about the threats they face as a result of the loss of their PII to third parties, as well as the steps they must take to protect themselves.

965.  The Court should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with the law and industry standards to protect Plaintiffs' and Class Members' PII.

966.  If an injunction is not issued, Plaintiffs and the Class will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of Defendants' systems or networks. The risk of another breach is real, immediate, and substantial.

967.  The hardship to Plaintiffs and the Class if an injunction does not issue exceeds the hardship to Defendants if an injunction is issued. If another data breach occurs, Plaintiffs and the Class will likely be subjected to fraud, identity theft, and other harms described herein. But, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is minimal given they have preexisting legal obligations to employ these measures.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class Members, request judgment against Defendants and that the Court grant the following:

A.  An Order certifying the Class and the Subclasses, as defined herein, and appointing Plaintiffs and their counsel to represent the Class and Subclasses;

B.  Equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' PII, and from refusing to issue prompt, complete, and accurate

disclosures to Plaintiffs and Class Members;

C.   Injunctive relief requested by Plaintiffs, including but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

i.   prohibiting Defendants from engaging in the wrongful and unlawful acts described herein;

ii.   requiring Defendants to protect, including through encryption, all data collected through the course of their business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

iii.   requiring Defendants to provide out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, tax fraud, and/or unauthorized use of their PII for Plaintiffs' and Class Members' respective lifetimes;

iv.   requiring Defendants to delete, destroy, and purge the PII of Plaintiffs and Class Members unless Defendants can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

v.   requiring Defendants to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of the PII of Plaintiffs and Class Members;

vi.   prohibiting Defendants from maintaining Plaintiffs' and Class Members' personally identifying information on a cloud-based database;

vii.   requiring   Defendants   to   engage   independent   third-party   security

auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

viii.   requiring Defendants to engage independent third-party security auditors and internal personnel to run automated security monitoring;

ix.   requiring Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

x.   requiring Defendants to segment data by, among other things, creating firewalls and access controls so that if one area of Defendants' network is compromised, hackers cannot gain access to other areas of Defendants' systems;

xi.   requiring Defendants to conduct regular database scanning and securing checks;

xii.   requiring Defendants to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling personally identifying information, as well as protecting the personally identifying information of Plaintiffs and Class Members;

xiii.   requiring Defendants to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xiv.  requiring Defendants to implement a system of tests to assess their respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendants' policies, programs, and systems for protecting personally identifying information;

xv.  requiring Defendants to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendants' information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xvi.  requiring Defendants to adequately educate all Class Members about the threats that they face as a result of the loss of their confidential PII to third parties, as well as the steps affected individuals must take to protect themselves;

xvii.  requiring Defendants to implement logging and monitoring programs sufficient to track traffic to and from Defendants' servers; and, for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendants' compliance with the terms of the Court's final judgment, to provide such report to the Court and to Class Counsel, and to report any material deficiencies or noncompliance with the Court's final judgment;

D.  For an award of damages, including actual, statutory, consequential, punitive, and nominal damages, as allowed by law in an amount to be determined;

E.  For an award of reasonable attorneys' fees, costs, and litigation expenses, as

allowed by law;

F.      For prejudgment interest on all amounts awarded; and

G.      Such other and further relief as this Court may deem just and proper.

### DEMAND FOR JURY TRIAL

Plaintiffs hereby demand that this matter be tried before a jury.

Date: March 28, 2024                    Respectfully submitted,


                                        */s/* Julie Braman Kane
                                        Julie Braman Kane
                                        Florida Bar No. 980277
                                        **COLSON HICKS EIDSON**
                                        255 Alhambra Circle—Penthouse
                                        Coral Gables, Florida 33134
                                        Telephone: (305) 476-7400
                                        Facsimile: (305) 476-7444
                                        julie@colson.com

                                        *Liaison Counsel*

                                        JOHN A. YANCHUNIS
                                        RYAN D. MAXEY
                                        **MORGAN & MORGAN**
                                        **COMPLEX LITIGATION**
                                        **GROUP**
                                        201 N. Franklin Street, 7th Floor
                                        Tampa, Florida 33602
                                        Telephone: (813) 223-5505
                                        jyanchunis@ForThePeople.com
                                        rmaxey@ForThePeople.com

                                        *Chair, Plaintiffs' Executive*
                                        *Committee*

                                        ADAM E. POLK (*pro hac vice*)
                                        JORDAN ELIAS (*pro hac vice*)
                                        SIMON GRILLE (*pro hac vice*)
                                        **GIRARD SHARP LLP**
                                        601 California Street, Suite 1400
                                        San Francisco, CA 94108
                                        Telephone: (415) 981-4800

apolk@girardsharp.com
jelias@girardsharp.com
sgrille@girardsharp.com

STUART ANDREW DAVIDSON
NICOLLE B. BRITO
**ROBBINS GELLER RUDMAN &
DOWD LLP**
225 N.E. Mizner Boulevard, Suite
720
Boca Raton, FL 33432
561-750-3000
Fax: 750-3364
sdavidson@rgrdlaw.com
nbrito@rgrdlaw.com
RACHELE R. BYRD (*pro hac vice*)
**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599
byrd@whafh.com

GARY M. KLINGER (*pro hac vice*
forthcoming)
**MILBERG COLEMAN BRYSON
PHILLIPS GROSSMAN, PLLC**
227 Monroe Street, Suite 2100
Chicago, IL 60606
Phone: 866.252.0878
Email: gklinger@milberg.com

*Members, Plaintiffs' Executive
Committee*

TERRY R. COATES (*pro hac vice*)
DYLAN J. GOULD (*pro hac vice*
forthcoming)
**MARKOVITS, STOCK &
DEMARCO, LLC**
119 E. Court Street, Suite 530
Cincinnati, OH 45202
Telephone: 513/651-3700
513/665-0219 (fax)
tcoates@msdlegal.com

dgould@msdlegal.com

M. ANDERSON BERRY (*pro hac vice*)
GREGORY HAROUTUNIAN (*pro hac vice* forthcoming)
**CLAYEO C. ARNOLD,**
**A PROFESSIONAL LAW CORP.**
865 Howe Avenue
Sacramento, CA 95825
Telephone: (916) 239-4778
Facsimile: (916) 924-1829
aberry@justice4you.com
gharoutunian@justice4you.com

JOSEPH M. LYON (pro hac vice forthcoming)
**THE LYON FIRM, LLC**
2754 Erie Avenue
Cincinnati, OH 45208
Telephone: (513) 381-2333
jlyon@thelyonfirm.com

DAVID K. LIETZ (pro hac vice forthcoming)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
5335 Wisconsin Avenue NW
Suite 440
Washington, D.C. 20015-2052
Telephone: (866) 252-0878
Facsimile: (202) 686-2877
Email: dlietz@milberg.com

LORI G. FELDMAN (*pro hac vice*)
**GEORGE GESTEN MCDONALD, PLLC**
*102 Half Moon Bay Drive*
*Croton-on-Hudson, New York 10520*
*Phone: (917) 983-9321*
*Fax: (888) 421-4173*
*Email: LFeldman@4-Justice.com*
*E-Service: eService@4-Justice.com*

*Additional Attorneys for Plaintiffs*

## **CERTIFICATE OF SERVICE**

The undersigned certifies that, on March 28, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served today on all counsel of record in this case via transmission of Notice of Electronic Filing generated by CM/ECF.

_/s/_ Julie Braman Kane
JULIE BRAMAN KANE